KENNETH G. HAUSMAN (Bar No. 57252)
kenneth.hausman@arnoldporter.com
DANIEL B. ASIMOW (Bar No. 165661)
daniel.asimow@arnoldporter.com
**ARNOLD & PORTER KAYE SCHOLER LLP**
Three Embarcadero Center, 10th Floor
San Francisco, CA 94111-4024
Telephone:    415.471.3100
Facsimile:    415.471.3400

[*additional counsel listed on signature page*]

Attorneys for Defendant THE OAKLAND
RAIDERS, a California limited partnership

JOHN E. HALL (Bar No. 118877)
jhall@cov.com
**COVINGTON & BURLING LLP**
One CityCenter
850 Tenth Street, NW
Washington, DC  20001-4956
Telephone:    202.662.6000
Facsimile:    202.662.6291

[*additional counsel listed on signature page*]

Attorneys for Defendants THE NATIONAL
FOOTBALL LEAGUE and all NFL Clubs other
than The Oakland Raiders

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN FRANCISCO DIVISION

| | |
|---|---|
| CITY OF OAKLAND,<br><br>          Plaintiff,<br><br>    vs.<br><br>THE OAKLAND RAIDERS, a California limited partnership; ARIZONA CARDINALS FOOTBALL CLUB LLC; ATLANTA FALCONS FOOTBALL CLUB, LLC; BALTIMORE RAVENS LIMITED PARTNERSHIP; BUFFALO BILLS, LLC; PANTHERS FOOTBALL, LLC; THE CHICAGO BEARS FOOTBALL CLUB, INC.; CINCINNATI BENGALS, INC.; CLEVELAND BROWNS FOOTBALL COMPANY LLC; DALLAS COWBOYS FOOTBALL CLUB, LTD; PDB SPORTS, LTD; THE DETROIT LIONS, INC.; GREEN BAY PACKERS, INC.; HOUSTON NFL HOLDINGS, LP; INDIANAPOLIS COLTS, INC.; JACKSONVILLE JAGUARS, LLC; KANSAS CITY CHIEFS FOOTBALL CLUB, INC.; CHARGERS FOOTBALL COMPANY, LLC; THE RAMS FOOTBALL COMPANY, LLC; MIAMI DOLPHINS, LTD.; MINNESOTA | Case No.:  3:18-cv-07444-JCS<br><br>Action Filed:  December 11, 2018<br><br>**DEFENDANTS' MOTION TO DISMISS**<br><br>Date:     June 7, 2019<br>Time:    9:30 a.m.<br>Place:   Courtroom G, 15th Floor<br>Judge:  Hon. Joseph C. Spero |

VIKINGS FOOTBALL, LLC; NEW
ENGLAND PATRIOTS LLC; NEW ORLEANS
LOUISIANA SAINTS, LLC; NEW YORK
FOOTBALL GIANTS, INC.; NEW YORK
JETS LLC; PHILADELPHIA EAGLES, LLC;
PITTSBURGH STEELERS LLC; FORTY
NINERS FOOTBALL COMPANY LLC;
FOOTBALL NORTHWEST LLC;
BUCCANEERS TEAM LLC; TENNESSEE
FOOTBALL, INC.; PRO-FOOTBALL, INC.;
and THE NATIONAL FOOTBALL LEAGUE,

Defendants.

**Page**

NOTICE OF MOTION AND MOTION TO DISMISS ..................................................... 1

ISSUES TO BE DECIDED… ............................................................................................ 1

MEMORANDUM OF POINTS AND AUTHORITIES ....................................................... 2

INTRODUCTION ............................................................................................................. 2

ALLEGATIONS OF THE COMPLAINT ............................................................................ 3

       A.    The Parties ............................................................................................... 3

       B.    The NFL Relocation Policy ...................................................................... 4

       C.    The Raiders' Prior Relocations And Negotiations To Stay In Oakland ................................................................................................... 5

       D.    The Raiders' Relocation To Las Vegas ..................................................... 6

       E.    The Alleged Harm To The City Of Oakland ............................................. 6

ARGUMENT…................................................................................................................ 7

    I.    PLAINTIFF'S ANTITRUST CLAIMS FAIL AS A MATTER OF LAW. ................ 7

       A.    The City Has Not Suffered Antitrust Injury.................................................. 7

       B.    The City Lacks Standing To Sue Under The Antitrust Laws. ......................... 9

           1.    The Clayton Act Does Not Permit Recovery For Alleged Harm To The City's Sovereign Interests. ............................................... 9

           2.    The City Alleges Only Indirect Injury. ............................................... 10

       C.    The City Fails Adequately To Allege A Relevant Market............................. 12

       D.    Each Of The City's Substantive Antitrust Claims Suffers From Additional Defects. ................................................................................. 15

           1.    The City Fails To Allege A Group Boycott In Count I Or A Concerted Refusal To Deal In Count II. ............................................. 15

           2.    The City Fails To Allege Price Fixing In Count III. .......................... 16

           3.    The Declaratory Judgment Claim In Count IV Fails For The Same Reasons As Counts I, II, And III....................................... 16

II.    THE COMPLAINT FAILS TO STATE A CLAIM FOR BREACH OF CONTRACT. ........................................................................................ 16

    A.    The Relocation Policy Does Not Constitute A Contract. ............................... 17

    B.    The City Is Not An Intended Third Party Beneficiary Of The Relocation Policy. ....................................................................................... 18

    C.    The City Fails To Allege A Breach Of The Relocation Policy. ..................... 21

III.    PLAINTIFF'S REMAINING DERIVATIVE CLAIMS SHOULD BE DISMISSED. ............................................................................................ 22

CONCLUSION ................................................................................................................... 23

**Cases**

*Am. Needle, Inc. v. Nat'l Football League*,
  560 U.S. 183 (2010) ................................................................................................... 12

*Associated Gen. Contractors of Cal., Inc. v. Cal. State Council of Carpenters*,
  459 U.S. 519 (1983) ............................................................................................. 9, 12

*Atl. Richfield Co. v. USA Petroleum Co.*,
  495 U.S. 328 (1990) ..................................................................................................... 9

*Baymiller v. Guarantee Mut. Life Co.*,
  No. SA CV 99-1566 DOC AN, 2000 WL 1026565, (C.D. Cal. May 3, 2000) .......................... 22

*Bell Atl. Corp. v. Twombly*,
  550 U.S. 544 (2007) ..................................................................................................... 7

*Belmont v. Milton*,
  43 Cal. App. 2d 120 (1941) ........................................................................................ 22

*Big Bear Lodging Ass'n v. Snow Summit, Inc.*,
  182 F.3d 1096 (9th Cir. 1999) .................................................................................... 13

*Brunswick Corp. v. Pueblo Bowl-O-Mat, Inc.*,
  429 U.S. 477 (1977) .................................................................................................. 7, 8

*Bubar v. Ampco Foods, Inc.*,
  752 F.2d 445 (9th Cir. 1985) .................................................................................. 11, 12

*Burgert v. Lokelani Bernice Pauahi Bishop Tr.*,
  200 F.3d 661 (9th Cir. 2000) ....................................................................................... 7

*Cal. Comput. Prods.* v. *IBM*,
  613 F.2d 727 (9th Cir. 1979) ........................................................................................ 8

*Case of State Freight Tax*,
  82 U.S. 232 (1873) ..................................................................................................... 10

*Charles O. Finley & Co. v. Kuhn*,
  569 F.2d 527 (7th Cir. 1978) ...................................................................................... 17

*Charlie's Taxi Radio Dispatch Corp. v. SIDA of Haw., Inc.*,
  810 F.2d 869 (9th Cir. 1987) ...................................................................................... 15

*City & Cty. of S.F. v. W. Air Lines, Inc.*,
  204 Cal. App. 2d 105 (1962) ....................................................................................... 19

*City of Oakland v. Oakland Raiders*,
    174 Cal. App. 3d 414 (1985) ........................................................................... 5

*City of Oakland v. Oakland Raiders*,
    203 Cal. App. 3d 78 (1988) ............................................................................. 5

*Daniels-Hall v. Nat'l Educ. Ass'n*,
    629 F.3d 992 (9th Cir. 2010) .......................................................................... 7

*Dormitory Auth. of the State of N.Y. v Samson Constr. Co.*,
    30 N.Y.3d 704 (N.Y. 2018) ........................................................................... 19

*Durell v. Sharp Healthcare*,
    183 Cal. App. 4th 1350 (2010) ...................................................................... 23

*Eagle v. Star-Kist Foods, Inc.*,
    812 F.2d 538 (9th Cir. 1987) ........................................................................ 11

*Fourth Ocean Putnam Corp. v. Interstate Wrecking Co.*,
    66 N.Y.2d 38 (N.Y. 1985) ............................................................................ 19

*Goonewardene v. ADP, LLC*,
    —Cal. 4th—, No. S238941, 2019 WL 470963 (Feb. 7, 2019). ..................... 18, 20, 21

*Gutride Safier LLP v. Reese*,
    No. C–13–1062 EMC, 2013 WL 4104462 (N.D. Cal. Aug. 9, 2013) ......................... 17

*H.N. & Frances C. Berger Found. v. Perez*,
    218 Cal. App. 4th 37 (2013) .......................................................................... 19

*Hairston v. Pac. 10 Conference*,
    101 F.3d 1315 (9th Cir. 1996) ....................................................................... 20

*Harris v. Cty. of Orange*,
    682 F.3d 1126 (9th Cir. 2012) ........................................................................ 4

*Haw. v. Standard Oil Co.*,
    405 U.S. 251 (1972) ................................................................................. 9, 10

*Hedging Concepts, Inc. v. First Alliance Mortg. Co.*,
    41 Cal. App. 4th 1410 (1996) ........................................................................ 22

*Hicks v. PGA Tour, Inc.*,
    897 F.3d 1109 (9th Cir. 2018) .................................................................... 13, 14

*Huskinson & Brown, LLP v. Wolf*,
    32 Cal. 4th 453 (2004) ................................................................................. 23

*Ill. Brick Co. v. Ill.*,
    431 U.S. 720 (1977) ..................................................................................... 11

*In re Dual-Deck Video Cassette Recorder Antitrust Litig.*,
  11 F.3d 1460 (9th Cir. 1993) ............................................................................. 12

*In re eBay Seller Antitrust Litig.*,
  545 F. Supp. 2d 1027 (N.D. Cal. 2008) .............................................................. 13

*Innovation Marine Protein, LLC v. Pac. Seafood Grp.*,
  No. 6:17-CV-00815-MC, 2018 WL 1461501 (D. Or. Mar. 23, 2018) ...................... 11

*Karo v. San Diego Symphony Orchestra Ass'n*,
  762 F.2d 819 (9th Cir. 1985) .............................................................................. 19

*Kendall v. Visa U.S.A., Inc.*,
  518 F.3d 1042 (9th Cir. 2008) .............................................................................. 7

*Klor's, Inc. v. Broadway-Hale Stores, Inc.*,
  359 U.S. 207 (1959) .......................................................................................... 15

*Kunda v. Caremark PhC, L.L.C.*,
  119 F. Supp. 3d 56 (E.D.N.Y. 2015) .................................................................... 18

*Ladas v. Cal. State Auto. Ass'n*,
  19 Cal. App. 4th 761 (1993) ........................................................................ 17, 18

*L.A. Mem'l Coliseum Comm'n v. Nat'l Football League*,
  726 F.2d 1381 (9th Cir. 1984) ........................................................... 4, 12, 13, 22

*L.A. Mem'l Coliseum Comm'n v. Nat'l Football League*,
  791 F.2d 1356 (9th Cir. 1986) ......................................................................... 8, 9

*Levine v. Blue Shield of Cal.*,
  189 Cal. App. 4th 1117 (2010) ........................................................................... 23

*Lobosco v. N.Y. Tel. Co./NYNEX*,
  96 N.Y.2d 312 (N.Y. 2001) ................................................................................. 18

*Maas v. Cornell Univ.*,
  94 N.Y.2d 87 (N.Y. 1999) ................................................................................... 18

*Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*,
  475 U.S. 574 (1986) ............................................................................................ 9

*Mid-South Grizzlies v. Nat'l Football League*,
  720 F.2d 772 (3d Cir. 1983) ............................................................................... 12

*Morgan, Strand, Wheeler & Biggs v. Radiology, Ltd.*,
  924 F.2d 1484 (9th Cir. 1991) ............................................................................ 13

*Nat'l Basketball Ass'n v. SDC Basketball Club*,
  815 F.2d 562 (9th Cir. 1987) ................................................................................ 8

*Nat'l Hockey League Players' Ass'n v. Plymouth Whalers Hockey Club*,
  325 F.3d 712 (6th Cir. 2003) ............................................................................ 12

*Newcal Indus., Inc. v. Ikon Office Sol.*,
  513 F.3d 1038 (9th Cir. 2008) ...................................................................... 13, 14

*Nw. Wholesale Stationers, Inc. v. Pac. Stationery & Printing Co.*,
  472 U.S. 284 (1985) ......................................................................................... 15

*Oakland Raiders v. Oakland-Alameda Cty. Coliseum, Inc.*,
  144 Cal. App. 4th 1175 (2006) ................................................................ 5, 6, 10

*Premium Mortg. Corp. v. Equifax, Inc.*,
  583 F.3d 103 (2d Cir. 2009) .............................................................................. 19

*Prostar Wireless Grp., LLC v. Domino's Pizza, Inc.*,
  No. 3:16-cv-05399-WHO, 2018 WL 6831026 (N.D. Cal. Dec. 28, 2018) .................. 17

*R.C. Dick Geothermal Corp. v. Thermogenics, Inc.*,
  890 F.2d 139 (9th Cir. 1989) ............................................................................. 11

*Reiter v. Sonotone Corp.*,
  442 U.S. 330 (1979) ......................................................................................... 10

*Rick–Mik Enters., Inc. v. Equilon Enters., LLC*,
  532 F.3d 963 (9th Cir. 2008) ............................................................................. 16

*Sacramento Valley, Chapter of the Nat.'l Elec. Contractors' Ass'n v. Int'l Bhd. of
  Elec. Workers, Local 340*, 888 F.2d 604 (9th Cir. 1989) ...................................... 12

*Schwarzkopf v. Int'l Bus. Machs., Inc.*,
  No. C 08-2715 JF (HRL), 2010 WL 1929625 (N.D. Cal. May 12, 2010) .................. 18

*Smith v. Microskills San Diego L.P.*,
  153 Cal. App. 4th 892 (2007) ............................................................................ 19

*Solinger v. A. & M. Records, Inc.*,
  719 F.2d 298 (9th Cir. 1983) ............................................................................. 11

*Somers v. Apple, Inc.*,
  729 F.3d 953 (9th Cir. 2013) ............................................................................. 10

*Souza v. Westlands Water Dist.*,
  135 Cal. App. 4th 879 (2006) ............................................................................ 19

*St. Louis Convention & Visitors Comm'n v. Nat'l Football League*,
  154 F.3d 851 (8th Cir. 1998) ............................................................................... 8

*St. Louis Reg'l Convention & Sports Complex Auth. v. Nat'l Football League*,
  No. 1772-CC00976, 2017 WL 6885089 (Mo. Cir. Ct. Dec. 27, 2017) ..................... 21

*Sterling v. Nat'l Basketball Ass'n*,
No. CV 14-4192 FMO, 2016 WL 1204471 (C.D. Cal. Mar. 22, 2016).........................8

*StubHub, Inc. v. Golden State Warriors, LLC*,
No. C 15-1436 MMC, 2015 WL 6755594 (N.D. Cal. Nov. 5, 2015) .........................14

*Supermarket of Homes, Inc. v. San Fernando Valley Bd. of Realtors*,
786 F.2d 1400 (9th Cir. 1986) .........................................................15

*Tanaka v. Univ. of S. Cal.*,
252 F.3d 1059 (9th Cir. 2001)....................................................13, 14

*Universal Grading Serv. v. eBay, Inc.*,
No. C-09-2755 RMW, 2011 WL 846060 (N.D. Cal. Mar. 8, 2011).........................16

*Verni v. Cleveland Chiropractic Coll.*,
212 S.W.3d 150 (Mo. banc 2007) .....................................................21

*Vinci v. Waste Mgmt., Inc.*,
80 F.3d 1372 (9th Cir. 1996)....................................................11, 12

*Wall St. Network, Ltd. v. N.Y. Times Co.*,
164 Cal. App. 4th 1171 (2008).......................................................21

**Statutes and Rules**

15 U.S.C. § 1 .........................................................................15

Fed. R. Civ. P 12(b)(6)......................................................... 1, 7, 13

Fed. R. Evid. 201 ......................................................................4

Cal. Civ. Code
§ 1559 .................................................................................19
§ 1646 .................................................................................17

**Other Authorities**

C. Wesseling, "NFL to offer Chargers, Raiders assistance package," *available at*
http://www.nfl.com/news/story/0ap3000000621719/article/nfl-to-offer-chargers-raiders-assistance-package ..................................................8

Amended and Restated Joint Exercise of Powers Agreement dated as of December
17, 1996, *available at* https://lafco.acgov.org/lafco-assets/docs/JPAs/Oakland-Alameda%20County%20Coliseum%20JPA%20Agreement.pdf ...................................4

## NOTICE OF MOTION AND MOTION TO DISMISS

TO ALL PARTIES AND THEIR COUNSEL OF RECORD:

Please take notice that on June 7, 2019 at 9:30 a.m., or as soon thereafter as the matter may be heard, in the courtroom of the Honorable Joseph C. Spero, Courtroom G, 15th Floor, United States District Court, 450 Golden Gate Avenue, San Francisco, California, Defendants will and hereby do move the Court, pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure, for an order dismissing with prejudice Plaintiff's Complaint in its entirety. This motion to dismiss is brought on the ground that the Complaint fails to state a claim upon which relief can be granted.

This motion is based on this Notice of Motion and Motion, the accompanying Memorandum of Points and Authorities, the complete files and records in this action, oral argument of counsel, and such other and further matters as this Court may consider.

## ISSUES TO BE DECIDED

(1)     Whether Plaintiff's Complaint, which seeks to prevent competition by barring a franchise from relocating to a market that it deems more attractive, states an antitrust claim under the Sherman Act;

(2)     Whether Plaintiff, which alleges only indirect injury in the form of (a) allegedly reduced tax revenue and (b) harm to a separate entity in which Plaintiff has an ownership interest, has standing to pursue the antitrust claims alleged in the Complaint;

(3)     Whether Plaintiff's proposed market definition, which is not a market for goods or services that could be bought or sold, is cognizable under the antitrust laws;

(4)     Whether Plaintiff has failed adequately to plead the elements of its antitrust claims of a group boycott, concerted refusal to deal, and price fixing; and

(5)     Whether Plaintiff has pled an actionable breach of contract claim based upon its theory that it is an intended third party beneficiary of the NFL's Relocation Policy when (i) the Policy is not a binding contract; (ii) the Policy does not mention Plaintiff or any class of which Plaintiff is a member and on its face evidences an intent solely to benefit the NFL and its member Clubs; and (iii) Plaintiff does not allege a breach of the Policy.

## **MEMORANDUM OF POINTS AND AUTHORITIES**

### **INTRODUCTION**

Plaintiff City of Oakland's ("the City" or "Oakland") lawsuit turns antitrust on its head. The Raiders want to move to Las Vegas. Las Vegas wants to host the Raiders. The Las Vegas opportunity is more attractive, so much so that the Raiders are willing to pay a relocation fee of over $300 million in order to move. The NFL and its member clubs have approved the relocation.

In a free market, a product or service flows from a willing seller to the willing buyer who values it most. No one has impeded that competitive process here. There is simply no "restraint of trade" with respect to the Raiders' relocation. Yet, in a striking perversion of antitrust law, the City contends that the NFL and its member clubs had an obligation to stifle the competitive process and force the Raiders to remain in Oakland.

No case has ever held that a sports league or its member clubs violate the antitrust laws when they *permit* a team to relocate. For that reason, it is not surprising that the City's antitrust claims suffer from numerous independent defects—any one of which is sufficient to require dismissal of the Complaint.

First, the City has not suffered antitrust injury, which is injury caused by a decrease in competition. Rather, the City's putative injury flows from an *increase* in competition, *i.e.*, another community's willingness to make an offer better than Oakland's. *See* Part IA, *infra*.

Second, because its asserted injuries are indirect—the loss of tax revenue or perhaps the loss of rental income by the separate entity that owns and operates the Oakland Coliseum—the City lacks antitrust standing. *See* Part IB, *infra*.

Third, the "market" described in the Complaint—"Host Cities offering [or] willing to offer…home stadia and other support to major league professional football in the geographic United States" (Complaint For Damages (ECF 1) ("Cplt.") ¶88)—is nonsensical: It is not a market for a good or service that can be bought or sold; nor is it a market that incorporates all reasonable substitutes, as the antitrust laws require. *See* Part IC, *infra*.

Finally, the Complaint alleges that only one team—the Raiders—does not wish to play its home games in Oakland; there is no allegation (nor could there be) that the NFL and member clubs

collectively agreed that *no* club would play its home games in Oakland. But a boycott or refusal to deal claim requires allegations and proof that multiple entities refused to transact with the plaintiff. Similarly, a price-fixing claim requires allegations that competitors agreed on the price of a good or service. There are no such allegations in the Complaint. *See* Part ID, *infra*.

The City's other primary claim, for alleged breach of contract, fares no better. The City does not allege breach of a lease or any other promise made by any defendant to the City. Rather, the City premises its contract claim on its purported status as a third party beneficiary under an internal League document—the NFL Relocation Policy—that enumerates certain non-binding factors that NFL clubs may consider in deciding whether to permit a club to relocate. The City has not, and cannot, state a claim for breach of contract based on this Policy, for three independent reasons.

First, under applicable state law, this unilateral statement of policy from the NFL Commissioner is not a contract. *See* Part IIA, *infra*. Second, the Policy's language shows that its purpose was to guide the discretion of club owners in advancing the interests of the NFL and its clubs; there is nothing in the Policy that comes close to supporting a claim that its motivating purpose was to benefit the City, as a recent decision of the California Supreme Court makes clear is required to plead third-party beneficiary status. *See* Part IIB, *infra.* Third, and in any event, the Complaint fails to allege a breach of the Policy; there is no allegation that the NFL clubs did not consider the factors, which is the most the Policy could be read to require. *See* Part IIC, *infra*.

The remaining claims are derivative of the antitrust and breach of contract claims and fail accordingly. *See* Part III, *infra*.

## ALLEGATIONS OF THE COMPLAINT[1]

### A. The Parties

Plaintiff City of Oakland is a municipal corporation. Cplt. ¶17. It does not own or operate the Coliseum facility in which the Raiders have played professional football; the City describes itself as only an "indirect owner." *Id.* The actual owner of the Coliseum is the Oakland-Alameda County Coliseum Authority ("OACCA"), a joint powers agency that is "a public entity separate

---

[1] Many allegations of the Complaint are incorrect, in particular those regarding the Raiders' course of dealing with Oakland, but they are accepted as true for purposes of this motion to dismiss.

from the City and County." Amended and Restated Joint Exercise of Powers Agreement dated as of December 17, 1996, *available at* https://lafco.acgov.org/lafco-assets/docs/JPAs/Oakland-Alameda%20County%20Coliseum%20JPA%20Agreement.pdf.[2] Neither the OACCA nor the County of Alameda is a party to the action.

Defendants are the NFL, an unincorporated association with its principal place of business in New York, and its 32 member clubs. Cplt. ¶¶18-19.

**B.      The NFL Relocation Policy**

The Complaint alleges that any relocation of an NFL club requires the approval of three-quarters of the NFL clubs and that a relocating club typically   must pay a relocation fee to the NFL (or its clubs). *Id.* ¶28. Following the Ninth Circuit's decision in *Los Angeles Memorial Coliseum Commission v. National Football League*, 726 F.2d 1381 (9th Cir. 1984) ("*Raiders I*"), a case that concerned NFL restraints that *prevented* a team from relocating, the NFL adopted a Relocation Policy that sets forth criteria that the NFL clubs may consider in decisions regarding team relocations. Cplt. ¶¶3, 4, 30.

The Complaint asserts that the clubs "collectively agreed to amend the NFL Constitution by adding the Relocation Policies as an addendum," *id.* ¶32, but no *facts* are alleged in support of this assertion and it is incorrect. There was no amendment. The current version of the Relocation Policy, which is attached to the Complaint, reflects on its face that the policy was promulgated pursuant to the NFL Commissioner's unilateral "authority to interpret and from time to time establish policy and procedure in respect to the provisions of the Constitution and Bylaws." (ECF 1-2) (Policy and Procedures for Proposed Franchise Relocations ("Policy")) at 1.

As set forth in the Relocation Policy, "each club's primary obligation *to the League and to all other member clubs* is to advance the interest of the League in its home territory." Policy at 1 (emphasis added). The Policy provides that clubs will attempt to develop "suitable stadium facilities in their home territories" through good faith negotiations, but recognizes that this may not always be possible. *Id.*

---

[2] The Court may take judicial notice of the Joint Exercise of Powers Agreement as a public document, the content of which is not reasonably subject to dispute. *See* Fed. R. Evid. 201; *Harris v. Cty. of Orange*, 682 F.3d 1126, 1131-32 (9th Cir. 2012).

The Policy goes on to explain that evaluation of "a proposed franchise relocation" is a "business judgment" for which "the membership is entitled to consider a wide range of appropriate factors." *Id.* at 2; *see also id.* at 3 ("The League has analyzed many factors in making prior business judgments concerning proposed franchise relocations. Such business judgments may be informed through consideration of the factors listed below, as well as other appropriate factors that are considered relevant by the Commissioner or the membership."). The Policy does not purport to limit the discretion of the NFL or its member clubs in making relocations decisions, but instead lists twelve factors that "may be considered in evaluating the proposed transfer." *Id.* at 4. These factors are identified as "useful ways to organize data and inform…business judgment…to assist the clubs in making a decision based on their judgment and experience," while noting that "other appropriate factors that are considered relevant by the Commissioner or the membership" may also be considered. *Id.* at 4-5. In addition, the Policy sets forth procedures for relocation applications, *id.* at 3-4, and provides factors that the Commissioner will consider in recommending the amount of a relocation fee. *Id.* at 6-7.

## C. The Raiders' Prior Relocations And Negotiations To Stay In Oakland

The Complaint purports to summarize the history of the Raiders' moves to and from Oakland. Cplt. ¶41  The Complaint notes that the Raiders moved away from Oakland in 1982, but omits any description of the City's unsuccessful attempt to prevent that move. *Id.*[3] The Complaint also notes Oakland's success in inducing the Raiders' return to Oakland in 1995 and the club's entry into a 16-year lease of the Oakland Coliseum. *Id.* ¶47. The Raiders and entities associated with the Oakland Coliseum had various disputes thereafter, indicating a strained and difficult business relationship. *Id.* ¶¶48-49.[4]

---

[3] These efforts culminated with Oakland attempting to assert eminent domain over the Raiders' franchise, an action found to violate the Commerce Clause of the United States Constitution. *City of Oakland v. Oakland Raiders*, 174 Cal. App. 3d 414 (1985). Oakland thereafter was required to pay millions of dollars in attorneys fees to the Raiders. *See City of Oakland v. Oakland Raiders,* 203 Cal. App. 3d 78, 85-86 (1988) (affirming trial court order awarding $2 million in fees and $853,756 in costs, and awarding Raiders additional appellate attorneys fees).

[4] For instance, in *Oakland Raiders v. Oakland-Alameda County Coliseum, Inc.*, 144 Cal. App. 4th 1175 (2006), a jury awarded $34.2 million in damages to the Raiders based on negligent misrepresentations by the Oakland-Alameda County Coliseum ("OACC") and found that OACC had breached the implied covenant of good faith and fair dealing in its negotiations of a long-term

(Footnote Cont'd on Following Page)

By 2008, the NFL concluded that the Raiders required a new stadium. Cplt. ¶52. In the years that followed, the Raiders engaged in unsuccessful negotiations with Oakland concerning a possible new stadium. *Id.* ¶¶58-59. In 2016, the Raiders sought permission from the League to relocate to Los Angeles. The NFL conditionally approved this application, which was contingent on the Chargers' not exercising an option to join the Rams in relocating to Los Angeles. *Id.* ¶¶60-61. In late 2016, a private investment group made a proposal to construct a stadium in Oakland and to acquire an ownership interest in the Raiders. *Id.* ¶¶64-65. The NFL had doubts about the workability of this proposal and the Raiders rejected it. *Id.* ¶67.

### D. The Raiders' Relocation To Las Vegas

The Complaint alleges that the Raiders began at some time pursuing the possibility of moving to Las Vegas. *See, e.g.*, *id.* ¶¶51, 62. The Raiders filed a relocation application with the NFL on January 19, 2017. *Id.* ¶68. The NFL considered the relocation proposal at its annual meeting in March 2017. *Id.* ¶73. The NFL clubs thereafter voted 31 to 1 to approve the Raiders' relocation to Las Vegas. *Id.* ¶75. In connection with the relocation, the Raiders are paying $378 million to the NFL clubs. *Id.* ¶¶1, 69.

At a committee meeting prior to the vote, Oakland Mayor Libby Schaaf presented a proposal for the Raiders to stay in Oakland and later reiterated this proposal in a letter to the NFL. Cplt. ¶¶71-74. The NFL Commissioner noted that the information from Oakland "d[id] not present a proposal that is clear and specific, actionable in a reasonable timeframe, and free of major contingencies" and that it was not "a viable solution." *Id.* ¶72. Mayor Schaaf conceded that the Oakland offer did not "provide the level of public subsidy Nevada offers." *Id.* ¶74.

### E. The Alleged Harm To The City Of Oakland

Oakland alleges a series of indirect harms resulting from the Raiders' relocation. The primary asserted harm is loss of "tax and other income that it derives from the presence of the Raiders and the economic activity their presence generates." Cplt. ¶96. In addition, Oakland

---

(Footnote Cont'd From Previous Page)

contract with the Raiders. A divided appellate court overturned this verdict on the ground that the Raiders had waived their fraud claims by entering into a lease extension after learning of the fraud. *Id.* at 1186-89.

contends that it has "lost the value of its significant investment in the Raiders" (*id.* ¶15), although it is not an owner of the club. Oakland also asserts that it "is burdened with a stadium of significantly diminished value" (*id.*), but it concedes that it is not the owner of the stadium. *Id.* ¶17. Finally, Oakland asserts that it has "invested and borrowed significant sums of money…in reliance on the Relocation Policies and the presence of the Raiders in Oakland at the Coliseum" *Id.* ¶96.

## ARGUMENT

Under Rule 12(b)(6), the Court should accept the complaint's well-pleaded factual allegations and draw all reasonable inferences in the plaintiff's favor. *See, e.g.*, *Burgert v. Lokelani Bernice Pauahi Bishop Tr.*, 200 F.3d 661, 663 (9th Cir. 2000). However, the Court is not "required to accept as true allegations that contradict exhibits attached to the Complaint or matters properly subject to judicial notice, or allegations that are merely conclusory, unwarranted deductions of fact, or unreasonable inferences." *Daniels-Hall v. Nat'l Educ. Ass'n*, 629 F.3d 992, 998 (9th Cir. 2010). To survive a motion to dismiss, a plaintiff's claims must allege "enough facts to state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555-56, 570 (2007); *see also Kendall v. Visa U.S.A., Inc.*, 518 F.3d 1042, 1046-47 (9th Cir. 2008) (plaintiff must plead "not just ultimate facts . . . but evidentiary facts").

Recognizing "the unusually high cost of discovery in antitrust cases," in *Twombly* the Supreme Court directed district and appellate courts to apply pleading requirements rigorously in order to avoid the burden associated with litigating "largely groundless claim[s]." 550 U.S. at 558-59. *See also Kendall*, 518 F.3d at 1047 ("discovery in antitrust cases frequently causes substantial expenditures and gives the plaintiff the opportunity to extort large settlements even where he does not have much of a case").

## I.    PLAINTIFF'S ANTITRUST CLAIMS FAIL AS A MATTER OF LAW.

### A.    The City Has Not Suffered Antitrust Injury.

A fundamental requirement for any antitrust claim is that the plaintiff establish (and at the motion to dismiss stage, allege facts that, if proved, would establish) that it has suffered "antitrust injury." Antitrust injury is injury "of the type the antitrust laws were designed to prevent and that flows from that which makes defendants' acts unlawful." *Brunswick Corp. v. Pueblo Bowl-O-Mat,*

Inc., 429 U.S. 477, 489 (1977). The *Brunswick* standard is satisfied only "'on a showing that the injury was caused by a reduction, rather than an increase, in competition flowing from the defendant's acts.'" *L.A. Mem'l Coliseum Comm'n v. Nat'l Football League*, 791 F.2d 1356, 1364 (9th Cir. 1986) ("*Raiders II*") (quoting *Cal. Comput. Prods.* v. *IBM*, 613 F.2d 727, 732 (9th Cir. 1979)).

The Complaint alleges that the Raiders considered the benefits of remaining in Oakland, compared them to the benefits of moving to Las Vegas, and decided that Las Vegas was more attractive. *See* Cplt. ¶74 (Oakland mayor acknowledged that Oakland's offer was economically inferior). The difference was so great that the Raiders accepted the Las Vegas opportunity notwithstanding their obligation to pay a relocation fee of $378 million in order to move. The relocation fee benefited Oakland in the negotiations: it had a $378 million head start over Las Vegas, but still did not provide an offer that matched what Las Vegas put on the table.[5]

Oakland's complaint is that it was forced to face a competitive market (or, perhaps more accurately, a market tilted in its favor) and lost. That is not injury arising from a *reduction* in competition. *See generally Sterling v. Nat'l Basketball Ass'n*, No. CV 14-4192 FMO (SHx), 2016 WL 1204471, at *6 (C.D. Cal. Mar. 22, 2016) ("Sterling's claims of antitrust injury are not an injury to competition, but rather, disappointment that he lost ownership of the Clippers . . . The exclusion of Sterling's membership in the league would not have an anticompetitive effect nor an effect upon the public interest. The Clippers continue as an operating club.") (internal citation omitted).[6]

---

[5] In fact, Oakland's advantage was $478 million because the NFL also offered to grant the Raiders $100 million for stadium development in Oakland, a benefit not made available for construction of a new stadium in Las Vegas. *See* C. Wesseling, "NFL to offer Chargers, Raiders assistance package," *available at* http://www.nfl.com/news/story/0ap3000000621719/article/nfl-to-offer-chargers-raiders-assistance-package.

[6] Not surprisingly, prior decisions addressing team relocation do not focus on leagues' decisions to *permit* a move. Instead, they focus on league decisions to prevent or inhibit teams from relocating. *E.g., St. Louis Convention & Visitors Comm'n v. Nat'l Football League*, 154 F.3d 851 (8th Cir. 1998) (affirming judgment in favor of NFL in claim by stadium authority that NFL restrictions discouraged other teams from moving to St. Louis, forcing St. Louis to offer overly favorable deal to attract the Rams); *Nat'l Basketball Ass'n v. SDC Basketball Club*, 815 F.2d 562, 568 (9th Cir. 1987) (*Raiders II* decision did not hold "that a franchise movement rule, in and of itself, was invalid under the antitrust laws"); *Raiders II*, 791 F.2d at 1364.

The City cannot claim a right under the antitrust laws to be shielded from competition; "it is inimical to [the antitrust] laws to award damages for losses stemming from continued competition." *Atl. Richfield Co. v. USA Petroleum Co.*, 495 U.S. 328, 334 (1990). Indeed, "mistaken inferences in cases such as this one are especially costly because they chill the very conduct the antitrust laws are designed to protect." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 594 (1986). Because the antitrust laws are concerned with too little competition rather than too much, the Complaint does not and cannot allege antitrust injury from the Raiders' relocation to Las Vegas or NFL rules or conduct that permitted that move.

### B. The City Lacks Standing To Sue Under The Antitrust Laws.

Even if Oakland had made a plausible allegation of antitrust injury, it would not be the proper plaintiff to pursue this claim. An antitrust plaintiff is required to show more than the "injury in fact" required for constitutional standing; for a complaint to survive a motion to dismiss, "the court must make a further determination whether the plaintiff is a proper party to bring a private antitrust action." *Associated Gen. Contractors of Cal., Inc. v. Cal. State Council of Carpenters*, 459 U.S. 519, 535 n. 31 (1983).

In evaluating antitrust standing, the Supreme Court has explained that courts should consider:

> (1) the motive of the defendant—whether it specifically intended to cause plaintiff's harm; (2) the nature of plaintiff's injury—whether it was of a type the antitrust laws were designed to prevent; (3) the directness of the causal connection between the violation and the injury; (4) the extent to which abstract speculation underlies the allegations of injury and of their causation by defendant's antitrust violations; and (5) the risk of duplicate recoveries or complex apportionment of damages if plaintiffs such as this are permitted to recover.

*Raiders II*, 791 F.2d at 1363 (citing *Associated Gen. Contractors*, 459 U.S. at 537–45).

### 1. The Clayton Act Does Not Permit Recovery For Alleged Harm To The City's Sovereign Interests.

The City of Oakland cannot allege that it was injured in its "business or property" as required for standing under the Clayton Act. The only concrete harm that the City alleges is to its sovereign interests. *See* Cplt. ¶96. That is not a basis for antitrust standing. Under *Hawaii v.*

*Standard Oil Co.*, 405 U.S. 251 (1972), a government entity may bring an antitrust action only for "damages for injuries to its commercial interests." *Id.* at 264; *see id.* at 265 ("in its capacity as a consumer of goods and services"). "[W]here, as here, the State seeks damages for other injuries, it is not properly within the Clayton Act." *Id.*; *see also id..* at 262 ("[Congress] could have, for example, required violators to compensate federal, state, and local governments for the estimated damage to their respective economies caused by the violations. But, this remedy was not selected."); *Somers v. Apple, Inc.*, 729 F.3d 953, 963 (9th Cir. 2013) (antitrust standing requires that "the party alleging the injury must be either a consumer of the alleged violator's goods or services or a competitor of the alleged violator in the restrained market") (internal citation and quotation omitted).

The City has not alleged that it suffered injury to its "commercial interests" as the buyer (or seller) in a market. It does not and cannot allege that it purchases anything from or sells anything to the NFL or any of its teams. The only concrete direct harm alleged by the City is the loss of tax revenues. Cplt. ¶96 ("Plaintiff will soon lose the significant tax and other income that it derives from the presence of the Raiders and the economic activity their presence generates."). But the City does not buy or sell taxes (or "economic activity"), and it lacks standing because taxation is a sovereign activity, not a commercial transaction. *See Reiter v. Sonotone Corp.*, 442 U.S. 330, 341–42 (1979) ("The phrase 'commercial interests' was used [in *Hawaii* ] as a generic reference to the interests of the State of Hawaii as a party to a commercial transaction."); *see generally Case of State Freight Tax*, 82 U.S. 232, 278 (1873) ( "A tax is a demand of sovereignty."). Accordingly, the City lacks standing here.

### 2. The City Alleges Only Indirect Injury.

The City lacks antitrust standing for the further reason that its alleged injuries, if any, would be indirect. The City alleges that it now "owns a stadium that has been boycotted by the NFL and, thus, has incurred the significant diminution in property value caused by that boycott." But the City is only an "indirect owner" of the Coliseum (Cplt. ¶17); the stadium is in fact owned and operated by the OACCA, which is not a party to this case. *See Oakland Raiders v. Oakland-Alameda Cty. Coliseum*, 144 Cal. App. 4th at 1179-80. The City does not have antitrust standing as an "indirect

owner." *Vinci v. Waste Mgmt., Inc.*, 80 F.3d 1372, 1375 (9th Cir. 1996) ("'[a] shareholder of a corporation injured by antitrust violations has no standing to sue in his or her own name.'") (quoting *Solinger v. A. & M. Records, Inc.*, 719 F.2d 298, 299 (9th Cir. 1983)).[7]

The City also alleges that it "has invested and borrowed significant sums of money, totaling over $240 million, in reliance on the Relocation Policies and the presence of the Raiders in Oakland and at the Coliseum." Cplt. ¶96. Such borrowings and investments do not provide a basis for antitrust standing. To the extent that these outlays were made in connection with the stadium, the City remains an indirect owner with injuries, if any, that are derivative of the stadium's injuries. And if the borrowings were for the purpose of investing in the stadium in the future, the City's injury is even less direct. *See Bubar v. Ampco Foods, Inc.*, 752 F.2d 445, 451 (9th Cir. 1985) ("the policy reasons why a stockholder is not permitted standing to sue for antitrust injury to the corporation are, in this case, greatly magnified when we have as plaintiffs potential stockholders"). To the extent that the City invested or borrowed to invest in public infrastructure or the provision of public services, this again constitutes neither commercial activity nor an activity through which the City could have been *directly* injured.

The Complaint focuses on the relocation fee paid to the NFL owners in connection with the relocation. Cplt. ¶12. But as noted above, the fee made it *harder* for the Raiders to leave Oakland, and in any event the Complaint acknowledges that this relocation fee was paid by the Raiders, not by the City, *id.* ¶2. The City does not have standing to complain about a fee paid by a third party; only the party that paid the fee has standing to sue. *Ill. Brick Co. v. Ill.*, 431 U.S. 720, 746 (1977).

Finally, although no such claim is specifically asserted in the Complaint, the City would not have standing based on any injury purportedly flowing from the NFL's decision to operate with a set number of member clubs (now 32). "The requirement that the alleged injury be related to anti-competitive behavior requires, as a corollary, that the injured party be a participant in the same market as the alleged malefactors." *Eagle v. Star-Kist Foods, Inc.*, 812 F.2d 538, 540 (9th Cir.

---

[7] Nor would the City have standing as landlord for the OACCA. *See R.C. Dick Geothermal Corp. v. Thermogenics, Inc.*, 890 F.2d 139, 148 (9th Cir. 1989) (landlord does not suffer antitrust injury); *Innovation Marine Protein, LLC v. Pac. Seafood Grp.*, No. 6:17-CV-00815-MC, 2018 WL 1461501, at *7 (D. Or. Mar. 23, 2018) (developer and landlord lacks standing).

1987) (internal quotation marks omitted); *Sacramento Valley, Chapter of the Nat. Elec. Contractors' Ass'n v. Int'l Bhd. of Elec. Workers, Local 340*, 888 F.2d 604, 606 (9th Cir. 1989) (affirming dismissal for lack of antitrust standing because plaintiff "was neither a consumer nor a competitor in the market in which trade was restrained.") (internal citation omitted); *accord Associated Gen. Contractors*, 459 U.S. at 538-39. The City is not "a participant in the same market" as the NFL and its member clubs: It does not own a professional football club and it has not alleged (nor could it reasonably allege) that it has taken "substantial demonstrable steps" to acquire one. *In re Dual-Deck Video Cassette Recorder Antitrust Litig.*, 11 F.3d 1460, 1465 (9th Cir. 1993). Even if it did (falsely) make such an allegation, the claim would fail. *See Mid-South Grizzlies v. Nat'l Football League*, 720 F.2d 772, 786-87 (3d Cir. 1983) (rejecting Sherman Act claim that NFL had obligation to admit additional club).

Likewise, the Complaint does not allege (nor could it reasonably allege) that the City has standing as a participant in a market for football stadiums. Even if that were somehow deemed a market in which Defendants compete, the Complaint at most alleges the City "voted to enter into negotiations" regarding an arrangement in which it would provide some "public funds" in support of a private owner's development efforts. Cplt. ¶65. A mere shareholder or investor in an entity (or someone considering entering into negotiations to become a shareholder or investor) lacks standing to assert a claim based on injury to the entity. *Vinci*, 80 F.3d at 1375; *Bubar*, 752 F.2d at 451.

**C.** **The City Fails Adequately To Allege A Relevant Market.**

The NFL's rules and Defendants' conduct in this case are governed by the antitrust rule of reason. *Raiders I*, 726 F.2d at 1392 (NFL relocation policies analyzed under the rule of reason because "the unique structure of the NFL precludes application of the per se rule"). *See also Am. Needle, Inc. v. Nat'l Football League*, 560 U.S. 183, 203 (2010) (collective decisions of NFL clubs generally analyzed under the rule of reason); *Nat'l Hockey League Players' Ass'n v. Plymouth Whalers Hockey Club*, 325 F.3d 712, 719 (6th Cir. 2003) ("[I]t is now settled that the practices typically associated with the organization of professional sports leagues . . . are not subject to the per se rule." (citation and internal quotation marks omitted)).

Under the rule of reason, the City would be required to prove anticompetitive effects in a

relevant market. *Hicks v. PGA Tour, Inc.*, 897 F.3d 1109, 1120 (9th Cir. 2018) ("Plaintiffs must plead a relevant market to state an antitrust claim under the Sherman Act, unless they assert a per se claim."). This relevant market definition is necessary because it "provides the basis on which to balance competitive harms and benefits of the restraints at issue." *Raiders I*, 726 F.2d at 1392 (internal citation omitted). "[A] complaint may be dismissed under Rule 12(b)(6) if the complaint's 'relevant market' definition is facially unsustainable." *Newcal Indus., Inc. v. Ikon Office Sol.*, 513 F.3d 1038, 1045 (9th Cir. 2008). *See also Tanaka v. Univ. of S. Cal.*, 252 F.3d 1059, 1063 (9th Cir. 2001) ("Failure to identify a relevant market is a proper ground for dismissing a Sherman Act claim.").

Relevant markets are defined on the basis of "reasonable interchangeability." *See Big Bear Lodging Ass'n v. Snow Summit, Inc.*, 182 F.3d 1096, 1105 (9th Cir. 1999) (affirming dismissal of antitrust claim when plaintiff failed adequately to allege that asserted market was the "area of effective competition" and "there are no other goods or services … reasonably interchangeable"). "Where the plaintiff fails to define its proposed relevant market with reference to the rule of reasonable interchangeability and cross-elasticity of demand, or alleges a proposed relevant market that clearly does not encompass all interchangeable substitute products even when all factual inferences are granted in plaintiff's favor, the relevant market is legally insufficient and a motion to dismiss may be granted." *In re eBay Seller Antitrust Litig.*, 545 F. Supp. 2d 1027, 1031 (N.D. Cal. 2008) (internal quotation omitted); *see also Tanaka*, 252 F.3d at 1062-63 (9th Cir. 2001) (affirming dismissal under rule of reason analysis where plaintiff failed to identify an "appropriately defined" market).

The City alleges a relevant market "of all Host Cities offering, and all cities and communities that are willing to offer (i.e., potential Host Cities), home stadia and other support to major league professional football teams in the geographic United States." Cplt. ¶88. But a relevant market can consist only of goods or services that are bought or sold. *Morgan, Strand, Wheeler & Biggs v. Radiology, Ltd.*, 924 F.2d 1484, 1489 (9th Cir. 1991) (physician referrals not a relevant market because "nothing in the record suggests that the referrals as such are ever sold"). Host cities are not bought and sold, and as such are not a proper relevant market. Dismissal is warranted on this basis alone.

Even if the market definition were recast to something like "services for major league professional football," it would remain inadequate. A market definition based upon the consumers of a product and not the product itself is "facially unsustainable." *Newcal*, 513 F.3d at 1045 ("First and foremost, the relevant market must be a *product* market. The consumers do not define the boundaries of the market; the products or producers do."). A putative market of services "for major league professional football teams"—a market defined based upon the customers of the product— would be legally insufficient under this standard.

More fundamentally, the Complaint does not even attempt to explain why services for professional football teams are not reasonably interchangeable with services offered to attract other businesses. The Complaint offers the cursory allegation that "an NFL Host City faced with the situation that Oakland now faces cannot shift its host status to another professional sport like Major League Baseball." Cplt. ¶89. But that "conclusory assertion" does not suffice to properly allege a relevant market. *Tanaka*, 252 F.3d at 1063-64.[8] Cities compete for all sorts of businesses, none of which is unique in its ability to generate tax revenue. For example, as the widely publicized competition to attract the next Amazon headquarters demonstrates, cities can and do compete for many types of businesses that generate "tax and other income" and "economic activity" of the kind that the City alleges (Cplt. ¶96) to have lost here.

In *Hicks*, the Ninth Circuit affirmed dismissal of a gerrymandered market limited to advertising on golf caddies' bibs because it was obvious that advertisers had other options, such as advertising on television, radio, websites, and social media. 897 F.3d at 1121 (characterizing plaintiffs' relevant market as "not natural, artificial, and contorted to meet their litigation needs"). Plaintiff's relevant market here is no more "natural" than the market definition rejected on a motion to dismiss in *Hicks*. *See also StubHub, Inc. v. Golden State Warriors, LLC*, No. C 15-1436 MMC, 2015 WL 6755594, at *3 (N.D. Cal. Nov. 5, 2015) (dismissing antitrust claim because plaintiffs' market definition, which ignored reasonable interchangeability from the perspective of consumers, was "not cognizable as a matter of law").

---

[8] The allegation is also incorrect on its face: The Oakland Coliseum hosts a Major League Baseball team that has shared the Coliseum with the Raiders every year since the Raiders returned to Oakland.

**D. Each Of The City's Substantive Antitrust Claims Suffers From Additional Defects.**

    **1. The City Fails To Allege A Group Boycott In Count I Or A Concerted Refusal To Deal In Count II.**

In Counts I and II, the City alleges that Defendants have engaged in a "group boycott" and a concerted refusal to deal, each a violation of Section 1 of the Sherman Act, 15 U.S.C. § 1. These two claims are identical: a group boycott *is* a concerted refusal to deal. *See, e.g.*, *Nw. Wholesale Stationers, Inc. v. Pac. Stationery & Printing Co.*, 472 U.S. 284, 293 (1985) (using "group boycott" and "concerted refusal to deal" interchangeably); *Klor's, Inc. v. Broadway-Hale Stores, Inc.*, 359 U.S. 207, 212 (1959) (same).

Regardless of what the City calls the claim, it fails to allege any *facts* to support it because there is (and could be) no allegation that the NFL or any team other than the Raiders agreed not to deal with the City. "[A] unilateral refusal by one trader to deal with another is not a group boycott. An agreement, some concerted effort, is required before a group boycott exists." *Supermarket of Homes, Inc. v. San Fernando Valley Bd. of Realtors*, 786 F.2d 1400, 1405 (9th Cir. 1986). While the Raiders decided to leave Oakland, neither the NFL nor any of its other member clubs is alleged to have agreed either that the Raiders *could* not stay in Oakland or that any other club *would* not play its home games in Oakland. That is fatal to both Counts because, "[i]n order to have a group boycott, there must be more than one boycotter." *Charlie's Taxi Radio Dispatch Corp. v. SIDA of Haw., Inc.*, 810 F.2d 869, 877 n.7 (9th Cir. 1987). The assent of the NFL and its teams to the Raiders' decision to relocate does not render the NFL or another team a boycotter or transform the Raiders' decision regarding where they would play their home games into a group boycott.

Moreover, the City's claim of a group boycott or concerted refusal to deal with the City is fundamentally flawed because the NFL's rules made it *harder* for the Raiders to leave Oakland by imposing a significant relocation fee as a condition of the relocation. The City's real complaint is that the League did not force a team to play its home games in Oakland against its will and against its economic interest. That is not a group boycott.[9]

---

[9] It also bears mention that there has been and remains another NFL team—the San Francisco 49ers—in what the Complaint describes as the market in which the Oakland Raiders were based. *See* Cplt. ¶70 ("Oakland…is an emerging metropolis located nearby the booming city of San

(Footnote Cont'd on Following Page)

### 2. The City Fails To Allege Price Fixing In Count III.

In Count III, the City purports to assert a claim for "price fixing" of the "artificially inflated and monopolistic rents charged to, and paid by, wealthier Host Cities." Cplt. ¶124. This claim fails because the Complaint does not allege an agreement between the Raiders and any other party regarding "rents" paid by Oakland. Only agreements between competing sellers (or buyers) can be "price fixing," and a complaint that does not allege an agreement between competitors must be dismissed. *See Rick–Mik Enters., Inc. v. Equilon Enters., LLC*, 532 F.3d 963, 976 (9th Cir. 2008) (affirming dismissal of price fixing claim because plaintiff could not state claim under theory of horizontal price fixing where defendants did not compete); *Universal Grading Serv. v. eBay, Inc.*, No. C-09-2755 RMW, 2011 WL 846060, at *7 (N.D. Cal. Mar. 8, 2011) (dismissing claim because "Plaintiffs do not allege that defendants eBay and PNG are competitors of each other, nor do they cite a single case allowing a claim of horizontal price fixing to proceed where defendants are not competitors of each other").

### 3. The Declaratory Judgment Claim In Count IV Fails For The Same Reasons As Counts I, II, And III.

Count IV purports to state a claim for a declaratory judgment that defendants have violated the antitrust laws. But Count IV does not allege underlying conduct that differs in any way from the group boycott, refusal to deal, and price fixing claims in Counts I, II, and III. *See* Cplt. ¶134 ("Defendants' unlawful contract, combination or conspiracy in restraint of trade and interstate commerce operates as a horizontal group boycott and concerted refusal to deal. Defendants' conduct also operates as a horizontal price fixing scheme."). Accordingly, Count IV is subject to dismissal for the same reasons as Counts I, II, and III.

## II. THE COMPLAINT FAILS TO STATE A CLAIM FOR BREACH OF CONTRACT.

Count V of the Complaint seeks damages for breach of contract. Oakland claims to be a third party beneficiary of the NFL's Relocation Policy, to which it is not a party. Cplt. ¶140. This

---

(Footnote Cont'd From Previous Page)

Francisco…the East Bay area…and, of course, Silicon Valley"); *id.* ("Oakland is based in the United States' 6th largest media market"). It is absurd to suggest, as the Complaint does, that Defendants are boycotting the Bay Area market.

claim fails for three independent reasons: (1) the Policy is not an enforceable contract; (2) even if it were, the City would not be an intended third party beneficiary; and (3) the City has not alleged a breach of the Policy.

The Complaint assumes that California law applies to the contract claim. *See* Cplt. ¶139. The Court need not resolve any choice-of-law question now because the contract claim fails under both California and New York law. But if the Court were to resolve that question, New York law would govern since the Relocation Policy was promulgated there. *See* Cal. Civ. Code § 1646 (providing that "[a] contract is to be interpreted . . . according to the law and usage of the place where it is made" if there is no single place of performance indicated).[10]

### A.    The Relocation Policy Does Not Constitute A Contract.

Plaintiff's breach of contract claim fails because the Relocation Policy is not a contract. The Relocation Policy identifies certain factors that NFL owners may consider in deciding whether to permit a club to relocate. A promise to *consider* certain factors when making a decision does not create an enforceable contract. *See Ladas v. Cal. State Auto. Ass'n*, 19 Cal. App. 4th 761, 771 (1993) ("An amorphous promise to 'consider' what employees at other companies are earning cannot rise to the level of a contractual duty."). That is because an obligation to consider certain factors "provides no rational method for determining breach or computing damages." *Id.*; *see also Prostar Wireless Grp., LLC v. Domino's Pizza, Inc.*, No. 3:16-cv-05399-WHO, 2018 WL 6831026, at *9 (N.D. Cal. Dec. 28, 2018) ("A promise is too amorphous to rise to the level of a contractual duty when it provides no standard by which a fact finder could decide on whether the parties met their obligations.").

Notably, the NFL's Relocation Policy uses even less mandatory language than the unenforceable "promise to `consider'" at issue in *Ladas*. The Policy only lists "[f]actors that *may* be considered in evaluating the proposed transfer." Policy at 4. It notes that other factors have been

---

[10] *See Gutride Safier LLP v. Reese*, No. C–13–1062 EMC, 2013 WL 4104462, at *4 (N.D. Cal. Aug. 9, 2013) (same); Policy at 2 (stating Relocation Policy was promulgated pursuant to Article 8.5 of the NFL Constitution and Bylaws, which "vests in the [NFL] Commissioner the authority" to establish policy and procedure); Cplt. ¶18 (acknowledging that NFL is located in New York*). See generally Charles O. Finley & Co. v. Kuhn*, 569 F.2d 527, 542 (7th Cir. 1978) (applying Illinois choice of law principles to conclude that because, "[t]he Major League [Baseball] Agreement was and is to be performed in more than one state" but was adopted in Chicago, Illinois law applies).

considered in the past and that "other appropriate factors" may also be relevant. *Id.* Indeed, it expressly notes that the factors are merely "useful ways to organize data and to inform [each club's] business judgment." *Id.* It does not attempt to constrain that judgment; rather it notes that the factors may "assist the clubs in making a decision based on business judgment and experience." *Id.* at 3. In short, the Policy is not a contract, and to hold otherwise would amount to an "unwarranted intrusion on the ability of business enterprises to manage internal affairs." *Ladas*, 19 Cal. App. 4th at 772.

In addition, the Relocation Policy was unilaterally imposed by the NFL Commissioner. *See* Cplt. Ex. 2, at 1 (citing article 8.5 of the NFL Constitution and Bylaws, which "vests in the Commissioner the authority to interpret and from time to time establish policy and procedure in respect to the provisions of the Constitution and Bylaw"). As such, and because it may be revised at any time by the Commissioner, it lacks the required hallmarks of a binding contract, including offer and acceptance. *See Schwarzkopf v. Int'l Bus. Machs., Inc.*, No. C 08-2715 JF (HRL), 2010 WL 1929625, at *8 (N.D. Cal. May 12, 2010) (recognizing "that contract formation does not occur when an employer retains absolute discretion or a unilateral right to modify or cancel employee commission").[11]

### B.     The City Is Not An Intended Third Party Beneficiary Of The Relocation Policy.

Even if the Relocation Policy were enforceable as a contract, it would not be enforceable by the City. As the California Supreme Court recently made clear, a third party beneficiary claim may proceed only where the complaint alleges facts that answer three separate questions affirmatively:

> (1) whether the third party would in fact benefit from the contract, but also (2) whether a motivating purpose of the contracting parties was to provide a benefit to the third party, and (3) whether permitting a third party to bring its own breach of contract action against a contracting party is consistent with the objectives of the contract and the reasonable expectations of the contracting parties.

---

[11] The Relocation Policy similarly would not qualify as an enforceable contract under New York law. *See Maas v. Cornell Univ.*, 94 N.Y.2d 87 (N.Y. 1999) (affirming dismissal of breach of contract claim premised on university's failure to observe its procedures and bylaws that were "heavily informational in nature," "[do] not express or support the implication of any promise," and "[could] be [unilaterally] altered at any time"); *see also Kunda v. Caremark PhC, L.L.C.*, 119 F. Supp. 3d 56, 64 (E.D.N.Y. 2015) (finding that policy handbook did not amount to enforceable contract where it "provide[d] a non-exhaustive list of conduct that may warrant termination or discipline" but clarified "that the list is 'not limited' to those specified" acts); *Lobosco v. N.Y. Tel. Co./NYNEX*, 96 N.Y.2d 312, 317 (N.Y. 2001) ("Routinely issued employee manuals, handbooks, and policy statements should not lightly be converted into binding employment agreements.").

*Goonewardene v. ADP, LLC*, —Cal. 4th—, No. S238941, 2019 WL 470963, at *7 (Feb. 7, 2019). In sustaining a demurrer to a complaint alleging a third party beneficiary claim, the Supreme Court emphasized that "the contracting parties must have a motivating purpose to benefit the third party, and not simply knowledge that a benefit to the third party may follow from the contract." *Id.* at *8. The Supreme Court rejected a claim that an employee was a third party beneficiary of a contract between the employer and a payroll company. It noted that an employer ordinarily retains a payroll company to provide a benefit to itself and that permitting employees to sue would impose additional costs on the parties and undermine the purpose of the agreement. *Id.* at *12.

Numerous other cases confirm the substantial burden to plead a breach of contract claim premised on alleged third party beneficiary status. *See, e.g.*, *Souza v. Westlands Water Dist.*, 135 Cal. App. 4th 879, 891 (2006). "Because third party beneficiary status is a matter of contract interpretation, a person seeking to enforce a contract as a third party beneficiary . . . must plead a contract which was made expressly for his or her benefit and one in which it clearly appears that he or she was a beneficiary." *H.N. & Frances C. Berger Found. v. Perez*, 218 Cal. App. 4th 37, 43 (2013) (affirming the trial court's grant of defendant's demurrer because the pleadings and attached documents demonstrated that plaintiff was merely an incidental beneficiary to the agreements at issue). "The term 'expressly' in Civil Code section 1559 means…'in an express manner; in direct or unmistakable terms; explicitly; definitely; directly.'" *Smith v. Microskills San Diego L.P.*, 153 Cal. App. 4th 892, 898 (2007) (quoting *City & Cty. of S.F. v. W. Air Lines, Inc.*, 204 Cal. App. 2d 105, 120 (1962)). Moreover, while the third party beneficiary need not be identified expressly in the contract, the contract must at least identify a class of intended beneficiaries to which the plaintiff belongs. *See Karo v. San Diego Symphony Orchestra Ass'n*, 762 F.2d 819, 822 (9th Cir. 1985).[12]

Nothing in the Relocation Policy expresses an intent to benefit the City. To the contrary, the Policy repeatedly and exclusively references the interests of the NFL and its clubs. It states "that

_____

[12] New York law also rejects attempts by a third party "to enforce the agreement in the absence of terms that 'clearly evidence[ ] an intent to permit enforcement by the third party' in question." *Premium Mortg. Corp. v. Equifax, Inc.*, 583 F.3d 103, 108 (2d Cir. 2009). *See also Dormitory Auth. of the State of N.Y. v Samson Constr. Co.*, 30 N.Y.3d 704, 710 (N.Y. 2018); *Fourth Ocean Putnam Corp. v. Interstate Wrecking Co.*, 66 N.Y.2d 38, 44 (N.Y. 1985) (citing Restatement (Second) of Contracts, Section 302).

each club's primary obligation *to the League* and *to all other member clubs* is to advance the *interest of the League* in its home territory." Policy at 1 (emphasis added). The Policy further emphasizes "the League's television interests, the League's interest in strong and geographically distributed franchises, the League's interest in securing attractive stadium facilities in which to play its games, and the League's interest in having financially viable franchises." *Id.* at 3. Even the statement referenced in the Complaint regarding an "obligation" to work with "home territories" is framed in terms of the League's policy and interests: "*Because League policy favors stable team-community relations*, clubs are obligated to work diligently and in good faith to obtain and to maintain suitable stadium facilities in their home territories, and to operate in a manner that maximizes fan support in their current home community." *Id.* at 1, Policy § A.1. (emphasis added).

The Policy's few generic references to "home territory," "incumbent community," and "current community," do not change the analysis. *See Hairston v. Pac. 10 Conference*, 101 F.3d 1315, 1320 (9th Cir. 1996) (affirming the district court's dismissal of student-athletes' third-party beneficiary claim because language relied on by the athletes in the Pac–10 constitution consisted of "vague, hortatory pronouncements . . . that by themselves . . . [were] not sufficient to support the [athletes'] claims that the Pac–10 intended to assume a direct contractual obligation to every football player on a Pac–10 team"). As an initial matter, a city—like Oakland—is distinct from a home territory. The Policy does not speak at all to relocations to a different city within the same home territory, meaning that a city can suffer the exact same injury alleged here without the Policy being implicated in any way.[13] Even if Oakland were somehow equated with the entire "home territory," the Policy at most makes it an incidental beneficiary. Nothing in the Relocation Policy or the circumstances alleged in the Complaint regarding its adoption suggests that the NFL and its members had a "motivating purpose" to benefit particular jurisdictions, regions or amorphous groups of individuals. *See Goonewardene*, 2019 WL 470963, at *7. If, as the Complaint concedes, the Policy was adopted by the NFL to protect it and its member clubs from lawsuits, it would make

---

[13] For instance, in 2014 the San Francisco 49ers relocated from municipally owned Candlestick Park in San Francisco to a new stadium in Santa Clara. The relocation left Candlestick without a tenant, deprived the City and County of San Francisco of rental income, and resulted in the demolition of the vacant stadium.

no sense to conclude that the NFL intended to make the City of Oakland a third party beneficiary that could haul the league and its clubs into court with nebulous claims that consideration of the non-binding factors in the Relocation Policy "required [the relocating club] to stay" in its home territory. Cplt. ¶78. The motivating purpose of the Policy is that which it states: "to assist the clubs in making a decision based on their judgment and experience…with regard to each proposed move." Policy at 4. As with the third party claim at issue in *Goonewardene*, permitting third parties to bring claims under these circumstances would merely drive up costs and undermine the interest of the NFL and its member clubs in managing their internal affairs and avoiding entangling litigation.[14]

### C. The City Fails To Allege A Breach Of The Relocation Policy.

A necessary element of any contract claim is an alleged breach of the contract. *Wall St. Network, Ltd. v. N.Y. Times Co.*, 164 Cal. App. 4th 1171, 1178 (2008) (listing "defendant's breach" as element of contract claim). But the Complaint does not allege any facts that would amount to a breach of the Relocation Policy. As Plaintiff acknowledges, all that the Policy requires is that the NFL and NFL clubs *consider* certain factors. Cplt. ¶34 ("The Relocation Policies also require NFL team owners to *consider* the following factors, among others . . . .") (emphasis added).[15] The Complaint nowhere alleges that the Defendants failed to consider the specified factors.

Rather, the City asserts that six of the twelve non-exclusive factors purportedly favored the Raiders' staying in Oakland and that Defendants accordingly should have reached a different result. *See, e.g.*, Cplt. ¶78 ("the Raiders were required to stay in Oakland"), *id*, ¶79 ("Relocation Policies

---

[14] The Missouri trial court's order in the litigation regarding the Rams' relocation does not require a different result. *See St. Louis Reg'l Convention & Sports Complex Auth. v. Nat'l Football League*, No. 1772-CC00976, 2017 WL 6885089 (Mo. Cir. Ct. Dec. 27, 2017). At an early juncture in the case, the Missouri trial court, applying Missouri law, declined to grant a motion to dismiss a third-party beneficiary claim based on the Relocation Policy. The court's entire analysis consisted of summarizing the allegations of the complaint and concluding, "Clearly, Plaintiffs allege facts that give rise to a breach of an enforceable contract." *Id.* at *1. This state court order is not binding on this Court, contains insufficient analysis to provide persuasive value, and, in any event is incorrect as a matter of Missouri law. *See, e.g.*, *Verni v. Cleveland Chiropractic Coll.*, 212 S.W.3d 150, 153 (Mo. banc 2007) (plaintiffs must show that terms of alleged contract "clearly express [an] intent to benefit . . . an identifiable class of which" they are members).

[15] The Policy sets forth some procedural steps as well for a franchise relocation, such as publishing a statement of reasons in local newspapers. *See* Policy at 4. However, the Complaint contains no allegation that these procedures were not followed.

DEFENDANTS' MOTION TO DISMISS                                         CASE NO. 3:18-cv-07444-JCS

favored a stay in Oakland"), *id.*, ¶143 ("All of these factors supported the Raiders' continued presence in Oakland."). That is not sufficient to allege a breach of the Policy. *See, e.g.*, *Baymiller v. Guarantee Mut. Life Co.*, No. SA CV 99-1566 DOC AN, 2000 WL 1026565, at *1-2 (C.D. Cal. May 3, 2000) (no breach of contract where insurance policy provided for setting rates within a certain range "*in the amount and by the method determined by the Company*") (emphasis in original); *Belmont v. Milton*, 43 Cal. App. 2d 120, 121, 124 (1941) (party that failed to pick oranges before a freeze did not breach contract requiring him to pick crops "at such time or place as will in his judgment yield the maximum returns therefor" because language left the matter of when to pick oranges to his discretion).

**III.   PLAINTIFF'S REMAINING DERIVATIVE CLAIMS SHOULD BE DISMISSED.**

The remaining claims in the Complaint are derivative of the antitrust and breach of contract claim and should be dismissed.

Count VI is titled "Quantum Meruit Restitution." The count essentially repeats the allegations of Plaintiff's breach of contract claim, referring to the alleged "obligatory nature" (Cplt. ¶154) of the Relocation Policy, and seeks a recovery in the form of restitution instead of damages. For the same reasons that the City may not recover damages on its breach of contract claim, it may not obtain an alternative remedy of restitution.

Furthermore, to the extent the quantum meruit claim is based on an assertion that the City provided benefits to the Raiders in the form of stadium improvements, the Raiders compensated their landlord through the payment of rent under their lease. *See* Cplt. ¶¶47, 57 (alleging existence of lease). Quantum meruit is unavailable when there is a written agreement regarding the subject matter. *Hedging Concepts, Inc. v. First Alliance Mortg. Co.*, 41 Cal. App. 4th 1410, 1419 (1996) ("[I]t is well settled that there is no equitable basis for an implied-in-law promise to pay reasonable value when the parties have an actual agreement covering compensation."). Indeed, the Ninth Circuit has previously noted that "local governments ought to be able to protect their investment through the leases they negotiate with the teams for the use of the stadia." *Raiders I*, 726 F.3d at 1397. The Raiders have been in Oakland for the last 24 years, 8 more than the 16 agreed in the documents executed upon their 1995 return to Oakland and sufficient time for Plaintiff to recoup

any legitimate investment. A landlord (much less an "indirect" owner of a landlord) may not avoid the limitations of the lease by suing the tenant in quantum meruit, particularly where there is not even an allegation that the parties had any understanding or expectation that the tenant would pay extra-contractual rent. *See Huskinson & Brown, LLP v. Wolf*, 32 Cal. 4th 453, 458 (2004) (quantum meruit requires "some understanding or expectation of both parties that compensation therefor was to be made").

Count VII is even more misplaced. It is titled "Unjust Enrichment Under California Law Damages/Disgorgement" but cites no California law. Cplt. ¶¶158-61. California does not recognize a free-standing claim for unjust enrichment. *See Levine v. Blue Shield of Cal.*, 189 Cal. App. 4th 1117, 1138 (2010); *Durell v. Sharp Healthcare*, 183 Cal. App. 4th 1350, 1370 (2010) ("[t]here is no cause of action in California for unjust enrichment."). In any event, because the underlying conduct alleged in the complaint is not wrongful, it provides no basis for a recovery under the law of unjust enrichment. *See Levine*, 189 Cal. App. 4th at 1138.

**CONCLUSION**

For the foregoing reasons, the Complaint should be dismissed.

DATED: March 1, 2019.

Respectfully submitted,

**ARNOLD & PORTER KAYE SCHOLER LLP**
KENNETH G. HAUSMAN (Bar No. 57252)
kenneth.hausman@arnoldporter.com
DANIEL B. ASIMOW (Bar No. 165661)
daniel.asimow@arnoldporter.com
DAVID J. REIS (Bar No. 155782)
david.reis@arnoldporter.com
Three Embarcadero Center, 10th Floor
San Francisco, CA 94111-4024
Telephone:    415.471.3100
Facsimile:    415.471.3400

WILLIAM J. BAER (*pro hac vice*)
bill.baer@arnoldporter.com
JONATHAN I. GLEKLEN (*pro hac vice*)
jonathan.gleklen@arnoldporter.com
601 Massachusetts Ave, NW
Washington, D.C. 20001-3743
Telephone:    202.942.5000
Facsimile:    202.942.5999

By:    /s/ Daniel B. Asimow
      DANIEL B. ASIMOW

*Attorneys for Defendant*
THE OAKLAND RAIDERS

**COVINGTON & BURLING LLP**
JOHN E. HALL (Bar No. 118877)
jhall@cov.com
GREGG H. LEVY (*pro hac vice*)
glevy@cov.com
DEREK LUDWIN (*pro hac vice*)
dludwin@cov.com
BENJAMIN J. RAZI (*pro hac vice*)
brazi@cov.com
One CityCenter
850 Tenth Street, NW
Washington, DC  20001-4956
Telephone:    202.662.6000
Facsimile:    202.662.6291

By:    /s/ John E. Hall
      JOHN E. HALL

*Attorneys for Defendants*
THE NATIONAL FOOTBALL LEAGUE and
all NFL clubs other than The Oakland Raiders

## SIGNATURE ATTESTATION

I, Daniel B. Asimow, am the ECF user whose user ID and password are being utilized to electronically file this **Defendants' Motion to Dismiss**. Pursuant to Local Rule 5-1(i)(3), I hereby attest that the other signatory to the Consent, John E. Hall, has concurred in this filing.

Dated: March 1, 2019.

ARNOLD & PORTER KAYE SCHOLER LLP

By:    /s/ Daniel B. Asimow
      DANIEL B. ASIMOW

Attorneys for Defendant
THE OAKLAND RAIDERS

- 24 -