BARBARA J. PARKER (Bar No. 69722)
  bparker@oaklandcityattorney.org
MARIA BEE (Bar No. 167716)
  mbee@oaklandcityattorney.org
ERIN BERNSTEIN (Bar No. 231539)
  ebernstein@oaklandcityattorney.org
**OAKLAND CITY ATTORNEY**
One Frank Ogawa Plaza, 6th Floor
Oakland, California  94612
Telephone:  (510) 238-3601
Facsimile:   (510) 238-6500

CLIFFORD H. PEARSON (Bar No. 108523)
  cpearson@pswlaw.com
DANIEL L. WARSHAW (Bar No. 185365)
  dwarshaw@pswlaw.com
MICHAEL H. PEARSON (Bar No. 277857)
  mpearson@pswlaw.com
MATTHEW A. PEARSON (Bar No. 291484)
  mapearson@pswlaw.com
**PEARSON, SIMON & WARSHAW, LLP**
15165 Ventura Boulevard, Suite 400
Sherman Oaks, California  91403
Telephone:  (818) 788-8300
Facsimile:   (818) 788-8104

JAMES W. QUINN (*pro hac vice*)
  jquinn@bafirm.com
DAVID BERG (*pro hac vice*)
  dberg@bafirm.com
MICHAEL M. FAY (*pro hac vice*)
  mfay@bafirm.com
JENNY H. KIM (*pro hac vice*)
  jkim@bafirm.com
CHRIS L. SPRENGLE (*pro hac vice*)
  csprengle@bafirm.com
BRONWYN M. JAMES (*pro hac vice*)
  bjames@bafirm.com
**BERG & ANDROPHY**
120 West 45th Street, 38th Floor
New York, New York  10036
Telephone:  (646) 766-0073
Facsimile:   (646) 219-1977

[Additional Counsel Listed on Signature Page]

*Attorneys for Plaintiff City of Oakland*

# UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA, SAN FRANCISCO DIVISION

| | |
|---|---|
| CITY OF OAKLAND,<br><br>               Plaintiff,<br><br>        v.<br><br>THE OAKLAND RAIDERS, A CALIFORNIA LIMITED PARTNERSHIP; ARIZONA CARDINALS FOOTBALL CLUB LLC; ATLANTA FALCONS FOOTBALL CLUB, LLC; BALTIMORE RAVENS LIMITED PARTNERSHIP; BUFFALO BILLS, LLC; PANTHERS FOOTBALL, LLC; THE CHICAGO BEARS FOOTBALL CLUB, INC.; CINCINNATI BENGALS, INC.; CLEVELAND BROWNS FOOTBALL | CASE NO. 3:18-cv-07444-JCS<br><br>**PLAINTIFF CITY OF OAKLAND'S OPPOSITION TO DEFENDANTS' MOTION TO DISMISS**<br><br>Date:      June 7, 2019<br>Time:     9:30 a.m.<br>Place:    Courtroom G, 15th Floor<br><br>Assigned to the Honorable Joseph C. Spero |

1  COMPANY LLC; DALLAS COWBOYS
   FOOTBALL CLUB, LTD.; PDB SPORTS,
2  LTD.; THE DETROIT LIONS, INC.; GREEN
   BAY PACKERS, INC.; HOUSTON NFL
3  HOLDINGS, LP; INDIANAPOLIS COLTS,
   INC.; JACKSONVILLE JAGUARS, LLC;
4  KANSAS CITY CHIEFS FOOTBALL
   CLUB, INC.; CHARGERS FOOTBALL
5  COMPANY, LLC; THE RAMS FOOTBALL
   COMPANY, LLC; MIAMI DOLPHINS,
6  LTD.; MINNESOTA VIKINGS FOOTBALL,
   LLC; NEW ENGLAND PATRIOTS LLC;
7  NEW ORLEANS LOUISIANA SAINTS,
   LLC; NEW YORK FOOTBALL GIANTS,
8  INC.; NEW YORK JETS LLC;
   PHILADELPHIA EAGLES, LLC;
9  PITTSBURGH STEELERS LLC; FORTY
   NINERS FOOTBALL COMPANY LLC;
10 FOOTBALL NORTHWEST LLC;
   BUCCANEERS TEAM LLC; TENNESSEE
11 FOOTBALL, INC; PRO-FOOTBALL, INC.;
   and THE NATIONAL FOOTBALL
12 LEAGUE,

13                    Defendants.

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

# TABLE OF CONTENTS

**Page**

I.    INTRODUCTION ................................................................................................ 1

II.   SUMMARY OF ALLEGATIONS .................................................................... 2

III.  LEGAL ARGUMENT ........................................................................................ 4

    A.    STANDARD ON A MOTION TO DISMISS .......................................... 4

    B.    PLAINTIFF HAS SUFFICIENTLY ALLEGED CLAIMS UNDER THE ANTITRUST LAWS ................................................................................ 4

        1.    Plaintiff Has Adequately Pled Antitrust Injury ............................ 4

        2.    Plaintiff Has Adequately Alleged Antitrust Standing ................... 7

        3.    Plaintiff Has Adequately Alleged A Market Under The Sherman Act ....... 12

        4.    Plaintiff Has Adequately Alleged A Group Boycott And Refusal To Deal ........ 14

        5.    Plaintiff Has Adequately Pled A Price Fixing Scheme ............... 15

        6.    Plaintiff Has Adequately Pled Its Declaratory Judgment Claim ....... 16

    C.    PLAINTIFF HAS SUFFICIENTLY ALLEGED A CLAIM FOR BREACH OF CONTRACT ............................................................ 16

        1.    Plaintiff Has Sufficiently Alleged That The Relocation Policies Constitute A Valid, Binding Contract ........................ 17

        2.    Plaintiff Has Sufficiently Alleged That The City Of Oakland Was An Intended And Actual Third Party Beneficiary ..................... 20

            (a)    The Relocation Policies provided a benefit to Plaintiff ........ 21

            (b)    Providing a benefit to Host Cities was a "motivating purpose" ..................... 22

            (c)    Enforcement of the Relocation Policies by a Host City against the NFL and NFL Clubs is consistent with the objectives and reasonable ............... 23

        3.    Plaintiff Has Sufficiently Alleged That Defendants Breached The Contract And That Plaintiff Has Suffered And Will Suffer Damages As A Result of Defendants' Breach ........ 23

    D.    PLAINTIFF HAS SUFFICIENTLY PLED ITS QUANTUM MERUIT AND UNJUST ENRICHMENT CLAIMS ........................ 24

IV.   CONCLUSION .................................................................................................. 25

1

## <u>TABLE OF AUTHORITIES</u>

2

**Page(s)**

3

**Cases**

4

*Albert v. Postmates Inc.*,
   No. 18-cv-07592-JCS, 2019 WL 1045785 (N.D. Cal. Mar. 5, 2019) (Spero, J.) ......................4

*Am. Ad Mgmt., Inc. v. Gen. Tel. Co. of California*,
   190 F.3d 1051 (9th Cir. 1999)...........................................................................8

*Ashcroft v. Iqbal*,
   556 U.S. 662 (2009) ...........................................................................................4

*Barragan v. Nationstar Mortg. LLC*,
   No. 12-cv-01618, 2012 WL 12895717 (C.D. Cal. Nov. 7, 2012)...........................20

*Bell Atl. v. Twombly*,
   550 U.S. 544 (2007) ...........................................................................................4

*California Dental Ass'n. v. Am. Dental Ass'n.*,
   23 Cal. 3d 346 (1979)........................................................................................17

*Callan v. Merrill Lynch & Co.*,
   No. 09-cv-0566-BEN, 2010 WL 11508843 (S.D. Cal. Jan. 22, 2010) .....................16

*Carpa, Inc. v. Ward Foods, Inc.*,
   536 F.2d 39 (5th Cir. 1976).................................................................................9

*City of Oakland v. Wells Fargo Bank, N.A.*,
   No. 15-cv-04321-EMC, 2018 WL 3008538 (N.D. Cal. June 15, 2018) ...................11

*Coalition for ICANN Transparency, Inc. v. VeriSign, Inc.*,
   567 F.3d 1084 (9th Cir. 2009)..............................................................................5

*Dang v. San Francisco Forty Niners*,
   964 F. Supp. 2d 1097 (N.D. Cal. 2013) ...............................................................13

*Deerpoint Grp., Inc. v. Agrigenix, LLC*,
   345 F. Supp. 3d 1207 (E.D. Cal. 2018).................................................................20

*Dimidowich v. Bell & Howell*,
   803 F.2d 1473 (9th Cir. 1986)..............................................................................15

*FTC v. Lundbeck*,
   650 F.3d 1236 (8th Cir. 2011)..............................................................................14

*Glen Holly Entm't Inc. v. Tektronix Inc.*,
    352 F.3d 367 (9th Cir. 2003) ................................................................................................7

*Goonewardene v. ADP, LLC*,
    434 P.3d 124 (2019) ...............................................................................................21, 22, 23

*Hawaii v. Standard Oil Co.*,
    405 U.S. 251 (1972) ..............................................................................................................10

*Hemi Group, LLC v. City of New York, LLC*,
    559 U.S. 1 (2009) ............................................................................................................10, 11

*Hicks v. PGA Tour, Inc.*,
    897 F.3d 1109 (9th Cir. 2018) ............................................................................................13

*Huskinson & Brown v. Wolf*,
    32 Cal. 4th 453 (2004) .........................................................................................................24

*Innovation Marine Protein, LLC v. Pac Seafood Grp.*,
    No. 17-cv-00815-MC, 2018 WL 1461501 (D. Or. Mar. 23, 2018) ............................8

*Jerrold Elecs. Corp. v. Wescoast Broad. Co.*,
    341 F.2d 653 (9th Cir. 1965) ................................................................................................9

*Knevelbaard Dairies v. Kraft Foods, Inc.*,
    232 F.3d 979 (9th Cir. 2000) ..............................................................................................12

*Lexmark Int'l, Inc. v. Static Control Comps., Inc.*,
    572 U.S. 118 (2014) ..............................................................................................................11

*Lopez v. Smith*,
    203 F.3d 1122 (9th Cir. 2000) ..............................................................................................4

*Los Angeles Mem'l Coliseum Comm'n v. Nat'l Football League*,
    726 F.2d 1381 (9th Cir. 1984) ................................................................................. *passim*

*Los Angeles Mem'l Coliseum Comm'n v. Nat'l Football League*,
    791 F.2d 1356 (9th Cir. 1986) ................................................................................. *passim*

*McNeary-Calloway v. JP Morgan Chase Bank, N.A.*,
    863 F. Supp. 2d 928 (N.D. Cal. 2012) .............................................................................25

*N. Star Int'l v. Ariz. Corp. Comm'n*,
    720 F.2d 578 (9th Cir. 1983) ................................................................................................4

*Newcal Indus., Inc. v. Ikon Office Sol.*,
    513 F.3d 1038 (9th Cir. 2008) ............................................................................................13

*O'Bannon v. Nat'l Coll. Athletic Ass'n*,
    No. 09-cv-1967-CW, 2010 WL 445190 (N.D. Cal. Feb. 8, 2010) .........................6, 9

*Oakland Raiders v. Nat'l Football League*,
  131 Cal. App. 4th 621 (2005)..................................................................................17

*Oakland Raiders v. Oakland-Alameda Cty. Coliseum*,
  144 Cal. App. 4th 1175 (App. Ct. 2006) ..................................................................8

*Orr v. S. Pac. Co.*,
  226 F.2d 841 (9th Cir. 1955)....................................................................................9

*Otay Land Co., LLC v. U.E. Ltd., L.P.*
  15 Cal. App. 5th 806 (2017)....................................................................................20

*R.C. Dick Geotermal Corp. v. Thermogenics*,
  890 F.2d 139 (9th Cir. 1989)....................................................................................8

*Rick-Mik Enters., Inc. v. Equilon Enters., LLC*,
  532 F.3d 963 (9th Cir. 2008)..................................................................................15

*Schachar v. Amer. Acad. Of Ophthalmology, Inc.*,
  870 F.2d 397 (7th Cir. 1989)....................................................................................6

*Serv. Emps. Int'l Union, Local 99 v. Options--A Child Care & Human Servs. Agency*,
  200 Cal. App. 4th 869 (2011)..................................................................................20

*Sidik v. Royal Sovereign Int'l Inc.*,
  348 F. Supp. 2d 206 (E.D.N.Y. 2018)....................................................................16

*Solyndra Residual Tr v. Suntech Power Holdings Co., Ltd.*,
  62 F. Supp. 3d 1027 (N.D. Cal. 2014) ....................................................................12

*St. Louis Reg'l Convention and Sports Complex Auth. v. Nat'l Football League*,
  No. 1722-CC00976, 2017 WL 6885089 (Mo. Cir. Dec. 27, 2017) ...............16, 17, 25

*Starr v. Baca*,
  652 F.3d 1202 (9th Cir. 2011)..................................................................................4

*Sterling v. NBA*,
  No. 14-cv-4192-FMO, 2016 WL 1204471 (C.D. Cal. Mar. 22, 2016)........................7

*StubHub, Inc. v. Golden State Warriors, LLC*,
  No. 15-cv-1436-MMC, 2015 WL 6755594 (N.D. Cal. Nov. 5, 2015) ......................14

*Tanaka v. Univ. of S. Cal.*,
  252 F.3d 1059 (9th Cir. 2001)..................................................................................14

*Theme Promotions, Inc. v. News Am. Mktg. FSI*,
  546 F.3d 991 (9th Cir. 2008)....................................................................................9

*U.S. v. Apple*,
    791 F.3d 290 (2d Cir. 2015) ...............................................................................15

*United States v. Socony-Vacuum Oil Co.*,
    310 U.S. 150 (1940) ....................................................................................15, 16

*Universal Grading Serv. v. eBay, Inc.*,
    No. 09-cv-2755-RMW, 2011 WL 846060 (N.D. Cal. Mar. 8, 2011) ......................................15

*In re Vizio, Inc.*,
    238 F. Supp. 3d 1204 (C.D. Cal. 2017) ....................................................................24

*Young v. Cree*,
    2018 WL 1710181 (N.D. Cal. Apr. 9, 2018) ...........................................................24

**Rules**

Fed. R. Civ. P. 8(a) ...................................................................................................4

**Statutes**

Cal. Civ. Code § 1559 ...................................................................................16, 18, 19

**Other Authorities**

ABA Model Jury Instructions In Civil Antitrust Cases (2016 ed.), Ch. 6, B.1 ...............................10

H. Hovenhamp, Federal Antitrust Policy:  The Law of Competition and its
    Practices (West 1994) ......................................................................................9

Restatement (Second) of Contracts, § 302 (1981) ...................................................................20

PLAINTIFF CITY OF OAKLAND'S OPPOSITION TO DEFENDANTS' MOTION TO DISMISS

I.        **INTRODUCTION**

Defendants' Motion to Dismiss (Dkt. 41) must fail as it is based almost entirely on factual analysis and issues to be decided by a trier of fact, rather than the sufficiency of the allegations contained in Plaintiff's Complaint (Dkt. 1).  Plaintiff has alleged a conspiracy among Defendants to boycott the City of Oakland and approve the Raiders' move to Las Vegas in complete contravention and breach of the Relocation Policies.  When taken as true, as is required at the pleading stage, Plaintiff's detailed allegations sufficiently set forth each of its claims.

As fully set forth in Plaintiff's well-pled Complaint, Defendants failed to make even the most basic effort to comply with their own Constitution and Bylaws (Compl., Ex. 1) and Relocation Policies (Compl., Ex. 2) in voting to relocate the Raiders.  In fact, Defendants admit this failure in their opening statement:  "The Raiders *want* to move to Las Vegas.  Las Vegas *wants* to host the Raiders."  (Def. Mem. at 2 (emphasis added)).  This is exactly what the Relocation Policies seek to prevent – a Host City (such as Plaintiff) being shut out of the Host Cities market simply because billionaire NFL Club owners decide they want a change of scenery.  Defendants cite the exact language of the Relocation Policies that forms the basis of this lawsuit in their own brief:  "*Because League policy favors stable team-community relations*, clubs are obligated to work diligently and in good faith to obtain and to maintain suitable stadium facilities in their home territories, *and to operate in a manner that maximizes fan support in their current home community*."  (Def. Mem. at 20 (emphasis original)).  Among other things, Plaintiff's allegations establish antitrust injury and Plaintiff's status as an intended third party beneficiary of a valid, enforceable contract.

First, Plaintiff adequately alleges both the existence of and harm flowing from Defendants' collusion.  Defendants' Motion attempts to shift the focus from the alleged anticompetitive conduct to arguments that mischaracterize the law and facts, or are premature at the pleading stage.  Defendants' arguments regarding Plaintiff's antitrust claims all fall short.  Defendants argue:

- *There is no antitrust injury because competition increased rather than decreased*, but in reality, competition was artificially constrained by the 32-team cap;
- *Oakland's injuries are indirect*; however, Oakland is an owner of the Coliseum and the damages it suffered and will suffer as an owner and Host City are direct and tangible;
- *The alleged relevant market is nonsensical*, but in actuality, it is well-defined, and recognized by the Ninth Circuit Court of Appeals; and

PLAINTIFF CITY OF OAKLAND'S OPPOSITION TO DEFENDANTS' MOTION TO DISMISS

- *There has been no group boycott nor price fixing and thus no per se violation*, which, as alleged, there was.

Second, Plaintiff has adequately alleged a claim for breach of contract and sufficiently established its status as a contemplated and actual third party beneficiary.  Defendants' assertion that no contract exists is baseless.  Defendants argue:

- *The Relocation Policies are not a contract but rather guidelines by which the NFL can exercise their discretion and business judgment*, but this is simply false as the terms are enforceable and consequences result from non-compliance;
- *Oakland is not an intended beneficiary of the Policies*, however, the Policies are expressly for the benefit of Host Cities, which include Plaintiff; and
- *There is no breach*, although there clearly was, as Defendants did not negotiate in good faith as required and the considerations required by the Policies indicated that the relocation of the Raiders should not have been approved.

Of course, the application of the terms of the contract, the circumstances of the breach, and the damages suffered are all questions of fact for the trier of fact to consider.

Finally, Plaintiff's claims for quantum meruit and unjust enrichment are each pled with sufficiency and survive independently and in conjunction with the other claims.

This lawsuit is not the first of its kind – many of the claims alleged have been litigated in the past as a result of the Raiders' prior departures from Oakland, as well as currently in Missouri state court as a result of the Rams' move to Los Angeles.  Nonetheless, Defendants have continued their unlawful, cartel-like control of the market for hosting NFL Clubs, extracting supra-competitive pricing and cartel payments to each other totaling billions of dollars.  For the reasons set forth herein, Defendants' Motion to Dismiss should be denied.

## II.    <u>SUMMARY OF ALLEGATIONS</u>

Oakland, as an owner of the Coliseum and the boycotted Host City of the Raiders, commenced this action by filing the Complaint on December 11, 2018.  (Dkt. 1).  The Complaint sets forth detailed allegations demonstrating a collusive scheme by Defendants to boycott Oakland from hosting an NFL team.  This boycott arose out of Defendants' collective decision (in the form of an owners' vote) to relocate the Raiders from Oakland to Las Vegas, in violation of Defendants' own Relocation Policies as well as federal antitrust laws.  (Compl. ¶¶ 1-16, 23-87).

Specifically, in March 2017, the NFL approved the Raiders' move from Oakland to Las

PLAINTIFF CITY OF OAKLAND'S OPPOSITION TO DEFENDANTS' MOTION TO DISMISS

1   Vegas, despite Oakland's significant efforts to keep its team.  (Compl. ¶¶ 58-79).  In 1985, the NFL

2   adopted the Relocation Policies in response to an antitrust ruling against it by the Ninth Circuit.  The

3   Relocation Policies were intended to prevent future anticompetitive decisions and are binding on

4   Defendants as an addendum to the NFL Constitution.  (Compl. ¶¶ 30-35).  Thus, the Relocation

5   Policies applied to and should have controlled Defendants' decision-making concerning the Raiders'

6   proposed relocation.  Those Policies make it clear that "each [NFL] club's primary obligation . . . is

7   to advance the interest of the League *in its home territory*."  (Compl. ¶ 33 (emphasis added)).

8          Given that the "Raider Nation" was one of the most loyal, passionate, and long-established

9   fan bases in the NFL; that Oakland proffered multiple viable stadium plans; and Defendants'

10   admission in its Motion papers that the Raiders' move was simply for enhanced revenues, it is clear

11   that Defendants, at best, ignored their own Relocation Policies or, at worst, violated them willingly.

12   (Compl. ¶¶ 58-87).  Indeed, Defendants planned to relocate the Raiders to Las Vegas long before

13   they began disingenuous negotiations with Oakland to build a new stadium.  (Compl. ¶¶ 58-68).

14          Oakland went through extraordinary efforts to keep the Raiders from relocating, including

15   offering multiple viable plans to renovate the existing Oakland-Alameda County Coliseum.

16   (Compl. ¶¶ 58-79).  Defendants did not seriously consider these offers, rejecting the last the same

17   day it was made, because, among other things, the offers would not earn Defendants the exorbitant,

18   arbitrary $378 million Relocation Fee they were able to collect from the Raiders' move.  (*Id.*).  In a

19   competitive market, Oakland could reject Defendants' supra-competitive prices and seek a new

20   team willing to play in the existing, upgraded or proposed new stadium, but the market for Host

21   Cities for NFL teams is not competitive:  it is intentionally constrained to 32 teams and its

22   incentives are skewed by the Relocation Fee.  (Compl. ¶¶ 1-16, 23-87).  The primacy of the

23   Relocation Fee is demonstrated by the fact that the fee for the Raiders' relocation was determined

24   *before the actual relocation vote took place*.  (Compl. ¶¶ 69, 73-76).

25          The Relocation Policies are a valid, binding contract enforced by the NFL against the 32

26   NFL Clubs for the express benefit of Host Cities, such as Oakland.  (Compl. ¶¶ 140, 142).  Oakland,

27   as an intended beneficiary, reasonably relied on the Policies in making significant investments in the

28   Raiders, such as maintaining and upgrading the Coliseum.  (Compl. ¶ 144).  As a direct result of

1   Defendants' breach, Plaintiff has suffered and will suffer significant damages.  (Compl. ¶ 146).

2   **III.     LEGAL ARGUMENT**

3         **A.     STANDARD ON A MOTION TO DISMISS**

4         "The purpose of a motion to dismiss under Rule 12(b)(6) is to test the legal sufficiency of the

5   complaint." *N. Star Int'l v. Ariz. Corp. Comm'n*, 720 F.2d 578, 581 (9th Cir. 1983).  "Generally, a

6   plaintiff's burden at the pleading stage is relatively light."  *Albert v. Postmates Inc.*, No. 18-cv-

7   07592-JCS, 2019 WL 1045785, at \*3 (N.D. Cal. Mar. 5, 2019) (Spero, J.).   To survive such a

8   motion, a plaintiff need only allege "enough facts to state a claim to relief that is plausible on its

9   face." *Bell Atl. v. Twombly*, 550 U.S. 544, 570 (2007); *see also* Fed. R. Civ. P. 8(a).   Under this

10  "facial plausibility" standard, a plaintiff must allege facts that add up to "more than a sheer

11  possibility that a defendant has acted unlawfully."  *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).

12  When deciding whether a plaintiff has stated a claim upon which relief can be granted, the court

13  must assume that the plaintiff's allegations are true and must draw all reasonable inferences in the

14  plaintiff's favor.  *See Starr v. Baca*, 652 F.3d 1202, 1216 (9th Cir. 2011); *see also Albert*, 2019 WL

15  1045785, at \*3 (In ruling on a motion to dismiss under Rule 12(b)(6), the court analyzes the

16  complaint and takes "all allegations of material fact as true and construe[s] them in the light most

17  favorable to the non-moving party.") (citing *Parks Sch. of Bus. v. Symington*, 51 F.3d 1480, 1484

18  (9th Cir. 1995)).[1]

19        **B.     PLAINTIFF HAS SUFFICIENTLY ALLEGED CLAIMS UNDER THE
20               ANTITRUST LAWS**

21             1.     Plaintiff Has Adequately Pled Antitrust Injury

22        Defendants' first argument is that Oakland has not alleged an "antitrust injury," and they cite

23  *Los Angeles Mem'l Coliseum Comm'n v. Nat'l Football League* ("*Raiders II*"), 791 F.2d 1356, 1364

24  (9th Cir. 1986), for the proposition that such injury requires "a showing that the injury was caused

25  _____

26  [1] In instances where a court dismisses the Complaint, the Ninth Circuit has "repeatedly held that a
    district court should grant leave to amend even if no request to amend the pleading was made,
27  unless it determines that the pleading could not possibly be cured by the allegation of other facts."
    *Lopez v. Smith*, 203 F.3d 1122, 1130 (9th Cir. 2000) (citations and quotation marks omitted).
28

1  by a reduction, rather than increase, in competition flowing from the defendant's acts."  Defendants

2  then characterize the events described in the Complaint as a friendly bidding contest for the Raiders

3  that had no impact on competition:  since 32 NFL Clubs existed prior to the Raiders' decision to

4  relocate, and 32 NFL Clubs existed after, the relocation had no anticompetitive effect.   As

5  Defendants put it:  "The Raiders want to move to Las Vegas.  Las Vegas wants to host the Raiders."

6  (Def. Mem. at 2).

7       Of course, the number of NFL Clubs was the same before and after Defendants' anti-

8  competitive relocation decision at issue in *Raiders II*, and the Ninth Circuit still affirmed a finding

9  that Defendants had violated the antitrust laws in two markets:  one for professional football teams

10  and another for stadium hosts of those teams.  *See Los Angeles Mem'l Coliseum Comm'n v. Nat'l*

11  *Football League* ("*Raiders I*"), 726 F.2d 1381, 1393-1394 (9th Cir. 1984).  Here, Oakland alleges

12  that Defendants have once again inflicted an anticompetitive injury on this second market, and the

13  fact that the number of teams stayed the same is not, as Defendants state, evidence that there was no

14  anticompetitive effect, but in fact, evidence of the opposite:  no matter the demand, the number of

15  teams cannot change, because *Defendants' product market is intentionally constrained to 32 teams*,

16  so Defendants can extract excess profits from Host Cities.  (Compl. ¶¶ 8, 23-29, 80-87).

17       Indeed, although 32 NFL Clubs existed before and after the Raiders' decision to relocate, *the*

18  *relocation process demonstrates that in a competitive market, there would now be 33 clubs*, with

19  one in Oakland and one in Las Vegas (and probably 35 clubs, with clubs also in St. Louis and San

20  Diego).  All these cities wanted and could support NFL clubs.  The fact that some must go without

21  is due not to market forces but rather artificial constraint.  The NFL's constraint on the number of

22  NFL clubs is the very reason its boycotts of Host Cities – Los Angeles in *Raiders II*, Oakland here,

23  and San Diego and St. Louis in recent years – inflicts such devastating injuries on those cities.

24  (Compl. ¶¶ 80-87).  Defendants cannot deny that they intentionally constrain the market to 32

25  Clubs; that number is required by their own Constitution.  (Compl. Ex. 1, Article III 3.1(A)).  This

26  concerted effort to exclude willing market participants, thereby decreasing competition, is a

27  hallmark of anticompetitive behavior.  *See Coalition for ICANN Transparency, Inc. v. VeriSign,*

28  *Inc.*, 567 F.3d 1084, 1090 (9th Cir. 2009) ("We have expressly held . . . that concerted action

between co-conspirators to eliminate competitive bidding for a contract is an actionable harm to competition"); *O'Bannon v. Nat'l Coll. Athletic Ass'n*, No. 09-cv-1967-CW, 2010 WL 445190, at *5 (N.D. Cal. Feb. 8, 2010) ("O'Bannon has also sufficiently plead [sic] significant anticompetitive effects.  O'Bannon pleads that he and putative class members are excluded from the market by Defendants' actions").

As Judge Easterbrook of the Seventh Circuit Court of Appeals observed in an antitrust case involving a trade association:

> Antitrust law is about consumers' welfare and the efficient organization of production. It condemns reductions in output that drive up prices as consumers bid for the remaining supply. . . .  In a market with thousands of providers – that is, in the market for ophthalmological services – what any one producer does cannot curtail output; someone else will step in. . . .  Other trade association cases . . . involved enforcement devices.  Perhaps members boycotted those who fell out of step [], or perhaps the producers agreed "not to manufacture, distribute, or purchase certain types of products[.]"  These enforcement mechanisms are the "restraints" of trade.  Without them there is only uncoordinated individual action, the essence of competition.

*Schachar v. Amer. Acad. Of Ophthalmology, Inc.*, 870 F.2d 397, 399 (7th Cir. 1989) (internal citations omitted).  Defendants did not simply pick Las Vegas over Oakland with respect to the Raiders; they "coordinated" and imposed an "enforcement mechanism" on Oakland, as a Host City. (Compl. ¶ 100).  Specifically, teams are constrained to an artificially low number of 32, and if a Host City is unwilling to pay Defendants' supra-competitive prices – *i.e.*, if the Host City "falls out of step" – it is boycotted from hosting any of this limited supply of teams.  (Compl. ¶¶ 16, 69-87). Defendants' bad faith in imposing this enforcement mechanism is amply demonstrated by their blatant disregard for their own Relocation Policies, which were adopted to prevent anticompetitive behavior.[2]  (Compl. ¶¶ 78-79).  Further, the Relocation Fee – an enormous incentive for the NFL Clubs to violate their own policies – makes a mockery of any claim that Oakland and Las Vegas

---

[2] The Relocation Policies are meant to prevent a boycott situation by ensuring that only if a Host City is not being sufficiently supportive of an NFL Club – and thus can reasonably be characterized as no longer a willing participant in the Host City marketplace – may a relocation be approved. Here, as in St. Louis and San Diego, those Policies were ignored.

PLAINTIFF CITY OF OAKLAND'S OPPOSITION TO DEFENDANTS' MOTION TO DISMISS

1    were engaged in a truly competitive process.[3]

2       The Ninth Circuit Court of Appeals has defined five elements of "antitrust injury":  "(1)

3    unlawful conduct, (2) causing an injury to the plaintiff, (3) that flows from that which makes the

4    conduct unlawful, . . . (4) that is of the type the antitrust laws were intended to prevent," and (5) that

5    "the injured party be a participant in the same market as the alleged malefactors" (quotations and

6    citations omitted)."  *Glen Holly Entm't Inc. v. Tektronix Inc.*, 352 F.3d 367, 372 (9th Cir. 2003).  As

7    to the last of these elements, "the party alleging the injury must be either a consumer of the alleged

8    violator's goods or services or a competitor of the alleged violator in the restrained market."  *Id.*

9    Here, Plaintiff has alleged in detail how Defendants used their cartel-like control of professional

10   football teams to constrain the supply of those teams, force participants in the market of cities for

11   those teams to pay supra-competitive prices for stadia, and boycott those cities which fail to do so.

12   (Compl. ¶¶ 8, 23-29, 80-87).

13       As the Ninth Circuit held in analyzing the NFL:

14       Collective [NFL] action in areas such as League divisions, scheduling and rules must
         be allowed, as should other activity that aids in producing the most marketable
15       product attainable.  Nevertheless, legitimate collective action should not be construed
         to allow the owners to extract excess profits.  In such a situation the owners would be
16       acting as a classic cartel.  Agreements among competitors, *i.e.*, cartels, to fix prices or
         divide market territories are presumed illegal under § 1 because they give
17       competitors the ability to charge unreasonable and arbitrary prices instead of setting
18       prices by virtue of free market forces.

19   *Raiders I*, 726 F.2d at 1392.  Oakland alleges Defendants – ignoring their own Relocation Policies

20   and constraining the market for NFL Clubs – boycotted Oakland as a Host City and, in doing so,

21   acted as a "classic cartel" to "extract excess profits."  (Compl. ¶¶ 1-17, 23-29, 69-87, 98-129).

22              2.    Plaintiff Has Adequately Alleged Antitrust Standing

23       Defendants next make a variety of arguments decrying Oakland's supposed lack of "antitrust

24

25   [3] Defendants cite *Sterling v. NBA*, No. 14-cv-4192-FMO, 2016 WL 1204471 (C.D. Cal. Mar. 22,
     2016), although that case is inapposite.  In *Sterling*, the former owner of the Clippers sued for being
26   permanently barred by the NBA from team ownership.  The market at issue was NBA teams, not
     Host Cities, and the court found that the plaintiff had failed to show that the NBA's decision to bar
27   him had any anti-competitive effect on the market for NBA teams.  *Id.* at *2-3, 5-6.  Here, the Host
     City market is at issue and, as alleged in the Complaint, the rules at issue, the Relocation Policies,
28   supported keeping Oakland as a Host City (and, therefore, denying the Raiders' relocation bid).

standing."   These are based on Defendants' erroneous assumption that the Oakland-Alameda County Coliseum Authority ("Authority"), rather than the City of Oakland, is the owner of the Oakland Alameda County Coliseum (the "Coliseum").   The Authority does not own the Coliseum. The Coliseum is jointly owned by the City of Oakland and Alameda County and is leased to the Oakland-Alameda County Coliseum Financing Corporation, which, in turn, has assigned its rights under that lease to the Authority.   In fact, the Authority exists only to finance improvements to the Oakland Alameda County Coliseum Complex, and to manage the Coliseum Complex on behalf of the City and the County.   Oakland is a very real owner of the Coliseum, and thus has standing to sue.[4]   (Compl. ¶ 96 ("...Plaintiff now owns a stadium that has been boycotted by the NFL...").

Nonetheless, relying again on *Raiders II*, Defendants contend that Oakland has not pleaded facts demonstrating that it has standing under the *Associated General* considerations cited in that decision.   (Def. Mem. at 9)   Those considerations[5] include:   "(1) the motive of the Defendant – whether it specifically intended to cause plaintiff's harm; (2) the nature of plaintiff's injury – whether it was of a type the antitrust laws were designed to prevent; (3) the directness of the causal connection between the violation and the injury; (4) the extent to which abstract speculation underlies the allegations of injury and of their causation by Defendant's antitrust violations; and (5) the risk of duplicate recoveries or complex apportionment of damages if plaintiffs such as this are permitted to recover."   *Raiders II*, 791 F.2d at 1363 (citing *Associated Gen. Contractors of California, Inc. v. California State Council of Carpenters*, 459 U.S. 519, 537-45 (1983)).

---

[4] Neither of Defendants' citations – to the decision in *Oakland Raiders v. Oakland-Alameda Cty. Coliseum*, 144 Cal. App. 4th 1175, 1179-1180 (App. Ct. 2006) or to a 1996 Authority resolution – support their assumption that the Authority owns the Coliseum.  In fact, in a footnote, Defendants seem to concede that Oakland owns the Coliseum, but argue that it lacks standing because it is a "landlord." (Def. Mem. at 11, fn.7).  Defendants' cases, however, involve no general prohibition of "landlord" actions, but rather support a fulsome analysis of a plaintiff's claimed antitrust injuries (*R.C. Dick Geotermal Corp. v. Thermogenics*, 890 F.2d 139, 146-48 (9th Cir. 1989); *Innovation Marine Protein, LLC v. Pac Seafood Grp.*, No. 17-cv-00815-MC, 2018 WL 1461501, at *5-8 (D. Or. Mar. 23, 2018)), and a determination that plaintiffs were not participants in the relevant markets. A fulsome analysis here shows that Plaintiff is an owner and participates in the relevant market.

[5] "To conclude that there is antitrust standing, a court need not find in favor of the plaintiff on each factor. . . .   Generally [n]o single factor is decisive. . . .   Nevertheless, we give great weight to the nature of the plaintiff's alleged injury."  *Am. Ad Mgmt., Inc. v. Gen. Tel. Co. of California*, 190 F.3d 1051, 1055 (9th Cir. 1999).

1

The Complaint specifically alleges that:

2

- Defendants intentionally acted to harm Oakland through, among other anticompetitive conduct, a group boycott (*see* Compl. ¶ 102: "Defendants' group boycott constitutes an unreasonable restraint of trade . . . . the clear objective of Defendants' misconduct is to freeze the number of competitive professional football teams and to increase Defendants' profits, voting in favor of relocations in direct opposition to the Relocation Policy in order to collect exorbitant relocation fees, and monopolistic rents paid by wealthier Host Cities");

3

4

5

- Oakland's injuries, those resulting directly from this boycott, are exactly what the antitrust laws are meant to prevent (*see* Compl. ¶¶ 95-96: "Such collusive conduct has been enormously injurious to Plaintiff and its citizens.  Among other damages, Plaintiff has invested and borrowed significant sums of money, totaling over $240 million, in reliance on the Relocation Policies and the presence of the Raiders in Oakland and at the Coliseum. Further, Plaintiff will soon lose the significant tax and other income that it derives from the presence of the Raiders and the economic activity their presence generates.  In addition, Plaintiff now owns a stadium that has been boycotted by the NFL and, thus, has incurred the significant diminution in property value caused by that boycott"); and, accordingly,

6

7

8

9

10

- A direct causal connection exists (*see id.*);

11

- There is no abstract speculation (*see id.*); and

12

- There is no risk of duplicate recoveries (as the City of Oakland, as a market participant in this case, is the victim of this antitrust injury).  (Compl. ¶¶ 1-16, 69-87, 98-137).  Further, any argument that a recovery by Plaintiff would be duplicative of the potential recovery by the County of Alameda and/or the Authority is unfounded, as those entities have not sued, the damages suffered by each are distinct, and Plaintiff is only seeking damages associated with its specific interests.

13

14

15   *O'Bannon*, 2010 WL 445190, at *7 ("Defendants' actions have allegedly prevented O'Bannon and

16   other student athletes from participating in the collegiate licensing market.  In doing so, Defendants

17   have decreased competition in the market.  Antitrust law is intended to prevent such harm.").

18         Defendants also argue (ostensibly as a standing issue) that Oakland's alleged damages are

19   too "indirect" to withstand a Rule 12(b)(6) motion.  This is in reality a proximate cause issue, which

20   is for the trier of fact.  *See, e.g.*, *Orr v. S. Pac. Co.*, 226 F.2d 841, 843 (9th Cir. 1955) ("[A] finding

21   of proximate cause is one peculiarly within the province of the jury or other trier of fact"); *see also*

22   *Theme Promotions, Inc. v. News Am. Mktg. FSI*, 546 F.3d 991, 1001 (9th Cir. 2008) ("[A]ntitrust

23   injury and proximate cause are closely related concepts").

24         Further, Defendants' arguments are baseless.  Oakland has alleged that the unlawful

25   relocation of the Raiders has left it with significant sums that were "invested and borrowed" in

26   reliance on the Raiders' presence; these sunk investment costs are recoverable damages in actions

27   for group boycotts.  *See Carpa, Inc. v. Ward Foods, Inc.*, 536 F.2d 39, 51 (5th Cir. 1976); *Jerrold*

28   *Elecs. Corp. v. Wescoast Broad. Co.*, 341 F.2d 653, 665 (9th Cir. 1965); H. Hovenhamp, Federal

Antitrust Policy:  The Law of Competition and its Practices, at § 17.6, p. 626 (West 1994); ABA Model Jury Instructions In Civil Antitrust Cases (2016 ed.), Ch. 6, B.1 (Antitrust law "provides that [a] plaintiff should be fairly compensated for all damages to its business or property that were a direct result or likely consequence of the conduct" that a jury has "found to be unlawful").  Oakland has also alleged losses from the depreciated value of the boycotted Coliseum, and lost revenues. (Compl. ¶¶ 15, 95-97).  Both of these were categories of damages in *Raiders II*, where the Ninth Circuit upheld the entirety of the jury's damage award.  791 F.2d at 1365-1366; *see also* Second Amended and Supplemental Complaint for Injunctive Relief and Damages under the Anti-Trust Laws, *Raiders II*, No. 78-cv-3523 (C.D. Cal. May 20, 1980), ¶¶ 25-28.

Although Defendants contend that Oakland cannot commence this action as a "sovereign," their only authority, *Hawaii v. Standard Oil Co.*, 405 U.S. 251 (1972), is of no support.  *Hawaii* involved an action by the State of Hawaii *parens patriae* on behalf of all of its citizens for injuries to its "general economy;" in response, the U.S. Supreme Court ruled that the antitrust laws – which protect "commercial interests" – did not extend to such actions.  Here, Oakland is not suing on behalf of its citizens for damages to its general economy on the basis of its "sovereign activity," but rather on its own behalf, for losses incurred from Oakland's very real interest in the Coliseum and as a boycotted Host City.  These specific losses include tax revenues and other income derived from economic activity generated by the presence of the Raiders, as well as Oakland's lost investments in the team and monies expended in efforts to keep the Raiders.  Indeed, Defendants are decidedly disingenuous in contending that Oakland somehow had no interest in the commercial transactions involving the Raiders when, in fact, Oakland was the principal party negotiating with the Raiders and NFL in what ultimately was a futile effort to keep the Raiders in Oakland.  (Compl. ¶¶ 58-79).

Defendants also rely on *Hawaii* in contending that lost tax revenues are not recoverable by a "sovereignty," although *Hawaii* says nothing of the sort, a fact that U.S. Supreme Court Justice Ginsburg recognized.[6]  As Defendants well know, Host Cities rely heavily on anticipated tax

---

[6] In *Hemi Group, LLC v. City of New York, LLC*, 559 U.S. 1 (2009), Justice Ginsburg discussed the petitioner's citation to *Hawaii* and dismissed any relationship between it and tax revenues: "[*Hawaii v. Standard Oil*] involved not a loss of tax revenues, but 'injury to the general economy of (footnote continued)

revenues in making decisions to invest in professional sports clubs.  What then limits a city's ability to seek recovery for those tax losses when it is the subject of an unlawful boycott?  The answer is nothing, except the basic principles governing proximate cause.  *See, e.g., Lexmark Int'l, Inc. v. Static Control Comps., Inc.*, 572 U.S. 118, 132 (2014) (stating "we generally presume that a statutory cause of action is limited to plaintiffs whose injuries are proximately caused by violations of the statute" and citing the Clayton Act as an example); *City of Oakland v. Wells Fargo Bank, N.A.*, No. 15-cv-04321-EMC, 2018 WL 3008538, at *10 (N.D. Cal. June 15, 2018) (denying motion to dismiss Oakland's FHA claims seeking to recover lost "tax revenues").

In *Raiders II*, the Ninth Circuit squarely addressed the issue Defendants raise here – the injury to a Host City from Defendants' anticompetitive conduct – and found a direct link between anticompetitive relocation decisions and the deprived host injured by that decision:

> [In *Raiders I*], we found sufficient evidentiary support for the jury's finding that the NFL's territorial restraints in this case not only impaired competition between NFL football team franchises, but also restrained competition in the "stadia market" between rival stadia (such as the Oakland Coliseum and the L.A. Coliseum) that seek to secure NFL tenants.
>
> Clearly, the [L.A.] Coliseum suffered direct harm as the result of the NFL's antitrust restraints in that latter market. . . .  The [L.A.] Coliseum was a competitor in a market in which competition was restrained directly and foreseeably, if not also intentionally.  This stadium, which previously had sought to acquire the Minnesota Vikings team as a tenant, was engaged in a bidding struggle with its Oakland counterpart for the tenancy of the Raiders, and was injured when the NFL's application of its territorial restrictions foreclosed further undistorted negotiations.

791 F.2d at 1365.  The same reasoning applies here.

Defendants also argue that Oakland has no standing because it somehow is not in the same market as Defendants, as Oakland "does not own a professional football club."  (Def. Mem. at 12).  This argument is nonsensical.  Oakland, as a Host City, is in the market for hosting NFL Clubs; Oakland is the willing buyer/consumer in this market, and Defendants are the unwilling sellers/producers in this same market.  In both *Raiders I* and *Raiders II*, the Ninth Circuit recognized a market of rival "stadia" for NFL Clubs; since a new stadium was contemplated for the Raiders by

---

a State' – insofar as it was threatened by violations of antitrust law . . . .  Hawaii's interest, both more general and derivative of harm to individual businesses, differs significantly from the particular tax loss . . . directly at issue here."  559 U.S. at 31.

1    Oakland and Las Vegas, the Complaint merely tweaks this market to define it around "Host Cities"

2    with proposed stadia, instead of existing stadia.

3        Lastly, Defendants simply ignore the standards which apply to their Motion when they argue

4    that Oakland has not sufficiently pled that it took "substantial demonstrable steps" to acquire (here,

5    keep) an NFL team.  (Def. Mem. at 12).  The Complaint contains numerous allegations about the

6    lengths to which Oakland went to keep the Raiders in Oakland.  (Compl. ¶¶ 58-79).

7              3.    Plaintiff Has Adequately Alleged A Market Under The Sherman Act

8        Regarding the relevant market, Defendants confusingly and inaptly claim that Oakland is not

9    a "buyer or seller," NFL Clubs are not a "product" to Host Cities and stadia, Oakland does not own

10   a NFL Club, and Oakland (as a Host City) is not "bought and sold."  (Def. Mem. at 11-13).[7]

11       As noted above, Defendants essentially concede the existence of the relevant market when

12   referring to what they claim was a heated competition between Las Vegas and Oakland for the

13   Raiders—the very market Oakland has pleaded in the Complaint.  (Def. Mem. at 2, 5-6).  Of course,

14   there must be a market for Host Cities, as alleged.  Otherwise, there would be no need or reason for

15   a NFL Club to pay a Relocation Fee – it is either an indication of the value of moving (which is

16   related to the value of the Host City in the relevant market), or it is arbitrary.

17       Moreover, the NFL has previously agreed that there is a market for cities hosting stadium

18   activities.  In *Raiders I*, the NFL recognized such a market, arguing only that the market should not

19   be limited to just professional football:

20       The L.A. Coliseum claims the relevant market is stadia offering their facilities to NFL
         teams (the product market) in the United States (the geographic market).  The NFL
21       agrees with this geographic market, but argues the product market involves cities
         competing for all forms of stadium entertainment, including NFL football teams.

22   _____

23   [7] All of this misdirection is beside the point as Plaintiff has alleged *per se* violations that do not
     require a defined market.  However, if the Court finds that rule of reason does apply here, Plaintiff
24   has adequately pled relevant market.  "[U]nder the rule of reason . . . the factfinder weighs all of the
     circumstances of a case in deciding whether a restrictive practice should be prohibited as imposing
25   an unreasonable restraint on competition . . .  [P]laintiffs can [also] allege that a restraint is
     illegal *per se* because it is so plainly anticompetitive that no elaborate study of the industry is
26   needed to establish their illegality."  *Solyndra Residual Tr. v. Suntech Power Holdings Co., Ltd.*, 62
     F. Supp. 3d 1027, 1039 (N.D. Cal. 2014).  "When a *per se* violation such as horizontal price fixing
27   has occurred, there is no need to define a relevant market or to show that the defendants had power
     within the market."  *Knevelbaard Dairies v. Kraft Foods, Inc.*, 232 F.3d 979, 986 (9th Cir. 2000).

28

1    726 F.2d at 1393.

2         Of course, the NFL lost its "all forms of stadium entertainment" argument before the jury

3    (*id.* at 1394), and *Raiders I* makes clear that the issue of whether professional football is, in and of

4    itself, a stadia product market or sub-market is a jury question.  *See id.* ("That NFL football has

5    limited substitutes from a consumer standpoint is seen from evidence that the Oakland Coliseum

6    sold out for 10 consecutive years despite having some of the highest ticket prices in the League");

7    *see also Raiders II*, 791 F.2d at 1363 ("[In *Raiders I*], we found sufficient evidentiary support for

8    the jury's finding that the NFL's territorial restraints . . . restrained competition in the 'stadia

9    market' between rival stadia (such as the Oakland Coliseum and the L.A. Coliseum) that seek to

10   secure NFL tenants").  In fact, by describing the Raiders' move as nothing more than a friendly

11   competition between Oakland and Las Vegas (Def. Mem. at 2), Defendants have not only conceded

12   the existence of a Host City market but also recognized that it could be a truly competitive

13   marketplace absent their collusion.

14        Nonetheless, Defendants complain that Oakland's definition of the relevant market fails to

15   incorporate "reasonably interchangeab[le]" products or services.  (Def. Mem. at 13-14).  There is a

16   reason for that:  Oakland – like the plaintiffs in *Raiders I* and *Raiders II* – asserts that there are no

17   reasonable "substitutes" or "interchangeable" products when it comes to NFL football.  However,

18   contrary to Defendants' assertion, whether a product is a substitute for, or reasonably

19   interchangeable with, another product is determined by consumer choice, a very real factual issue.[8]

20   *See Dang v. San Francisco Forty Niners*, 964 F. Supp. 2d 1097, 1104 (N.D. Cal. 2013) ("[N]o more

21   definite rule can be declared than that commodities reasonably interchangeable by consumers for the

22   same purposes make up that 'part of the trade or commerce [constituting a 'relevant market']'")

23   (quotation omitted).  Accordingly, although "facially unsustainable" market definitions can be

24   dismissed at the motion to dismiss juncture, "[t]he determination of the relevant market is an issue

25

26   [8] Defendants cite *Newcal Indus., Inc. v. Ikon Office Sol.*, 513 F.3d 1038, 1045 (9th Cir. 2008) as
     ruling that "consumers do not define the boundaries of the market".  In fact, the Ninth Circuit held
27   the opposite:  "We agree with Newcal.  Under *Eastman Kodak*, Newcal's market definition [around
     a group of consumers] does not fail as a matter of law, at least on a Rule 12(b)(6) motion."  *Id.* at
28   1046.

PLAINTIFF CITY OF OAKLAND'S OPPOSITION TO DEFENDANTS' MOTION TO DISMISS

1  for the trier of fact." *FTC v. Lundbeck*, 650 F.3d 1236, 1239 (8th Cir. 2011).[9]

2  Here, Oakland's market definition is more than "facially sustainable."  Like the plaintiffs in

3  *Raiders I* and *Raiders II*, Oakland sets forth significant allegations about the uniqueness of

4  professional football, and the lengths to which Host Cities go to attract NFL Clubs to their cities.

5  Oakland then defines a market that tracks the accepted market definition in *Raiders I* and *Raiders II*,

6  with a refinement that was not at issue in those two cases (*i.e.*, the contemplation of new stadia).

7  4.  Plaintiff Has Adequately Alleged A Group Boycott And Refusal To Deal

8  Defendants contend that Oakland has failed to allege a group boycott or refusal to deal

9  (Counts I and II) because "[a]n agreement, some concerted effort, is required before a group boycott

10  exists."  (Def. Mem. at 15 (quoting *Supermarket of Homes, Inc. v. San Fernando Valley Bd. of

11  Realtors*, 786 F.2d 1400, 1405 (9th Cir. 1986))).  Of course, the Complaint contains numerous

12  allegations about Defendants' concerted effort to boycott Oakland.  (Compl. ¶¶ 1-16, 23-29, 69-87,

13  98-118).  Defendants collectively voted to approve the relocation of the Raiders to Las Vegas and,

14  along the way, ignored their own Relocation Policies, collected a handsome Relocation Fee, and

15  took public shots at Oakland and its efforts to persuade the Raiders to stay.  (Compl. ¶¶ 58-87).

16  Defendants have not offered Oakland another NFL team, and no NFL Club has even suggested that

17  it is willing to move to Oakland.  Why?  Because Oakland has demonstrated an unwillingness to pay

18  Defendants' supra-competitive prices.  Defendants as a group are acting as a cartel, not as "one

19  boycotter", to exclude other competitors from the market.  (Def. Mem. at 15).  *See Raiders I*, 726

20  F.2d at 1392 ("[L]egitimate collective action should not be construed to allow the owners to extract

21  excess profits.  In such a situation the [NFL] owners would be acting as a classic cartel.").

22  Defendants' treatment of the Relocation Policies is powerful evidence of their concerted

23  _____

24  [9] Defendants' cited case law is of no help to their position, in that the alleged markets at issue in
those actions were wholly without merit.  In *Hicks v. PGA Tour, Inc.*, 897 F.3d 1109, 1121 (9th Cir.
25  2018), a group of golf caddies tried to carve up golf advertisement into nonsensical "markets" to suit
their particular litigation.  In *StubHub, Inc. v. Golden State Warriors, LLC*, No. 15-cv-1436-MMC,
26  2015 WL 6755594, at *3 (N.D. Cal. Nov. 5, 2015), the plaintiff attempted to argue that there were
different markets for the same game tickets based on where they were purchased.  And, in *Tanaka v.
27  Univ. of S. Cal.*, 252 F.3d 1059, 1063 (9th Cir. 2001), the plaintiff alleged that the women's soccer
program at UCLA and UCLA alone was the relevant market.
28

1  refusal to deal.  It was imperative that the entire NFL – each NFL Club and the NFL as a collection

2  of Clubs – ensure that they complied with those Policies.  (Compl. ¶¶ 3-7, 30-35, 78-79, 138-146).

3  Instead, the Policies were openly defied.  Even if Oakland had failed to plead Defendants' collective

4  agreement to boycott Oakland, their intent is obvious from this evidence of bad faith:  "concerted

5  action may be inferred from circumstantial evidence of the defendant's conduct and course of

6  dealings."  *Dimidowich v. Bell & Howell*, 803 F.2d 1473, 1479 (9th Cir. 1986).

7       Lastly, Defendants contend that the Relocation Fee makes it harder to relocate.  Putting aside

8  the legitimacy of such a fee, this is a remarkable contention as the Relocation Fee is paid *to the*

9  *voting NFL Clubs*, thus obviously encouraging the "yes" votes needed for a move.  Defendants

10  simply ignore Oakland's allegations that Defendants are a cartel which now commands supra-

11  competitive prices.  (Compl. ¶¶ 23-29, 80-87).  Host Cities and fans, not the Raiders, are paying the

12  Relocation Fee.

13               5.   Plaintiff Has Adequately Pled A Price Fixing Scheme

14       Defendants also err in arguing that Oakland has failed to allege price fixing under Section 1

15  of the Sherman Act (Count III of the Complaint).  Defendants seem to contend that because they did

16  not agree to any specific "Host City" price, they cannot have "fixed prices."  (Def. Mem. at 16).

17  Defendants are wrong.  As the U.S. Supreme Court has made clear, whether Defendants entered into

18  an agreement to charge "uniform" or "rigid" prices is "immaterial" to a price fixing claim:

19      Nor is it important that the prices paid by the combination were not fixed in the sense
that they were uniform. . . .  An agreement to pay or charge rigid, uniform prices

20  would be an illegal agreement under the Sherman Act.  But so would agreements to
raise or lower prices whatever machinery for price-fixing was used. . . .  In this case,

21  the result was to place a floor under the market—a floor which served the function of
increasing the stability and firmness of market prices.  That was repeatedly

22  characterized in this case as stabilization.  But in terms of market operations
stabilization is but one form of manipulation. . .  As we have indicated, the machinery

23  employed by a combination for price-fixing is immaterial.

24  *United States v. Socony-Vacuum Oil Co.*, 310 U.S. 150, 222-223 (1940).  *See also U.S. v. Apple*,

25  791 F.3d 290, 327 (2d Cir. 2015) ("[I]t is well established that *per se* condemnation is not limited to

26  agreements that literally set or restrict prices").[10]

27

28  [10] Defendants' cited cases are of no help to their arguments.  In *Rick-Mik Enters., Inc. v. Equilon* (footnote continued)

1    The Complaint alleges an agreement among Defendants to restrict the number of Clubs, and

2    use this restricted market to force Host Cities to bid up the costs of stadia.  (Compl. ¶¶ 8, 23-29, 80-

3    87).  These allegations demonstrate Defendants' "market manipulation" which "distorts prices" and

4    "prevents the determination of those prices by free competition alone."  *Socony*, 310 U.S. at 223.[11]

5                 6.    Plaintiff Has Adequately Pled Its Declaratory Judgment Claim

6        Defendants' only challenge to Oakland's Declaratory Judgment Claim (Count IV) is that it

7    should fail along with Oakland's other antitrust causes of action.  Since, as shown above, Plaintiff

8    has adequately pled its antitrust claims, Count IV also should not be dismissed.

9    C.    **PLAINTIFF HAS SUFFICIENTLY ALLEGED A CLAIM FOR BREACH OF**
              **CONTRACT**
10

11       Plaintiff has sufficiently alleged facts and circumstances to support the fifth cause of action

12   for breach of contract.  "A contract, made expressly for the benefit of a third person, may be

13   enforced by him at any time before the parties thereto rescind it."  Cal. Civ. Code § 1559.  Here,

14   Plaintiff has alleged (1) the existence of a valid, binding contract (Compl. ¶ 140); (2) that Plaintiff

15   was an intended and actual third party beneficiary of the contract (Compl. ¶¶ 141-42); and (3) that

16   Defendants breached the contract and that Plaintiff has suffered and will suffer damages as a result

17   of Defendants' breach (Compl. ¶ 146).[12]  These allegations and analyses are consistent with those in

18   _____

19   *Enters., LLC*, 532 F.3d 963, 976 (9th Cir. 2008), plaintiff failed to allege the identity of Defendants'
     alleged "co-conspirator banks or financial institutions," or "the nature of the conspiracy or
20   agreement."  No such deficiencies exist here.  In *Universal Grading Serv. v. eBay, Inc.*, No. 09-cv-
     2755-RMW, 2011 WL 846060, at *7 (N.D. Cal. Mar. 8, 2011), the plaintiff alleged a price fixing
21   scheme between eBay and a coin collecting association.  Here, Oakland alleges a scheme among all
     of the competing NFL teams.

22   [11] Defendants focus on the Complaint's use of the term monopolistic or economic "rents."  (Def.
     Mem. at 16).  Of course, this is an economic term and means any payment to the owner of
23   production that exceeds competitive pricing.  (Compl. ¶¶ 100, 102, 111, 113, 122, 124, 133, 135).

24   [12] Defendants' assertion that the analysis and application of the contract should be under New York
     law is incorrect, and in any case, moot.  (Def. Mem. at 17).  There is no conflict between California
25   and New York with respect to third party beneficiary law.  *Compare* Cal. Civ. Code § 1559 *with*
     *Sidik v. Royal Sovereign Int'l Inc.*, 348 F. Supp. 2d 206, 214 (E.D.N.Y. 2018).  Accordingly, this
26   Court can and should apply California law.  *See, e.g., Callan v. Merrill Lynch & Co.*, No. 09-cv-
     0566-BEN, 2010 WL 11508843, at *4, n.1 (S.D. Cal. Jan. 22, 2010) ("[G]iven the absence of any
27   conflict of law between New York and California on the elements for breach of fiduciary duty, the
     Court assumes for purposes here that California law applies").

28

*St. Louis Reg'l Convention and Sports Complex Auth. v. Nat'l Football League* ("*St. Louis*"), No. 1722-CC00976, 2017 WL 6885089 (Mo. Cir. Dec. 27, 2017),where the court was presented with very similar facts and circumstances (the Rams leaving St. Louis for Los Angeles) and *the exact same contractual instruments*.  There, on a motion to dismiss, the court held that the Relocation Policies constituted a valid, enforceable contract; the plaintiffs were third party beneficiaries; and the Complaint adequately alleged that defendants breached the contract and plaintiffs suffered damages.  *St. Louis*, 2017 WL 6885089, at*1.  The same result should occur in this case.[13]

1.  <u>Plaintiff Has Sufficiently Alleged That The Relocation Policies Constitute A Valid, Binding Contract</u>

The allegations in Plaintiff's Complaint sufficiently set forth the existence of an enforceable contract.  The NFL Constitution and the Relocation Policies are collectively a binding, enforceable contract among Defendants.  (Compl. ¶ 140).  The Relocation Policies are explicitly established pursuant to the NFL Constitution:

"The Commissioner shall interpret and from time to time establish policy and procedure in respect to the provisions of the Constitution and Bylaws and any enforcement thereof." (Compl., Ex. 1 p. 32).

"The policy and procedures that apply to any proposed transfer of a club's home territory is promulgated pursuant to Section 4.3 of the NFL Constitution." (Compl., Ex. 2 p. 2).

Under California law, "the rights and duties of the members as between themselves and in their relation to (a private voluntary) association, in all matters affecting its internal government and the management of its affairs, are measured by the terms of (its) constitution and by-laws." *California Dental Ass'n. v. Am. Dental Ass'n.*, 23 Cal. 3d 346, 353 (1979) (quotation omitted).  Even the Raiders have conceded "that the NFL's constitution and bylaws govern the NFL and constitute a contract to which all member clubs agreed." *Oakland Raiders v. Nat'l Football League*,

---

[13] Although not precedent, the *St. Louis* decision on the motion to dismiss is instructive.  There, the Court strictly abided by the standard of review at the pleading stage and ultimately allowed that well-pled complaint to survive.  Defendants' argument that the *St. Louis* Court's review was in any way sub-standard is baseless and fails to appreciate the well-established standard of review on a motion to dismiss, no matter the venue.  (Def. Mem. at 21, fn. 14).

1   131 Cal. App. 4th 621, 639 (2005); *see also Raiders I*, 726 F.2d at 1391 ("Our rejection of the

2   NFL's single entity defense implicitly recognized the existence of the first element—the 28 member

3   clubs have entered an agreement in the form of the NFL Constitution and Bylaws.").

4       Pursuant to California Civil Code Section 1559, a contract for the benefit of a third party

5   may be enforced at any time prior to its rescission.  Here, the Relocation Policies were expressly

6   instituted for the benefit of Plaintiff and other Host Cities.  (Compl. ¶ 140).  In fact, the purpose of

7   these Policies was to entice the massive investments in stadia and other support for a "local" team in

8   exchange for the promise that the team would not simply move because it wanted to.  (Compl. ¶

9   141).  Ironically, The Relocation Policies were promulgated after the Raiders decided to leave

10  Oakland in 1982 for Los Angeles.  At that time, the NFL undertook substantial efforts to prevent the

11  Raiders' move and to keep the team in Oakland.  Having failed to do so, the NFL crafted the

12  Relocation Policies to prevent the type of "franchise free agency" which led to the Raiders' decision

13  to leave Oakland in the first place (before their return to Oakland in 1995).  (Compl. ¶ 142).  The

14  NFL has now turned its back both on the purpose of the Relocation Policies and on Oakland.  (*Id.*).

15      Pursuant to the NFL Constitution and the Relocation Policies, Defendants assumed direct

16  obligations to Plaintiff.  (Compl. ¶ 143).  The express terms of the document contradict Defendants'

17  assertion that the Relocation Policies are mere suggestions and not requirements:

18      Article 4.3 also confirms that no club has an "entitlement" to relocate simply because
    it perceives an opportunity for enhanced club revenues in another location.  Indeed,
19  League traditions disfavor relocations if a club has been well-supported and
    financially successful and is expected to remain so.  Relocation pursuant to Article
20  4.3 may be available, however, if a club's viability in its home territory is threatened
    by circumstances that cannot be remedied by diligent efforts of the club working, as
21  appropriate, in conjunction with the League Office, or if compelling League interests
    warrant a franchise relocation.
22

23  (*Id.* Ex. 2 p. 2).  Defendants were obligated to operate under the Relocation Policies and comply

24  with the processes set forth therein.  That was not done here.  Here, there were no circumstances that

25  could not be remedied.  But Plaintiff could not do it alone; the City needed the Raiders' cooperation

26  and, simply put, they were not interested.  They had already decided to relocate.  (Compl. ¶¶ 50, 57).

27      Of course, now that the Relocation Policies are not in direct alignment with the flow of

28  millions of dollars into the owners' pockets, Defendants seek to re-characterize and walk back the

1    otherwise clear intent of the contract by deliberately omitting the Policies' key mandatory language

2    from their Motion.   The Relocation Policies affirmatively state that each NFL Club's "primary

3    obligation" is to "advance the interests of the NFL in its *home territory.*"  (Compl. ¶ 33; Ex. 2 p. 2

4    (emphasis added)).   Further, the Policies declare that because "League policy favors stable team-

5    community relations, clubs are *obligated to work diligently and in good faith* to obtain and to

6    maintain suitable stadium facilities in their home territories, and to operate in a manner that

7    maximizes fan support in their current home community."   (*Id.*).   The Relocation Policies also

8    require a notice of a proposed transfer to be published in newspapers, and provided to governmental

9    and business representatives of both the incumbent community and the community to which the

10   team proposes to move, as well as the stadium authority (if any) in the incumbent community (the

11   "interested parties").  (*Id.* at Ex. 2 p. 3).  Of course, each of these *requirements* is in addition to the

12   factors stated in the Policies (*Id.* at Ex. 2 p. 4-6) which, as explained in the Complaint (Compl. ¶

13   143), Defendants "must" analyze in good faith before any decision or vote.  (*Id.* at Ex. 2 p. 3).  Each

14   of these factors supported the Raiders' continued presence in Oakland.  (Compl. ¶ 143).

15   Most surprisingly, even Defendants have admitted that the Policies impose obligations on

16   the NFL Clubs, and that the Policies must be satisfied for a relocation petition to be approved.  (*Id.*

17   ¶ 154).   Apparently that acknowledgement does not apply here as each of these mandatory

18   provisions has been ignored and Defendants have breached their obligations to Oakland.  By doing

19   so, each of the 31 NFL Clubs other than the Raiders received their share of the $378 million

20   Relocation Fee, which was negotiated prior to the relocation approval vote.  (Compl. ¶¶ 2, 36, 69).

21   Defendants' argument that because "the Relocation Policy was unilaterally imposed by the

22   NFL Commissioner" and "because it may be revised at any time by the Commissioner, it lacks the

23   required hallmarks of a binding contract" is not persuasive.  (Def. Mem. at 18).  In fact, California

24   Civil Code section 1559 specifically addresses this point in that a contract that benefits a third party

25   "may be enforced by him at any time before the parties thereto rescind it."  A unilateral modification

26   of the Relocations Policies would rescind one version and establish a new, enforceable version.

27   Notwithstanding that there was an enforceable contract, Plaintiff justifiably and reasonably

28   relied on the Relocation Policies.  (Compl. ¶¶ 35, 144).  The Policies prohibit Defendants from

1   shutting a viable Host City out of the negotiating process and ensure that Defendants do not award

2   an NFL club to the highest bidder.  (Compl. ¶ 78).  The Policies offer the certainty that NFL Clubs

3   stay committed to their home markets and that Host Cities be guaranteed a fair and level playing

4   field in any negotiations regarding stadia and/or relocations.  (Compl. ¶¶ 78, 35).  Given the history

5   of the Relocation Policies – and the NFL's position regarding the Policies' role in the relocation

6   process – Plaintiff relied on the contract in structuring its relationship with the Raiders.  (Compl. ¶

7   151, 154).  Plaintiff has adequately alleged a valid, binding contract.

8                    2.    <u>Plaintiff Has Sufficiently Alleged That The City Of Oakland Was An</u>
9                          <u>Intended And Actual Third Party Beneficiary</u>

10          As alleged in the Complaint, the City of Oakland was an intended and actual third party

11   beneficiary of the NFL Constitution and the Relocation Policies.  A third party may sue for breach

12   of contract if it can show that the contract was made with the "express or implied intention of the

13   parties to the contract to benefit the third party." *Barragan v. Nationstar Mortg. LLC*, No. 12-cv-

14   01618, 2012 WL 12895717, at *2 (C.D. Cal. Nov. 7, 2012) (citing *Klamath v. Patterson*, 204 F.3d

15   1206, 1210 (9th Cir. 1999)).  Generally, whether a third party is an intended beneficiary under a

16   contract is a question of fact.  *Deerpoint Grp., Inc. v. Agrigenix, LLC*, 345 F. Supp. 3d 1207, 1229

17   (E.D. Cal. 2018).  The issue only becomes a matter of law if it "can be answered by interpreting the

18   contract as a whole and doing so in light of the uncontradicted evidence of the circumstances and

19   negotiations of the parties making the contract. . . ."  *Id.* (quoting *Souza v. Westlands Water Dist.*,

20   135 Cal. App. 4th 879, 891 (2006)).  A person need not be the sole or even the primary beneficiary

21   of a contract to be a third party beneficiary.  *Serv. Emps. Int'l Union, Local 99 v. Options--A Child*

22   *Care & Human Servs. Agency*, 200 Cal. App. 4th 869, 875 (2011).  Nor does the beneficiary need to

23   be identified by name in a contract in order to be entitled to enforce it; it is sufficient if the third

24   party claimant belongs to a class of persons for whose benefit it was made.  *Otay Land Co., LLC v.*

25   *U.E. Ltd., L.P.*, 15 Cal. App. 5th 806, 855 (2017).  An intended beneficiary exists where "the

26   beneficiary would be reasonable in relying on the promise as manifesting an intention to confer a

27   right" on the beneficiary.  Restatement (Second) of Contracts, § 302 (1981).

28          The Relocation Policies repeatedly mention an identifiable set of intended beneficiaries:

1   "home territory," "home community," "incumbent community" or "stadium authority (if any) in the

2   incumbent community". (Compl. ¶¶ 4, 33, 34; Ex. 2 p. 1-5). This is no coincidence, as "home

3   territory" is defined in Article 4 of the NFL Constitution as "the city in which [any NFL] club is

4   located and for which it holds a franchise and plays its home games, and includes the surrounding

5   territory to the extent of 75 miles in every direction from the exterior corporate limits of such

6   city. . . ." (Compl., Ex. 1 p. 15). Further, Oakland is specifically mentioned by name in the NFL

7   Constitution in relation to "Home Territory." (*See* Compl., Ex. 1 p. 12).

8   The California Supreme Court has recently determined that a third party beneficiary claim

9   may proceed where the following elements are satisfied: "(1) [not only] whether the third party

10  would in fact benefit from the contract, but also (2) whether a motivating purpose of the contracting

11  parties was to provide a benefit to the third party, and (3) whether permitting a third party to bring

12  its own breach of contract action against a contracting party is consistent with the objectives of the

13  contract and the reasonable expectations of the contracting parties." *Goonewardene v. ADP, LLC*,

14  434 P.3d 124, 133 (2019). Each of these elements is satisfied here.

15              (a)     *The Relocation Policies provided a benefit to Plaintiff*

16  Here, it cannot be disputed that Plaintiff would "benefit from the contract." The Relocation

17  Policies prohibit Defendants from shutting a viable Host City out of the negotiating process and

18  ensuring that Defendants do not award an NFL club to the highest bidder. (Compl. ¶ 78). To the

19  contrary, the Policies expressly offer the certainty that NFL Clubs stay committed to their home

20  markets and that Host Cities be guaranteed a fair and level playing field in any relocation

21  negotiations. (Compl. ¶¶ 78, 35).

22  In *Goonewardene*, the plaintiffs did not claim they were privy to the contract between the

23  employer and the payroll company. As a result, the Court held that the alleged benefit conferred

24  upon the employees was too vague and conclusory to support their proposition. *See Goonewardene*,

25  434 P.3d at 136-137 ("When an employer hires a payroll company, providing a benefit to employees

26  with regard to the wages they receive is ordinarily not a motivating purpose of the transaction.

27  Instead, the relevant motivating purpose is to provide a benefit to the employer . . ."). Here,

28  Plaintiff was fully aware of the benefits the Relocation Policies provided, as well as the obligations

PLAINTIFF CITY OF OAKLAND'S OPPOSITION TO DEFENDANTS' MOTION TO DISMISS

1 that it required (*i.e.*, maintaining facilities).  (Compl. ¶ 74).

2         (b)    *Providing a benefit to Host Cities was a "motivating purpose"*

3       In *Goonewardene,* the court used the term "motivating purpose" in the second element to

4 clarify the term "intent."  434 P.3d at 133.  The Relocation Policies were adopted to respond to the

5 following Ninth Circuit guidance in *Raiders I*:

6
7 > [t]o withstand antitrust scrutiny, restrictions on team movement should be more
> closely tailored to serve the needs inherent in producing the NFL 'product' and
> competing with other forms of entertainment.   An express recognition and
8 > consideration of those objective factors espoused by the NFL as important, such as
> population, economic projections, facilities, regional balance, etc., would be well
9 > advised. . .  Fan loyalty and location continuity could also be considered.

10 726 F.2d at 1397.  Accordingly, the Relocation Policies expressly benefit Host Cities (such as

11 Oakland) that provided economic support and loyal fans, with the focus on "location continuity:"

12
13 > Article 4.3 confirms that each club's primary obligation to the League and to all other
> member clubs is to advance the interests of the League in its home territory. This
> primary obligation includes, but is not limited to, maximizing fan support, including
14 > attendance, in its home territory.

15 (Compl. ¶ 4; Ex. 2 p. 1 ("League traditions disfavor relocations if a club has been well-supported

16 and financially successful and is expected to remain so;" NFL Clubs are required to "operate in a

17 manner that maximizes fan support in their current home community")).  Plaintiff has adequately

18 pled Defendants' motivating purpose in enacting the Relocation Policies; to support "the

19 procompetitive goals of the Relocation Policies."  (Compl. ¶¶ 4, 149).  Defendants intended to

20 benefit Host Cities by establishing objective standards for relocations and limiting subjective

21 decision-making, thereby protecting the interests and investments of Host Cities, like Plaintiff.

22 (Compl. ¶ 141).

23       Plaintiff, reflecting its known status as a third party beneficiary, operated and invested based

24 on the representations of Defendants (specifically the Raiders) and the terms of the contract.

25 (Compl. ¶¶ 35, 73, 78, 144).  Plaintiff maintained and constantly upgraded the Coliseum (Compl. ¶

26 58), and, when it was clear the facility needed replacing, made bona fide proposals for a new

27 stadium complex (Compl. ¶¶ 7, 65, 78).  In exchange, Plaintiff reasonably relied on Defendants'

28 compliance with the contract.  That did not happen here; Defendants reaped the benefits of the long-

PLAINTIFF CITY OF OAKLAND'S OPPOSITION TO DEFENDANTS' MOTION TO DISMISS

term relationship with Oakland, but when the time came to negotiate in good faith, the opposite occurred.  (Compl. ¶ 33 (The Relocation Policies declare that because "League policy favors *stable team-community relations*, clubs are obligated to work diligently and in good faith … and to *operate in a manner that maximizes fan support in their current home community.*" (emphasis added)).

As such, Plaintiff has pled a "motivating purpose" to benefit Host Cities.

        (c)    *Enforcement of the Relocation Policies by a Host City against the NFL and NFL Clubs is consistent with the objectives and reasonable*

The Relocation Policies were created to hold the NFL and the NFL Clubs accountable to each other and to protect established fan bases and Host Cities.  Without the threat of enforcement, the Policies are not worth the paper they are printed on.  Plaintiff's lawsuit was not filed on the day of the relocation announcement, it was filed after all possible options were exhausted.  Enforcement of the Policies is consistent with the expressed objectives and reasonable under the circumstances.

It is not required to show that the contracting parties actually considered the third party enforcement question as a prerequisite to the applicability of the third party beneficiary doctrine:

> Accordingly, the third element does not focus upon whether the parties specifically intended third party enforcement but rather upon whether, taking into account the language of the contract and all of the relevant circumstances under which the contract was entered into, permitting the third party to bring the proposed breach of contract action would be consistent with the objectives of the contract and the reasonable expectations of the contracting parties.

*Goonewardene*, 434 P.3d at 133 (quotation and citation omitted).  "In other words, this element calls for a judgment regarding the potential effect that permitting third party enforcement would have on the parties' contracting goals, rather than a determination whether the parties actually anticipated third party enforcement at the time the contract was entered into."  *Id.* at 135.  Here, as discussed, the benefit conferred and the motivating purpose behind the Policies is clear, especially when dealing with the investment and distribution of hundreds of millions of dollars of public funds.  As such, enforcement of the Policies on Defendants is consistent with their objectives and reasonable.

        3.    <u>Plaintiff Has Sufficiently Alleged That Defendants Breached The Contract And That Plaintiff Has Suffered And Will Suffer Damages As A Result of Defendants' Breach</u>

Plaintiff has sufficiently alleged that Defendants breached the Relocation Policies.

1    Defendants had contractual obligations, as discussed *infra* in Section III.C.1, but instead, they

2    colluded to facilitate the Raiders' move before and during the time negotiations (in which Oakland

3    participated in good faith) were taking place.  (Compl. ¶¶ 50, 51, 58, 62, 72).  In contrast, Oakland

4    made significant efforts to satisfy the Relocation Policies' requirements, which should have

5    disallowed the Raiders' move.  (Compl. ¶¶ 65, 74).  Defendants blatantly ignored the Relocation

6    Policies in order for the 31 NFL Club owners to reap the $378 million Relocation Fee.  (Compl. ¶¶

7    2, 9, 72).  This conduct constitutes a breach of the contract at issue.

8         Defendants failed to conduct themselves diligently and in good faith.  As a result,

9    Defendants intentionally breached their primary obligation to "advance the interests of the NFL in

10   its home territory" and "to obtain and to maintain suitable stadium facilities in their home territories,

11   and to operate in a manner that maximizes fan support in their current home community."  (Compl.

12   ¶¶ 33; Ex. 2 p. 2).  Despite the financial support and loyalty provided to the Raiders by Plaintiff and

13   the Oakland-based fans, Defendants have breached the terms of the Relocation Policies to Plaintiff's

14   detriment (Compl. ¶¶ 65, 74, 145).  As a direct and proximate result of Defendants' breach, Plaintiff

15   has suffered and will suffer significant damages.  (Compl. ¶¶ 96, 146).

16        **D.      PLAINTIFF HAS SUFFICIENTLY PLED ITS QUANTUM MERUIT AND**

17        **UNJUST ENRICHMENT CLAIMS**

18        Plaintiff has also sufficiently alleged facts to support claims for Quantum Meruit (Count VI)

19   and Unjust Enrichment (Count VII).  "Quantum meruit refers to the well-established principle that

20   'the law implies a promise to pay for services performed under circumstances disclosing that they

21   were not gratuitously rendered.'"  *Huskinson & Brown v. Wolf*, 32 Cal. 4th 453, 458 (2004) (quoting

22   *Long v. Rumsey*, 12 Cal.2d 334, 342 (1938)).  This claim is simply the common law equivalent of a

23   contract claim, and is often alternatively pled in addition to breach of contract.

24        With respect to unjust enrichment:  "The Ninth Circuit has instructed district courts to

25   construe claims for unjust enrichment under California law as quasi-contract claims."  *In re Vizio,*

26   *Inc.*, 238 F. Supp. 3d 1204, 1233 (C.D. Cal. 2017) (Staton, J.) (citing *Astiana v. Hain Celestial Grp.,*

27   *Inc.*, 783 F.3d 753, 762 (9th Cir. 2015) and *Brazil v. Dole Packaged Foods, LLC*, 660 Fed. Appx.

28   531 (9th Cir. 2016) (reversing district court's dismissal of an unjust enrichment claim)); *see also*

1   *Young v. Cree*, 2018 WL 1710181, at *8 (N.D. Cal. Apr. 9, 2018) (citing *Hartford Cas. Ins. Co. v.*

2   *J.R. Mktg., L.L.C.*, 61 Cal. App. 4th 988 (2015)) (denying motion to dismiss unjust enrichment

3   claims because "the California Supreme Court has clarified that unjust enrichment is a valid cause

4   of action in California").   A claim for unjust enrichment is understood as one for restitution.

5   *McNeary-Calloway v. JP Morgan Chase Bank, N.A.*, 863 F. Supp. 2d 928, 964 (N.D. Cal. 2012).

6   To state a restitution claim, a plaintiff "must plead 'receipt of a benefit and the unjust retention of

7   the benefit at the expense of another.'"   *Id.*   In addition, plaintiffs' claim for unjust enrichment was

8   also upheld in *St. Louis*.   2017 WL 6885089, at *2 ("The Court finds that Plaintiffs have adequately

9   pleaded a benefit conferred upon Defendants at the expense of Plaintiffs.").

10          Here, the Complaint alleges that Plaintiff "invested hundreds of millions of dollars to attract,

11   retain and support the Raiders, all spent in reliance on the Relocation Policies and the obligations of

12   Defendants under those Policies."   (Compl. ¶ 151).   Plaintiff made those investments with the

13   express understanding between Plaintiff and Defendants that (a) Defendants would comply with the

14   Relocation Policies, which includes an obligation to negotiate in good faith and to advance the

15   interests of the league in its home territory; (b) Defendants would support Oakland as the Host City

16   for the Raiders; and (c) Plaintiff would recoup its investments in the Raiders through the revenues

17   generated by the Raiders' continued presence in Oakland.   (Compl. ¶¶ 4, 7, 151).   Plaintiff

18   reasonably relied on the Relocation Policies to Defendants' benefit.   Neither Plaintiff nor

19   Defendants believed that Plaintiff's investment in the Raiders was gratuitous, or that the Relocation

20   Policies somehow did not apply to Plaintiff or the Raiders.   (Compl. ¶ 152).

21   **IV.**    **CONCLUSION**

22          Plaintiff's Complaint is well-pled and contains sufficient facts and allegations to establish

23   the basis for the claims on which recovery is sought, including for violations of federal antitrust

24   laws, breach of contract, quantum meruit and unjust enrichment.   Defendants' arguments are almost

25   entirely factual, and should only be considered after discovery.   As such, Plaintiff has met (and

26   exceeded) the requisite pleading standard and, based on the foregoing, respectfully requests that the

27   Court deny Defendants' Motion to Dismiss in its entirety.

28

PLAINTIFF CITY OF OAKLAND'S OPPOSITION TO DEFENDANTS' MOTION TO DISMISS

1  DATED:  April 3, 2019

2

3  By:          */s/ Maria Bee*                    By:          */s/ James W. Quinn*
                 MARIA BEE                            JAMES W. QUINN

4  BARBARA J. PARKER (Bar No. 69722)      JAMES W. QUINN (*pro hac vice*)
   bparker@oaklandcityattorney.org           jquinn@bafirm.com

5  MARIA BEE (Bar No. 167716)            DAVID BERG (*pro hac vice*)
   mbee@oaklandcityattorney.org            dberg@bafirm.com

6  ERIN BERNSTEIN (Bar No. 231539)       MICHAEL M. FAY (*pro hac vice*)
   ebernstein@oaklandcityattorney.org       mfay@bafirm.com

7  **OAKLAND CITY ATTORNEY**          JENNY H. KIM (*pro hac vice*)

8  One Frank Ogawa Plaza, 6th Floor        jkim@bafirm.com
  Oakland, California  94612             CHRIS L. SPRENGLE (*pro hac vice*)

9  Telephone:  (510) 238-3601             csprengle@bafirm.com
  Facsimile:  (510) 238-6500             BRONWYN M. JAMES (*pro hac vice*)

10                                        bjames@bafirm.com

11                                 **BERG & ANDROPHY**
                                120 West 45th Street, 38th Floor

12                                 New York, New York  10036

13                                 Telephone:  (646) 766-0073
                                 Facsimile:  (646) 219-1977

14  By:        */s/ Michael H. Pearson*

15           MICHAEL H. PEARSON
  CLIFFORD H. PEARSON (Bar No. 108523)  BRUCE L. SIMON (Bar No. 96241)

16   cpearson@pswlaw.com              bsimon@pswlaw.com
  DANIEL L. WARSHAW (Bar No. 185365)   BENJAMIN E. SHIFTAN (Bar No. 265767)

17   dwarshaw@pswlaw.com            bshiftan@pswlaw.com
  MICHAEL H. PEARSON (Bar No. 277857)  **PEARSON, SIMON & WARSHAW, LLP**

18   mpearson@pswlaw.com            44 Montgomery Street, Suite 2450
  MATTHEW A. PEARSON (Bar No. 291484)  San Francisco, California  94104

19   mapearson@pswlaw.com           Telephone:  (415) 433-9000

20  **PEARSON, SIMON & WARSHAW, LLP**   Facsimile:  (415) 433-9008
  15165 Ventura Boulevard, Suite 400

21  Sherman Oaks, California  91403
  Telephone:  (818) 788-8300

22  Facsimile:  (818) 788-8104

23  *Attorneys for Plaintiff City of Oakland*

24

25

26

27

28