MAKAN DELRAHIM
Assistant Attorney General, Antitrust Division

DAVID L. ANDERSON (CABN 149604)
United States Attorney

ANDREW C. FINCH
Principal Deputy Assistant Attorney General, Antitrust Division

MICHAEL F. MURRAY
Deputy Assistant Attorney General, Antitrust Division

TAYLOR M. OWINGS
Counsel to the Assistant Attorney General, Antitrust Division

KRISTEN C. LIMARZI
JEFFREY D. NEGRETTE (DCBN 482632)
Attorneys, Antitrust Division
U.S. Department of Justice
950 Pennsylvania Ave. NW
Office 3222
Washington, DC 20530
Telephone: (202) 598-2384
Facsimile: (202) 514-0536
E-mail: jeff.negrette@usdoj.gov

Attorneys for the United States of America

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN FRANCISCO DIVISION

| | |
|---|---|
| CITY OF OAKLAND,<br><br>Plaintiff,<br><br>vs.<br><br>THE OAKLAND RAIDERS, a California limited partnership; ARIZONA CARDINALS FOOTBALL CLUB LLC; ATLANTA FALCONS FOOTBALL CLUB, LLC; BALTIMORE RAVENS LIMITED PARTNERSHIP; BUFFALO BILLS, LLC; | No. 3:18-cv-07444-JCS<br><br>**STATEMENT OF INTEREST OF THE UNITED STATES**<br><br>Date: July 19, 2019<br>Time: 9:30 a.m.<br><br>The Honorable Joseph C. Spero<br>Courtroom G, 15th Floor |

PANTHERS FOOTBALL, LLC; THE
CHICAGO BEARS FOOTBALL CLUB,
INC.; CINCINNATI BENGALS, INC.;
CLEVELAND BROWNS FOOTBALL
COMPANY LLC; DALLAS COWBOYS
FOOTBALL CLUB, LTD; PDB SPORTS,
LTD; THE DETROIT LIONS, INC.; GREEN
BAY PACKERS, INC.; HOUSTON NFL
HOLDINGS, LP; INDIANAPOLIS COLTS,
INC.; JACKSONVILLE JAGUARS, LLC;
KANSAS CITY CHIEFS FOOTBALL
CLUB, INC.; CHARGERS FOOTBALL
COMPANY, LLC; THE RAMS FOOTBALL
COMPANY, LLC; MIAMI DOLPHINS,
LTD.; MINNESOTA VIKINGS FOOTBALL,
LLC; NEW ENGLAND PATRIOTS LLC;
NEW ORLEANS LOUISIANA SAINTS,
LLC; NEW YORK FOOTBALL GIANTS,
INC.; NEW YORK JETS LLC;
PHILADELPHIA EAGLES, LLC;
PITTSBURGH STEELERS LLC; FORTY
NINERS FOOTBALL COMPANY LLC;
FOOTBALL NORTHWEST LLC;
BUCCANEERS TEAM LLC; TENNESSEE
FOOTBALL, INC.; PRO-FOOTBALL, INC.;
and THE NATIONAL FOOTBALL
LEAGUE,

Defendants.

## INTEREST OF THE UNITED STATES

The United States respectfully submits this statement pursuant to 28 U.S.C. § 517, which permits the Attorney General to direct any officer of the Department of Justice to attend to the interests of the United States in any case pending in a federal court.  The United States enforces the federal antitrust laws and has a strong interest in their correct application both in public and private antitrust enforcement actions in order to protect competition for the benefit of consumers. The United States files this statement to explain that tax revenues lost by governmental entities are not recoverable under the Clayton Act as injury to "business or property."  Such expansive recovery would be contrary to the language of the statute and to precedent, and could lead to anticompetitive effects from over-deterrence.

The United States believes its participation in the scheduled hearing for pending motions would be useful to the Court and respectfully requests the opportunity to make an oral argument.

## BACKGROUND

The Raiders, a professional football franchise of the National Football League (NFL), currently perform in Oakland but recently announced plans to move to Las Vegas.  The City of Oakland filed a complaint against the NFL and each of its member franchises, alleging that Defendants conspired to 1) boycott and refuse to deal with Oakland and 2) fix prices for the presence of a professional football team, in facilitating the Raiders' move from Oakland to Las Vegas.  Compl., Doc. 1, ¶¶ 14-15, 86, 99-105, 111-116, 124-127, 134-135.[1]

Oakland seeks damages for investments and debt exceeding $240 million and for the diminished value of the Oakland Coliseum.  Compl. ¶ 96.  Oakland asserts that the Coliseum is "jointly owned by the City of Oakland and Alameda County and is leased to the Oakland-Alameda County Coliseum Financing Corporation, which, in turn, has assigned its rights under that lease to the [Oakland-Alameda County Coliseum] Authority."  Pl. Opp., Doc. 48, at 8. Oakland also seeks "significant tax and other income that it derives from the presence of the

---

[1] Plaintiff also seeks recovery under various state contract law claims which are not addressed in this statement.

STATEMENT OF INTEREST OF THE UNITED STATES
Case No. 3:18-cv-07444-JCS                    1

1  Raiders and the economic activity their presence generates," among other unspecified damages.

2  Compl. ¶ 96.

3      Defendants moved to dismiss the complaint, arguing that Oakland does not have standing

4  to recover under Section 4 of the Clayton Act, along with other legal and factual defects.  *See*

5  Def. Mot., Doc. 41; Def. Reply, Doc. 49.  Defendants assert Oakland is an improper plaintiff

6  because it "cannot allege that it purchases anything from or sells anything to the NFL or any of

7  its teams."  Def. Mot. at 10.  According to Defendants, Oakland's standing is improperly

8  grounded in "indirect injury," because Oakland is a remote participant in any relevant market

9  with no more than a shareholder or landlord interest in the Oakland Coliseum.  *Id.* at 10-11.

10  Defendants also move the Court to reject Oakland's other claimed source of injury.  They argue

11  Oakland cannot use the move's effect on tax revenue as a basis for standing, "because taxation is

12  a sovereign activity, not a commercial transaction."  *Id.* at 10

13                                **ARGUMENT**

14      Section 4 of the Clayton Act provides that "any person who shall be injured in his

15  business or property by reason of anything forbidden in the antitrust laws" may sue for treble

16  damages.  15 U.S.C. § 15.  Plaintiff City of Oakland seeks to recover lost tax revenue from the

17  Raiders' departure, but tax injuries are not cognizable under Section 4 and must be dismissed as

18  a matter of law.  As a threshold matter, a government party's interest in collecting tax revenue is

19  a sovereign interest that is outside the "business or property" scope of the Clayton Act.

20  Additionally, tax losses are an improper basis for antitrust standing because they are entirely

21  derivative of the harm to market participants who miss out on welfare-enhancing transactions.

22  To find otherwise would entitle a government entity to threefold recovery rights for lost tax

23  revenues, on top of the private damages incurred by the market participants, any time

24  anticompetitive effects occurred in its jurisdiction.  The threat of such liability will have the

25  effect of over-deterring, inducing entities to minimize risk by curtailing otherwise pro-

26  competitive behavior.  Accordingly, this Court should dismiss as a matter of law any Section 4

27  claims to the extent they are based on lost tax revenues.  The United States takes no position on

28  whether Plaintiff's other allegations of harm are cognizable injuries under the antitrust laws, nor

1   does it take any position on the merits of any theory of harm for which Plaintiff may have

2   suffered a cognizable injury.

3   **I.     Tax Revenue Losses Are Not "Business or Property" as Required by Section 4**

4           Any party injured in its "business or property" by an antitrust law violation may

5   recover damages under Section 4. 15 U.S.C. § 15(a). The Supreme Court characterized

6   injury to "business or property" under Section 4 as injury to "commercial interests or

7   enterprises." *Hawaii v. Standard Oil Co. of Cal.*, 405 U.S. 251, 264 (1972). In *Hawaii*,

8   the state sought antitrust damages for excessive prices it paid for petroleum product the

9   state had purchased from the defendants, but also for general harm to the state's

10  economy. *Id.* at 255. The Court noted that injury to the state's general economy was

11  inevitably duplicative of the injury to business and property of its citizens. Thus, the

12  Court looked for "a clear expression of a congressional purpose" to provide for such

13  excessive recovery, but found none. *Id.* at 265. The Court analogized to Section 4A,

14  which authorizes antitrust damages suits by the United States. It held that Section 4A

15  limits recovery to "those injuries suffered in [the United States'] capacity as a consumer

16  of goods and services," that is, injury to its "business or property." *Id.* The Court went

17  on to reason that "the conclusion is nearly inescapable that Section 4, which uses

18  identical language, does not authorize recovery for economic injury to the sovereign

19  interests of a State," but only for injury to its "commercial interests" as a direct

20  participant in the market. *Id.* at 264-65; *see also Reiter v. Sonotone Corp.*, 442 U.S. 330,

21  341-42 (1979) (*Hawaii* holds "injury to a state's total economy…was not cognizable

22  under Section 4" because it was not harm to its "commercial interests," that is, not harm

23  to Hawaii "as a party to a commercial transaction").[2]

24

25  _____

    [2] Oakland observes that *Hawaii* plaintiffs sought recovery under a *parens patriae* claim, whereas
26  Oakland brings the case on behalf of itself. Pl. Opp., at 10. The Court was very clear, however,
    that "[t]he question in this case is not whether Hawaii may [sue] on behalf of its citizens, but
27  rather whether the injury for which it seeks to recover is compensable under [Section] 4…."
    *Hawaii*, 405 U.S. at 259. Finding that governments cannot recover for economic injuries to their
28  sovereign interests, the Court classified sovereign interests as outside the scope of "business or
    property." *Id.* at 265.

Like injury to a state's "general economy," lost tax revenue is not an injury that a government suffers as a party to a commercial transaction but an injury to its sovereign interests.  The Supreme Court explained this distinction in the context of taxation by Indian tribes.  "[A] tribe acts as a commercial partner when it agrees to sell the right to the use of its land for mineral production, but the tribe acts as a sovereign when it imposes a tax on economic activities within its jurisdiction."  *Kerr-McGee Corp. v. Navajo Tribe of Indians*, 471 U.S. 195, 200 (1985).  Because taxation was a sovereign act, the tribe could tax activity on its land without approval of the Interior Secretary.  *Id.*; *see also McCulloch v. Maryland*, 17 U.S. 316, 338-39 (1819) ("the right of taxing property…[t]his is the highest attribute of sovereignty, the right to raise revenue….").  The Court should here apply the same distinction: Oakland does not act as a market participant or party to the commercial transaction for purposes of the antitrust laws when it merely taxes transactions that might be affected by alleged anticompetitive conduct.

Oakland disagrees, arguing unpersuasively that the Court should follow the dissent in a RICO case involving an alleged scheme to evade taxes, *Hemi Group, LLC v. City of New York, LLC*, 559 U.S. 1 (2010).  Pl. Opp. at 10.  In *Hemi*, the City of New York brought a private action under the RICO statute for the cigarette tax revenue it lost when the defendants allegedly violated the Jenkins Act by selling and mailing cigarettes into the state without filing required reports to identify the sales.  According to New York City, the Jenkins Act violation was part of a scheme designed to evade the tax collection, and constituted a RICO conspiracy to commit mail and wire fraud.  The question before the Supreme Court was whether New York City could recover the lost cigarette tax revenue in a private action for losses to "business and property" under the RICO statute, 18 U.S.C. § 1964(c).

The majority rejected the private cause of action for tax revenue for lack of causation.  The failure to file reports was too indirectly related to New York City's losses.  *See* 559 U.S. at 8.  In so deciding, the majority did not need to reach the question whether tax revenues fell into the definition of "business or property," recoverable under the RICO statute, 18 U.S.C. § 1964(c).  *Id.*

STATEMENT OF INTEREST OF THE UNITED STATES
Case No. 3:18-cv-07444-JCS                    4

The dissent would have found sufficient causation in part because defendants allegedly misrepresented their sales "*in order to*" bring about the tax losses.  559 U.S. at 23 (Breyer, J., dissenting) ("It knew the loss would occur; it *intended* the loss to occur; one might even say it *desired* the loss to occur.").  Additionally, the dissent pointed out, the tax losses were the kind of harm that the predicate statute—the Jenkins Act—was designed to prevent.  *Id.*  Given this level of causation, the dissent would have gone on to hold lost tax revenue was injury to "business or property" recoverable in a private right of action under the RICO statute.  Here again, though, the dissent relied on the intended reach of the predicate statute.  It explained that laws against fraud are consistently interpreted to recognize tax evasion as a type of prohibited behavior, and to recognize the associated tax losses as recoverable in an action for damages.  *Id.* at 30-31.  The dissent specifically distinguished these types of losses from the antitrust claims in *Hawaii*, discussed above.  It explained that, in addition to being more generalized than tax losses, Hawaii's claimed "business or property" losses were merely "derivative" of harms to individual businesses, which are the target of the antitrust laws.  *Id.* at 30-31.  The tax losses in *Hemi*, on the other hand, were particularized harms suffered by the tax-collecting governments, whose interests were protected by the predicate statute underlying the RICO claim.  *Id.*

In sum, the *Hemi* dissent's interpretation of "business or property" as it appears in the RICO statute sheds only minimal light on the meaning of "business or property" in Section 4 of the Clayton Act.  To the extent the dicta is persuasive, it actually suggests the opposite conclusion from what Oakland argues here.  The Clayton Act's reference to "business or property" is distinct from the definition under RICO (and its predicate statutes) because the target of the two laws is different.  Tax revenues might be "business or property" when the illegal acts target or directly interfere with the business of tax collecting, but under the Clayton Act, "business or property" refers to the fruits of an individual entity's participation in a market.

This conclusion is consistent with *Hawaii* and other precedent cited above, holding that a government can recover under an antitrust theory of harm only when it acted as a market participant, and not when it acted as a sovereign.  This Court should therefore hold that Oakland does not have standing to bring an antitrust claim based on the allegation that it will lose tax

revenue if the Raiders move to Las Vegas.  If the Court reaches this categorical conclusion, it need not reach the issue addressed in the next section: whether the type of tax revenues at issue in this case are sufficiently related to the harm to constitute an antitrust injury.

## II.  Tax Revenue Losses Are Too Remote from Harm to Competition to Satisfy the Standing Requirements of Section 4

A Section 4 injury must be caused "by reason of" conduct proscribed by the antitrust laws.  15 U.S.C. § 15.  In other words, Section 4 contains a proximate cause requirement. Although an antitrust violation "may be expected to cause ripples of harm to flow through the Nation's economy," the Supreme Court has held that not every person "tangentially affected" by an antitrust violation can recover damages.  *Blue Shield of Virginia, Inc. v. McCready,* 457 U.S. 465, 476-477 (1982).  In evaluating whether an alleged injury is too remote or removed, courts apply an antitrust standing framework based on: "(1) …the physical and economic nexus between the alleged violation and the harm to the plaintiff, and (2), more particularly … the relationship of the injury alleged with those forms of injury about which Congress was likely to have been concerned in making defendant's conduct unlawful and in providing a private remedy under § 4."  *Id.* at 478.  Oakland's claim for the tax revenue loss it would allegedly suffer if the Raiders move to Las Vegas satisfies neither test.

A.  Tax losses are merely derivative of harm to direct market participants

Following *McCready*, the Court reiterated the need to assess the "directness or indirectness of the asserted injury," and limit Section 4 recoveries to those injuries directly connected to alleged violations.  *Associated Gen. Contractors of Cal., Inc. v. Cal. State Council of Carpenters* ("*AGC*"), 459 U.S. 519, 540 (1983).  After observing "the chain of causation between the [plaintiff's] injury and the alleged restraint . . . contains several somewhat vaguely defined links," the *AGC* Court considered it "obvious that any such injuries were only an indirect result of whatever harm may have been suffered by [direct market participants]."  *Id.* at 540-41.

Oakland's lost tax revenues are derivative and indirect by the very nature of taxation – the taxed entity, not the taxing entity, is the direct victim of any competitive harm.  Oakland

contemplates taxation of everything from ticket sales to concessionaire sales to hotel bookings and any other taxable commerce stimulated by the presence of the Raiders. Compl. ¶ 96. Each of these taxed enterprises is a more direct plaintiff to state a claim for competitive injury. The existence of such a class of more direct victims "diminishes the justification for allowing a more remote party…" to seek relief under Section 4. *AGC*, 459 U.S. at 542.

B. <u>Tax losses are not an injury of the type likely caused by competitive harm</u>

*McCready* further limits recoverable injuries to those associated with competitive harm, as previously articulated by the *Brunswick* Court: "Plaintiffs must prove antitrust injury, which is to say injury of the type the antitrust laws were intended to prevent and that flows from that which makes defendants' acts unlawful…. It should, in short, be 'the type of loss that the claimed violations . . . would be likely to cause.'" *Brunswick Corp. v. Pueblo Bowl-O-Mat, Inc.*, 429 U.S. 477, 489 (1977) (citing *Zenith Radio Corp. v. Hazeltine Research, Inc.*, 395 U.S. 100, 125 (1969)). "The antitrust laws were enacted for 'the protection of *competition*, not *competitors*.'" *Atl. Richfield Co. v. USA Petroleum Co.*, 495 U.S. 328, 338 (1990), citing *Brown Shoe Co. v. United States*, 370 U.S. 294, 320 (1962). As a general matter, it is not at all clear whether tax revenue would usually increase or usually decrease as competitive harm increased within a sovereign's jurisdiction. For instance, the sovereign could tax supra-competitive profits earned by per se illegal price-fixing. Indeed, Oakland's tax revenues to date may have been inflated by limitations on competition in the professional football market. Lost tax revenue is therefore not the type of injury that is likely to flow from competitive harm. *Cf. AGC*, 459 U.S. at 539 (reasoning the plaintiff was improper in part because "[i]t is not clear whether the Union's interests would be served or disserved by enhanced competition in the market").

III. **Allowing Governmental Entities to Recover Treble Lost Tax Revenues Could Create an Over-deterring, Anticompetitive Effect**

The automatic treble damages provision of Section 4 is an uncommonly powerful tool, serving both to incent private enforcement and to deter wrongdoers. Wielded indiscriminately, however, it can impose more harm than good: "Given the potential scope of antitrust violations

and the availability of treble damages, an over-broad reading of § 4 could result in 'overdeterrence,' imposing ruinous costs on antitrust defendants, severely burdening the judicial system and possibly chilling economically efficient competitive behavior." *Greater Rockford Energy & Tech. Corp. v. Shell Oil Co.*, 998 F.2d 391, 394 (7th Cir. 1993).  Section 4's rigorous standing requirements are intended to mitigate this risk: "[B]y restricting the availability of private antitrust actions to certain parties, we ensure that suits inapposite to the goals of the antitrust laws are not litigated and that persons operating in the market do not restrict procompetitive behavior because of a fear of antitrust liability." *Todorov v. DCH Healthcare Auth.*, 921 F.2d 1438, 1449 (11th Cir. 1991).

Oakland's claim for lost tax revenues poses the very threat contemplated by these courts. If upheld, local governments could bring substantial Section 4 claims anytime anticompetitive conduct was found to reduce economic activity in their jurisdictions.  Even if tax revenue losses were limited to instances where governmental entities were *also* a direct commercial victim of competitive harm, allowing recovery for lost tax revenues would greatly exceed the amount awarded to an equivalent, non-governmental party, even though the harm *to competition* would be the same in both cases.

*      *      *

Lost tax revenue is not a cognizable injury under Section 4 because it is not an injury to the City's "business or property," but rather to its sovereign interests.  Additionally, the lost tax revenue would be too remote and disconnected from the alleged anticompetitive conduct to support recovery.  Accordingly, Oakland's claims for lost tax revenues should not be the basis for the Court to find that the City has standing to pursue antitrust claims against the Raiders or the NFL in this case.

Respectfully submitted,

MAKAN DELRAHIM
Assistant Attorney General

DAVID L. ANDERSON
United States Attorney

<table>
<tr><td>1</td><td></td></tr>
<tr><td>2</td><td></td></tr>
</table>

ANDREW C. FINCH
Principal Deputy Assistant Attorney
General, Antitrust Division

MICHAEL F. MURRAY
Deputy Assistant Attorney General

TAYLOR M. OWINGS
Counsel to the Assistant Attorney General

KRISTEN C. LIMARZI
JEFFREY D. NEGRETTE
Attorneys, Appellate Section

Dated:  July 12, 2019

/s/ Jeffrey D. Negrette
JEFFREY D. NEGRETTE

Attorneys for the United States of America

STATEMENT OF INTEREST OF THE UNITED STATES
Case No. 3:18-cv-07444-JCS                    9