1

2

3

4

UNITED STATES DISTRICT COURT

5

NORTHERN DISTRICT OF CALIFORNIA

6

| | |
|---|---|
| CITY OF OAKLAND, | Case No. 18-cv-07444-JCS |
| Plaintiff, | |
| v. | **ORDER GRANTING MOTION TO DISMISS** |
| OAKLAND RAIDERS, et al., | Re: Dkt. No. 41 |
| Defendants. | |

## I.      INTRODUCTION

Plaintiff the City of Oakland ("Oakland") brings this action against the Defendants the Oakland Raiders (the "Raiders"), the National Football League (the "NFL"), and all thirty-one other teams in the NFL, asserting that the Raiders' decision to leave Oakland, and the NFL's approval of that decision, violate the antitrust laws and the NFL's own governing documents, among other claims.[1]  Defendants move to dismiss for failure to state a claim under Rule 12(b)(6) of the Federal Rules of Civil Procedure.  The Court held a hearing on July 19, 2019.  For the reasons discussed below, Defendants' motion is GRANTED, although Oakland may amend its claims if it can allege facts sufficient to cure the deficiencies identified below.  If Oakland chooses to amend, it may file an amended complaint no later than September 9, 2019.[2]

---

[1] The other teams are the Arizona Cardinals, Atlanta Falcons, Baltimore Ravens, Buffalo Bills, Carolina Panthers, Chicago Bears, Cincinnati Bengals, Cleveland Browns, Dallas Cowboys, Denver Broncos, Detroit Lions, Green Bay Packers, Houston Texans, Indianapolis Colts, Jacksonville Jaguars, Kansas City Chiefs, Los Angeles Chargers, Los Angeles Rams, Miami Dolphins, Minnesota Vikings, New England Patriots, New Orleans Saints, New York Giants, New York Jets, Philadelphia Eagles, Pittsburgh Steelers, San Francisco 49ers, Seattle Seahawks, Tampa Bay Buccaneers, Tennessee Titans, and Washington Redskins.  The full names of the entities controlling those teams and named as defendants can be found at paragraph 19 of Oakland's complaint.

[2] The parties have consented to the jurisdiction of the undersigned magistrate judge for all purposes pursuant to 28 U.S.C. § 636(c).

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

United States District Court
Northern District of California

## II.    BACKGROUND

### A.    Factual Background and Allegations of the Complaint

Because factual allegations are generally taken as true on a motion to dismiss under Rule 12(b)(6), this section recites the allegations of Oakland's complaint as if true.  Nothing in this order should be construed as resolving any issue of fact that might be disputed at a later stage of the case.

#### 1.    Overview of Raiders History

The Raiders were based in Oakland from the creation of the franchise in 1960 through 1982, and again from 1994 through the present, playing their home games for most of that period at a stadium in Oakland known as the Coliseum.  *See* Compl. ¶¶ 38–47.  The Raiders were managed and at least partially owned by the late Al Davis for much of the team's existence.  *See id.* ¶¶ 40–50.  Al Davis's son Mark Davis assumed control of the team after his father's death in 2011.  *Id.* ¶ 54.

The team's history has been fraught with litigation, much of it related to the team's 1982 move to Los Angeles and its lease at the Coliseum after returning to Oakland.  As but a few examples, Oakland unsuccessfully attempted to acquire the Raiders through eminent domain (*City of Oakland v. Oakland Raiders*, 174 Cal. App. 3d 414 (1985)), the Raiders and a stadium commission in Los Angeles successfully sued to enjoin enforcement of the NFL's then-existing rules restricting movement of teams (*L.A. Mem'l Coliseum Comm'n v. Nat'l Football League*, 726 F.2d 1381 (9th Cir. 1984)), and after the Raiders' return to Oakland, the Raiders and Oakland engaged in litigation over the status of the Raiders' lease of the Coliseum (Compl. ¶¶ 48–49).

#### 2.    Plans to Relocate

In 2017, the Raiders announced that they were relocating from Oakland to Las Vegas— giving rise to the present case.  Compl. ¶ 2.  Oakland alleges that Mark Davis and the Raiders had considered such a move as early as 1998, when Mark Davis registered the domain name "LasVegasRaiders.com" (which he subsequently renewed annually) and acquired a cell phone number with a Las Vegas area code.  *Id.* ¶ 51.

"In December of 2008, NFL Commissioner Roger Goodell . . . announced that the NFL

2

wanted the Raiders to receive a new stadium," but the Raiders renewed their lease at the Coliseum the following year. *Id.* ¶ 52.  The Raiders nevertheless engaged in discussions with the San Francisco 49ers regarding potentially sharing a stadium in Santa Clara, California. *Id.* ¶ 53.  In 2010, a private entity proposed building a stadium in Los Angeles for several NFL teams including the Raiders, and in 2012, the NFL sent a memorandum to its teams describing circumstances under which two teams could move to Los Angeles, which "was believed to be largely addressed to the Raiders, Rams, and Chargers." *Id.* ¶¶ 53, 55.  Those three teams applied in 2016 to relocate to Los Angeles, but the NFL granted the Raiders permission for such a move only if the Chargers declined to move to Los Angeles. *Id.* ¶¶ 60–61.

Meanwhile, the Raiders also pursued relocation to Las Vegas.  Mark Davis told an NFL executive in 2014, "I'm going to Vegas, baby!" *Id.* ¶ 57.  Despite that statement and the application to move to Los Angeles, the Raiders continued negotiating with Oakland regarding a potential new stadium.  Davis announced in 2015 that he would commit $500 million to build a stadium if Oakland provided an additional $400 million, for a total cost of $900 million. *Id.* ¶ 59. In January of 2016, Davis met with Nevada billionaire Sheldon Adelson to discuss funding a $1.7 billion stadium in Las Vegas, despite having announced his intention to keep the Raiders in Oakland at a town hall "a few weeks" earlier. *Id.* ¶ 62.  Davis told a Nevada tourism committee in April of 2016 that he would commit $500 million to a stadium in Las Vegas, and the following month characterized his position as a "commitment" to move the Raiders to Las Vegas if sufficient public funding was provided for a stadium. *Id.* ¶ 63.  "In August 2016, Adelson convinced the Nevada state legislature to create a bill that appropriated $750 million in public money, which had originally been intended to fund a public project, to a professional football stadium." *Id.*  While NFL Commissioner Goodell stated in September 2016 that he hoped the Raiders would reach an agreement for a stadium in Oakland, Dallas Cowboys owner Jerry Jones encouraged Nevada lawmakers to pursue bringing the Raiders to Las Vegas. *Id.* ¶ 64.

Oakland, meanwhile, attempted to reach a deal to keep the Raiders in Oakland.  An investment group including former NFL players Ronnie Lott and Rodney Peete offered $600 million towards a stadium in Oakland in November of 2016—$200 million more than the $400

million in public funding that the Raiders had claimed was needed in 2015. *Id.* ¶ 65. In December

of 2016, Oakland officials voted to enter negotiations with Lott's group, earmarking $350 million

in public funds for the project, to be combined with $400 million from Lott's group and $500

million from the Raiders for an approximately $1.3 billion stadium. *Id.* ¶ 65. The proposal

"included the possibility that Mark Davis would eventually sell some part of the team to the Lott

group," which Oakland characterizes as a development that the NFL should have supported as

consistent with its efforts to increase leadership positions held by racial minorities. *Id.* ¶ 66.

While Oakland contends that "the Lott Proposal was real," the NFL dismissed it as incomplete and

unworkable, and a Raiders official at a "closed-door NFL meeting" described it as a "political,

cover-your-ass joke." *Id.* ¶ 67.

> The Raiders officially applied to the NFL for permission to move to Las Vegas on January 19, 2017. *Id.* ¶ 68.

### 3.   NFL Rules Regarding Team Relocation

> The relocation of NFL teams is governed by Article 4.3 of the Constitution and Bylaws of the NFL:

> > The League shall have exclusive control of the exhibition of football games by member clubs within the home territory of each member. No member club shall have the right to transfer its franchise or playing site to a different city, either within or outside its home territory, without prior approval by the affirmative vote of three-fourths of the existing member clubs of the League.

Compl. Ex. 1 art. 4.3. In litigation related to the Raiders' 1982 move to Los Angeles, the Ninth

Circuit affirmed a jury's determination that Article 4.3, at least as the NFL sought to apply it to

block that relocation, was an unreasonable restraint of trade in violation of § 1 of the Sherman Act.

*L.A. Mem'l Coliseum*, 726 F.2d at 1390–98. The Ninth Circuit's opinion discussed changes that

might make similar restrictions permissible:

> > To withstand antitrust scrutiny, restrictions on team movement should be more closely tailored to serve the needs inherent in producing the NFL "product" and competing with other forms of entertainment. An express recognition and consideration of those objective factors espoused by the NFL as important, such as population, economic projections, facilities, regional balance, etc., would be well advised. *See* L. Kurlantzick, *Thoughts on Professional Sports and the Antitrust*

United States District Court
Northern District of California

4

*Laws*, 15 Conn. L.R. 183, 206 (1983). Fan loyalty and location continuity could also be considered. *Id.* at 206–207. Al Davis in fact testified that in 1978 he proposed that the League adopt a set of objective guidelines to govern team relocation rather than continuing to utilize a subjective voting procedure.

Some sort of procedural mechanism to ensure consideration of all the above factors may also be necessary, including an opportunity for the team proposing the move to present its case. *Id.*; *see Silver v. New York Stock Exchange*, 373 U.S. 341 (1963) (without procedural safeguards, the collective act of the Exchange in disconnecting the wire service to a broker constituted a boycott, per se illegal under § 1); *cf. Deesen v. Professional Golfers Ass'n*, 358 F.2d 165 (9th Cir.), *cert. denied*, 385 U.S. 846 (1966) (where PGA had reasonable rules governing eligibility of players for tournaments, there was not a § 1 violation). In the present case, for example, testimony indicated that some owners, as well as Commissioner Rozelle, dislike Al Davis and consider him a maverick. Their vote against the Raiders' move could have been motivated by animosity rather than business judgment.

*Id.* at 1397–98.

At some point after that decision, the NFL Commissioner, pursuant to his authority under Article 8.5 of the NFL bylaws to "interpret and from time to time establish policy and procedure in respect to the provisions of the Constitution and Bylaws," promulgated "Policy and Procedures for Proposed Franchise Relocations," fleshing out the basic three-fourths vote required by Article 4.3 with additional policies, procedures, and factors to be considered.  Compl. ¶ 32 & Ex. 2. Under that policy, "each club's primary obligation to the League and to all member clubs is to advance the interests of the League in its home territory," and relocations are "disfavor[ed] . . . if a club has been well-supported and financially successful and is expected to remain so."  *Id.* Ex. 2; *see id.* ¶ 33.  The policy also provides that the "business judgment" to be exercised in deciding whether to approve a transfer "may be informed by consideration of" a non-exhaustive list of factors including, for example, fan loyalty, stadium adequacy, financial performance, the degree of good faith negotiations to remain, and the extent to which team owners have contributed to circumstances giving rise to the proposed relocation.  *Id.* Ex. 2 pt. C; *see also id.* ¶ 34.  Oakland characterizes these policies as an effort to avoid antitrust problems by complying with the suggestions of the Ninth Circuit in *Los Angeles Memorial Coliseum*.  *Id.* ¶ 32.

Under the policy, "the relocating club will ordinarily be expected to pay a transfer fee to the League" if its request is approved, to "compensate other member clubs of the League for the

loss of the opportunity appropriated by the relocating club and the enhancement (if any) in the value of the franchise resulting from the move." *Id.* Ex. 2 pt. E; *see id.* ¶ 36.  Oakland characterizes this fee as "a source of income that the NFL Club owners do not share" and "a pure cartel payment that goes straight to the NFL Club owners' bottom lines when they together decide that a team should leave its Host City." *Id.* ¶ 37.

### 4.    Approval of Relocation to Las Vegas

On March 6, 2017, Bank of America agreed to provide financing for the Las Vegas stadium, and the NFL teams' owners held a meeting the same day to determine the fee that the Raiders would be required to pay if the relocation was approved. *Id.* ¶ 69.  Oakland characterizes that meeting as "effectively an auction for a 'yes' vote" where "the relocation fee was bid up until enough NFL owners were satisfied with their personal payment to vote 'yes,'" and cites a report that owners purportedly opposed to the relocation pushed for a higher fee. *Id.*  The owners agreed on a fee of $378 million. *Id.*

Oakland submitted its final proposal in conjunction with Lott's investment group the same month, but the NFL rejected it as not "clear and specific, actionable in a reasonable timeframe, and free of major contingencies," and thus not "a viable solution." *Id.* ¶ 72. Oakland Mayor Libby Schaaf appealed to the team owners to reject the relocation, although she conceded "that Oakland was 'unable to provide the level of public subsidy Nevada offers.'" *Id.* ¶¶ 73–74.

The owners voted 31 to 1 to approve the relocation. *Id.* ¶ 75.  According to Oakland, that vote violated the NFL's relocation policy, because "every objective factor to be considered in the Relocation Policies favored a stay in Oakland," the Oakland market is more favorable than Las Vegas, and Oakland negotiated in good faith the keep the Raiders. *Id.* ¶¶ 75, 78–79.  Oakland cites a statement from the Miami Dolphins' owner Stephen Ross—the lone dissenting vote—that he "just [did]n't think everything was done to try and stay in Oakland," *id.* ¶ 76, as well as comments from Mark Cuban—the owner of a professional basketball team in Dallas—that he considered Oakland to be a better market than Las Vegas for an NFL team, *id.* ¶ 70.

### 5.    Oakland's Claims

Oakland alleges that the NFL and its teams act as an anticompetitive cartel extracting

6

significantly greater payments for stadium construction and maintenance from host cities than would be possible in a competitive market "by not only limiting the number of NFL Clubs in the United States [to thirty-two teams], but also collectively controlling, and dictating under what terms and conditions, cities can have professional football team presence." *Id.* ¶ 8; *see also id.* ¶¶ 23–29 (alleging that the NFL has secured public funding for a majority or significant share of the cost of several stadiums costing hundreds of millions to over a billion dollars each since 2000, and shared in relocation fees of approximately $1.4 billion). Oakland defines the relevant market for its antitrust claims as "the market of all Host Cities offering, and all cities and communities that are willing to offer (*i.e.*, potential Host Cities), home stadia and other support to major league professional football teams in the geographic United States." *Id.* ¶ 88.

Oakland asserts the following seven claims: (1) group boycott in violation of section 1 of the Sherman Act, based on Oakland's inability to retain the Raiders or attract another NFL team so long as it is not willing to "pay the enormous demands associated with new and renovated stadia," *id.* ¶¶ 98–107; (2) concerted refusal to deal in violation of section 1 of the Sherman Act, based on Defendants' demands for stadium funding as well as "freez[ing] the number of competitive professional football teams, *id.* ¶¶ 108–18; (3) price fixing in violation of section 1 of the Sherman Act, based again on the demands for stadium financing, *id.* ¶¶ 119–29; (4) declaratory judgment that Defendants' conduct violates section 1 of the Sherman Act as a result of Defendants' "boycott of Oakland and refusal to comply with their own relocation policies" and "redistribution of the resulting ill-gotten supra-competitive gains though artificially set relocation fees," *id.* ¶¶ 130–137; (5) breach of contract under California law, based on the premise that the relocation policy is a binding contract to which Oakland is a third-party beneficiary, *id.* ¶¶ 138–46; (6) quantum meruit, based on Oakland's alleged investments in the Raiders in reliance on the relocation policy, *id.* ¶¶ 147–56; and (7) unjust enrichment, on the basis that Defendants received "ill-gotten gains resulting from their unlawful , unjust, and inequitable conduct," *id.* ¶¶ 157–61.

Oakland claims damages including over $240 million invested in reliance on the Raiders remaining in Oakland, loss of "tax and other income that it derives from the presence of the Raiders and the economic activity their presence generates," and reduced property value of the

Coliseum as a result of the stadium having "been boycotted by the NFL." *Id.* ¶ 96. Oakland seeks treble damages for its antitrust claims. *See id.* at 44 (prayer for relief).

### B. Parties' Arguments

#### 1. Defendants' Motion to Dismiss

Defendants move to dismiss all of Oakland's claims with prejudice. With respect to Oakland's antitrust claims, Defendants argue that Oakland has not alleged antitrust injury, because allowing the Raiders to move to a city willing to provide more funding promotes, rather than impairs, competition, and because the restrictions on relocation tended to benefit rather than harm Oakland in its efforts to keep the team from leaving. Mot. at 7–9. Defendants contend that Oakland lacks standing because the only concrete injury it has alleged, loss of tax revenue, is a sovereign rather than commercial interest, because its indirect ownership interest in the Coliseum is insufficient, and because Oakland is not a participant in the same market as any defendant. *Id.* at 9–12. Defendants also argue that Oakland has not sufficiently alleged a relevant market. *Id.* at 12–14. Although Oakland's complaint asserts a relevant market of cities and other communities "offering . . . [or] willing to offer . . . home stadia and other support to major league professional football teams in the geographic United States," Compl. ¶ 88, Defendants argue that such a market is not cognizable because "[h]ost cities are not bought and sold," and markets must be defined by a product itself rather than the consumers of a product, Mot. at 13–14.

In addition to those broad objections to Oakland's antitrust theory, Defendants contend that Oakland's individual antitrust claims are substantively flawed. According to Defendants, Oakland's first two claims—"Group Boycott" and "Refusal to Deal"—describe the same theory of recovery, and fail because Oakland has not alleged that that any team besides the Raiders sought to prevent the Raiders or any other team from dealing with Oakland. *Id.* at 15. Defendants contend that Oakland cannot bring a boycott claim based on the other NFL teams' failure to *prevent* the Raiders from leaving Oakland. *Id.* As for Oakland's price fixing claim, Defendants argue that Oakland fails to "allege an agreement between the Raiders and any other party regarding 'rents' paid by Oakland." *Id.* at 16. Defendants argue that Oakland's declaratory judgment claim is derivative of its antitrust claims and is therefore also subject to dismissal for the

1    reasons discussed above. *Id.*

2          Turning to Oakland's claim for breach of contract under California law, Defendants argue

3    that the NFL's relocation policy is not a contract, both because it does not include mandatory

4    language and because it was imposed unilaterally by the NFL Commissioner, not mutually agreed

5    upon by the teams. *Id.* at 17–18. Defendants also argue that even if the relocation policy were

6    construed as a contract, Oakland is not a party to or third-party beneficiary of the policy, and has

7    not alleged that Defendants breached the policy, which only required Defendants to "consider"

8    certain factors. *Id.* at 18–22.

9          Defendants contend that Oakland's remaining claims, for quantum meruit and unjust

10   enrichment (which Defendants argue is not a claim under California law) are derivative of

11   Oakland's other claims and also should be dismissed. *Id.* at 22–23.

12                        **2.    Oakland's Opposition**

13         Oakland's opposition brief focuses more heavily than its complaint on the NFL's

14   limitation to thirty-two teams. *See, e.g.*, Opp'n (dkt. 48) at 3 ("[T]he market for Host Cities for

15   NFL teams is not competitive: it is intentionally constrained to 32 teams and its incentives are

16   skewed by the Relocation Fee."). According to Oakland, that restriction causes the reduction in

17   competition necessary to establish antitrust injury, because "the relocation process demonstrates

18   that that in a competitive market, there would now be 33 clubs, with one in Oakland and one in

19   Las Vegas," both of which "want and could support NFL clubs." *Id.* at 5 (emphasis omitted).

20   Oakland contends that the limit on number of teams, combined with the NFL's process for

21   collectively determining where those teams are based, allows Defendants to "act[] as a 'classic

22   cartel' to 'extract excess profits.'" *Id.* at 7 (citation omitted).[3]

23         With respect to antitrust standing, Oakland asserts that Defendants' position regarding

24   ownership of the Coliseum is incorrect: the stadium is not owned by the Oakland-Alameda County

25   Coliseum Authority (the "OACCA"), but instead jointly owned by Oakland and Alameda County,

26   which leased it to another entity, which assigned its rights under the lease to the OACCA. *Id.* at

27

28   [3] Despite this apparent focus of the brief, Oakland's attorneys disclaimed at the hearing an intent
     to base Oakland's theory of recovery on the thirty-two team structure of the NFL.

7–8.  Oakland contends that case law supports its recovery of sunken investments and reduced property value as antitrust damages, and that although the Supreme Court has held that a state cannot recover for damages to its "general economy" on behalf of its citizens, such authority does not prohibit a local government from recovering lost tax revenue as antitrust damages.  *Id.* at 8–11.  Oakland notes that the Ninth Circuit has previously recognized the market for NFL stadiums in litigation related to the Raiders' 1982 move to Los Angeles, and argues that a market for "Host Cities" here is similar but properly modified to include not only stadiums that already exist, but also cities willing to build new stadiums.  *Id.* at 11–14.  As for its specific antitrust claims, Oakland argues that Defendants' collective vote, influenced by the relocation fee and purportedly in violation of the NFL relocation policy, establishes a group boycott and refusal to deal,[4] *id.* at 14–15, and that the limitation to thirty-two teams is a market restriction sufficient to support a claim for "price fixing" with respect to stadium funding even if Defendants did not agree to a specific amount of funding required, *id.* at 15–16.  Oakland contends that its declaratory judgment claim should survive for the same reasons.  *Id.* at 16.

Oakland argues that the relocation policy is enforceable as a contract because it was established pursuant to the NFL Commissioner's authority under the NFL Constitution and Bylaws, which has itself been recognized as a contract by multiple courts.  *Id.* at 17–18.  Oakland contends that the relocation policy's references to a team's obligation to advance the NFL's interests "'in its *home territory*'" renders Oakland a third-party beneficiary of the policy, and that Oakland meets the test for such status recently articulated by the California Supreme Court.  *Id.* at 18–23 (citing *Goonewardene v. ADP, LLC*, 6 Cal. 5th 817 (2019)).  Oakland also contends that it has sufficiently alleged a breach of the policy.  *Id.* at 23–24.

Finally, Oakland argues that its claim for quantum meruit is sufficient because such a claim "is simply the common law equivalent of a contract claim, and is often alternatively pled in addition to breach of contract," and that its claim for unjust enrichment should be construed as a quasi-contract claim and allowed to proceed.  *Id.* at 24–25.

[4] In addressing these two claims together, Oakland appears to agree with Defendants that they describe the same theory of recovery.

10

### 3. Defendants' Reply

Defendants characterize Oakland's focus on the thirty-two team limit as an attempt "to recast its complaint," and argue that Oakland cannot succeed on such a claim. Reply (dkt. 49) at 2–7. As a starting point, Defendants contend that Oakland has not shown injury in fact from the limited number of teams, because it has not alleged that a team would play in Oakland if the NFL allowed additional teams. *Id.* at 3. Defendants also argue that the Supreme Court dissent Oakland cites for the proposition it should be able to recover lost tax revenue is inapposite, *id.* at 4 (citing *Hemi Grp., LLC v. City of New York*, 559 U.S. 1, 31 (2010) (Breyer, J., dissenting)), and that Ninth Circuit precedent bars Oakland from recovering "losses based on purported municipal investments in business development, *id.* at 5 (citing *City of Rohnert Park v. Harris*, 601 F.2d 1040, 1044 (9th Cir. 1979)). Defendants contend that Oakland's alleged injury is "indirect" because "the only party 'directly' affected by an agreement to prescribe the number of teams would be a team that sought to join the NFL joint venture," because Oakland serves at most as a landlord, and because even in that role its relationship with the Raiders runs through the OACCA, which is not a party to this case. *Id.* at 5–6. Finally, Defendants argue that even if Oakland were properly situated to challenge the limitation on the number of teams, such a challenge would fail, because the Third Circuit ruled in favor of the NFL when a non-NFL football team brought such a claim in 1983. *Id.* at 6–7 (citing *Mid-South Grizzlies v. Nat'l Football League*, 720 F.2d 772 (3d Cir. 1983)).

Defendants contend that Oakland cannot prevail on an antitrust claim based on the NFL's refusal to block the relocation because: (1) Oakland—having declined to pay the costs to which it objects—has not suffered an antitrust injury as result of the relocation; (2) "Host Cities" is not a cognizable market; (3) a single team choosing to leave Oakland is not a group boycott; and (4) Oakland does not allege that Defendants fixed any particular price with respect to stadiums. *Id.* at 7–10. Defendants also renew their arguments that the relocation policy is not a contract, that Oakland is not a third-party beneficiary, and that Oakland has not alleged breach of the policy, as well as Defendants' request that the remaining claims be dismissed as derivative of other defective claims. *Id.* at 10–14.

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

United States District Court
Northern District of California

## III.   ANALYSIS

### A.   Legal Standard

A complaint may be dismissed under Rule 12(b)(6) of the Federal Rules of Civil Procedure

for failure to state a claim on which relief can be granted.  "The purpose of a motion to dismiss

under Rule 12(b)(6) is to test the legal sufficiency of the complaint."  *N. Star Int'l v. Ariz. Corp.*

*Comm'n*, 720 F.2d 578, 581 (9th Cir. 1983).  Generally, a plaintiff's burden at the pleading stage

is relatively light.  Rule 8(a) of the Federal Rules of Civil Procedure states that a "pleading which

sets forth a claim for relief . . . shall contain . . . a short and plain statement of the claim showing

that the pleader is entitled to relief."  Fed. R. Civ. P. 8(a).

In ruling on a motion to dismiss under Rule 12(b)(6), the court analyzes the complaint and

takes "all allegations of material fact as true and construe[s] them in the light most favorable to the

non-moving party."  *Parks Sch. of Bus. v. Symington*, 51 F.3d 1480, 1484 (9th Cir. 1995).

Dismissal may be based on a lack of a cognizable legal theory or on the absence of facts that

would support a valid theory.  *Balistreri v. Pacifica Police Dep't*, 901 F.2d 696, 699 (9th Cir.

1990).  A complaint "'must contain either direct or inferential allegations respecting all the

material elements necessary to sustain recovery under some viable legal theory.'"  *Bell Atl. Corp.*

*v. Twombly*, 550 U.S. 544, 562 (2007) (quoting *Car Carriers, Inc. v. Ford Motor Co.*, 745 F.2d

1101, 1106 (7th Cir. 1984)).  "A pleading that offers 'labels and conclusions' or 'a formulaic

recitation of the elements of a cause of action will not do.'"  *Ashcroft v. Iqbal*, 556 U.S. 662, 678

(2009) (quoting *Twombly*, 550 U.S. at 555).  "[C]ourts 'are not bound to accept as true a legal

conclusion couched as a factual allegation.'"  *Twombly*, 550 U.S. at 555 (quoting *Papasan v.*

*Allain*, 478 U.S. 265, 286 (1986)).  "Nor does a complaint suffice if it tenders 'naked assertion[s]'

devoid of 'further factual enhancement.'"  *Iqbal*, 556 U.S. at 678 (quoting *Twombly*, 550 U.S. at

557) (alteration in original).  Rather, the claim must be "'plausible on its face,'" meaning that the

plaintiff must plead sufficient factual allegations to "allow[] the court to draw the reasonable

inference that the defendant is liable for the misconduct alleged."  *Id.* (quoting *Twombly*, 550 U.S.

at 570).

**B.    Antitrust Claims**

Oakland's complaint asserts three antitrust claims for damages, all for violation of section 1 of the Sherman Act, which prohibits "contract[s], combination[s] in the form of trust or otherwise, or conspirac[ies], in restraint of trade." 15 U.S.C. § 1.  Courts have long held that the Sherman Act is not as broad as its literal language might suggest, and "that Congress intended to outlaw only *unreasonable* restraints." *Texaco v. Dagher*, 547 U.S. 1, 5 (2006) (quoting *State Oil Co. v. Khan*, 522 U.S. 3, 10 (1997)) (emphasis in *Texaco*).  Courts "presumptively appl[y] rule of reason analysis, under which antitrust plaintiffs must demonstrate that a particular contract or combination is in fact unreasonable and anticompetitive before it will be found unlawful."  *Id.*

Oakland's three antitrust damages claims are captioned as "Group Boycott," "Refusal to Deal," and "Price Fixing."[5]  Both parties appear to agree that the first two claims describe the same theory of recovery, and Oakland does not identify separate conduct as supporting its various claims, although the parties address Oakland's price fixing claim as distinct from its claims for a group boycott or concerted refusal to deal.  The statutory language of the Sherman Act does not distinguish among these theories, which are instead relevant primarily to judicially created doctrines under which certain restraints of trade are per se illegal rather than subject to the generally applicable rule of reason.  *See, e.g.*, *NYNEX Corp. v. Discon, Inc.*, 525 U.S. 128, 138 (1998) ("[A]ntitrust law does not permit the application of the *per se* rule in the boycott context in the absence of a horizontal agreement, though in other contexts, say, vertical price fixing, conduct may fall within the scope of a *per se* rule not at issue here . . . .").

Where some "'restraints on competition are essential if the product is to be available at all,'" however—as in the case of professional sports leagues—"*per se* rules of illegality are inapplicable, and instead the restraint must be judged according to the flexible Rule of Reason." *Am. Needle, Inc. v. Nat'l Football League*, 560 U.S. 183, 203 (2010) (quoting *NCAA v. Bd. of Regents of Univ. of Okla.*, 468 U.S. 85, 101 (1984)); *see also L.A. Mem'l Coliseum*, 726 F.2d at

---

[5] For the purpose of the present motion, the parties agree that Oakland's declaratory judgment claim stands or falls with its antitrust damages claims.  *See* Mot. at 16; Opp'n at 16.

United States District Court
Northern District of California

1392 ("[T]he unique structure of the NFL precludes application of the per se rule.").[6]  Under that

analysis, it is not material whether Oakland captions its claims as based on theories of "boycott" or

"price fixing."  Regardless of such labels, Oakland must "demonstrate that a particular contract or

combination is in fact unreasonable and anticompetitive," *Texaco*, 547 U.S. at 5, or in other words,

"whether the restraint imposed is such as merely regulates and perhaps thereby promotes

competition or whether it is such as may suppress or even destroy competition," *Am. Needle*, 560

U.S. at 203 n.10 (quoting *Bd. of Trade of Chi. v. United States*, 246 U.S. 231, 238 (1918)).  The

Court therefore analyzes Oakland's antitrust damages claims together based on the rule of reason

and other generally applicable principles of antitrust law.[7]

### 1.    Antitrust Standing and Injury

Section 4 of the Clayton Act, codified as 15 U.S.C. § 15, authorizes suits for treble

damages by "any person who shall be injured in his business or property by reason of anything

forbidden in the antitrust laws."  15 U.S.C. § 15(a).  In much the same way that the facially broad

language of the Sherman Act has been construed as addressing only certain restraints on

competition, however, "[t]he Supreme Court has held that Congress did not intend to afford a

remedy to everyone injured by an antitrust violation."  *Knevelbaard Dairies v. Kraft Foods, Inc.*,

232 F.3d 979, 987 (9th Cir. 2000) (citing *Associated Gen. Contractors of Cal., Inc. v. Cal. State

Council of Carpenters*, 459 U.S. 519, 535 (1983)).  In other words, it is not enough that a plaintiff

has been injured; the plaintiff also "must have 'antitrust standing.'"  *Id.*  That question turns on the

following factors: "(1) the nature of the plaintiff's alleged injury; that is, whether it was the type

---

[6] Oakland argues in a footnote that the per se rule applies to its claims, Opp'n at 12 n.7, but fails to address precedent holding per se doctrines inapplicable in the context of professional sports leagues.

[7] To the extent that these labels might be relevant to the analysis of an amended complaint, the Court agrees with Defendants that Oakland has not alleged a "group boycott" where Oakland claims only that Defendants jointly *allowed* the Raiders to relocate, not an agreement that *no team* could be located in or do business with Oakland.  While the term "price fixing," based on the plain meaning of those words, might not apply in the absence of an allegation of any fixed supra-competitive price, that doctrine is more on point, as courts have recognized that restrictions on supply can have an equivalent effect to fixing prices.  *See, e.g.*, *Westinghouse Elec. Corp. v. Gulf Oil Corp.*, 588 F.2d 221, 226 (7th Cir. 1978) ("[A]n agreement to restrict the production of uranium unquestionably is a price fixing arrangement.  'Price fixing' is a characterization which extends to all conspiracies designed to manipulate the price of goods.").

the antitrust laws were intended to forestall; (2) the directness of the injury; (3) the speculative measure of the harm; (4) the risk of duplicative recovery; and (5) the complexity in apportioning damages." *Id.* (quoting *Am. Ad Mgmt., Inc. v. Gen. Tel. Co. of Cal.*, 190 F.3d 1051, 1054 (9th Cir. 1999)).

The first of those factors, "antitrust injury," is a "substantive element of an antitrust claim, and the fact of injury or damage must be alleged at the pleading stage." *Somers v. Apple, Inc.*, 729 F.3d 953, 963 (9th Cir. 2013). "'Antitrust injury' means 'injury of the type the antitrust laws were intended to prevent and that flows from that which makes defendants' acts unlawful,'" and "consists of four elements: '(1) unlawful conduct, (2) causing an injury to the plaintiff, (3) that flows from that which makes the conduct unlawful, and (4) that is of the type the antitrust laws were intended to prevent.'" *Id.* (quoting *Brunswick Corp. v. Pueblo Bowl-O-Mat, Inc.*, 429 U.S. 477, 489 (1977); *Am. Ad Mgmt., Inc. v. Gen. Tel. Co. of Cal.*, 190 F.3d 1051, 1055 (9th Cir. 1999)). The Ninth Circuit also requires "that 'the injured party be a participant in the same market as the alleged malefactors, meaning 'the party alleging the injury must be either a consumer of the alleged violator's goods or services or a competitor of the alleged violator in the restrained market.'"[8] *Id.* (quoting *Glen Holly Entm't, Inc. v. Tektronix, Inc.*, 343 F.3d 1000, 1008 (9th Cir. 2003)). In at least some circumstances, a potential market entrant thwarted from entering a market by the defendant's violations can also establish antitrust injury. *See, e.g.*, *In re Dual-Deck Video Cassette Recorder Antitrust Litig.*, 11 F.3d 1460, 1464 (9th Cir. 1993).

a.    Relocation Fee

To the extent that Oakland bases its claims on the NFL's requirement that teams seeking to relocate pay a fee to the NFL to obtain approval, Oakland has not plausibly alleged antitrust injury as a result of that policy. Oakland implies that the fee is an incentive for teams to relocate, but the Raiders gain nothing by having to pay the NFL hundreds of millions of dollars. Even if, as

---

[8] Defendants' arguments that Oakland is not a participant in the same market as Defendants or lacks a sufficiently direct relationship to any harm because it is not itself a professional football team neglect the basic principle that markets have at least two distinct classes of participants— sellers and buyers. *See, e.g.*, Reply at 5 (asserting that "the only party 'directly' affected by an agreement to prescribe the number of teams would be a team that sought to join the NFL joint venture").

1    Oakland contends in its opposition brief, "Host Cities and fans, not the Raiders, are paying the

2    Relocation Fee,"[9] Opp'n at 15, the Raiders would presumably have been in a position to capture

3    and keep greater payments for themselves from public entities and fans who wanted to see an NFL

4    team in Las Vegas if the NFL had not assessed the fee.  It is difficult to see how the relocation fee

5    could have encouraged, rather than discouraged, the Raiders' decision to relocate, and Oakland

6    has not plausibly alleged that the Raiders would have been less likely to seek relocation but for the

7    fee.

8            After the Raiders made that decision, and apparently resolved to pay a significant

9    relocation fee if imposed, the fee—which Oakland characterizes as a direct payment to the entities

10   responsible for determining whether to approve the relocation—certainly increased the likelihood

11   that the Raiders' application would be approved.  But Oakland has not explained how such a result

12   is anticompetitive.  Restrictions on NFL teams' ability to relocate to different cities are *themselves*

13   restraints on competition *favoring the existing cities*, although they may in some circumstances be

14   justified under the rule of reason.  *See L.A. Mem'l Coliseum*, 726 F.2d at 1395 ("The competitive

15   harms of Rule 4.3 are plain.").  In a market entirely lacking such restraints, no approval from the

16   NFL would have been necessary, and the Raiders' decision to relocate to Las Vegas would have

17   been the end of the story.  Oakland has not explained how the relocation fee, which makes

18   approval more likely—only after a team has applied to relocate—and thus brings the process

19   closer to that which would exist in a market lacking competitive restraints, is itself an

20   anticompetitive restraint harming existing host cities.[10]  Oakland's position on this issue would go

21   beyond the dicta of *Los Angeles Memorial Coliseum* indicating that some restraints on team

---

[9] Oakland's contention that the new host city effectively pays the relocation fee appears to be a dubious proposition, as the timeline set forth in the complaint suggests that the amount of public funding provided for a Las Vegas stadium was set well before the NFL determined the amount of the relocation fee, and that the relocation fee was set in an arbitrary manner such that the amount would have been difficult to predict during the earlier negotiations for public funding.

[10] To the extent that the relocation fee might discourage a team from seeking to relocate, that team (or the entity seeking to attract it to a new location) might experience a cognizable antitrust injury if, as Oakland contends here, the fee is in fact arbitrary and not tied to procompetitive goals. *See L.A. Mem'l Coliseum*, 726 F.2d at 1397 ("To withstand antitrust scrutiny, restrictions on team movement should be more closely tailored to serve the needs inherent in producing the NFL 'product' and competing with other forms of entertainment.").  Such questions are beyond the scope of this case, where neither the Raiders nor any entity in Las Vegas has challenged the fee.

16

relocation may be *permissible*, and instead asks the Court to hold that such restraints are *required* under the antitrust laws.  Oakland cites no authority for such a proposition, and the Court holds that any harm Oakland may have suffered as an existing host city from procedures that tend to encourage NFL approval of teams' requests to relocate neither "flows from that which makes the conduct unlawful" nor "is of the type the antitrust laws were intended to prevent."  Oakland's antitrust claims based on the relocation fee are DISMISSED.  Although it is not clear how Oakland could amend to cure the defects of this theory, the Court grants leave to attempt to do so if Oakland so chooses.

b.      Thirty-Two Team Structure

With respect to the limitation of the league to thirty-two teams, the basic premise that the restriction increases the amount of public funding that teams can demand for stadiums is, at the very least, plausible.  Courts have long recognized that restrictions on supply can increase prices beyond competitive levels.  *See, e.g.*, *NCAA v. Bd. of Regents of Univ. of Okla.*, 468 U.S. 85, 116–17 (1984) ("The television plan protects ticket sales by limiting output—just as any monopolist *increases revenues by reducing output*." (emphasis added)); *Westinghouse Elec. Corp. v. Gulf Oil Corp.*, 588 F.2d 221, 226 (7th Cir. 1978).  It is less clear, however, that Oakland was itself harmed by that restriction.

Oakland does not contend that it actually paid the inflated rates of public stadium funding that teams could purportedly obtain as a result of the league's structure.[11]  Instead, Oakland argues that it would have been able to host an NFL team if the NFL allowed more teams in the league, asserting in its opposition brief that "in a competitive market, there would now be 33 clubs, with one in Oakland and one in Las Vegas (and probably 35 clubs, with clubs also in St. Louis and San Diego)."  Opp'n at 5 (emphasis omitted).  Oakland's complaint, however, does not include allegations to that effect, and attorney argument in a brief cannot substitute for allegations of a complaint.  *See Udom v. Fonseca*, 846 F.2d 1236, 1238 (9th Cir. 1988) (affirming dismissal,

---

[11] To the extent that Oakland might have paid such a premium to upgrade the Coliseum when the Raiders returned from Los Angeles in the 1990s, it has not asserted that possible injury as a basis for its claims, and the four-year statute of limitations for such a claim has almost certainly expired. *See* 15 U.S.C. § 15b.

United States District Court
Northern District of California

1   although reversing denial of leave to amend, where a "plaintiff [had] attempt[ed] to expand the

2   scope of his complaint by making allegations in a collateral document not subject to counter by

3   means of an answer or motion to dismiss").

4        Moreover, even if the complaint had included the conclusory assertion stated in Oakland's

5   opposition, it does not include factual allegations to render such a conclusion plausible.  As an

6   incomplete list of issues that might be relevant, the complaint does not address: (1) whether there

7   are additional potential owners willing to establish new teams if the NFL allowed them to do so;

8   (2) whether such potential owners would have based a team in Las Vegas before the Raiders

9   decided to relocate there; (3) whether the Raiders would still have left Oakland for another city if

10  the NFL allowed additional teams; (4) if the Raiders might still have left, whether an additional

11  team would have been established in Oakland to replace the Raiders; or (5) whether Oakland has

12  made any effort to attract an existing team other than the Raiders or to establish a new expansion

13  team to replace the Raiders.  As an additional complicating factor, neither Oakland's complaint

14  nor its opposition brief address what sort of structure Oakland believes would be permissible if the

15  current limitation on the number of teams is not—do the antitrust laws require the NFL to admit

16  any team interested in joining?  If not, what number would be an allowable limit, and would

17  Oakland have fared differently if the limit had been set at that number?

18       Accordingly, based on its present allegations, Oakland has not alleged injury-in-fact as a

19  result of the NFL's thirty-two team structure, and its antitrust claims are DISMISSED on that

20  basis.  *See Rohnert Park*, 601 F.2d at 1045 (remanding for dismissal where a plaintiff city "ha[d]

21  not made a sufficient showing that, absent the alleged antitrust violations by [the defendants], its

22  commercial area would have been selected as a site for shopping center development," and "the

23  question whether [the city] would have benefited but for [the defendants'] actions [was therefore]

24  entirely speculative").  It is conceivable, however, that Oakland could allege such injury.  Because

25  it is at least possible that Oakland could plausibly allege that it suffered harm as a result of the

26  NFL's structure, the current complaint's failure to allege non-speculative damages as a result of

27  the thirty-two team limit is not grounds for dismissal with prejudice.

28

United States District Court
Northern District of California

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

## 2.    Damages Theories and Other Arguments

While the failure to allege antitrust injury discussed above is sufficient to dismiss Oakland's antitrust claims as currently pleaded, the Court addresses several of Defendants' other arguments to determine whether leave to amend would be futile, although the Court declines to resolve certain issues on the present motion.  Most of the other arguments reached in this order do not require dismissal with prejudice, but aspects of Oakland's theory of damages appear to be untenable.

Defendants contend that Oakland's interest as a "landlord" is not cognizable under the antitrust laws, based on the plurality opinion in *R.C. Dick Geothermal Corp. v. Thermogenics, Inc.*, 890 F.2d 139, 148 (9th Cir. 1989) (en banc).  *E.g.*, Reply at 5–6.  That case involved a complex theory of recovery offered by a plaintiff that owned (or at some relevant times held a master lease to) land on which geothermal steam energy could be produced, and alleged that the companies that subleased land from it concealed the true production capacity of the land from the plaintiff in an effort to prevent the plaintiff from itself engaging in geothermal steam production. *See R.C. Dick*, 890 F.2d at 142–43.  Among other issues, the Ninth Circuit plurality rejected the plaintiff's attempt to limit the geographic market to little more than its own property, held that the plaintiff was not a participant in the market for steam, and held that the plaintiff failed to show an anticompetitive effect on the market for rights to steam-producing property. *Id.* at 144, 148–49. The plurality's reference to "[m]ere injury as a landlord" referred to the plaintiff's attempt to satisfy the requirement of antitrust injury based on the reduced royalties it received from the defendants' operation of a plant that allegedly produced less power than it could have—with the intent, according to the plaintiff, of deceiving the plaintiff as to the opportunities on the land, not of restricting the supply of steam per se.  *See id.* at 148.

The theory here is more straightforward: Oakland alleges that cities compete to host NFL teams by offering public funding for stadiums that may be leased to the teams, Defendants have artificially restricted the market for such transactions by limiting the number of teams and collectively determining when and where teams may relocate, and teams can therefore demand more favorable deals from the host cities.  The Court declines to read *R.C. Dick* as barring all

antitrust claims where plaintiff claims damages from its status as a landlord, and instead construes that case as requiring that, for such damages to be viable, the market at issue in the case must be the market for rental transactions, and the plaintiff must show an anticompetitive effect in that market. *See id.* at 148 (immediately after stating that the plaintiff's "[m]ere injury as a landlord or lessor entitled to royalties" was insufficient, quoting an earlier case for the rule that "'the injured party [must] be a participant in the same market as the alleged malefactors'" (citation omitted)). If, for example, a cartel of all potential renters of a certain type of property conspired to fix a low price at which they were willing to rent, a landlord adversely affected by that agreement could likely recover antitrust damages.

While the Court disagrees with Defendants' position that an antitrust plaintiff's status as a landlord is inherently disqualifying,[12] the principle that landlords might in some circumstances be able to claim antitrust damages for lost or reduced rent does not clearly apply to Oakland's claims here, because Oakland has not specifically alleged damages based specifically on rent (although it is perhaps conceivable that it could amend to do so). *See* Compl. ¶ 96. Instead, Oakland claims damages based on sunk investments, lost "tax and [unspecified] other income," and diminution in property value of the Coliseum. *Id.*

The holding of *Rohnert Park*, a Ninth Circuit case that Oakland fails to address in its brief, forecloses the claim for lost municipal investment. There, the plaintiff city Rohnert Park brought antitrust claims based on the development of a regional shopping center in a neighboring city after Rohnert Park had already made investments for such a shopping center within its own boundaries. *Rohnert Park*, 601 F.2d at 1042–43. After acknowledging that a city may bring antitrust claims based only on its propriety interests (and not in a parens patriae capacity) the Ninth Circuit

---

[12] It is also not clear that Oakland's status as an "indirect" landlord, with the OACCA as a middleman directly contracting with the Raiders, bars Oakland's claims. Neither party cites authority addressing analogous circumstances where, as was allegedly the case here, an antitrust plaintiff negotiated directly with the defendant despite their contractual relationship running through a third party. Moreover, Oakland alleges that it sought to build a new stadium in partnership with the Raiders and other investors, with no allegation that the OACCA or any other intermediary would be involved in that relationship. At this time, while it remains unclear whether Oakland can amend to cure the more straightforward question of antitrust injury addressed above, Court declines to resolve the issue of whether Oakland's "indirect" relationship with the Raiders bars its antitrust claims.

1    summarily rejected Rohnert Park's argument that its investment by raising and disbursing special

2    assessment funds was a sufficient interest to support an antitrust claim:

3            Rohnert Park . . . contends that it acted in a proprietary capacity in
             raising and disbursing the special assessment funds used to improve
4            the commercial zone. It cites no authority supporting the contention
             that this is a sufficient proprietary interest under § 16, and we decline
5            to so hold.

6    *Id.* at 1044 (footnote omitted).  That case is binding authority as to this Court, and Oakland has not

7    offered any explanation for why it does not apply to Oakland's investment of municipal funds in

8    the Coliseum.  Oakland therefore cannot recover damages based on investment in stadium

9    development comparable to the municipal investment at issue in *Rohnert Park*.

10           Oakland also cannot recover damages based on lost tax revenue from the broad scope of

11   economic activity associated with the presence of a professional football team.  Defendants rely on

12   the Supreme Court's holding in *Hawaii v. Standard Oil Co. of California*, 405 U.S. 251 (1972),

13   that the Clayton Act's authorization of private suits for injury to "business or property" does not

14   allow a state to sue as parens patriae for damages based on general damage to its economy.  In

15   reaching that outcome, the Court concluded that where a "State seeks damages for injuries to its

16   commercial interests, it may sue under § 4[, b]ut where, as here, the State seeks damages for other

17   injuries,"—including those based on its "quasi-sovereign interests"—"it is not properly within the

18   Clayton Act."  *Id.* at 264.  Defendants here, as well as the United States in a statement of interest

19   (dkt. 55) filed pursuant to the attorney general's authority under 28 U.S.C. § 517,[13] contend that

20   damages based on lost taxes fall in the latter category as an element of the state's sovereign rather

21   than commercial interest.

22           While Oakland is correct that it has a more personal and proprietary interest in damages

23

24   ───────────────
     [13] At least one court has questioned the propriety of such statements and refused to allow a
     statement of interest—there, after the United State declined to intervene in a qui tam case. *United*
25   *States ex rel. Ruckh v. Salus Rehab.*, No. 8:11-CV-1303-T-23TBM, 2017 WL 1495862, at *1
     (M.D. Fla. Apr. 26, 2017); *see also, e.g.*, *LSP Transmission Holdings, LLC v. Lange*, 329 F. Supp.
26   3d 695, 703 (D. Minn. 2018) (declining as a matter of discretion to consider a statement of interest
     filed months after briefing had concluded).  The Court declines to address that issue in this
27   instance.  The United States' statement in this case does not raise arguments significantly different
     from those presented in Defendants' briefs, and the outcome of the present motion would not
28   differ if the statement were excluded.

United States District Court
Northern District of California

based on lost tax revenue than a state has in a parens patriae suit for "injury to its general economy," *see Hawaii*, 405 U.S. at 263–64, lost tax revenue based broadly on "the presence of the Raiders and the economic activity their presence generates," Compl. ¶ 96, is not the sort of injury to "business or property" compensable under the antitrust laws, *see* 15 U.S.C. § 15(a).  Of the factors relevant to antitrust standing, "the directness of the injury," "the risk of duplicative recovery," and "the complexity in apportioning damages," *see Knevelbaard Dairies*, 232 F.3d at 987, most clearly weigh against Oakland's theory, because the taxes Oakland claims to have lost would have been assessed on transactions involving countless third parties, any of whom might (or might not) be entitled to their own claims if, as Oakland contends, the Raiders' relocation arose from violations of the Sherman Act.  Oakland cites no case allowing a comparable theory of damages under the Clayton Act, and the Court DISMISSES Oakland's claims to the extent they are based on lost tax revenue based on undefined "economic activity" associated with the Raiders.

The Court does not reach the question of whether lost tax revenue can ever constitute recoverable damages in an antitrust action.  Defendants cite no case so holding, and instead rely on an otherwise-inapplicable 1872 decision by the Supreme Court for the proposition that a "'tax is a demand of sovereignty.'"  Mot. at 10 (quoting *In re State Freight Tax*, 82 U.S. 232, 278 (1872), *abrogated on other grounds as recognized by Okla. Tax Comm'n v. Jefferson Lines, Inc.*, 514 U.S. 175, 181–83 (1995)).  Because antitrust damages must be based on "commercial interests," *see Hawaii*, 406 U.S. at 264, Defendants argue that the "sovereign" interest in taxation does not qualify.  Mot. at 10.  While Oakland does not specifically allege such damages here, there could perhaps be circumstances where a tax specifically negotiated as part of an agreement between a local government and a private entity could take on a "commercial" instead of—or as well as— "sovereign" character.  *Cf. Hemi Grp., LLC v. City of New York*, 559 U.S. 1, 30 (2010) (Breyer, J., dissenting) (concluding that lost tax revenue could, in at least some circumstances, constitute harm to "business or property" under language in the RICO Act similar to that at issue here in the Clayton Act, an issue not reached by the majority).  With no such damages alleged in the present complaint, however, the Court declines to resolve that issue on the present motion.

Oakland's remaining categories of damages are "other income that it derives from the

presence of the Raiders" and diminution of value of the Coliseum.  Compl. ¶ 96.  The reference to "other income" is too vague and conclusory to determine whether it encompasses recoverable damages that might establish antitrust injury.  As for the value of the Coliseum, Defendants argue only that Oakland lacks a direct ownership interest in the stadium.  While the nature of Oakland's ownership interest is unclear from the present complaint, *see* Compl. ¶ 17 (alleging that Oakland is an "indirect owner"), Oakland asserts in its opposition brief that it (along with Alameda County) directly owns the Coliseum, Opp'n at 8, and could presumably amend to so allege.  Of course, a damages theory based entirely on diminution of value of the Coliseum after the Raiders' departure would require Oakland to plausibly allege not only that the Raiders would have remained in Oakland but for Defendants' purported antitrust violation, but also that the Raiders would have remained at the Coliseum, rather than a new stadium such as envisioned by the proposal involving Ronnie Lott's investment group, because in the latter scenario the Coliseum would no longer host an NFL team regardless of whether the Raiders relocated to Las Vegas or to a new stadium in Oakland.

Oakland's theory of the relevant market—cities offering or willing to offer "home stadia and other support to major league professional football teams in the geographic United States," Compl. ¶ 88—is somewhat unorthodox.  Although *L.A. Memorial Coliseum* considered a somewhat similar market for "[f]ootball stadia," 791 F.2d at 1365, Oakland cites no case recognizing a market comprised of cities seeking to attract professional sports franchises.  Failure to plead a relevant market for a rule of reason antitrust claim warrants dismissal, *Hicks v. PGA Tour, Inc.*, 897 F.3d 1109, 1120 (9th Cir. 2018), and as Defendants note, markets defined by their consumers rather than the products at issue are not generally cognizable, *Newcal Indus., Inc. v. Ikon Office Sol.*, 513 F.3d 1038, 1045 (9th Cir. 2008).  Oakland's reference to "support to major league professional football teams" raises issues with respect to that rule, although Oakland may be able to amend to allege specific forms of "support" that happen to be unique to NFL teams.  As Defendants also note, Oakland's complaint includes only conclusory assertions that other professional sports franchises do not complete with NFL teams for stadiums.  *See* Compl. ¶ 89 ("Not only is the entire Host City tied up in the NFL process, a professional baseball team is not a

1   substitute for a professional football team.").  Oakland's complaint does not address the test of

2   "whether a hypothetical monopolist could impose a 'small but significant nontransitory increase in

3   price' ('SSNIP') in the proposed market," or whether potential host cities would respond to such

4   an increase by substituting other "products."  *See Saint Alphonsus Med. Ctr.-Nampa Inc. v. St.*

5   *Luke's Health Sys., Ltd.*, 778 F.3d 775, 784 (9th Cir. 2015).  On the other hand, the massive public

6   subsidies of NFL stadiums and the competition among cities alleged in the complaint tend to

7   suggest a market at least similar to Oakland's proposed definition.  While the Court declines to

8   resolve whether Oakland's current allegations support a cognizable relevant market, if Oakland

9   chooses to amend its complaint, it should consider Defendants' arguments regarding this issue.

10          **C.    Breach of Contract**

11          Oakland asserts that it can bring a claim for breach of the NFL's relocation policy based on

12  its status as a third-party beneficiary of the policy, a doctrine originating in common law and

13  codified as section 1559 of the California Civil Code.[14]  Defendants argue that the relocation

14  policy is not a contract, although they do not dispute that the NFL's bylaws constitute a contract.

15  The Court assumes for the sake of argument that, in vesting the Commissioner with authority to

16  interpret the bylaws and "establish policy and procedure," Compl. Ex. 1 art. 8.5, the bylaws are at

17  least amenable to interpretation under which they bind member teams to the Commissioner's

18  interpretations and policies, such that breach of a policy established under article 8.5 can be

19  enforced as a breach of the bylaws themselves.

20          Defendants' stronger argument is that Oakland lacks standing as a third-party beneficiary.

21  In order to establish such standing, a plaintiff must establish all of the following elements:

22                  (1) whether the third party would in fact benefit from the contract, but
                    also (2) whether a motivating purpose of the contracting parties was
23                  to provide a benefit to the third party, and (3) whether permitting a
                    third party to bring its own breach of contract action against a
24                  contracting party is consistent with the objectives of the contract and
                    the reasonable expectations of the contracting parties.
25

26  *Goonewardene v. ADP, LLC*, 6 Cal. 5th 817, 830 (2019); *see also Spinks v. Equity Residential*

27  _____

28  [14] "A contract, made expressly for the benefit of a third person, may be enforced by him at any
    time before the parties thereto rescind it."  Cal. Civ. Code § 1559.

United States District Court
Northern District of California

*Briarwood Apartments*, 171 Cal. App. 4th 1004, 1024 (2009) (addressing the purported

beneficiary's burden).[15]   Although disputes regarding purported third-party beneficiaries may in

some circumstances be questions of fact, *Souza v. Westlands Water Dist.*, 135 Cal. App. 4th 879,

891 (2006), dismissal at the pleading stage is appropriate where it is clear from the terms of the

contract and the circumstances alleged in the complaint that the plaintiff was not a third-party

beneficiary, *see Goonewardene*, 6 Cal. 5th at 822–37, 842–43 (reversing a contrary decision by

the appellate court and reinstating a trial court judgment entered after sustaining a demurrer

without leave to amend).

        The first element is a relatively low hurdle in this case.  As an existing host city, Oakland

would benefit from policies that restrict the ability of the Raiders to leave Oakland for a new city.

The remaining elements are not as favorable to Oakland's claim.

        To show a "motivating purpose" of benefiting host cities, Oakland relies on a passage of

the relocation policy providing that:

> each club's primary obligation to the League and to all other member
> clubs is to advance the interests of the League *in its home territory*.
> This primary obligation includes, but is not limited to, maximizing
> fan support, including attendance, in its home territory.

Compl. ¶ 4 (quoting Compl. Ex. 2 at 1).  While Oakland is correct that this provision includes a

reference to "home territory," it also makes clear on its face that the obligation is owed "to the

League and to all other member clubs," with no indication of obligations owed to local

governments. *See id.*  Some other passages of the policy might, read in isolation, tend to support

Oakland's proposed reading.  *E.g.*, Compl. Ex. 2 at 1, § A.1 ("[C]lubs are obligated to work

diligently and in good faith to obtain and to maintain suitable stadium facilities in their home

territories . . . .").  Taken as a whole, however, the policy repeatedly reinforces the conclusion that

its overriding motivation is the NFL's business interests.

        Oakland argues and alleges that the NFL enacted the relocation policy, including the

---

[15] Although Defendants briefly preserve an argument that the NFL's governing documents should
be interpreted under New York law, both parties rely primarily on California authority in their
arguments regarding Oakland's contract claim, and the Court assumes for the purpose of this order
that California law applies.

1   factors that Oakland claims the NFL failed to consider, in response to the 1984 decision in *Los*

2   *Angeles Memorial Coliseum* holding the NFL's unconstrained authority to block relocations under

3   article 4.3 to be a violation of the Sherman Act.  Compl. ¶ 3; Opp'n at 22.  In that case, the Ninth

4   Circuit did not suggest that the NFL owed a duty to host cities, but instead held that "[t]o

5   withstand antitrust scrutiny, restrictions on team movement should be more closely tailored to

6   serve the needs inherent in producing the NFL 'product' and competing with other forms of

7   entertainment."  *L.A. Mem'l Coliseum*, 726 F.2d at 1397.  Taking as true Oakland's allegation that

8   the Ninth Circuit's decision motivated the NFL to enact its relocation policy to avoid antitrust

9   scrutiny only reinforces the conclusion that it was intended solely to benefit the NFL and its

10  member teams, not existing host cities.

11       The third element, addressing the parties' expectations, also requires dismissal of

12  Oakland's contract claim.  The California Supreme Court explained this element as follows:

> With regard to the third element, we observe that academic
> commentators have pointed out that the parties to a contract are
> typically focused on the terms of performance of the contract rather
> than on the remedies that will be available in the event of a failure of
> performance [citation], and that our cases have not required a showing
> that the contracting parties actually considered the third party
> enforcement question as a prerequisite to the applicability of the third
> party beneficiary doctrine. [citations] Accordingly, the third element
> does not focus upon whether the parties specifically intended third
> party enforcement but rather upon whether, taking into account the
> language of the contract and all of the relevant circumstances under
> which the contract was entered into, permitting the third party to bring
> the proposed breach of contract action would be "consistent with the
> objectives of the contract and the reasonable expectations of the
> contracting parties." [citation] In other words, this element calls for a
> judgment regarding the potential effect that permitting third party
> enforcement would have on the parties' contracting goals, rather than
> a determination whether the parties actually anticipated third party
> enforcement at the time the contract was entered into.
>
> Furthermore, the requirement in the third element that third party
> enforcement be consistent with "the objectives of the contract" is
> comparable to the inquiry, proposed in Professor Eisenberg's article,
> regarding whether third party enforcement will effectuate "'the
> contracting parties' performance objectives,'" namely "those
> objectives of the *enterprise* embodied in the contract, read in the light
> of surrounding circumstances . . . ." [citation]

27  *Goonewardene*, 6 Cal. 5th at 830–31 (ellipsis in original).

28       In *Goonewardene*, the court held that an employee did not satisfy this element with respect

1    to a contract between her employer and its payroll processor, because the employer was itself in a

2    position to sue the payroll processor for any breach that rendered the employer liable for wage and

3    hour violations, and thus, "[s]imply put, permitting an employee to sue [the payroll processor] for

4    an alleged breach of its contractual obligations to [the employer was] not necessary to effectuate

5    the objectives of the contract." *Id.* at 836. The California Supreme Court also discussed one of its

6    previous decisions, where job trainees lacked standing to bring a claim based on the terms of a

7    government contract for the private entity that provided their training program, noting that, among

8    other factors, the existence of an administrative process to resolve disputes between the

9    government and the training company as evidence that the parties did not intend that the contract

10   would be enforced through suits brought by dissatisfied trainees. *Id.* at 832 (discussing *Martinez*

11   *v. Socoma Cos., Inc.*, 11 Cal. 3d 394, 401–02 (1974)).

12   Here, the section of the policy introducing the factors that Oakland claims Defendants

13   failed to consider makes clear that the factors are intended to inform Defendants' determination of

14   their own best business interests:

15           The League has analyzed many factors in making prior business
16           judgments concerning proposed franchise relocations. Such business
             judgments may be informed through consideration of the factors
17           listed below, as well as other appropriate factors that are considered
             relevant by the Commissioner or the membership.[16]

18           [. . .]

19           In considering a proposed relocation, the Member Clubs are making
20           a business judgment concerning how best to advance their collective
             interests. Guidelines and factors such as those identified below are
21           useful ways to organize data and to inform that business judgment.
             They are intended to assist the clubs in making a decision based on
22           their judgment and experience, and taking into account those factors
             deemed relevant to and appropriate with regard to each proposed
23           move.

24   Compl. Ex. 2 at 3, § C.

25

26   [16] A footnote included here in the policy states that the list of factors was largely "contained in a
     bill reported by a Senate committee in 1984," but "essentially restate matters that the League has
27   considered important in connection with team location decisions in the past." Compl. Ex. 2 at 3
     n.1. The footnote also states that the "factors are also contained in a 'Statement of Principles'
28   relating to franchise location developed by the League in consultation with the U.S. Conference of
     Mayors." *Id.*

United States District Court
Northern District of California

The "objectives of the enterprise embodied in the contract," *see Goodewardene*, 6 Cal. 5th at 831 (citation and emphasis omitted), are the NFL's business interests, not the interests of host cities. Moreover, like in *Martinez*, where an administrative process to resolve disputes between the contracting parties weighed against granting a third-party beneficiary the right to sue, the contract lays out a process to resolve whether a proposed relocation satisfies the NFL teams' business interests: the vote of the NFL's member teams themselves. Oakland's conclusory assertion that "enforcement of the Policies [by a host city against] Defendants is consistent with their objectives and reasonable" because the policy implicates "the investment and distribution of hundreds of millions of dollars of public funds" does not establish either that *Defendants*, as the contracting parties, intended that host cities should be able to sue for breach of the relocation policy, or that allowing such lawsuits would promote *Defendants'* own purposes of protecting their business interests and avoiding antitrust liability. This Court is bound by the test set by the California Supreme Court, which does not consider whether allowing suit by a third party would serve public interests separate from the interests of the contracting parties.

As noted above, Oakland must establish each of the three *Goonewardene* elements to be able to sue for breach of a contract to which it was not a party. Because the face of the relocation policy and Oakland's own allegations indicate both that Defendants did not promulgate the policy to protect host cities and that allowing host cities to enforce the policy is not "consistent with the objectives of the contract and the reasonable expectations of the contracting parties," Oakland's breach of contract claim is DISMISSED. Although this order need not reach Defendants' remaining arguments regarding the contract claim, the issues of whether the relocation policy's statement that teams' "business judgments may be informed through consideration of the factors listed below, as well as other appropriate factors" is a sufficiently definite promise to be enforceable and whether Oakland has plausibly alleged a breach of that provision would likely also support dismissal of Oakland's contract claim, and Oakland should consider those issues in deciding whether or how to pursue this claim in an amended complaint.

### D.   Quantum Meruit and Unjust Enrichment

Oakland's final claims are captioned as claims for "quantum meruit" and "unjust

United States District Court
Northern District of California

enrichment." Compl. ¶¶ 147–61.  "A quantum meruit or quasi-contractual recovery rests upon the equitable theory that a contract to pay for services rendered is implied by law for reasons of justice. . . . However, it is well settled that there is no equitable basis for an implied-in-law promise to pay reasonable value when the parties have an actual agreement covering compensation." *Hedging Concepts, Inc. v. First All. Mortg. Co.*, 41 Cal. App. 4th 1410, 1419 (1996).  Courts interpret claims for "unjust enrichment" in the same manner:

> [U]njust enrichment is "not a cause of action . . . or even a remedy, but rather a general principle, underlying various legal doctrines and remedies. It is synonymous with restitution." *McBride v. Boughton*, 123 Cal. App. 4th 379, 387 (2004). As such, a claim for unjust enrichment is properly pled as a claim for a contract implied-in-law. It "does not lie when an enforceable, binding agreement exists defining the rights of the parties." *Paracor Fin., Inc. v. Gen. Elec. Capital Corp.*, 96 F.3d 1151, 1167 (9th Cir. 1996). California, however, recognizes an exception to the rule that unjust enrichment does not lie when an enforceable contract exists: "Restitution may be awarded in lieu of breach of contract damages when the parties had an express contract, but it was procured by fraud or is unenforceable or ineffective for some reason." *McBride*, 123 Cal. App. 4th at 388.

*Boon Rawd Trading Int'l Co. v. Paleewong Trading Co.*, 688 F. Supp. 2d 940, 956 (N.D. Cal. 2010).

Oakland alleges that the terms of the Raiders' tenancy at the Coliseum—including Oakland's investment in the Coliseum and other Raiders facilities—were governed by a signed lease agreement, which was extended at least once.  Compl. ¶¶ 47, 52.  Oakland does not address either the rule that implied contract claims do not lie where an enforceable contract exists or the exception for unenforceable contracts, and there is no indication that the lease agreement was unenforceable, that the Raiders breached any term of that express contract, or that Oakland provided any investment or services to the Raiders at any time when an express lease agreement was not in place.  Oakland's quantum meruit and unjust enrichment claims are therefore DISMISSED.

/ / /

/ / /

/ / /

/ / /

United States District Court
Northern District of California

## IV.    CONCLUSION

For the reasons discussed above, Defendants' motion is GRANTED, and Oakland's claims are DISMISSED.  If Oakland is able to cure the defects identified in this order, it may file an amended complaint no later than September 9, 2019

**IT IS SO ORDERED.**

Dated: July 25, 2019

_____
JOSEPH C. SPERO
Chief Magistrate Judge