Pages 1-49

1                        UNITED STATES DISTRICT COURT
                        NORTHERN DISTRICT OF CALIFORNIA
2                          SAN FRANCISCO DIVISION

3

4    CITY OF OAKLAND,              )  Case No.  18-cv-07444-JCS
                                   )
5             Plaintiff,           )  San Francisco, California
                                   )  Courtroom G, 15th Floor
6        v.                        )  Friday, July 19, 2019
                                   )
7    OAKLAND RAIDERS, et al.,      )
                                   )
8             Defendants.          )
     _____)

9

10          TRANSCRIPT OF FURTHER CASE MANAGEMENT CONFERENCE
                        AND MOTION HEARING
11           BEFORE THE HONORABLE JOSEPH C. SPERO
             UNITED STATES CHIEF MAGISTRATE JUDGE

12

13   APPEARANCES:

14   For Plaintiff:                BRUCE L. SIMON, ESQ.
                                   Pearson, Simon & Warshaw, LLP
15                                 44 Montgomery Street, Suite 2450
                                   San Francisco, California 94104
16                                 (415) 433-9000

17                                 MICHAEL H. PEARSON, ESQ.
                                   CLIFFORD H. PEARSON, ESQ.
18                                 Pearson, Simon & Warshaw LLP
                                   15165 Ventura Boulevard, Suite 400
19                                 Sherman Oaks, California 91403
                                   (818) 788-8104
20
                                   BARBARA J. PARKER, ESQ.
21                                 MARIA BEE, ESQ.
                                   Oakland City Attorney's Office
22                                 One Frank H. Ogawa Plaza, 6th Floor
                                   Oakland, California 94612-1999
23                                 (510) 238-3815

24

25   Proceedings recorded by electronic sound recording; transcript
     produced by transcription service.

2

```
 1   APPEARANCES:  (Cont'd.)

 2   For Plaintiff:               JAMES W. QUINN, ESQ.
                                  MICHAEL M. FAY, ESQ.
 3                                Berg & Androphy
                                  120 West 45th Street, 38th Floor
 4                                New York, New York 10036
                                  (646) 766-0073
 5
     For Defendant               DANIEL B. ASIMOW, ESQ.
 6   Oakland Raiders:            Arnold & Porter Kaye Scholer, LLP
                                  Three Embarcadero Center, 10th Floor
 7                                San Francisco, California 94111-4024
                                  (415) 471-3100
 8
     For Defendants Arizona      JOHN E. HALL, ESQ.
 9   Cardinals Football Club LLC, Covington & Burling LLP
     Atlanta Falcons Football     One City Center
10   Club, LLC, Baltimore Ravens 850 Tenth Street, NW
     Limited Partnership, Buffalo Washington, DC 20001-4956
11   Bills, LLC, Panthers         (202) 662-5104
     Football, LLC, Chicago Bears
12   Football Club, Inc.,         BENJAMIN J. RAZI, ESQ.
     Cincinnati Bengals, Inc.,    Covington & Burling, LLP
13   Cleveland Browns Football    1201 Pennsylvania Avenue, NW
     Company LLC, Dallas Cowboys  Washington, DC 20004
14   Football Club, Ltd., PDB     (202) 662-5463
     Sports, Ltd., Detroit Lions,
15   Inc., Green Bay Packers, Inc.,
     Houston NFL Holdings, LP,
16   Indianapolis Colts, Inc.,
     Jacksonville Jaguars, LLC,
17   Kansas City Chiefs Football
     Club, Inc., Chargers
18   Football Company, LLC, Rams
     Football Company, LLC,
19   Miami Dolphins, Ltd.,
     Minnesota Vikings Football,
20   LLC, New York Football
     Giants, Inc., New York Jets
21   LLC, Philadelphia Eagles,
     LLC, Pittsburgh Steelers
22   LLC, Forty Niners Football
     Company LLC, Football
23   Northwest LLC, Buccaneers
     Team LLC, Tennessee
24   Football, Inc., Pro-
     Football, Inc., National
25   Football League,
```

3

1  APPEARANCES:  (Cont'd.)

2  For Defendants New England        JOHN E. HALL, ESQ.
   Patriots, LLC, New Orleans        (See Above for Address)
3  Louisiana Saints, LLC:
                                     BENJAMIN J. RAZI, ESQ.
4                                    (See Above for Address)

5  For Interested Party             JEFFREY D. NEGRETTE, ESQ.
   United States of America:        Department of Justice
6                                   Antitrust
                                    950 Pennsylvania Avenue, NW
7                                   Office 3224
                                    Washington, DC 20530
8                                   (202) 598-2384

9  Transcription Service:          Peggy Schuerger
                                   Ad Hoc Reporting
10                                  2220 Otay Lakes Road, Suite 502-85
                                   Chula Vista, California 91915
11                                  (619) 236-9325

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1    SAN FRANCISCO, CALIFORNIA  FRIDAY, JULY 19, 2019  9:27 A.M.

2                              --oOo--

3              THE CLERK:  We are calling Case Number 18-cv-07444, the

4    City of Oakland v. The Oakland Raiders.

5              THE COURT:  Appearances, please.

6              MR. SIMON:  Good morning, Your Honor.  Bruce Simon,

7    Pearson, Simon & Warshaw, on behalf of the City of Oakland, and

8    I'd like to introduce you to the City Attorney, Barbara Parker is

9    here, --

10             THE COURT:  Welcome.

11             MR. SIMON:  -- and the Deputy City Attorney, Maria Bee.

12             THE COURT:  Welcome.  Welcome.

13             MR. QUINN:  Good morning, Your Honor.  Jim Quinn from

14   Berg & Androphy, also representing the City of Oakland.

15             THE COURT:  Welcome.

16             MR. M. PEARSON:  Good morning, Your Honor.  Michael

17   Pearson from Pearson, Simon & Warshaw on behalf of the City.

18             THE COURT:  Okay.

19             MR. FAY:  And, Your Honor, Michael Fay from Berg &

20   Androphy on behalf of Oakland as well.

21             MR. ASIMOW:  Good morning, Your Honor.  Daniel Asimow,

22   Arnold & Porter, for the Raiders.

23             MR. HALL:  Good morning, Judge.  John Hall, Covington &

24   Burling, for the National Football League and the other 31 clubs

25   besides the Raiders, and with me is my partner, Ben Razi.

1              THE COURT:  Welcome.

2              MR. RAZI:  Good morning, Your Honor.

3              MR. NEGRETTE:  Good morning, Your Honor.  Jeff Negrette

4      for the United States.

5              THE COURT:  Oh, welcome.  The United States is here.

6      Great.  You didn't travel from Washington for this, did you?

7              MR. NEGRETTE:  I did.

8              THE COURT:  Wow.  That is dedication.  Or maybe you just

9      wanted to get out of Washington, especially in July.

10             MR. NEGRETTE:  Pretty hot there, Your Honor.

11             THE COURT:  July is -- this week especially.

12             MR. NEGRETTE:  It's been hot.

13             THE COURT:  So let me tell you my preliminary thoughts

14     about the case.  My bottom line is I think that I would give the

15     Plaintiffs an opportunity to amend to cure the defects that I see

16     in the current pleading.

17        I think that there's no good argument that this is anything

18     other than a Rule of Reason case based on the precedents both from

19     the Circuit in the *Raiders* 1 case, I think, in the *American Needle*

20     case, that has lots of implications, but the first challenge that

21     I think on its face is legitimate is the question about antitrust

22     injury.

23        And what I'll do is I'll go through my thoughts on this and

24     give you a chance to talk me out of it.  There's a lot of people

25     in the audience, but I do have a 10:30 criminal calendar, so we're

1  rather pressed.

2      The question is whether or not there was an antitrust injury

3  that resulted from unlawful conduct.  And the ground is shifting

4  in the sort of two elements that appear to be most prevalent in

5  the opposition brief, at least, and, to a certain degree, in the

6  complaint, but mostly in the opposition brief, are the relocation

7  fee and the 32-team limitation.

8      As to the first, I don't actually see a plausible argument

9  that the relocation fee is anything that resulted in an antitrust

10  injury.  The relocation fee is not something that encouraged the

11  Raiders to leave; if anything, the relocation fee from the

12  Raiders' point of view is certainly -- from any franchise that's

13  moving -- is discouraging of that rule.  There's no show- --

14  certainly no allegation and no showing that but for the fee, the

15  Raiders would have not sought relocation.  In fact, if they didn't

16  have to have approval, if they didn't have to have a relocation

17  fee, it would -- it would be easier to move.

18      It doesn't make sense to me that relocation fee, which makes

19  it more likely, on the other hand, at least how the allegation

20  goes, would be proved as anti-competitive.  In an unrestrained

21  market, in the absence of all those things, people could just

22  move.  The fact that they can move more freely because they pay

23  this fee I don't think changes that analysis.

24      So I would hold, if I sustain this tentative, that the

25  relocation fee doesn't result in an antitrust injury.

1        The  32-team  limitation  is  more  of  the  type  of  supply

2    restriction that we're used to dealing with in antitrust cases and

3    a supply restriction can have -- result in antitrust injuries.  I

4    don't  think  that  the  allegations  are  currently  sufficient,  but

5    they  might  be  able  to  be  made  sufficient  with  respect  to  those

6    limitations.

7        The  --  and  what  I'm  not  willing  to  do  is  take  on  in  this

8    round  of  briefing  the  argument  that  was  largely  contained  in  the

9    reply  brief,  that  the  32-team  restriction  is  a  lawful  and

10   reasonable restriction because it's not fully briefed.  And it may

11   actually  end  up  being  the  heart  of  the  case,  and  maybe  we'll  have

12   to  deal  with  it  in  the  next  round,  but  I'm  not  going  to  do  it  the

13   way  the  briefing  has  unfolded  in  this  room.

14       On  this  round,  the  allegations  of  Oakland  appear  to  me  to  be

15   insufficient  with  respect  to  their  being  harmed  by  the  32-team

16   restriction.   They've  got  nothing  that's  very  useful  in  that

17   regard  in  the  complaint.   In  the  briefing,  they  have  something

18   that  was  not  in  the  complaint,  some  conclusory  assertions  that

19   without  limitation,  they  would  have  gotten  a  team,  essentially.

20   There  would  have  been  33  teams  or  there  would  have  been  35  teams

21   or  whatever  it  says.

22       You  know,  I  --  it's  not  in  the  complaint,  so  we're  going  to

23   have  to  go  to  the  next  step  and  grant  leave  to  amend,  but  I

24   guarantee  that  on  its  face,  if  that's  all  you  say  in  the

25   complaint,  the  case  will  be  dismissed  because  that's  not

1  sufficient.  That is to say, the conclusory assertion that there

2  would have been 33 teams or that there would have been 35 teams is

3  not, without other factual development, sufficient in my mind to

4  show the kind of antitrust injury that you need to show, at least

5  have allegations about.  You need detailed factual recitation of

6  the -- you know, that but for the 32-team restriction, you know,

7  whatever specific consequences there are -- there would have been

8  another -- there would have been -- we know that there are people

9  who are trying to make teams and they've said that they would have

10 put a team here or they would have put a team there.  But just

11 sort of this in the air "we would have gotten a team" doesn't make

12 it for me when it comes to your allegation.

13      So the -- you know, that's sort of to me the beginning and

14 the end of the story in terms of that I need to dismiss the case

15 with leave to amend.  But there are several embedded issues that

16 I wanted to give you some guidance on and potentially hear from

17 you today on as well, if you would like, that I'm going to cover

18 when we address this in writing that would be useful in deciding

19 how you're going to amend.

20      The first question arises are injuries as a landlord

21 cognizable under antitrust laws?  And the answer is not the way

22 you've alleged it, but possibly.  I don't think that the precedent

23 absolutely forecloses someone who sustains an injury due to anti-

24 competitive conduct from recovering just because they are a

25 landlord and is in their capacity as landlord that they are

1  injured.  There's loose language about landlords, but I don't --

2  but the actual holdings of the case are not quite so broad.  If

3  the injuries are in the market at issue -- so, for example, if

4  it's the rental market, then there's an argument that part of this

5  has to do with the rental market, then it's potentially possible.

6      I mean, if you had a situation where everyone in any

7  particular industry all of the suppliers got together -- the

8  suppliers being people who rented from some series of landlords

9  and decide, We're not going to rent to any landlord who doesn't

10  pay these super-competitive prices and we all agree to that.  So

11  when, you know, John Doe who has a building won't reduce our rent

12  or whatever it is, then that could be something.  It's not -- I

13  think the allegations of the complaint even on ownership are,

14  shall we say, a little imprecise and most of this needs to be

15  cleaned up and it needs to be an injury that is in the market that

16  is at issue.

17      Second, investment loss.  So municipal investment loss of the

18  kind that was discussed in the *Rohnert Park* case where, you know,

19  you raise money through normal taxation or assessments or whatever

20  it is and then you spend it on infrastructure and that's an

21  investment, that's not recoverable.

22      But the investment loss that is at issue in this case, I have

23  no idea what it is because -- I mean, maybe I do in my head

24  because I read the papers, but I don't know what it is from the

25  complaint because it doesn't say.  So you'd need to spell out what

1    it is to make sure -- to explain to the Court why it doesn't fall

2    under the teaching of *Rohnert Park* and other cases that these sort

3    of pure municipal investments are not cognizable in antitrust

4    cases.

5        Taxes.  Taxes, whether it's Judge Breyer or Judge Ginsburg

6    dissenting, are not entirely clear to me what the result is.  I

7    think it's clear that the normal sort of taxes that we think of as

8    benefits that result from getting a big enterprise into a

9    municipality are not recoverable.  They're not cognizable as an

10   antitrust injury.

11       I suppose I could think of situations where it's not like

12   that, where it is much more tied directly to the commercial

13   activity and based on direct commercial contracts with the big

14   entity that's moving in and providing all this revenue.  So the

15   fact that it actually comes in the form of taxes may just be a

16   part of the question in deciding whether it's commercial activity

17   for which you can recover under the antitrust laws.

18       Right now, there's no -- the allegation says taxes from sort

19   of generalized taxes.  That wouldn't be sufficient.  If you want

20   to get that as your antitrust injury, you need to do better than

21   that.

22       There's also vague conclusory language about other income

23   that Oakland derives.  You know, if you want that to be included

24   in the thought process about having an antitrust injury, you have

25   to spell that out.

1      The next -- and I think really the pointed question in the

2 case -- is relevant market.  I am not sure what the relevant

3 market is.  I think one of the great teachings of the Raider

4 series of cases is we don't have to define it with precision.

5 It's -- I don't know quite how that works, but that's certainly

6 what the Ninth Circuit said.

7      But I'm pretty sure that it's not the vaguely-defined market

8 that the Plaintiffs -- you know, just a bunch of -- anybody who

9 really wants a stadium or anybody who really wants an NFL team.

10 I don't know what that is, and that's not a product.  So that

11 you're going to have to take another stab at the -- at what the

12 market is that is more precisely defined and is defined by a

13 product and that we can test by the usual mechanisms for defining

14 market so you'll know is it -- and I'm not sure what it is.  I

15 don't know whether it's the market for suppliers of stadiums.  I

16 don't know if it's the market for -- you know, for the patronage

17 of NFL teams.  That seems a little loosey-goosey to me, but I

18 haven't really thought it through because I just was focusing on

19 the way to define it.

20      The only part of the case that I'm inclined to dismiss with

21 prejudice is the breach of contract action.  I think it's very

22 clear that Oakland is not a third party beneficiary under the

23 recent California Supreme Court precedent.  There's nothing in the

24 so-called contract, in the guidelines that were promulgated by the

25 Commissioner, which indicate that it was done to benefit the host

1   location.  To the contrary, the exact language quoted by Oakland

2   shows that it was designed to benefit "the League" in the host

3   location.  So I think it's clear that it's not motivated -- which

4   is one of the tests -- to benefit a host location.

5        I also think that enforcement of this contract by Oakland

6   does not further the objective of the contract.  The objective of

7   the contract is to promote, as it says over and over again, the

8   business interests of the clubs and the League.  I'm not -- I'm

9   pretty clear that the adding enforcement by a potential host

10  against the clubs and the League is not what these people

11  envisioned in deciding that.

12       So I also think that, frankly, there's no -- there are

13  insufficient allegations of breach.  If you read -- I find it

14  somewhat bizarre that the NFL is taking the position that the

15  guidelines that were promulgated to protect the NFL and its clubs

16  from antitrust cases are not binding on the clubs and the NFL.  I

17  hope you won't be seeing that in the next suit by a team that's

18  trying to move and you're trying to keep from moving, but I do

19  agree, actually, that while it may have certain implications, it

20  is, with respect to the relevant things for which a breach is

21  sought, a guideline.  They are factors that "may" be considered by

22  the members.  That's the word that's used.  They do not appear to

23  be mandatory.  And it's -- it -- so it's questionable as to

24  whether or not there can be one.  The argument on the other side

25  is, I suppose if you didn't consider any of those factors, that

1   would be a potential allegation, but I don't -- even so, it says

2   they may consider it.  It's not the sort of thing that they have

3   to consider.

4       So that's my tentative.  Let's see which way the wind blows.

5   So why don't I hear from the Plaintiffs.

6           MR. QUINN:  Your Honor, Jim Quinn again and I'm going to

7   address the antitrust issues.

8           THE COURT:  Yes, please.

9           MR. QUINN:  And my colleague, Mr. Simon, will talk with

10  regard to the contractual issues.

11          THE COURT:  Okay.

12          MR. QUINN:  Okay.  So I'm taking them in order.  Let me

13  flip one of them.  We are not -- and I think Your Honor also

14  articulated this -- we are not attacking the 32-team limitation

15  per se.  It may or may not be legal, but --

16          THE COURT:  That's flatly contradicted by your reply

17  brief, flatly, flatly contradicted.  When asked the question, you

18  know -- get the reply brief out and I'll point it out to you

19  because it's in the introduction and it struck me and I paid close

20  attention to it because I had thought there might be some other

21  theory than the one that I was thinking about.  And I was

22  wondering what it is.  And so I looked in the reply brief and it

23  says, "There's no antitrust injury" -- this is the argument of the

24  Defense -- "because competition is increased rather than

25  decreased."

1  Okay.  The answer to that, to quote the reply brief, "But, in

2 reality, competition was artificially constrained by the 32-team

3 cap."

4  I don't -- what is left if you don't have the 32-team cap?

5   MR. QUINN:  Perhaps the -- we were inartful in how we

6 were expressing it, Your Honor.  But --

7   THE COURT:  Okay.

8   MR. QUINN:  -- what our argument is, is that it's not

9 the cap itself that is illegal.  It's the manner in which the

10 League and the teams -- because *Raiders* case -- in the context of

11 Section 4.3, the relocation rules that are in the constitution,

12 the *Raiders* cases hold for the proposition that the manner in

13 which the NFL and the NFL teams operate with regard to 4.3, that

14 they are acting as a cartel.  And as -- because, otherwise, Your

15 Honor, why do they have these rules at all?  They have the 4.3

16 rules  precisely  in  order  to  eliminate  competition  among

17 themselves.  That's what the rules are all about -- so that one

18 team doesn't move into another team's territory.  That's why 43.

19 exists in the first place.

20  So what the *Raiders* cases hold is that when they're operating

21 with regard to relocation under 4.3, putting aside the policies

22 themselves, they act as a cartel.  And when they act as a cartel,

23 they have to -- and that's why this -- the *Raiders* 2, I guess, or

24 maybe  it  was  *Raiders*  1 -- said  that  in  order  to  withstand

25 antitrust scrutiny, they have to have reasonable policy.

1      And what we're saying is that --

2            THE COURT:  Let me just --

3            MR. QUINN:  I'm sorry, Your Honor.  Go ahead.

4            THE COURT:  Let me just take your arm on that.  What the

5  *Raiders* case hold is when you want to restrict supply by refusing

6  to allow the team to move, you have to have reasonable policies.

7  It doesn't say when you do anything as a group with regards to

8  moving, you have to have reasonable policies.  It says "when you

9  restrict supply," because that's the anti-competitive conduct in

10  the first set of *Raiders* cases.  It was just -- there was the

11  supply restriction; right?

12            MR. QUINN:  Well, they were -- in those cases, they were

13  attempting to prevent Oakland from moving to Los Angeles.  That's

14  correct.  But, Your Honor, I don't think it matters whether or not

15  you're talking about moving or staying.  The whole idea when the

16  -- if you read the *Raiders* case, the whole idea when it says "in

17  order to withstand antitrust scrutiny," they were talking about

18  protecting the host city.  That's what they were saying.  If you

19  look at the list of things that they then list as possible rules

20  that they should -- they should promulgate, all of them were to

21  protect the city that might be using the team.  That is -- the

22  whole concept --

23            THE COURT:  See, I don't read that at all into those,

24  I don't read that at all into the policies.  But we're not going

25  to talk about the policies.

1     MR. QUINN:  Okay.  Putting the policy aside, --

2     THE COURT:  Yeah.

3     MR. QUINN:  -- the -- under the *Raiders* case, they were

4  told that they had to have reasonable policies, okay, --

5     THE COURT:  In order to restrict --

6     MR. QUINN:  -- in order to --

7     THE COURT:  -- someone from leaving.

8     MR. QUINN:  Well, the language --

9     THE COURT:  In order to restrict the people -- the team

10  from going from one city to another.  What I'm struggling for is

11  what's the anti-competitive conduct?

12     MR. QUINN:  The anti-competitive conduct, Your Honor, is

13  that -- remember, they're acting as a group, okay?  They have to

14  -- they have to vote together as -- they're competitors and they

15  have to vote together to either allow or disallow a movement.

16     And when they go to a city like Oakland or St. Louis or San

17  Diego and they say, Listen, unless you give us what we want,

18  unless you give us what we say are super-competitive profits by

19  saying you've got to put $700 million up for this or that, which

20  they did in Oakland, they did in St. Louis, they did in San Diego

21  -- that unless you do that, we as a group are going to let this

22  team move.

23     THE COURT:  I see.  So they came to you -- to Oakland

24  and said as a group that that's what's going to happen?

25     MR. QUINN:  Absolutely they did.

1          THE COURT:  I thought it was Oakland that --

2          MR. QUINN:  No, no.

3          THE COURT:  -- said that they wanted to move.

4          MR. QUINN:  No.  Your Honor, and --

5          THE COURT:  Didn't Oakland -- didn't the Raiders decide

6   they wanted to move?

7          MR. QUINN:  The Raiders had decided they wanted to move.

8          THE COURT:  And the Raiders applied to the NFL for

9   permission to move.  Right?

10          MR. QUINN:  Yes, Your Honor, but when the NFL -- in the

11   NFL, the League Office came to Oakland --

12          THE COURT:  Yeah.

13          MR. QUINN:  -- on behalf of the other teams, --

14          THE COURT:  Yeah.

15          MR. QUINN:  -- the League Office acts on behalf of the

16   other teams.  It's not an entity unto itself.  It's only acting on

17   behalf of all the owners.

18          THE COURT:  Yeah.

19          MR. QUINN:  They come to Oakland as a group --

20          THE COURT:  Yeah.

21          MR. QUINN:  -- and they say, Listen, unless you give us

22   what we want, we as a group are gonna vote to let Oakland leave.

23          THE COURT:  And why is that anti-competitive?

24          MR. QUINN:  It's anti-competitive, Your Honor, --

25          THE COURT:  I mean, because Oakland is leaving for a

1    place that is willing to pay more money.

2              MR. QUINN:  It's anti-competitive because what they then

3    have done is they've knocked us out of the market.

4              THE COURT:  What do you mean knocked you out of the

5    market?

6              MR. QUINN:  We don't have a team and --

7              THE COURT:  Well, you don't have -- that doesn't mean

8    you're not in the market.  That means you don't have a team.  But

9    -- but why is that -- what I'm struggling with is you had two

10   cities bidding for this team.  You had Oakland and you had Las

11   Vegas.

12             MR. QUINN:  Right.  Yes.

13             THE COURT:  And they're both -- and Las Vegas bid more

14   money.  For whatever reason, they were bidding more money.  How is

15   it -- what's the anti-competitive conduct --

16             MR. QUINN:  Actually, in fairness, they really -- the

17   bidding was almost -- was almost the same.  The difference was

18   that the NFL owners, because they could put their thumb on the

19   scale and get $375 million in relocation fees, they -- they put

20   their thumb on the scale and said, Okay, we'll get $375 million in

21   relocation fees.  Oakland, you can move.

22             THE COURT:  So -- but that's not why the Raiders move.

23   It's -- that fee, as I've already said, is a disincentive to

24   moving.  So I'm not sure what you're talking about with the fee.

25             MR. QUINN:  Your Honor, with all due respect, I don't

1  believe the fee is really a disincentive to moving, and the reason

2  for that is Oakland Raiders are not going to pay that fee.  The

3  fans in Las Vegas are going to pay that fee.  That's been the --

4  that's --

5          THE COURT:  But that's a ridiculous argument.  That's

6  true of any product.  You can always pass it on to someone else.

7  You always -- but it still fits into the economic analysis when

8  you're trying to go someplace as to what the costs are and whether

9  you can get someone else to pay it.  So adding $300 million

10  matters.  It may be that it doesn't put them over the top, but it

11  certainly matters.  And there's no way it's an incentive for

12  Oakland.  If anything, it's a disincentive for Oakland.

13      But in any event, Oakland makes this choice.  Oakland doesn't

14  choose, I'm going to go because I get to pay $300 million to the

15  NFL.  That's not why they went.  They went because they thought it

16  was a better deal; right?

17          MR. QUINN:  Presumably, that's why they went.  That's

18  correct.

19          THE COURT:  Well, why can't they make that choice?

20          MR. QUINN:  Because, among other things, the *Raiders*

21  case said that, "When the League is acting under 4.3 as a cartel,

22  they can't do it in such a way as to simply squeeze extra through

23  the competitive process."  That's a direct quote out of the

24  *Raiders* case.

25          THE COURT:  No, it's not.  It's a direct misleading

1    quote because it's in the context of restricting movement.  It's

2    restricting.   They were never addressing sort of, Well, we're

3    going to let somebody go and we can't let them go.  We can't let

4    them go under certain circumstances.   We cannot permit the

5    movement.  That wasn't addressed in the *Raiders* case at all.  I

6    mean, that's --

7            MR. QUINN:  I agree it was not addressed in the *Raiders*

8    case because the facts there were different.  But the --

9            THE COURT:  I guess I'm just trying to understand the

10   theory because I don't think the *Raiders* case helps us at all

11   because it's a completely different set of considerations.

12           MR. QUINN:  Your Honor, I'm not sure -- I don't see why

13   it would make a difference as to whether or not we're talking

14   about allowing a team to move or preventing a team from moving.

15   The whole idea is it's being done in the context of a cartel which

16   is -- is acting in such a way to make sure that they are gonna get

17   excess profits one way or the other.

18           THE COURT:  Well, let's think about that.  So if a

19   cartel decides, I'm going to let my members charge whatever number

20   they want, whatever prices they want, that's not anti-competitive;

21   right?

22           MR. QUINN:  Well, it -- if they all agree.

23           THE COURT:  No, no.  If they all agree that, We can all

24   charge whatever we want -- high, low, doesn't matter --

25           MR. QUINN:  No.  That in and of itself would not be --

1          THE COURT:  Okay.

2          MR. QUINN:  -- anti-competitive.

3          THE COURT:  Why isn't this that?  Why isn't this the

4   Raiders are being allowed to move?

5          MR. QUINN:  It isn't because they've had a pattern in

6   the last several years where they have gone to individual cities

7   and said, Unless you give us X, Y, and Z, we are going to

8   collectively allow a team to move.

9          THE COURT:  Well, but that's my point, is that they're

10  collectively allowing a team to move to a city that's willing to

11  put up -- you know, don't get me wrong.  I have my own personal

12  feelings about whether this is good for the game or good for

13  municipalities or good for the country.  Those are beside the

14  point at the moment.

15     But why can't a team decide to go to the highest bidder?  Why

16  can't the NFL agree to allow them to go to the highest bidder?

17         MR. QUINN:  Well, first of all, I think part of it's a

18  question of fact.  They weren't necessarily the highest bidder.

19         THE COURT:  So -- well, that's not in the complaint.  If

20  your allegation is that it didn't go to the highest bidder and

21  that's relevant to this calculation, then it ought to be in here,

22  but that's -- that's not in this complaint.

23         MR. QUINN:  Well --

24         THE COURT:  And I also think there would be a question

25  of plausibility if you care to go down that route, but go ahead.

1   But so why can't they go to the highest bidder?

2           MR. QUINN:  Because --

3           THE COURT:  Why isn't that what competition is all

4   about?

5           MR. QUINN:  Well, because when they're acting as a

6   cartel, Your Honor, the -- we can at least agree that the *Raiders*

7   cases found that when the NFL is voting in connection with 4.3,

8   that they're acting as a cartel.  The cases said it several

9   different times.

10          THE COURT:  So why -- I --

11          MR. QUINN:  So I don't see the --

12          THE COURT:  Let me put it differently.

13          MR. QUINN:  Okay.

14          THE COURT:  How is it relevant for antitrust purposes?

15  How is there a competitive difference?  What is the difference

16  between the NFL saying, Go wherever you like -- as a group saying,

17  Go to wherever you like.  Go to the highest bidder, go to the

18  lowest bidder, do whatever you want and not acting at all, having

19  just no restriction, free market?  What's the -- what's the

20  relevant difference between those for competition?

21          MR. QUINN:  Well, if in fact -- if in fact that was the

22  case, that there was no 4.3, --

23          THE COURT:  Yeah.

24          MR. QUINN:  -- then I agree, then there wouldn't be a

25  competitive problem, but there is a 4.3.

1          THE COURT:  Okay.

2          MR. QUINN:  They do have a limitation in the number.

3 There's only so many teams.

4          THE COURT:  Well, but that's my point.  But that's

5 exactly my point -- that in the absence of a supply limitation,

6 this argument doesn't work because there's no difference, in the

7 absence of a supply limitation, between the NFL saying, Do

8 whatever you like, teams.  There's nothing in our constitution

9 that forbids you from moving.  Do whatever you like, and the NFL

10 saying, There's something in our constitution that says you have

11 to get our approval, but we approve it.  Do whatever you like.

12     From a competition point of view, those seem to be the same

13 things, unless there is some significance to the supply

14 limitation.

15          MR. QUINN:  Well, Your Honor, there is -- they used the

16 supply limitation in order to seek to extract super-competitive

17 profits.  That's what our allegation is.

18          THE COURT:  That's why I said that it all boils down to

19 you must have, in order to prove your case, as alleged -- maybe

20 you'll think of something else in the next 30 days -- but as

21 alleged, that the supply limitation is unlawful.  The supply

22 limitation is unlawful, not just -- not the other conduct.

23          MR. QUINN:  Absolutely.  I'm going to give Mr. Simon a

24 shot.

25          THE COURT:  Your junior colleague is going to --

1          MR. QUINN:  Oh, he's my senior colleague -- in this way.

2          MR. SIMON:  So, Your Honor, I want to take a shot at

3  answering your question outside of the theory of antitrust law.

4  And that is the entirety --

5          THE COURT:  Now you're really going to confuse me.

6          MR. SIMON:  Okay.  Well, --

7          THE COURT:  But go ahead.

8          MR. SIMON:  I thought we were more practical than that,

9  but --

10          THE COURT:  I'm very practical.

11          MR. SIMON:  So the bottom line is, is that the

12  relocation policy, which I would like to try to make an argument

13  to you by their own words are contractual in nature and use

14  contractual language but, putting that aside, they are intended to

15  illuminate the antitrust violation that occurred by the vote and

16  the NFL, the Commissioner, could have put language in there which

17  limited it to allowing teams to move versus preventing teams from

18  moving.  There's nothing in there to that effect whatsoever.

19          And the bottom line of why the relocation rules are in place

20  and what the NFL itself has said, and would concede if they come

21  up here, is that they were trying to prevent franchise free

22  agency.  So they made a determination that what you said the open

23  market should be, that a team should go to the highest bidder,

24  they themselves -- it was their policy that they didn't want that

25  to happen.

1      The relocation policy says the primary purpose of it is to

2  keep stable team/community relations, to keep the team where it's

3  supposed to be.

4          THE COURT:  So from a competition point of view -- from

5  a competition point of view, that means they put restrictions on

6  the ability of teams to move.

7          MR. SIMON:  Which they ignored.  Which is just --

8          THE COURT:  But so what?  So what?  They ignored them,

9  meaning there are no restrictions.  They can go to the highest

10  bidder if they want.  They're not living up to their -- in this

11  hypothetical world you posited -- not living up to their desire to

12  get rid of team free agency.  They're just letting it happen.

13  What does that have to do with an antitrust violation?

14          MR. SIMON:  It goes to the market and their argument

15  against the market.  They're trying to argue that the market could

16  be -- competition for whatever price, you know, a team will take

17  and move all over the place.  The entire history of the NFL is to

18  keep teams in their locations to have a stable market, to have 32

19  teams or 28 teams or whatever the number is at that time, and not

20  to have teams moving every year.

21          THE COURT:  Okay.

22          MR. SIMON:  That's how they define the market.  If they

23  define the market that way, then, contrary to how they define the

24  market and how we define the market, that you can have somebody

25  bid twice as much, you know.  It's not LeBron James.  It's not,

1    you know, free agency in basketball.  These are talking about

2    teams and communities.

3         THE COURT:  This doesn't make any sense to me.  First of

4    all, it's not antitrust theory.  You haven't made any argument for

5    the jury that they're contradicting themselves or that when they

6    say they don't want historically to do this, they've let it get

7    away and now they're doing it.  Or maybe they were misleading the

8    public in the first place.  I don't know what the answer is.

9         But the question is:  What they do right now, does that

10   unreasonably restrict a product in the market?

11        MR. SIMON:  Yes, 'cause it's a closed system by virtue

12   of the way they conduct themselves.  It's a closed system.

13        THE COURT:  I see.  So because there's only 32 teams,

14   it's a closed system.

15        MR. SIMON:  Amongst other things.  There's any number of

16   things that make it a closed system.

17        THE COURT:  In the absence of the 32- --

18        MR. SIMON:  The ability of them to vote, the

19   Commissioner's powers, it makes it a closed system.  We're not

20   operating in a market where you have five companies that want to

21   sell widgets and they can sell them at whatever price they want.

22        THE COURT:  But not every one of those is material as a

23   an antitrust violation.  What you're saying is that there's only

24   32 teams.  They control the supply, and so they can leverage that

25   into super-competitive prices other places.

1          MR. SIMON:  Which is -- yes.  Which is an antitrust

2    violation like in Microsoft where you take -- you're leveraging

3    one product and leveraging it into another product.

4          THE COURT:  Well, which gets me back to the point that

5    I made at first and Mr. Quinn disputed, but I'm going back to it

6    again -- you've got to show that the 32-team restriction is an

7    unreasonable restraint of trade.

8          MR. SIMON:  It's not just the 32-team restriction, Your

9    Honor.  We'll make other allegations, when you allow us to amend,

10   that will show that there are other restrictions which they

11   themselves have endorsed that make it a closed system which make

12   this particular allowing the move to the highest bidder not only

13   not consistent with their policies but anti-competitive.

14         THE COURT:  Okay.

15         MR. SIMON:  And it's happening --

16         THE COURT:  I'll look forward to that.

17         MR. SIMON:  It's happening in three -- it happened three

18   times in recent memory.  We're talking about Oakland, we're

19   talking about St. Louis, and we're talking about San Diego.  So it

20   is becoming a "franchise free agency" environment.

21      I --

22         THE COURT:  And it's a bad thing or is that a good

23   thing?

24         MR. SIMON:  It's a bad thing.

25         THE COURT:  From an antitrust point of view, forget

1  about what the NFL thinks because, you know, we can -- we can

2  agree to disagree -- and I don't know which side I'd come out on

3  -- on whether or not the NFL's desire to keep a closed system is

4  a good thing or a bad thing or whether free agency is a good thing

5  or a bad thing.  But is it from an antitrust point of view a good

6  thing?  And is it pro-competitive or is it anti-competitive?

7           MR. SIMON:  Your Honor, given the fact that we are

8  involving public entities who are taking public funds and

9  investing it in these teams -- we're not talking about General

10 Motors happening to lose, you know, a product line.  We're talking

11 about Oakland which put their heart and soul and money into this

12 team and it's just going to be no commitment whatsoever that the

13 team stays there if they follow their relocation policies.  Then

14 those relocation policies mean nothing --

15          THE COURT:  Yes.

16          MR. SIMON:  -- and that means that they haven't cured

17 what they tried to cure that was the antitrust violation in the

18 first place.

19          THE COURT:  That's just -- that's not an argument about

20 why it's anti-competitive.  It's not an argument about why it's

21 anti-competitive.  Why is it anti-competitive to let teams do what

22 they want?

23          MR. SIMON:  It is anti-competitive because it's a closed

24 system and within the context of that system, they're using their

25 leverage and their position in that system to create a result that

1    is not competitive.  And if it was truly competitive, it would be

2    competitive as to all host cities, all potential teams, and

3    otherwise, and it's never been the case.  And we're not alleging,

4    You have to let a team in -- you know, bring a new team in.

5    That's not what we're alleging.

6          But if you're operating in a closed system and you define the

7    system and that's the market as we allege it in the complaint, you

8    have to look at it from the lens of what's anti-competitive in

9    that system, not just simply opening it up to everything, which is

10   totally inconsistent with all their pronouncements on what the

11   system is supposed to operate by.

12          THE COURT:  Well, yeah.  But that's not the test.

13          MR. SIMON:  Well, --

14          THE COURT:  The pronouncements on what they think it's

15   supposed to operate.  The test for the Court ultimately, in lieu

16   of reasons, is whether or not the 32-team restriction is

17   reasonably necessary for the product.  If it is or isn't, I don't

18   know.  We'll figure that out.  And you're going to have to show

19   that, in the absence of a 32-team restriction, you would have

20   gotten a team or you would have had the Raiders.  You'll have to

21   show that because I don't know how that works.  There's no

22   allegations in the complaint of that and just saying it doesn't

23   make it so.  I don't know how you're going to show that you were

24   specifically harmed by the 32-team restriction; that is to say, in

25   its absence, but for the 32-team restriction, you wouldn't have

1   had these consequences.  I don't know how you're going to do that,

2   but you'll allege whatever you allege and we'll see what it is.

3           MR. SIMON:  I'd like to also ask you to allow us to

4   amend on the third party beneficiary claim.  I think --

5           THE COURT:  Why?

6           MR. SIMON:  Because --

7           THE COURT:  What are you going to say --

8           MR. SIMON:  Well --

9           THE COURT:  -- that you haven't already said?

10          MR. SIMON:  We could say more about what their

11  motivating factors are, and I believe that we've already said

12  enough about the motivating factors, but I will -- I say that for

13  two reasons.

14      Number one, I --

15          THE COURT:  Don't you think that I'm going to have to

16  make a decision as a matter of law?

17          MR. SIMON:  No.

18          THE COURT:  Yeah.  Okay.

19          MR. SIMON:  Let me just cite you to the *Bozzio* case *v.*

20  *EMI Group*.  This is -- the citation is 811 F.3d 1144.  It predates

21  *Goodwardene* but, nonetheless, --

22          THE COURT:  Which, by the way, made it clear you can do

23  it on demurrer.

24          MR. SIMON:  It did, in a very different situation.

25          THE COURT:  No.

1         MR.   SIMON:      Payroll   company   --   it's   a   totally

2   distinguishable situation.  But let me --

3         THE COURT:  This one, we have the contract in front of

4   us.

5         MR.  SIMON:   One thing, it doesn't -- well, it is a

6   contract, number one.

7         THE COURT:  Well, I think there's an argument it's a

8   contract among the NFL teams.

9         MR.  SIMON:   Well, I want to just take a shot at that

10   after, but let me first just make the point.  This case says --

11   and the California Supreme Court case does not change it -- that

12   endorses that "Third party beneficiaries are fact-bound inquiry,

13   ill-suited to resolution at the motion to dismiss stage.  Whether

14   the third party is an intended beneficiary or merely an incidental

15   beneficiary involves construction of the intention of the parties,

16   gathered from reading the contract as a whole in light of the

17   circumstances under which it was entered."

18       And that's exactly what the California Supreme Court says.

19   They were interpreting not just the contract but the circumstances

20   under which the contract was entered into.

21       And if you look at Exhibit 2 to the complaint, which are the

22   policies, not only does it have -- it's replete with contract-like

23   language, including in the beginning, at the very beginning of it.

24   It says, "Article 4.3 confirms that each club's primary obligation

25   to the League and to all other member clubs is to advance the

1   interests of the League in its home territory."  It says, "This

2   primary obligation includes, but is not limited to, maximizing fan

3   support and including attendance in its home territory.  Article

4   4.3 also confirms that no club has an entitlement to relocate

5   simply because it perceives an opportunity for enhanced club

6   revenues in another location."

7        That's the primary obligation.  That's contractual and that

8   -- those relocation policies arose out of the *Raiders* case which

9   involved Oakland and the Raiders.  Oakland had an expectation and

10  relied upon these relocation policies as we allege in the

11  complaint.

12          THE COURT:  But you're not and you don't allege that

13  there's a violation of those abstract words about responsibility

14  to the League and the League's interest and the number of clubs'

15  interest in that home territory.  That's not what you allege.

16          MR. SIMON:  We do allege.

17          THE COURT:  You allege -- well, you can't because it's

18  too vague.  It wouldn't be -- it's hard to imagine a breach of

19  contract --

20          MR. SIMON:  Your Honor, --

21          THE COURT:  -- except as fleshed out by the other stuff,

22  which is all -- you know, is you may consider this and you may

23  consider that and you may consider this.

24          MR. SIMON:  It is not vague, in all due respect.  And

25  the cases that are relied upon by the Defendants are all oral

1    contracts, implied-in-fact contracts, not third party beneficiary

2    contracts, with the exception of the California Supreme case which

3    I already told you is factually distinguishable and gets into a

4    factual issue in judging those -- the various settlements.

5         Look at the negotiations prior to reconsideration of a move.

6    It doesn't say preventing a move or allowing a move.  It says,

7    "Because League policy favors stable team/community relations,

8    clubs are obligated to work diligently and in good faith to obtain

9    and maintain suitable stadium facilities in their home

10   territories --

11             THE COURT:  Why?

12             MR. SIMON:  -- and to operate in a manner that maximizes

13   fan support in their current home territory."  Why?

14             THE COURT:  Why?

15             MR. SIMON:  So that you don't have --

16             THE COURT:  They're doing it because they want the City

17   of Oakland to grow?

18             MR. SIMON:  They're growing it because they do not want

19   to have franchise free agency.

20             THE COURT:  And why don't they?

21             MR. SIMON:  Because they do not want that -- they want

22   the system to be closed.

23             THE COURT:  Be -- for whose benefit do they want the

24   system to be closed?

25             MR. SIMON:  For the benefit of the host cities, for the

1  benefit of the teams --

2          THE COURT:  Show me where in the contract a single word

3  that says "for the benefit of the host cities."

4          MR. SIMON:  I will.  I'll -- there's multiple places

5  that talk about the fact that -- it talks about the incumbent

6  community, which is another word for it.

7          THE COURT:  No, no, no, no, no.  Yes, of course there's

8  an incumbent community.  They play in an incumbent community.

9  They operate in a host city.  Where is the statement that says you

10  can't -- I want you to do this so that -- not for the benefit of

11  the League, not for the benefit of the -- not for the business

12  interests of the League, but for this third party interest?

13          MR. SIMON:  I just read it -- "stable team/community

14  relations."

15          THE COURT:  But why are they doing it?  What's the

16  reason why they want that?  Isn't the reason obvious from the face

17  of the document?  The reason is because they think that benefits

18  the NFL and its interests.

19          MR. SIMON:  And the host cities that have the teams.

20  It's clear from the document -- first of all, if I can just go

21  through --

22          THE COURT:  You've got about 30 seconds left, so wrap it

23  up.

24          MR. SIMON:  All right.  I just wanted to have the

25  opportunity to amend and make this clear with you.  And, you know,

1    we would request that.

2            THE COURT:  Sure.  You can have leave to amend.

3            MR. SIMON:  But let me just read a couple of things.

4    First of all, I want to say that the Commissioner in his enormous

5    power that is defined under the cases, one of the enormous powers

6    he has, which has been said in the cases to be contractual in

7    nature, is the ability to interpret the constitution.  4.3 is part

8    of that.  So you can't detach the relocation policy from the --

9    from the constitution, which is the contract.

10           THE COURT:  As you noticed, I wasn't going of on that

11   basis.

12           MR. SIMON:  Yeah.  The host cities, the incumbent

13   community, as you call it, are defined as "interested parties

14   under the relocation policies and will have an opportunity to

15   provide oral and written comments regarding the proposed transfer,

16   specifically directed to the host cities."

17       Under the policies themselves, Number 4, which they are

18   supposed to consider, which there is no evidence they considered

19   any allegations -- we have multiple allegations that they

20   disregarded -- we say they disregarded them -- 4 is "The extent to

21   which the club directly or indirectly received public financial

22   support by means of any publicly-financed playing facility,

23   special tracks treatment, or any other form of public financial

24   support and the views of the stadium authority, if public, in the

25   current community."

1      The relocation policies anticipate and specifically call out

2  where there's public financing and they recognize the existence of

3  public financing and the fact that a host community relies on the

4  relocation policies and the fact that there should be stable

5  team/community relations is a factor in the host community putting

6  money into the franchise, which increases the price of the

7  franchise, which provides a value to the NFL, which makes the

8  brand better, all of which is to the NFL's benefit at the expense

9  of the host city in this closed system.

10     That --

11          THE COURT:  I don't disagree with any of that, but it

12  doesn't answer the question about the intended beneficiary.

13          MR. SIMON:  I don't see how it wouldn't.

14          THE COURT:  Yeah, I know you don't.

15          MR. SIMON:  It specifically --

16          THE COURT:  I know where we are.

17          MR.   SIMON:   It   specifically   calls   out   public

18  financing --

19          THE COURT:  Of course.

20          MR. SIMON:  -- as a motivating factor for -- if you find

21  it is a contract, the relocation policies -- it calls out -- how

22  about Item 6?

23          THE COURT:  I've read them.  I've read them in detail.

24  I've read them a dozen times.  I know exactly what you're talking

25  about.  My interpretation of those so far is that the reason the

1  NFL wants people to look at those, wants franchises and members to

2  look at those, is to protect the interests of the NFL.  That's the

3  reason they do it.  They want to do it because with good public

4  relations, we have good business.  That's why they want to do it.

5       If this is -- and -- that's sort of the theme of this case,

6  actually, is that they don't really care about the host cities.

7  That's your theme.  They don't really care about the host cities.

8  They don't have loyalty to the host cities.  They go anywhere they

9  want.

10            MR. SIMON:  It may be a --

11            THE COURT:  It's your theory.

12            MR. SIMON:  -- reason.  It's not the only reason and it

13  doesn't have to -- there can be multiple reasons and one reason --

14            THE COURT:  There can be multiple reasons.

15            MR. SIMON:  One reason is to protect the home cities,

16  and that is a principal reason of it.  And you can't on one hand

17  say you're going to protect the home cities by putting into place

18  policies that alleviated an antitrust violation in the first place

19  and then turn around and say they don't mean anything.  That's

20  totally duplicitous and that's the argument that they're making.

21  It can't be both.  It has to either be they mean something or they

22  don't mean something and they shouldn't be heard.  They should be

23  estopped from coming into this court and saying they don't mean

24  anything.

25            THE COURT:  You were going somewhere in the first, and

1   then you went a little over the top.  But I understand that.  I

2   definitely understand the argument.  I don't -- I'm pretty

3   strongly convinced you're wrong, but I might give you leave to

4   amend on that.

5           MR. SIMON:  You've been strongly convinced I'm wrong in

6   the past.

7           THE COURT:  And sometimes you turn me around and

8   sometimes you haven't.

9           MR. SIMON:  Well, but given the factual nature, given

10  everything that I argued, Your Honor, I think amending in this

11  particular situation does not harm anything.  It's going to -- I

12  mean, it's typical that we would get a right to amend.  We may not

13  convince you on the amendment, but at least we ask for that shot.

14          THE COURT:  No.  I understand.  Okay.  I appreciate

15  that.  Let me hear from the other side now.

16          UNIDENTIFIED SPEAKER:  Your Honor, just briefly, --

17          THE COURT:  No.  Let me hear from the other side.  We're

18  done.

19          MR. ASIMOW:  Thank you, Your Honor.  Daniel Asimow.

20          THE COURT:  Yes.

21          MR. ASIMOW:  I'll be pretty brief unless the Court has

22  questions.  On the third party beneficiary claim, the Court has

23  the document, obviously.  He's read it.  That provides a basis to

24  rule on whether or not the City of Oakland --

25          THE COURT:  Why is that the case?

1          MR. ASIMOW:  -- is a third party beneficiary,

2          THE COURT:  Why is that the case?  What Mr. Simon says

3     is that it's not uncomplicated, that there are multiple

4     motivations, and that they appear -- there are glimpses of them on

5     the face of the document, but that they should be allowed to amend

6     to show that there are multiple motivations and that one of the

7     entities or -- that is designed -- this is designed to benefit is

8     the host cities, and the reason may be because that's good

9     business, but it's still designed to benefit the host city.

10         MR. ASIMOW:  So what I would say about that, Your Honor,

11    is our disagreement is pretty clear about what its purpose and

12    motivation is because it says it over and over.  The League's

13    interests doesn't leave a lot of mystery about that.  And to the

14    extent the circumstances under which it was adopted come into play

15    here, that's the NFL trying to prevent litigation, trying to have

16    a defense, the antitrust litigation, if it gets sued.  It's not --

17    cannot be that you adopt the policy in order to limit your

18    exposure to litigation -- only to open yourself up --

19         THE COURT:  That happens all the time and you know that.

20    You know that's a --

21         MR. ASIMOW:  And I --

22         THE COURT:  -- be careful with what you wish for kind of

23    problem.  But the point is that because the fact that you did

24    something like that in order to protect yourself from litigation,

25    which is a perfectly fine motivation, may mean that there were

1    multiple complex things that you agreed would be considered.

2    Among those would be the interests of the host cities.

3           MR. ASIMOW:   Yeah.   And then I'd like to add, Your

4    Honor, that --

5           THE COURT:   Because I'm sure the NFL's not going to

6    stand here and say, We don't consider the interests of the host

7    cities when we decide whether there should be a move.   You won't

8    say that; right?

9           MR. ASIMOW:   Do you want me to go with the reality here

10   or we're stuck with the allegations in the complaint?   The

11   reality, of course, the Raiders made an application.   They

12   addressed all of these factors.   The NFL and the owners considered

13   the factors.   They weighed them in their business judgment.   They

14   had a lot of problems with the Oakland Coliseum and with the

15   proposals in Oakland and the League and teams concluded that the

16   move made business sense.

17          But we're stuck with the allegations of the complaint.   And

18   with this -- on the third party beneficiary claim -- and I think

19   the recent California Supreme Court case is really pretty helpful

20   here -- that's on a demurrer -- they didn't even have a contract.

21   You've got the contract here.   The court there only had

22   allegations about the contract.   They used practical judgment to

23   say, Come on, that's not what this contract is about.   When an

24   employer and a payroll service agreed to have the payroll service,

25   you know, run the checks for the employees, they are not opening

1  themselves up to lawsuits by every employee when there is a
2  mistake.  That's not what it's about and that's not what this is
3  about.

4      This is about the League providing some guidance to the teams
5  in the unfettered exercise of their business judgment when
6  considering a relocation.  It's got a few other procedural steps
7  in there, but there's no allegation that any of those were not
8  complied with.  There can't be such an allegation.  So I'd urge
9  the Court to adhere to its tentative and not have us deal with
10  this claim again.

11      And then I would make one comment, if I could, on the
12  antitrust claim.

13          THE COURT:  Sure.

14          MR. ASIMOW:  Which is I was surprised to hear Counsel
15  disclaim any reliance on the 32-team issue.  I mean, really a 32-
16  team limit -- it just happens to be 32 teams at the moment -- and
17  the NFL in its constitution, which the Court has that procedure,
18  is to consider an application for a new team.  Teams have been
19  added over the years.  We have not even a hint of an allegation
20  that some team tried to join the NFL so that they could play in
21  Oakland and was refused.

22      But putting that aside, Counsel seemed to disclaim any
23  reliance on the fact that the NFL operates at any given time wit
24  a set number of teams.  The Court tried to steer Counsel back to
25  that theory, but based on their representations, I believe they

1  are arguing their way out of leave to amend on the antitrust claim

2  because I do not see how the vote to allow the Raiders to

3  relocate, which Counsel returned to over and over, can possibly be

4  an antitrust violation.

5      Had there been no vote and no Article 4.3 of the

6  constitution, the Raiders could have relocated and nobody would

7  say that's an antitrust claim.

8      What happened here is the NFL clubs did not restrain trade.

9  They did not prevent the Raiders from moving.  One of the cases

10  that the Plaintiffs cited, the *Schachar* case, S-c-h-a-c-h-a-r,

11  from the Seventh Circuit says, "There can be no restraint of trade

12  without a restraint."

13      And what we have here is no restraint of trade.  They did not

14  restrain trade.  And so to equate this case with cases where a

15  league or other teams prevent a move I think is really off the

16  mark.  Of course there's an antitrust concern when a group of

17  competitors stops a team from relocating or makes it expensive to

18  relocate.  There have been many cases about that and those often

19  wind up being rule-reasoned cases.

20      This is the opposite.  This is they didn't restrain trade.

21  They didn't prevent a team from moving, and that's just not an

22  antitrust theory.

23          THE COURT:  Okay.

24          MR. ASIMOW:  I know we're short on time.  The other

25  things on calendar, we also have a case management conference and

1    the one thing I wanted to make sure we had the chance to discuss

2    with you and very much argue is discovery --

3              THE COURT:  I know -- I know what I'm going to do on

4    that.

5              MR. ASIMOW:  Okay.

6              THE COURT:  I just want to make sure the NFL doesn't

7    want to be heard on the motion to fully proceed.

8              MR. HALL:  Your Honor, may I just have one minute to try

9    to persuade you to stick with your original tentative ruling to

10   dismiss the common law claim as a matter of law?

11             THE COURT:  Okay.  On the clock.

12             MR. HALL:  Nothing in an amended complaint can change

13   what's in the policy.  Those are the words of the policy.  The

14   Court's job to interpret that language.  Your Honor has said

15   everything in that policy, all the wording, is about advancing the

16   League's interest.  The League's interests --

17             THE COURT:  What about -- what about the citation that

18   Mr. Simon gave us, which is -- there's other case that say the

19   same thing -- that the question of the motivation with respect --

20   not the motivation because it's a new case -- but the question

21   with respect to whether it's a third party beneficiary is factual.

22   I mean, it's not necessarily just on the face of a document.

23             MR. HALL:  Well, it is a question of law to interpret

24   the contract.  That very provision that Mr. Simon referred to also

25   refers to advancing the interests of the League.  I believe the

1  Court had it right when it said, Of course it takes into account

2  the interests of the local community because that's one of the

3  things that goes into the decision about whether or not it makes

4  sense for the NFL in advancing the NFL's interests and its member

5  clubs in deciding whether or not to permit a relocation or to

6  block a relocation.  And that's all that policy says.

7      It says -- it references the interests of the NFL, the

8  collective interests of the teams 15 times in this six-page

9  document.  I just don't think there's any reasonable way to read

10  that to suggest that under the California Supreme Court's recent

11  decision, you know, the motivating purpose of this policy was to

12  benefit a local government like Oakland, or that the reasonable

13  expectation of the Commissioner promulgating this was to provide

14  an enforceable contract right to allow Oakland to sue the League

15  and its member clubs.  It just can't be found in the agreement.

16      Last point.

17          THE COURT:  Yeah.

18          MR. HALL:  The facts about -- because there has been

19  some discussion about the facts that led to the adoption of this

20  policy, that being the *L.A. Coliseum* case, the Ninth Circuit

21  decision.  Of course, what the Ninth Circuit said in that case,

22  which involved a restriction on team movement, is that the League

23  would be well-advised to put together a list, an objective list of

24  factors that would be considered by the League, and the language

25  -- the language of the Ninth Circuit in that case was "to serve

1    the needs inherent in producing the NFL product."  Everything was

2    about recognizing that those were arguments advanced in that case

3    because we needed to do those things -- the League needed to do

4    those things to advance its own interests and the interests of the

5    club.

6        Nothing in the Ninth Circuit's decision said that the NFL

7    needed to protect the interests of local governments in order to

8    avoid antitrust liability.  In fact, Your Honor, if you look at --

9    if you'll look at -- so the cite is 726 F.2nd at 1397.  The Ninth

10   Circuit says, "Local governments ought to be able to protect their

11   investment through the leases they negotiate with the teams for

12   the use of their stadium."

13       In other words, the Ninth Circuit is making it clear that to

14   avoid antitrust liability, you don't need to address the interests

15   of local communities.  This is about just laying out objectively

16   the considerations that you and your member clubs would enter into

17   to advance your own interests.

18       So there's nothing -- there's nothing again in an amended

19   complaint that can change --

20          THE COURT:  I get -- well, I don't know that that's

21   right because if I'm going to consider the circumstances under

22   which this was entered into, they could have plenty of factual

23   allegations that are made, but they don't, that say, And in doing

24   this, the NFL wanted to make sure that the community's investments

25   were protected.  They could say that.  I don't know whether

1  they'll say that.  If they say that, then we'll have a fact issue;

2  right?

3          MR. HALL:  Well, the current complaint says in paragraph

4  3 that the reason for the adoption of these guidelines was to

5  employ antitrust liability as a result of the *L.A. Coliseum* case.

6          THE COURT:  I understand.  But that's just a piece of --

7  that is the context in which it was done.  Maybe there are others.

8  I don't know.  I just don't know.  I just don't -- it seems to me

9  we're going to have a motion to dismiss anyways.  We're going to

10 have an amended complaint.  I don't know whether or not it matters

11 very much if we go through this again.  I don't know.  I'm

12 skeptical on the subject, and we'll find out.

13         MR. HALL:  Understand, Your Honor.  Respect the Court's

14 ruling.  Just wanted to have a chance to be heard.

15         THE COURT:  Yes.

16         MR. HALL:  Thank you, Your Honor.

17         THE COURT:  Okay.  I'm going to give you leave to amend.

18         MR. SIMON:  Two quick things.  The *Goodwardene* case,

19 which is the California Supreme Court case, specifically

20 acknowledges that you take into account the language of the

21 contract and all the relevant circumstances under which the

22 contract was entered into so that the Court can make a judgment,

23 a factual judgment, about those circumstances.

24         THE COURT:  No, no.  It doesn't say factual judgment.

25 It says judgment.  This is a contract interpretation question;

1  right?  Is this -- does this contract mean that this other entity

2  is the third party beneficiary.  The normal rules of construction

3  would apply.  And under some circumstances, you take into account

4  the relevant circumstances.  Sometimes you do and sometimes you

5  don't.  It depends what the contract says.

6      But isn't that -- isn't that --

7          MR. SIMON:  Our argument is you have to in this

8  situation and we can allege other circumstances or more precisely

9  allege circumstances.  I want to make --

10          THE COURT:  I'm going to give you the opportunity.  You

11  don't need to repeat this.

12          MR. SIMON:  Can I make one other point because there

13  have been statements and there are statements in their briefs

14  which are incorrect about what we didn't allege.  We do allege

15  breach of contract.  There's a good faith obligation in the

16  relocation policies, and at paragraphs 7, 72, 77, and 145 we

17  allege breach of those good faith obligations in detail.

18          THE COURT:  Okay.

19          MR. SIMON:  And, secondly, they say there's no

20  allegations in the complaint -- they say -- this is the reply

21  brief -- that 13, 22 through 25, that the owners failed to

22  consider the relocation policies and we specifically alleged that

23  they ignored them at paragraph 6, that they disregarded them at

24  paragraph 15, that the deliberations were behind closed doors at

25  paragraph 28, that they were -- their decision was in direct

1   contravention of the policies at paragraph 72, and at paragraph

2   76, the Miami owner, who voted against (indiscernible) vote, even

3   though he pocketed his portion of the relocation fee, said, as

4   quoted in the complaint, "I just don't think everything was done

5   to try to stay in Oakland." And that is, in my opinion, the point

6   of this.   Everything wasn't done.   In fact, their very own

7   policies were disregarded.

8           THE COURT:  The policies don't say that everything has

9   to be done.   That's just -- that's just press coverage.   That's

10  not legal argument.   But, in any event, I'm giving you leave to

11  amend.

12      Now, the question for the table is what should we do about

13  discovery.  And my inclination is stop discovery for the moment.

14  We've got it all teed up.   You can continue your negotiations

15  about what will get produced and what won't get produced but not

16  have the things produced unless there's something specific that

17  you think ought to happen in the next 90 days while we get through

18  this.

19          MR. SIMON:  I tend to agree with you, so I would also

20  like to ask that we have 45 days to amend as opposed to 30.

21          THE COURT:  That's fine.

22          MR. SIMON:  Okay.

23          THE COURT:  Forty-five days to amend.  I want you to

24  continue on the process of negotiating what's going to be produced

25  and how it's going to be produced, but no production will take

49

1  place before the hearing on the next motion to dismiss.

2          MR. SIMON:  That's fine.

3          THE COURT:  All right.  Forty-five days and then you'll

4  get a motion and then we'll have some more fun.

5      Thank you, all.

6          ALL:  Thank you, Your Honor.

7      (Proceedings adjourned at 10:32 p.m.)

8

9          I, Peggy Schuerger, certify that the foregoing is a

10  correct transcript from the official electronic sound recording

11  provided to me of the proceedings in the above-entitled matter.

12

13  _____          July 22, 2019
    Signature of Approved Transcriber    Date

14

    Peggy Schuerger
15  Typed or Printed Name
    **Ad Hoc Reporting**
16  Approved Transcription Provider
    for the U.S. District Court,
17  Northern District of California

18

19

20

21

22

23

24

25