1  BARBARA J. PARKER (Bar No. 69722)
   bparker@oaklandcityattorney.org
2  MARIA BEE (Bar No. 167716)
   mbee@oaklandcityattorney.org
3  ERIN BERNSTEIN (Bar No. 231539)
   ebernstein@oaklandcityattorney.org
4
   **OAKLAND CITY ATTORNEY**              JAMES W. QUINN
5  One Frank Ogawa Plaza, 6th Floor          jquinn@bafirm.com
   Oakland, California  94612              DAVID BERG
6  Telephone: (510) 238-3601                 dberg@bafirm.com
                                           MICHAEL M. FAY
7  Facsimile:  (510) 238-6500                mfay@bafirm.com

8  CLIFFORD H. PEARSON (Bar No. 108523)   JENNY H. KIM
     cpearson@pswlaw.com                     jkim@bafirm.com
9  DANIEL L. WARSHAW (Bar No. 185365)     CHRIS L. SPRENGLE
     dwarshaw@pswlaw.com                     csprengle@bafirm.com
10 MICHAEL H. PEARSON (Bar No. 277857)    BRONWYN M. JAMES
     mpearson@pswlaw.com                     bjames@bafirm.com
11 MATTHEW A. PEARSON (Bar No. 291484)    EMILY BURGESS (*pro hac vice* forthcoming)
     mapearson@pswlaw.com                    eburgess@bafirm.com
12
   **PEARSON, SIMON & WARSHAW, LLP**       **BERG & ANDROPHY**
13 15165 Ventura Boulevard, Suite 400     120 West 45th Street, 38th Floor
   Sherman Oaks, California  91403         New York, New York  10036
14 Telephone: (818) 788-8300              Telephone: (646) 766-0073
   Facsimile:  (818) 788-8104             Facsimile:  (646) 219-1977
15

16 [Additional Counsel Listed on Signature Page]

17 *Attorneys for Plaintiff City of Oakland*

18              **UNITED STATES DISTRICT COURT**

19    **NORTHERN DISTRICT OF CALIFORNIA, OAKLAND DIVISION**

20 CITY OF OAKLAND,                        CASE NO. 3:18-cv-07444-JCS

21          Plaintiff,                     **FIRST AMENDED COMPLAINT FOR DAMAGES**

22          v.
                                           **JURY TRIAL DEMANDED**
23 THE       OAKLAND      RAIDERS,    A
   CALIFORNIA  LIMITED  PARTNERSHIP;
24 ARIZONA CARDINALS FOOTBALL CLUB
   LLC;  ATLANTA  FALCONS  FOOTBALL
25 CLUB,    LLC;    BALTIMORE    RAVENS
   LIMITED     PARTNERSHIP;     BUFFALO
26 BILLS,  LLC;  PANTHERS  FOOTBALL,
   LLC; THE CHICAGO BEARS FOOTBALL
27 CLUB,  INC.;  CINCINNATI  BENGALS,
   INC.; CLEVELAND BROWNS FOOTBALL
28 COMPANY    LLC;    DALLAS    COWBOYS

---

FOOTBALL CLUB, LTD.; PDB SPORTS, LTD.; THE DETROIT LIONS, INC.; GREEN BAY PACKERS, INC.; HOUSTON NFL HOLDINGS, LP; INDIANAPOLIS COLTS, INC.; JACKSONVILLE JAGUARS, LLC; KANSAS CITY CHIEFS FOOTBALL CLUB, INC.; CHARGERS FOOTBALL COMPANY, LLC; THE RAMS FOOTBALL COMPANY, LLC; MIAMI DOLPHINS, LTD.; MINNESOTA VIKINGS FOOTBALL, LLC; NEW ENGLAND PATRIOTS LLC; NEW ORLEANS LOUISIANA SAINTS, LLC; NEW YORK FOOTBALL GIANTS, INC.; NEW YORK JETS LLC; PHILADELPHIA EAGLES, LLC; PITTSBURGH STEELERS LLC; FORTY NINERS FOOTBALL COMPANY LLC; FOOTBALL NORTHWEST LLC; BUCCANEERS TEAM LLC; TENNESSEE FOOTBALL, INC; PRO-FOOTBALL, INC.; and THE NATIONAL FOOTBALL LEAGUE,

Defendants.

# TABLE OF CONTENTS

**Page**

I.      PRELIMINARY STATEMENT ................................................................. 2

II.     PARTIES ............................................................................................... 11

III.    JURISDICTION AND VENUE ................................................................ 14

IV.     INTRADISTRICT ASSIGNMENT .......................................................... 14

V.      FACTUAL ALLEGATIONS .................................................................... 15

        A.    The NFL's Anticompetitive Anatomy ...................................... 15

              1.    The NFL as a Cartel .................................................... 15

              2.    The NFL's Significant Revenue Sharing ...................... 22

              3.    The NFL's Market Power Over Franchise Relocations .............. 24

              4.    The Significant Value of the NFL's Cartel ................... 26

        B.    The NFL's Broken Relocation Promises ................................... 30

              1.    The 1980s:  Antitrust Liability and Federal Intervention ............ 31

              2.    The 1990s:  Placating Host Cities ................................ 34

              3.    2000s:  A Trail of Broken NFL Promises ..................... 39

        C.    The Raiders' History in Oakland .............................................. 42

              1.    The Raiders' Identity is Inextricably Linked With its Oakland Fans .......... 42

              2.    The Hectic Al Davis Years .......................................... 42

        D.    The Raiders' Unlawful Relocation From Oakland .................... 44

              1.    The Raiders and NFL Decide to Leave Oakland ........... 45

              2.    The Raiders' Pretextual and Bad Faith Negotiations with Oakland .......... 46

              3.    Defendants' Collusive Relocation Vote ........................ 49

        E.    The NFL's Unlawful Treatment of Oakland .............................. 54

              1.    Group Boycott/Refusal to Deal .................................... 54

              2.    Horizontal Price Fixing .............................................. 56

              3.    Breach of The Relocation Policies ............................... 58

                    (a)    The NFL Constitution and the Relocation Policies Constitute a Valid, Binding Contract ................................ 59

|  |  | (b) | Oakland was an Intended and Actual Third Party Beneficiary | 61 |

|  |  | (c) | Defendants Breached the Relocation Policies and Oakland has Suffered and Will Suffer Damages as a Result of that Breach | 66 |

| F. | The Relevant Market Applicable To Defendants' Misconduct | 68 |

| G. | Defendants' Conduct Has Injured Competition | 71 |

| H. | Defendants' Anticompetitive Conduct Has Injured Plaintiff | 72 |

|  | 1. | Lost Investment Value | 72 |

|  | 2. | Lost Income | 73 |

|  | 3. | Lost Tax Revenues | 73 |

|  | 4. | Devaluation of the Coliseum Property | 76 |

VI.   CAUSES OF ACTION ........................................................................ 78

COUNT I:  Violation of the Sherman Act (15 U.S.C. § 1) ................................. 78

COUNT II:  Breach of Contract (Cal. Civ. Code § 1559) .................................. 80

COUNT III:  Unjust Enrichment Under California Law ..................................... 82

VII.   PRAYER FOR RELIEF ....................................................................... 82

VIII.   DEMAND FOR JURY TRIAL .............................................................. 84

FIRST AMENDED COMPLAINT FOR DAMAGES

1    Plaintiff City of Oakland ("Oakland" or "Plaintiff"), by and through its attorneys, the

2 Offices of the Oakland City Attorney; Berg & Androphy; and Pearson, Simon & Warshaw, LLP,

3 as and for its amended complaint against Defendants The Oakland Raiders, a California Limited

4 Partnership, d/b/a Oakland Raiders ("Raiders"); Arizona Cardinals Football Club LLC, d/b/a

5 Arizona Cardinals ("Cardinals"); Atlanta Falcons Football Club, LLC, d/b/a Atlanta Falcons

6 ("Falcons"); Baltimore Ravens Limited Partnership, d/b/a Baltimore Ravens ("Ravens"); Buffalo

7 Bills, LLC, d/b/a Buffalo Bills ("Bills"); Panthers Football, LLC, d/b/a Carolina Panthers

8 ("Panthers"); The Chicago Bears Football Club, Inc., d/b/a Chicago Bears ("Bears"); Cincinnati

9 Bengals, Inc., d/b/a Cincinnati Bengals ("Bengals"); Cleveland Browns Football Company LLC,

10 d/b/a Cleveland Browns ("Browns"); Dallas Cowboys Football Club, Ltd., d/b/a Dallas Cowboys

11 ("Cowboys"); PDB Sports, Ltd., d/b/a Denver Broncos ("Broncos"); The Detroit Lions, Inc., d/b/a

12 Detroit Lions ("Lions"); Green Bay Packers, Inc., d/b/a Green Bay Packers ("Packers"); Houston

13 NFL Holdings, LP, d/b/a Houston Texans ("Texans"); Indianapolis Colts, Inc., d/b/a Indianapolis

14 Colts ("Colts"); Jacksonville Jaguars, LLC, d/b/a Jacksonville Jaguars ("Jaguars"); Kansas City

15 Chiefs Football Club, Inc., d/b/a Kansas City Chiefs ("Chiefs"); Chargers Football Company,

16 LLC, d/b/a Los Angeles Chargers ("Chargers"); The Rams Football Company, LLC, d/b/a Los

17 Angeles Rams ("Rams"); Miami Dolphins, Ltd., d/b/a Miami Dolphins ("Dolphins"); Minnesota

18 Vikings Football, LLC, d/b/a Minnesota Vikings ("Vikings"); New England Patriots LLC, d/b/a

19 New England Patriots ("Patriots"); New Orleans Louisiana Saints, LLC, d/b/a New Orleans Saints

20 ("Saints"); New York Football Giants, Inc., d/b/a New York Giants ("Giants"); New York Jets,

21 LLC, d/b/a New York Jets ("Jets"); Philadelphia Eagles, LLC, d/b/a Philadelphia Eagles

22 ("Eagles"); Pittsburgh Steelers, LLC, d/b/a Pittsburgh Steelers ("Steelers"); Forty Niners Football

23 Company LLC, d/b/a San Francisco 49ers ("49ers"); Football Northwest LLC, d/b/a Seattle

24 Seahawks ("Seahawks"); Buccaneers Team LLC, d/b/a Tampa Bay Buccaneers ("Buccaneers");

25 Tennessee Football, Inc., d/b/a Tennessee Titans ("Titans"); and Pro-Football, Inc., d/b/a

26 Washington Redskins ("Redskins," and with the Raiders, Cardinals, Falcons, Ravens, Bills,

27 Panthers, Bears, Bengals, Browns, Cowboys, Broncos, Lions, Packers, Texans, Colts, Jaguars,

28 Chiefs, Chargers, Rams, Dolphins, Vikings, Patriots, Saints, Giants, Jets, Eagles, Steelers, 49ers,

1  Seahawks, Buccaneers and Titans, the "NFL Clubs"); and The National Football League ("NFL,"

2  and with the NFL Clubs, the "Defendants"), allege as follows:

3  **I.     PRELIMINARY STATEMENT**

4       1.     This is an action for damages arising out of Defendants' unlawful decision to use

5  their collective market power, premised on their artificially-restricted 32-team professional

6  football league, to deprive Oakland of its long-resident NFL team, the Raiders.  That collective

7  decision – Defendants' 2017 vote to allow the Raiders to relocate to Las Vegas – was the

8  culmination of Defendants' threats against Oakland to both (a) relocate the Raiders to Las Vegas

9  <u>and</u> (b) deprive Oakland of any reasonable chance to host another NFL team.  Defendants first

10  created artificial scarcity in their product (NFL teams), and then used that scarcity in what

11  economists have described as "extortion" or "sabotage" power to demand supra-competitive prices

12  from host cities, such as Oakland.

13       2.     In order to remain the host city of an NFL team ("Host City"), Oakland was asked

14  to pay supra-competitive prices, including stadium investments, which are effectively a forced

15  subsidy.  When Oakland could not pay those prices, Defendants punished the city:  they voted to

16  allow the Raiders to move to Las Vegas, which left Oakland without an NFL team and caused

17  significant losses to Oakland.

18       3.     Defendants' misconduct – both their intentional restriction of the supply of NFL

19  teams, and their efforts to extort and punish Oakland when Defendants decided to relocate the

20  Raiders to a new host city – were blatant violations of the antitrust laws and a breach of

21  Defendants' own constitution and relocation policies.

22       4.     Although Oakland went to extraordinary efforts to keep the Raiders from leaving

23  for Las Vegas, Defendants ignored Oakland and decided to fully exploit their artificially-created

24  market control:  the relocation to Las Vegas resulted in more money to be shared by the cartel

25  (including, but not limited to, the relocation fee, new television rights in a new geographic

26  territory, new merchandising, new intellectual property and game receipts from a ultra-luxury

27  $1.9 billion stadium).

28  / / /

5.      Even though Oakland is a more significant metropolitan market, the Raiders' move to Las Vegas allows Defendants – a cartel that engages in significant revenue sharing – to reap a financial windfall.  The move to Las Vegas is projected to almost double the enterprise value of the Raiders to a monopoly-inflated $3 billion.  Indeed, Las Vegas, by agreeing to pay Defendants' supra-competitive price, will contribute $750 million toward the construction of a new $1.9 billion stadium, and provide the Raiders with numerous other benefits, including the sale of land at below-market prices.  While Oakland proposed a new $1.3 billion stadium that included a mix of public and private funding to the tune of $750 million, Oakland's offer did not meet Defendants' effective demand to create hundreds of millions in new monopoly-inflated enterprise value for the Raiders.[1]

6.      To be clear, Defendants did not sell the Raiders to the highest bidder in a fair and competitive auction.  Instead, they created an artificially-restricted market for NFL teams and then proceeded to extract supra-competitive prices from Las Vegas while simultaneously refusing to deal with Oakland in the market for hosting NFL teams.  In this case, Defendants constrained the supply of NFL teams, thereby leveraging their cartel power and orchestrating an illegal transfer of wealth from a municipality to private businesses.

7.      Moreover, Defendants' decision to allow the Raiders to specifically relocate to Las Vegas was an unreasonable restraint of competition, as Defendants' decision was driven by "control[ling], if not prevent[ing] competition among NFL teams through territorial divisions." *L.A. Mem'l Coliseum Comm'n v. Nat'l Football League* ("*Raiders I*"), 726 F.2d 1381, 1391 (9th Cir. 1984).  In other words, Defendants not only limit the supply of NFL teams in the marketplace, they also dictate where those teams will be allocated by territory.  The Rams and Chargers were allowed to relocate to Los Angeles, a city with no NFL teams.  The Raiders were allowed to relocate to Las Vegas, a city with no NFL teams.  Why?  Because Defendants, as a revenue-

---

[1] Of course, a new or significantly renovated stadium in Oakland would have also increased the Raiders' value, but, without a relocation fee, that enterprise value would not have been shared by the NFL cartel.

FIRST AMENDED COMPLAINT FOR DAMAGES

sharing cartel, reap enormous supra-competitive profits when a team moves to a new territory.  Of course, dictating where a team may move is exactly the same thing as preventing a team from moving in the first place.  Both are restrictions on movement imposed by Defendants to restrain competition in the marketplace for NFL teams at the expense of host cities, like Oakland, and solely to benefit the NFL cartel.

8.     Defendants' conduct in moving the Raiders to Las Vegas, as well as their refusal to deal with Oakland, can best be understood by focusing on two fundamental aspects of the NFL.

9.     *First*, the NFL is a closed sports cartel which, by design, is based on Defendants' agreement to artificially restrict the supply of its product (NFL teams) even though consumer demand in the market could support greater output (more teams).  Unlike open sports leagues in Europe and around the world, new football teams cannot qualify to play in the NFL simply by excelling at the second tier of the sport.  Instead, the only way a team can join the NFL is through Defendants' collective agreement.  Since 1966, the NFL has allowed only four new teams (for a current total of 32), even though the population of the United States has more than doubled and the number of U.S. cities capable of supporting an NFL team has increased at least threefold to over 50.

10.     The NFL has constructed this barrier to entry and thereby restricted the supply of NFL teams so that it can, *inter alia*, demand supra-competitive prices from cities that host NFL teams:

> In a competitive market, consumers will find sellers willing to provide the demanded output at a price covering costs, including the normal cost of essential facilities, such as a stadium.  Sports leagues with entry barriers, however, are not constrained by the competitive process in this regard.  By limiting the number of teams within their league, member clubs can create scarcity that results in consumers, through their local government authorities, bidding for scarce franchises by constructing stadiums at taxpayers' expense and through generous rental agreements.

S. Ross, *Competition Law as a Constraint on Monopolistic Exploitation by Sports Leagues and Clubs* ("*Exploitation by Sports Leagues*"), 19 OXFORD REV. OF ECON. POLICY 4, 569, 570-571 (Winter 2003).  Indeed, as described in more detail below, economists have recognized for

FIRST AMENDED COMPLAINT FOR DAMAGES

decades that the primary purpose of restricting the supply of teams in closed leagues like the NFL is to obtain supra-competitive prices.

11.    **Second**, the NFL is a cartel that engages in an enormous amount of revenue sharing.  Over 70 percent of all revenues generated by the NFL Clubs are collected and then shared evenly among the 32 teams.  In 2018, Defendants shared approximately $8.78 billion in profits.

12.    This revenue sharing means that each NFL Club benefits from every other NFL Club's financial gains.  It also means that Defendants have little incentive to add more NFL teams – a new team is just another mouth to feed.  Unlike true competitors in a truly competitive marketplace, NFL Clubs operate their businesses with the understanding that they will profit not from their own efforts in that market but, rather, through the collective efforts of a limited number of NFL teams, *i.e.*, through cartel action.  For example, the relocation fee – in the case of the Raiders' move to Las Vegas, the agreed-upon $378 million paid by the Raiders to the other NFL Clubs – cannot, even by the NFL's own assessment, be viewed as any real kind of payment by an NFL team.  As shown below, and as one NFL official has testified, the relocation fee is merely a means of sharing the increased enterprise value of a relocated NFL team with fellow cartel members.  For the Raiders, that increased value is approximately $1.6 billion, so the Raiders sharing $378 million of that increase with the other NFL Clubs is consistent with the behavior of cartel members and the NFL's revenue sharing structure.

13.    Significantly, these two fundamental aspects of the NFL – the closed structure and the significant revenue sharing – mean that NFL Clubs care less about their Host Cities and more about the collective value of their cartel and its continuing ability to demand supra-competitive prices.  Mark Davis, the owner representative of the Raiders, earns less than 30 percent of his revenues from Oakland-based fans.  The rest comes from the NFL's collective revenue sharing.  As one economist has recognized:

> Because of the extensive revenue sharing within the NFL, it doesn't really matter where its teams play.  It doesn't matter to the individual NFL clubs because they share most of their revenues, and it matters to the League only to the extent that a club's relocation

threatens a multi-regional presence necessary to maximize national media rights.

J. Vrooman, *Free Agency in Professional Sports Leagues* ("*Free Agency in Sports*"), 64 SOUTHERN ECON. J. 191, 217-218 (Jul. 1997). For Marc Davis and his fellow NFL Club owners, relocation to Las Vegas (with a new stadium, an extension of the NFL's media market, and other value extracted based on the scarcity of product, like below-market real estate) made perfect sense from a *collective, revenue-sharing perspective.* If Mark Davis collected 100 percent of his revenues locally – in Oakland and from the fans – he would have never risked losing Oakland's support and fan loyalty, and he never would have moved from the larger market.

14.     Putting these facts about the NFL together – including its disregard for NFL team home territories and local fans – it is clear that the NFL is, at its core, designed to engage in anticompetitive conduct. Although the NFL Clubs do have certain pro-competitive reasons for engaging in collective conduct (*e.g.*, scheduling games, adopting rules of play, and even ensuring that expansion and relocation of teams is done in an orderly, good faith manner), they have no pro-competitive reason for restricting further expansion (and preserving territorial allocation) and then using the resulting supply restriction of NFL teams to demand ever-increasing prices for their product.

15.     Indeed, prices for everything the NFL sells are far above the marginal costs of operating professional football teams and, as a result, the enterprise values of the NFL Clubs shoot up ceaselessly, regardless of whether or not a particular NFL Club is performing well. Once again, with revenue sharing, it does not matter how an individual team performs; every year each of the NFL Club owners receives 1/32 of billions of dollars.

16.     As evidenced by the events giving immediate rise to this lawsuit, Defendants' artificially-created market power directly impacts decisions about the relocation of NFL teams. NFL Clubs can demand supra-competitive prices from the consumer group at issue here – Host Cities like Oakland – by threatening relocation and demanding, among other things, massive public subsidies for new stadia and almost rent-free use of those stadia. Oakland tried, but was unable, to pay these artificially-created pricing demands. So, after over twenty years in Oakland –

with world-famous "Raider Nation" fans – the NFL has moved the Raiders to Las Vegas because that city managed to pay a supra-competitive "hosting" price and Defendants, collectively, have become much richer.  As described below, in a truly competitive marketplace, the Raiders would have stayed in the Oakland-Alameda County Coliseum ("Coliseum") (or Oakland would already have another NFL team, *see infra* ¶ 138).

17.     In addition, the Raiders' move – and the purported bidding process which preceded it – also violated the NFL's own relocation policies (the "Relocation Policies"), policies to which Oakland, as the host of the Raiders, is an intended beneficiary.  More than 35 years ago, the United States Court of Appeals for the Ninth Circuit affirmed that Article 4.3 of the NFL Constitution and Bylaws ("NFL Constitution," attached hereto in its entirety as Exhibit 1) – which requires three-fourths approval of all NFL Clubs for team relocations – amounted to an unreasonable restraint of trade in violation of Section 1 of the Sherman Act because no objective standards or durational limits were incorporated into the voting requirements.  *Raiders I*, 726 F.2d 1381 (9th Cir. 1984).  The Ninth Circuit found that, while some collective restraints may be necessary to producing a successful NFL product, such restraints must be closely tailored to advancing that purpose in order to withstand antitrust scrutiny.  The Court enumerated objective considerations – then lacking in Article 4.3 – such as population, economic projections, facilities, regional balance, fan loyalty, and team rivalries, among others, that should guide Defendants' territorial allocations of NFL teams in order to mitigate their collective actions under the rule of reason.

18.     The NFL needed to respond to the Ninth Circuit's antitrust ruling.  At the very same time, the United States Senate was considering legislation that would have imposed regulations on the movement of sports teams.  Indeed, one proposed bill would have taken relocation decisions away from the NFL and given them to an independent arbitration panel.  The whole purpose of the proposed legislation was to protect the interests of Host Cities.

19.     So, in late 1984 – to address both the Ninth Circuit's antitrust ruling and Congress' interest in regulation – the NFL adopted the first iteration of the Relocation Policies (current version attached hereto as Exhibit 2).  The considerations set forth in those Policies were lifted in

1   almost exact form from one of the Senate bills.  Put another way, in order to avoid both antitrust

2   liability and regulatory oversight, the NFL adopted a series of considerations that legislators had

3   drafted for the purpose of protecting Host Cities.

4          20.     In the 1990s, the Relocation Policies were amended.  New regulatory bills were

5   pending and this time the NFL decided to negotiate directly with a representative of Host Cities –

6   the Conference of U.S. Mayors (the "Mayors' Conference").  In 1996, the NFL and the Mayors'

7   Conference issued a "Statement of Principles" (attached hereto as Exhibit 3), which set forth the

8   NFL's promise to balance the interests of Host Cities and NFL Clubs in any potential relocation.

9   In 1999, the NFL sent a letter to the Mayors' Conference, applauding the Statement of Principles

10  *and announcing that the Relocation Policies had been amended to reflect those Principles.*  Thus,

11  18 years before the Raiders' move, the NFL promised to protect Host Cities in the relocation

12  process by adopting the Statement of Principles into the current Relocation Policies.

13         21.     At the outset, the Relocation Policies expressly confirm that:

14             [E]ach club's primary obligation to the League and to all other
               member clubs is to advance the interests of the League *in its home*
15             *territory*.  This primary obligation includes, but is not limited to,
               maximizing fan support, including attendance, in its home territory.
16

17  (emphasis added).  The Relocation Policies further confirm that "no club has an 'entitlement' to

18  relocate simply because it perceives an opportunity for enhanced club revenues in another

19  location."  In other words, the Relocation Policies first and foremost favor a team's home territory

20  over relocation in order to promote team stability, and all other considerations are supposed to be

21  viewed through that narrow lens.

22         22.     The Raiders were financially successful in Oakland, received significant support

23  from Oakland, and had one of the most loyal fan bases in the NFL in Oakland.  Accordingly,

24  under the Relocation Policies (which expressly favor NFL teams staying in their home territories),

25  there was simply no justification for a Raiders relocation.  However, Defendants openly ignored

26  those Policies and approved the Raiders relocation not because of some perceived lack of support

27  from Oakland – or some concern about what Oakland was willing to pay or not pay toward a new

28  or renovated stadium – but because of the supra-competitive payments that Defendants coerced

8
FIRST AMENDED COMPLAINT FOR DAMAGES

1   from Las Vegas and their collective financial gain from the relocation of the Raiders to a new

2   territory.

3         23.    Most egregiously, Defendants knowingly trampled on the Relocation Policies while

4   publicly promising Oakland that they would negotiate in good faith.  These statements were

5   blatant misrepresentations and a direct violation of those Policies, *which require that Defendants*

6   *negotiate in good faith*.  From 2014 to 2017, the Raiders, through Mark Davis, publicly stated

7   their desire to stay in and negotiate with Oakland while they affirmatively sought to move

8   anywhere else:  San Antonio, Los Angeles, San Diego, or Las Vegas.  In fact, at one point, Mark

9   Davis simply stopped speaking to Oakland's Mayor, Libby Schaaf.  By 2016, the NFL became

10  directly involved through Eric Grubman ("Grubman"), its Executive Vice President in charge of

11  stadia and relocations.  Although Grubman supposedly "negotiated" with Oakland, he actually

12  criticized Oakland's every move, including its $1.3 billion proposal for a new stadium near the

13  Coliseum.  The Raiders, the NFL, and ultimately, the vast majority of NFL Clubs, were just

14  stringing Oakland along as part of their collusive scheme to relocate the Raiders.

15        24.    For decades, Defendants have tightly limited the supply and territorial allocation of

16  the professional football teams in the United States by not only limiting the number of NFL Clubs,

17  but also collectively controlling and dictating which cities can have a professional football team

18  presence, and under what terms and conditions.  There are just 32 teams for the entire United

19  States and, thus, cities fiercely compete to be a Host City.  Accordingly, the NFL has repeatedly

20  employed the relocation threat:  pay up or watch your team move somewhere else.  The relocation

21  threat sets the floor for all NFL stadium negotiations (and when an NFL Club ultimately does

22  relocate, the other NFL Clubs share in the benefits of the move through the relocation fee and by

23  sharing in the revenue generated by the relocation).  Moreover, in the wake of each relocation,

24  every NFL Club's future threat to relocate becomes all the more credible.  Since 2013, three NFL

25  Clubs have made good on these relocation threats:  the Rams moved from St. Louis to Los

26  Angeles, the Chargers moved from San Diego to Los Angeles, and the Raiders are moving from

27  Oakland to Las Vegas.  As a result, the NFL Clubs have shared, or will share, in more than

28  $1.4 billion in relocation fees, and hundreds of millions (if not billions) more in the shared

1    revenue generated by game receipts from games at new, luxury stadia, television rights in new

2    territories, new team merchandise and additional intellectual property rights, among other things.

3    Further, it is worth noting that not a cent out of the relocation fees is committed to directly

4    accommodating any relocation-related expenses; it is a direct payment by one cartel member to the

5    others.

6        25.    This is not a fair process in a competitive marketplace: it is an NFL-rigged process

7    that, contrary to the Relocation Policies, promotes relocations in order to further line the pockets

8    of NFL Club owners with billions of dollars collected from municipalities (and, ultimately, fans)

9    that are forced to pay supra-competitive prices. This situation is compounded by the fact that the

10   economic incentives associated with the barriers to entry and revenue sharing perversely

11   contradict the NFL's expressed intent to benefit Host Cities with its Relocation Policies. It is a

12   leveraging of the NFL's cartel power, used to extract value from municipalities through an

13   anticompetitive "auction" process that ignores the court-mandated objective relocation procedures.

14   However, municipalities are not the only ones who lost out on the protections of the Policies;

15   because Defendants have ignored the Policies put in place to protect them from antitrust scrutiny,

16   they have lost that legal protection.

17       26.    The Relocation Policies' considerations and factors supported a decision to keep

18   the Raiders in Oakland. However, as a Host City, Oakland was unable to pay Defendants' cartel

19   prices, so the Raiders are moving and paying the cartel-dictated $378 million relocation fee.

20   Further, even though a recent economic analysis demonstrates that Oakland is the best prospect for

21   a new NFL franchise in the United States (*see infra* ¶ 138), Defendants have boycotted Oakland

22   from the market for hosting NFL teams by refusing even to consider Oakland for a new team.

23       27.    Defendants' unlawful conduct has caused Oakland significant injury and loss. As

24   described in detail below, Oakland has lost the value of its significant investment in the Raiders, is

25   burdened with a Coliseum site of significantly diminished value, and has lost the revenues

26   generated by its hosting of the Raiders at the Coliseum. Defendants' collective action lacked any

27   real pro-competitive justifications, was not grounded in objective criteria, and violated their own

28   Relocation Policies.

28.     Accordingly, Plaintiff brings this action for violations of the antitrust laws and breach of contract and, in the alternative, unjust enrichment, arising from Defendants' unlawful conduct.  Because of this unlawful conduct, Plaintiff is entitled to, among other remedies, treble damages from Defendants under 15 U.S.C. §§ 1 and 15; a disgorgement of the supra-competitive payments that Defendants have received, and will receive, from their unlawful conduct; and damages for Defendants' breach of their own Relocation Policies.

## II.     PARTIES

29.     Plaintiff City of Oakland is a municipal corporation located in California.  Oakland, with the County of Alameda, directly owns the Coliseum at which the Raiders currently play professional football in the NFL.  The Coliseum is jointly owned by Oakland and Alameda County and is leased to the Oakland-Alameda County Coliseum Financing Corporation, which, in turn, has assigned its rights under that lease to the Oakland-Alameda County Coliseum Authority ("Authority").  The Authority exists "to finance improvements to the Oakland Alameda County Coliseum Complex, and to manage the Coliseum Complex on behalf of the City and the County." *See* About the Authority, http://www.oraclearena.com/oacca/about-the-authority (last visited Sept. 7, 2019).  The Authority is directly controlled by Oakland and Alameda County, and the Authority's board of directors is made up of Oakland and Alameda County representatives.

30.     Defendant The National Football League is an unincorporated association consisting of the NFL Clubs.  The NFL's principal place of business is 345 Park Avenue, New York, New York 10065.

31.     The NFL Clubs are 32 separately-owned and independently-operated professional football franchises organized and operating for profit in the states set forth below.  In total, NFL Clubs play, or practice in, at least 23 different states:

| Defendant NFL Club Address | State of Organization (state of operation, if different) | NFL Club Name |
|---|---|---|
| Arizona Cardinals Football Club LLC 8701 Hardy Drive Tempe, Arizona 85284 | Delaware (Arizona) | Arizona Cardinals |

| Defendant NFL Club Address | State of Organization (state of operation, if different) | NFL Club Name |
|---|---|---|
| Atlanta Falcons Football Club, LLC<br>4400 Falcon Parkway<br>Flowery Branch, Georgia 30542 | Georgia | Atlanta Falcons |
| Baltimore Ravens Limited Partnership<br>1 Winning Drive<br>Owing Mills, Maryland 21117 | Maryland | Baltimore Ravens |
| Buffalo Bills, LLC<br>One Bills Drive<br>Orchard Park, New York 14127 | Delaware<br>(New York) | Buffalo Bills |
| Panthers Football, LLC<br>800 South Mint Street<br>Charlotte, North Carolina 28202 | North Carolina | Carolina Panthers |
| The Chicago Bears Football Club, Inc.<br>Halas Hall<br>1920 Football Drive<br>Lake Forest, Illinois 60045 | Delaware<br>(Illinois) | Chicago Bears |
| Cincinnati Bengals, Inc.<br>One Paul Brown Stadium<br>Cincinnati, Ohio 45202 | Ohio | Cincinnati Bengals |
| Cleveland Browns Football Company LLC<br>76 Lou Groza Boulevard<br>Berea, Ohio 44017 | Delaware<br>(Ohio) | Cleveland Browns |
| Dallas Cowboys Football Club, Ltd.<br>Cowboys Center<br>One Cowboys Parkway<br>Irving, Texas 75063 | Texas | Dallas Cowboys |
| PDB Sports, Ltd.<br>13655 Broncos Parkway<br>Englewood, Colorado 80112 | Colorado | Denver Broncos |
| The Detroit Lions, Inc.<br>222 Republic Drive<br>Allen Park, Michigan 48101 | Michigan | Detroit Lions |
| Green Bay Packers, Inc.<br>1265 Lombardi Avenue<br>Green Bay, Wisconsin 54304 | Wisconsin | Green Bay Packers |
| Houston NFL Holdings, LP<br>Two Reliant Park<br>Houston, Texas 77054 | Delaware<br>(Texas) | Houston Texans |
| Indianapolis Colts, Inc.<br>7001 West 56th Street<br>Indianapolis, Indiana 46254 | Delaware<br>(Indiana) | Indianapolis Colts |

| Defendant NFL Club Address | State of Organization (state of operation, if different) | NFL Club Name |
|---|---|---|
| Jacksonville Jaguars, LLC<br>One Alltell Stadium Place<br>Jacksonville, Florida 32202 | Delaware<br>(Florida) | Jacksonville Jaguars |
| Kansas City Chiefs Football Club, Inc.<br>One Arrowhead Drive<br>Kansas City, Missouri 64129 | Texas<br>(Missouri) | Kansas City Chiefs |
| Chargers Football Company, LLC<br>3333 Susan Street<br>Costa Mesa, California 92626 | California | Los Angeles Chargers |
| The Rams Football Company, LLC<br>29899 Agoura Road<br>Agoura Hills, California 91301 | Delaware<br>(California) | Los Angeles Rams |
| Miami Dolphins, Ltd.<br>7500 SW 30th Street<br>Davie, Florida 33314 | Florida | Miami Dolphins |
| Minnesota Vikings Football, LLC<br>9520 Viking Drive<br>Eden Prairie, Minnesota 55344 | Delaware<br>(Minnesota) | Minnesota Vikings |
| New England Patriots LLC<br>One Patriot Place<br>Foxborough, Massachusetts 02035 | Delaware<br>(Massachusetts) | New England Patriots |
| New Orleans Louisiana Saints, LLC<br>5800 Airline Drive<br>Metairie, Louisiana 70003 | Delaware<br>(Louisiana) | New Orleans Saints |
| New York Football Giants, Inc.<br>Timex Performance Center<br>1925 Giants Drive<br>East Rutherford, New Jersey 07073 | New York<br>(New Jersey) | New York Giants |
| New York Jets LLC<br>1 Jets Drive<br>Florham Park, New Jersey 07932 | Delaware<br>(New Jersey) | New York Jets |
| The Oakland Raiders,<br>A California Limited Partnership<br>1220 Harbor Bay Parkway<br>Alameda, California 94502 | California | Oakland Raiders |
| Philadelphia Eagles, LLC<br>1 Novacare Way<br>Philadelphia, Pennsylvania 19145 | Pennsylvania | Philadelphia Eagles |
| Pittsburgh Steelers LLC<br>3400 South Water Street<br>Pittsburgh, Pennsylvania 15203 | Pennsylvania | Pittsburgh Steelers |

FIRST AMENDED COMPLAINT FOR DAMAGES

| Defendant NFL Club Address | State of Organization (state of operation, if different) | NFL Club Name |
|---|---|---|
| Forty Niners Football Company LLC<br>4949 Centennial Boulevard<br>Santa Clara, California 95054 | Delaware (California) | San Francisco 49ers |
| Football Northwest LLC<br>12 Seahawks Way<br>Renton, Washington 98056 | Washington | Seattle Seahawks |
| Buccaneers Team LLC<br>One Buccaneer Place<br>Tampa, Florida 33607 | Delaware (Florida) | Tampa Bay Buccaneers |
| Tennessee Football, Inc.<br>460 Great Circle Road<br>Nashville, Tennessee 37228 | Delaware (Tennessee) | Tennessee Titans |
| Pro-Football, Inc.<br>21300 Redskin Park Drive<br>Ashburn, Virginia 20147 | Maryland (Virginia) | Washington Redskins |

## III.   JURISDICTION AND VENUE

32.    This is an action for violations of federal antitrust law, including 15 U.S.C. § 1. Accordingly, this Court has subject matter jurisdiction over this proceeding and all claims asserted herein pursuant to 28 U.S.C. §§ 1331 (federal question jurisdiction), 1337 (antitrust jurisdiction) and 1367(a) (supplemental jurisdiction).

33.    Venue is proper in this district under 15 U.S.C. §§ 15 and 22, and 28 U.S.C. § 1391 because:  (i) each of Defendants transact business, committed an unlawful or tortious act, and/or are found, in this district; and (ii) a substantial portion of the conduct detailed herein, and which affected interstate trade and commerce, has been carried out in this district.

## IV.   INTRADISTRICT ASSIGNMENT

34.    Pursuant to the Northern District Civil Local Rule 3-2(d), the intradistrict assignment should be to the Oakland Division or the San Francisco Division.  This action arises in Oakland and the County of Alameda because a substantial part of the events giving rise to these claims occurred in the City of Oakland and Alameda County, and the property that is the subject of the action (the Coliseum) is situated in the City of Oakland and Alameda County.

/ / /

35.     All parties have consented to proceed before Chief Magistrate Judge Joseph C. Spero for all proceedings, including trial and entry of judgment.  *See* Dkt. Nos. 20 & 21.

## V.     FACTUAL ALLEGATIONS

### A.     The NFL's Anticompetitive Anatomy

#### 1.     The NFL as a Cartel

36.     The NFL is a "league" of professional football teams that places strict limits on the number of member clubs, controls where those clubs are located, and requires that all member clubs share the financial benefits that result from participation in that "league."  The NFL is made up of only 32 teams in 30 cities, and has been characterized as a "cartel" by the United States Court of Appeals for the Ninth Circuit.  *Raiders I*, 726 F.2d at 1389.  Indeed, the NFL is such a tight-knit enterprise that, in the past, it has claimed that its 32 teams should be treated as a single commercial entity.  In 2010, the U.S. Supreme Court rejected that argument 9-0 in *Amer. Needle, Inc. v. Nat'l Football League*, 560 U.S. 183 (2010).

37.     Through its collective conduct, the NFL has created a classic "closed" sports league, in contrast to the "open" leagues that define sports leagues throughout the rest of the world.[2]  Virtually everything that the NFL and its individual clubs produce or have of value is not

---

[2] The closed nature of the NFL stands in stark contrast to the "open" leagues that define European football (soccer).  The Union of European Football Associations, or UEFA, is the parent league of all European and some Middle Eastern football teams.  The Union consists of 237 clubs; well-performing teams are "promoted" into the "Champions" league, whereas poorer performing teams are "relegated" down into the "Europa" league:

> A system of promotion and relegation places a significant limit on the monopoly power of sports leagues.  The system preserves the integrity of the league itself and indeed allows leagues to legitimately expand or contract to most effectively market the product.  At the same time, a club's threat to relocate without tax subsidies is diluted by the possibility that the team itself may be relegated and, more importantly, by the creation of alternative entry routes for cities that do not possess a major league team.  In other words, both the expected benefit of the subsidy for the municipality and the expected benefit to the team of its other option (relocation) are diminished.  As a result, the ability of teams to extract subsidies is either reduced or eliminated altogether.

S. Ross & S. Szymanski, *Open Competition in League Sports*, 2002 WISCONSIN L. REV. 625, 629.

1  available in the marketplace absent the consent of the group itself.  Further, according to the NFL,

2  no outside rules or forces impact its collective decision-making as to whether to share its value

3  with any particular market participant.  And, although the NFL likes to pretend that it has policies,

4  and acts reasonably pursuant to those policies, the NFL takes the position that any of its policies –

5  whether related to team membership, team relocation, or revenue sharing – are entirely

6  discretionary and unenforceable outside of the NFL itself.

7       38.    Not surprisingly, the NFL uses its cartel structure to engage in profit-maximizing,

8  monopolistic behavior.  A primary purpose of the NFL's collective decision-making, and

9  significant revenue sharing, is the recovery of supra-competitive profits for everything it sells,

10  including the ability to host an NFL Club:

> A [closed] sports league is a collection of team owners who agree on a common set of operating procedures, which insure larger profits than if each owner acted on his or her own.  These procedures include restricting entry of new teams, assigning exclusive franchise territory, and agreeing on a revenue-sharing formula, salary cap or luxury tax. . . .

> All leagues establish rules governing the awarding of franchises, conditions of entry and relocation, the market for players, and playing regulations.  These agreements tend to be joint-wealth maximizing and collusive for the owners. . . .

> Collusion in the form of entry restriction, revenue sharing and territorial rights generally does not affect the quality of play; rather it exists only to maintain profits . . . .

20  D. Rockerbie, THE ECONOMICS OF PROFESSIONAL SPORTS, 31-32 (4th ed. 2018).

21       39.    With 37 percent of Americans preferring football as their favorite spectator sport

22  (Gallup, Jan. 4, 2018), it is not surprising that, at various times, there have been more than

23  30 cities vying to host professional football clubs.  However, without any reasonable hope of a

24  professional football league that can compete with the NFL, the market for owning or hosting such

25  a club is significantly constrained.  The NFL's complete control over professional football in the

26  United States, combined with its ability to artificially limit the supply of professional football

27  clubs, enables it to extract from Host Cities premiums that would not otherwise exist in a

28  competitive market.

40.     Collective agreements to limit the supply of a good, such as Defendants' agreement to have only 32 NFL teams, are well established as anticompetitive:

> A restraint that has the effect of reducing the importance of consumer preference in setting price and output is not consistent with th[e] fundamental goal of antitrust law.  Restrictions on price and output are the paradigmatic examples of restraints of trade that the Sherman Act was intended to prohibit.

*NCAA v. Board of Regents of Univ. of Okla.*, 468 U.S. 85, 107 (1984) (footnote and citations omitted).  *See also id.* at 113 ("Thus [the NCAA's plan to restrict television broadcasts of football games] is inconsistent with the Sherman Act's command that price and supply be responsive to consumer preference") (footnote omitted).

41.     The illegality of these types of output restrictions was recently reaffirmed by the Ninth Circuit.  *See In re Sunday Ticket Antitrust Litig.*, __ F.3d ___, 2019 WL 3788253, at *12 (9th Cir. Aug. 13, 2019) ("Given that professional football games have no substitutes (as fans do not consider NFL games to be comparable to other sports or forms of entertainment), *see L.A. Mem'l Coliseum Comm'n v. Nat'l Football League*, 726 F.2d 1381, 1393 (9th Cir. 1984), the defendants in this case have effective control over the entire market for telecasts of professional football games.  The complaint therefore plausibly alleges a naked restraint on output:  that the defendants' interlocking agreements have the effect of limiting output to one telecast of each game, which is then broadcast in a limited manner, solely according to the NFL's agreements with CBS, Fox, and DirecTV"); *see also* H. Hovenkamp, *Exclusive Joint Ventures and Antitrust Policy,* 1995 COLUM. BUS. L. REV. 1, 61 ("[A]greements among competitors that achieve less than the competitive market wide output are a classic concern of the antitrust laws.  For a single firm to produce less than the optimal amount is one thing; for a group of competitors dominating a market to agree with each other to produce less than the optimal amount is quite another").[3]  Here, the

---

[3] Further, allowing cities to bid against each other for the artificially-created limited supply of NFL Clubs does not immunize Defendants' cartel behavior.  Auctions do not erase anticompetitive behavior, and where supply limitations (or similar acts of misconduct, like bid (footnote continued)

result of Defendants' cartel is the same:  complete control over the market.  In *Sunday Ticket*, Defendants controlled the entire market for telecasts of professional football.  The control found there is exactly the type of control exercised by Defendants here, *i.e.*, the control of the Host City market (and the number of NFL teams in that market).  No matter what the context, Defendants control every market related to professional football and every aspect related thereto and make collective decisions in furtherance of the cartel, the National Football League.

42.     The NFL has misused its market power for decades.  In 1966, the NFL announced its merger with the American Football League, creating a league of 28 teams.  At that time, the United States' population was around 197 million, with approximately 25 cities with a metropolitan population greater than 1 million.  Forty-three years later, the United States has a population of approximately 327 million (an increase of over 65 percent), and over 50 cities with a metropolitan population greater than 1 million.[4]  (*See Population of the largest metropolitan areas in the U.S. as of 2018*, Statista, available at https://www.statista.com/statistics/183600/population-of-metropolitan-areas-in-the-us/ (last visited Sept. 7, 2019).  And yet, the NFL has only grown to 32 teams, just 4 more than in 1966 (an increase of less than 15 percent).

43.     Today, there are dozens of U.S. cities that are larger in population than some NFL Host Cities, and yet they do not have – and have little chance of obtaining – an NFL team.  At this moment, there are a number of significant metropolitan areas in this country that could easily host, but have no chance of hosting, an NFL team (*i.e.*, Oakland, St. Louis, San Diego, San Antonio, Sacramento, Portland, Orlando, Austin, Columbus (Ohio)).  Indeed, focusing on factors of wealth and population, it has been estimated that the current NFL could support as many as 42 teams in

---

rigging or the payment of relocation fees) are present in an auction process, antitrust violations still arise.  *See, e.g.*, *United States v. Guillory*, 740 Fed. App'x. 554, 556 (9th Cir. 2018).

[4] Today, Green Bay, Wisconsin, one of the NFL Host Cities, has a metropolitan population of less than 400,000.  It has been estimated that any city with a population greater than 700,000 could support an NFL team.  Christian M. McBurney, *The Legality of Sports Leagues' Restrictive Admissions Practices*, 60 N.Y.U. L. REV. 925, 950 & n.145 (1985).

1  the United States.   M. Rosentraub, P. Sloan & R. Sandy, THE ECONOMICS OF SPORT: AN

2  INTERNATIONAL PERSPECTIVE 169 (2004).

3      44.   Further, empirical evidence demonstrates that in a competitive sports market,

4  several professional football teams can exist in large metropolitan areas like Chicago, Houston and

5  Philadelphia, and, in fact, two teams are hosted in the San Francisco-Bay Area (49ers and Raiders,

6  until the Raiders leave) and New York City (Jets and Giants).

7      45.   The NFL's 32-team limit is an enormous constraint of the market for professional

8  football and is inherently anticompetitive:

> One benefit of a free enterprise system is that the market usually
> responds to increased consumer demand for a product by spurring
> increased output of the product.   Monopoly sports leagues, in
> contrast, exercise their power deliberately to hold down the number
> of available franchises.   As a result, fans in cities without Major
> League Baseball or NFL franchises lose the opportunity to have a
> team that they may call their own.   Leagues exploit fans in cities
> with franchises by threats of relocation to the many "have-not"
> areas.   Of course, fans in markets capable of supporting expansion
> franchises but unable to obtain them suffer the major harm of not
> having a team to follow.   Monopoly sports leagues have significant
> economic incentives to keep the number of franchises below the
> number that would exist in a free market.   The fewer the franchises,
> the more incentive for have-not cities to provide generous tax
> subsidies to induce an existing team to relocate.   In addition, with
> fewer available franchises, "the competition among cities for teams
> will push the rents to essentially nothing."

19  S. Ross, *Monopoly Sports Leagues*, 73 MINN. L. REV. 643, 656-657 (1989).[5]

20      46.   Although the NFL often claims it needs to limit the number of NFL Clubs in order

21  to preserve quality of play, a professor at the University of San Francisco has shown the exact

22  opposite result, *i.e.*, that revenue sharing among the NFL Clubs encourages free-riding and

---

[5] *See also* M. Rosentraub, MAJOR LEAGUE LOSERS, 97 (1999) ("With too few teams relative to the number of cities able to support teams, and with an adequate supply of talent, an *undersupply* of teams exists, increasing the competition for franchises and raising the level of subsidies that cities are willing to provide") (emphasis added); J. Vrooman, *Free Agency in Sports*, 64 SOUTHERN ECON. J. 1 at 218 ("A monopoly league will seek to maximize its share of an expansion surplus, and consequently, league-expansion equilibrium will be inferior to the optimal league size").

1   discourages substandard teams from making the necessary expenditures to improve.  D. Rascher,

2   *Free Ride, Take It Easy: An Empirical Analysis of Adverse Incentives Caused by Revenue Sharing*

3   (2011), available at http://repository.usfca.edu/ess/22 (last visited Sept. 7, 2019).  For instance, as

4   Forbes magazine observed in 2017, thanks to revenue sharing, "Jacksonville operates in one of the

5   smallest markets and has been terrible for a decade but brought home a $92 million profit

6   according to Forbes' estimates."  B. Goff, *NFL Small Market "Problem" Is Overblown*, Forbes,

7   Apr. 20, 2017.

8           47.     Were the NFL's monopoly status challenged through some influx of economic

9   competition, there would be a substantial decrease in the price that cities would have to pay to host

10  a professional sports team:

11              Economic competition would tip the economic scales away from
                owners and players and toward fans and taxpayers. . . .

12              Perhaps the most dramatic impacts of competition would occur in
13              expansion and relocation.  Under competition, all financially viable
                locations would have a team from one league or another.  This
14              would probably increase the number of teams in megalopolis
                markets and fans in these locations would enjoy more professional
15              sports; but there would be a downside for other fans.  Because gate
                and TV revenues would be lower, current marginal locations might
16              become unprofitable.  As always, with changes in market structure,
17              there would be distributional consequences.  Here, the trade-off
                would appear to be between the fans of marginal teams in a few
18              cities and fans in larger areas.

19              State and local taxpayers also would feel the impact of competition
20              on expansion and relocation.  Because all viable locations would
                have a team, team owners would not be able to make threats about
21              leaving their current Host Cities.  In fact, the tables would take a
                dramatic turn: teams actually would compete for financially viable
22              locations.  If one team pushed its host too far, another team would
                be waiting in the wings for a lower subsidy.  Competition should
23              reduce subsidies to teams and possibly even put a market rental rate
                on existing and future publicly owned stadiums.

24              So, in a competitive economic environment, there would be more
25              teams in big cities and a team in all economically viable locations.

26  ///

27  ///

28  ///

FIRST AMENDED COMPLAINT FOR DAMAGES

R. Fort, *Market Power in Pro Sports:  Problems and Solutions*, 13-14 (in W. Kern, ed., The Economics of Sports (2000)).[6]  In a competitive marketplace, Defendants would not collusively constrain the supply of NFL Clubs, and they would lose the monopoly-inflated value of their current collusively-restricted market.

48.     Here, in the anticompetitive market created by Defendants, the relocation of the Raiders did not go to the "big cit[y]" of Oakland (in the 12th largest metropolitan market), but instead went to the much smaller tourist city of Las Vegas (in the 28th largest metropolitan market).

49.     In short, with real competition, the supra-competitive prices that the NFL charges Host Cities would all but disappear (as would subpar teams).  *See* D. Haddock, T. Jacobi & M. Sag, *League Structure & Stadium Rent-Seeking – The Role of Antitrust Revisited*, 65 FLA. LAW REV. 1, 5 (2013) ("*Stadium Rent Seeking*") ("The literature on stadium rent-seeking[7] overwhelmingly concludes that the practice is harmful in numerous ways.  Premature replacement of stadiums is an expensive, wasteful use of scarce public resources (diverting money from alternative infrastructure such as hospitals and roads), and seldom leads to the positive economic and cultural benefits that advocates routinely tout") (footnote omitted).[8]

/ / /

------------------------------------

[6] *See also* S. Ross, *Competition Law as a Constraint on Monopolistic Exploitation by Sports Leagues and Clubs,* 10 OXFORD REV. OF ECON. POLICY 4, 569, 570-571 (Winter 2003) ("In a competitive market, consumers will find sellers willing to provide the demanded output at a price covering costs, including the normal cost of essential facilities, such as a stadium.  Sports leagues with entry barriers, however, are not constrained by the competitive process in this regard.  By limiting the number of teams within their league, member clubs can create scarcity that results in consumers, through their local government authorities, bidding for scarce franchises by constructing stadiums at taxpayers' expense and through generous rental agreements").

[7] "Rent-seeking" is an economic term which refers to any attempt to extract greater value from one's existing wealth rather than creating new wealth.

[8] Although the authors of *Stadium Rent Seeking* display an all too common defeatist attitude about the willingness of courts to rectify NFL antitrust violations, one issue they raise – *i.e.*, whether a Host City can even recover as a political entity – has already been resolved in favor of Oakland by *Raiders I* and *Hawaii v. Standard Oil of Calif.*, 405 U.S. 251 (1972).

50.     Of course, the NFL and its clubs want to maintain these supra-competitive prices and thus, they constrain the supply of teams and ensure the financial success of the existing 32 NFL Clubs.  In 1996, NFL Commissioner Paul Tagliabue succinctly defined the anticompetitive purpose of the NFL's cartel structure, *i.e.*, protecting the existing teams from the forces of competition:

> Free market economics is the process of driving enterprises out of business.  Sports league economics is the process of keeping enterprises in business.  There is nothing like a sports league. Nothing.

J. Quirk & R. Fort, HARD BALL:  THE ABUSE OF POWER IN PRO TEAM SPORTS, 117 (1999) ("Hard Ball").

51.     The NFL is designed to preserve a 32-team cartel that maximizes profits by restricting supply; it is a classic anticompetitive venture designed to reap supra-competitive profits from its various consumers, including Host Cities.  Oakland, in trying to keep the Raiders at the Coliseum, was forced to negotiate with this cartel.  Because it could not pay Defendants' supra-competitive prices, Oakland lost the Raiders and any chance to host an NFL team.

2.     The NFL's Significant Revenue Sharing

52.     Because the NFL mandates significant revenue sharing, the NFL and its Clubs are even more incentivized to act as a cartel.  The NFL Clubs share revenue from virtually all of their revenue streams:   television rights, merchandising, intellectual property licensing, and game receipts (which are split 40 percent visiting team, 60 percent home team).  In recent years, the NFL's revenue sharing has been as high as 70 percent.  In 2018, the 32 NFL teams shared $8.78 billion in collective revenues.

53.     The incentive to restrict membership is especially strong when leagues engage in significant revenue sharing.  As one economist has explained, the NFL will collectively vote to allow another team into the league only if the expected revenues of that team exceed the loss of shared revenue caused by another team participating in the sharing:

> A league designed to maximize overall profits will increase the number of clubs, as long as the revenues from expansion outweigh increased costs plus lost revenues to existing clubs.  A club-run

league, however, will not expand unless a super-majority of clubs are compensated for any lost revenue, even though the league as a whole might benefit from expansion.  To illustrate, any expansion in the National Football League (NFL) will modestly expand television ratings, and each club's pro-rata share of broadcast revenues is likely to shrink, even if the expansion would be profitable from a league perspective. Because each club's representative votes for the amount of expansion that maximizes its own club's profits, there will be fewer clubs in club-run leagues.

S. Ross & S. Szymanski, *Antitrust and Inefficient Joint Ventures:  Why Sports Leagues Should Look More Like McDonald's and Less Like the United Nations*, 16 MARQ. SPORTS L. REV. 213, 226-227 (2006).

54.      In contrast, as Professor Vrooman has recognized, the NFL's significant revenue-sharing is directly correlated with the propensity of NFL Clubs to relocate:

As revenue sharing within a league increases, more of the gains from the extortion-expansion game accrue to the league, and in the syndicated NFL, the league has virtually become the firm.  As the portion of a club's revenue that is shared with the league approaches unity, the number of markets that promise superior or horizontal moves increases, and both the league and the club become indifferent as to whether the particular club stays or goes.  By comparison, franchise relocation is uncommon in MLB under its relatively modest revenue-sharing formulae, because the value of a MLB franchise is still determined to a large extent by the revenue potential inherent in its home market. . . .

Because of the extensive revenue sharing within the NFL, it doesn't really matter where its teams play.  It doesn't matter to the individual NFL clubs because they share most of their revenues, and it matters to the League only to the extent that a club's relocation threatens a multi-regional presence necessary to maximize national media rights.

*Free Agency in Sports Leagues*, at 217-218.  Revenue sharing breeds indifference to the home territory and a greater incentive to use what Professor Vrooman defines as the "extortion" value of the relocation threat.[9]

---

[9] *See also* W. Adams & J. Brock, *Monopoly, Monopsony, and Vertical Collusion: Antitrust Policy and Professional Sports*, 42 ANTITRUST BULL. 721, 729 (Fall 1997) ("*Antitrust and Professional* (footnote continued)

55.     The significance of revenue-sharing and the adverse impact it has on Host Cities (who are unlawfully disadvantaged in their negotiating position to host an NFL team) was made clear in Defendants' *collective* decision to move the Raiders to Las Vegas.  Specifically, a recurring refrain during the Raiders' "negotiations" with Oakland regarding the Raiders' relocation was "how can the Raiders leave the Raider Nation?"  In competitive marketplaces, suppliers cater to the consumers (such as football fans) of their particular product, as those consumers are the foundation for revenues and profits.  But in the case of the NFL, however, such devotion to consumers has been diminished by the extensive revenue-sharing among NFL teams.

56.     When a cartel like the NFL shares 70 percent of its revenue among its members, it simply does not matter that Raider Nation was one of the most devoted fan bases in the NFL; all that matters is that the Raiders' relocation to Las Vegas increased the collective pot of wealth for the NFL cartel to share among its members.  Again, had the Raiders stayed in Oakland and built the new stadium as proposed, the Raiders' enterprise value would have increased, but without a relocation fee, that enterprise value would not have been shared by the NFL cartel.  By relocating, the Raiders' doubled enterprise value would be shared with the NFL cartel via the relocation fee and the cartel members would also share in the supra-competitive revenue (*e.g.*, television rights in a new territory, new intellectual property rights) generated by the relocation.

### 3.     The NFL's Market Power Over Franchise Relocations

57.     Given the NFL's cartel structure, which is only enhanced by its collective revenue sharing and decision making, the NFL exercises enormous market power over franchise relocations.  With a limited number of teams, the NFL wields the power to extract supra-

---

*Sports*") ("[C]artels typically must promulgate additional mechanisms for apportioning monopoly profits among the members in order to maintain harmony, to cement group solidarity, and to deter differently situated firms from acting independently and thus threatening the group's monopoly control"); D. Meggyesy, *The National Football League Monopoly*, Society, 16, 17 (May/June 1986) ("Given extensive revenue sharing in the NFL, an incentive exists for the NFL to promote the movement of teams to larger stadiums and better television markets; the increase revenues will be shared among the twenty eight [now 32] members").

competitive prices from Host Cities through threatened and actual relocations.  As two economists have recognized:

> . . . If the financial responsibility for new facilities were left to team owners alone, or to other private investors, surely fewer and more modest facilities would be constructed.
>
> The financial attractiveness of a new playing facility is largely irrelevant, however, if a team can persuade someone else to pay for the facility.  Most professional sports franchise find themselves in precisely such an enviable position today.  They have lured state and local government officials into a frantic competition to build stadiums and arenas with tax or lottery revenues, requiring the teams to pay virtually no rent, while retaining all or nearly all of the revenues the facility generates.  Why do local governments agree to do this?
>
> The key to team owners' negotiating power is their status as members of the premier league in their sport.  The premier leagues in all four sports control the geographic mobility of established franchises as well as the authority to anoint new franchises with "major league" status.  This gives the sports leagues monopoly power over the placement of premier league franchises in their sport, enabling these franchises to extract subsidies from communities that might otherwise enjoy considerable surplus from hosting a franchise at a competitive price.

J. Siegfried & A. Zimbalist, *The Economics of Sports Facilities and their Communities*, 14 J. OF ECON. PERSPECTIVES 95, 98 (Summer 2000) (footnote omitted).[10]

58.     Indeed, as Professor Vrooman has found, even the "relocation fee" – *i.e.*, the "fee" that a relocating NFL Club pays the other 31 NFL Clubs for approving the relocation (*see supra* ¶ 54) – is "not a relocation deterrent," because of (i) the NFL's significant revenue sharing and

---

[10] *See also* Hard Ball at 129 ("To put teeth into team [relocation] threats, leagues routinely leave a number of desirable locations without teams. . . ."); J. Beisner, *Sports Franchise Relocation: Competitive Markets and Taxpayer Protection*, 2 YALE LAW & POLICY REV. 429, 448 (1988) ("Under present league rules and government regulations, a competitive market for professional sports franchises does not exist.  This lack of a competitive market has created inequities that force local officials to put the taxpayers they represent at substantial risk during negotiations to acquire or to retain a franchise.  Because market forces are restricted, the supply of sports teams is kept artificially below the level of demand and the costs of relocating are much lower than they might be otherwise.  Team owners do not have to consider the true costs, both internal and external, when deciding whether to relocate.").

(ii) the increased enterprise value that the relocating NFL Club obtains by demanding supra-competitive premiums from the new Host City.  *Free Agency in Sports Leagues*, at 218-219. Instead, the relocation fee is a form of "preemptive revenue sharing" based on the anticipated increase in market value of the relocated team.  D. Consentino, "NFL Relocation Fees Are Revenues The Players Will Never Touch," *Deadspin* (Apr. 11, 2017).[11]

59.    As discussed herein, the Raiders "paid" a relocation fee that was significantly less than the anticipated increase in the team's enterprise value when it relocated to Las Vegas, and the Raiders also shared in the relocation fees paid by the Rams and Chargers.  In other words, every member of the NFL cartel benefited from a relocation that the cartel itself as a group directed and approved.  The relocation fees are not a deterrent to moving and, as a whole, are pure profit for Defendants.

### 4.    The Significant Value of the NFL's Cartel

60.    Illegally constraining the supply of NFL teams and then using the resulting market power in the context of actual and threatened team relocations has been very profitable to the NFL.  There is substantial evidence of the enormous profits generated by the NFL's relocation decisions, in particular, related to subsidy demands for new or improved stadiums.

61.    From 2006 to 2016, NFL franchise values grew an estimated 85 percent across the entire NFL organization.  *See Antitrust and Professional Sports*, at 736 ("Skyrocketing franchise values attest to the owners' success in monopolistically restricting the supply of teams, limiting entry, and inducing (and sustaining) an artificial scarcity of supply relative to demand"). According to Forbes, NFL Clubs make up 29 of the world's 50 most valuable sports franchises. And both relocations and new/renovated stadiums were significant factors in this meteoric growth:

*/ / /*

---

[11] *See also St. Louis Conv. & Visitor Ctr. v. Nat'l Football League*, 154 F.3d 851, 855 n.5 (8th Cir. 1998) ("The relocation fee was described by the [NFL] commissioner as reflecting among other things the increased value of the team after the move to St. Louis and the value of that franchise opportunity compared to Anaheim"); USA Today, *Why Relocation Fees Are The Biggest Boondoggle In Sports* (Mar. 28, 2017).

FIRST AMENDED COMPLAINT FOR DAMAGES

The average NFL team is worth $2.34 billion, which is a 19% increase over last year.  The increase is primarily driven by the league's richer Thursday Night Football deals, the Rams relocating from St. Louis to Los Angeles, the Minnesota Vikings moving into their new stadium, and the Atlanta Falcons nearing the completion of their new stadium.

*Forbes Announces 19th Annual NFL Team Valuations*, Forbes, Sept. 14, 2016.

62.    If a Host City is unwilling or unable to pay for a new or renovated stadium, the club threatens to move to a Host City that will.  The billionaire-controlled NFL cartel supports such threats:  hard-ball stadium negotiations set the floor for all NFL Clubs (and when an NFL Club ultimately does relocate, the other NFL Clubs share in the benefits of the move through the relocation fee, and share in the enormous additional revenue generated from such a move, including revenue generated from television rights and new merchandise, among other things).  Moreover, in the wake of each relocation, every NFL Club's future threat to relocate its team become all the more credible.  As one economist notes:

Dependence of communities on a sole source of supply of something for which no good substitutes are available provides another potent basis for exploiting bilateral [players and teams] monopoly power.  It enables the monopolist to exercise 'sabotage power,' and to hold communities hostage by threatening to shut down operations (or move them) unless its financial demands are met.

In the case of professional sports, this power is exploited to extort vast public subsidies from local communities fearing the loss of an existing franchise, or anxious to become the site for a franchise relocated from another community.  It is a key instrument for enabling vertically coalescing sports cartels to whipsaw communities in order to extract a vast bounty of public subsidies, including free stadiums, low-interest loans, rents that are either nonexistent or far below free market rates, free land, tax "incentives" and abatements, highway and parking facilities, and publicly financed construction of privately profitable "luxury" skyboxes.  It thus is the heart of what George Will calls the "socialism of sports."

*Antitrust and Professional Sports*, at 738-739 (footnote omitted).

63.    For instance, in this case, it is projected that the Raiders, whose estimated enterprise value in 2015 was $1.4 billion (next to last among NFL franchises), will jump to a

1  valuation of $3 billion following the move to the $1.9 billion stadium in Las Vegas.

2  S. Wickersham and D. Van Natta, Jr., *Sin City or Bust*, ESPN.com, Apr. 13, 2017.  Under these

3  circumstances, the payment of a $378 million relocation fee paid over a number of years is hardly

4  a deterrent to making a move but, rather a way for the Raiders to share a part of the doubling of

5  enterprise value with fellow cartel members.

6      64.   And again, as shown in the below chart, it is the Host Cities (and their taxpayers)

7  who fund the vast majority of new stadia or stadia renovations that Defendants can command

8  because of their artificially-created market power:

| New and Renovated Stadia in the Last 20 Years | | | | | |
|---|---|---|---|---|---|
| City | Year | Type | Total Cost | Public Funding | % Public Funding |
| Cincinnati | 2000 | New | $449 million | $424 million | 94.40% |
| Indianapolis | 2008 | New | $719 million | $619 million | 86.10% |
| Buffalo | 2012 | Renovation | $271 million | $227 million | 83.80% |
| Denver | 2001 | New | $400 million | $289 million | 72.30% |
| Arizona | 2006 | New | $455 million | $310 million | 68.10% |
| Kansas City | 2010 | Renovation | $388 million | $263 million | 67.80% |
| Chicago | 2003 | Renovation | $587 million | $387 million | 65.90% |
| Seattle | 2002 | New | $461 million | $300 million | 65.10% |
| Houston | 2002 | New | $474 million | $289 million | 61.00% |
| Minnesota | 2016 | New | $1.087 billion | $498 million | 45.80% |
| Atlanta | 2017 | New | $1.400 billion | $594 million | 42.40% |
| Dallas | 2009 | New | $1.200 billion | $444 million | 37.00% |

18      65.   All of these Host City "gifts" – new stadia, taxpayer-funded subsidies, almost rent-

19  free use of stadia – are the supra-competitive price that Host Cities must pay in order to obtain or

20  keep an NFL Club that is threatening relocation.  As none of this value is within the marginal cost

21  of running an NFL Club, most of the value of the NFL's profit-maximizing relocation behavior

22  goes directly into the pockets of NFL Club owners.  This is classic rent-seeking by a cartel –

23  demand higher prices for the existing supply of product because there will be no new supply.  And

24  as seen in the case of the Oakland Coliseum, even when a Host City is willing and able to renovate

25  or construct a new stadium, NFL Clubs will still vote for relocation because it will result in greater

26  revenue shared by the cartel members than staying loyal to the Host City.

27      66.   In making these relocation decisions, the NFL and NFL Clubs hold secret, closed-

28  door meetings to collectively decide whether and where to move a team.  Under Section 4.3 of the

1   NFL's Constitution – the agreement governing the relationships between and among the 32 NFL

2   Clubs – no NFL team can move from one Host City to another without a three-fourths vote of

3   approval from the NFL Clubs.   Thus, it is the NFL owners acting collectively (and not the

4   individual teams) who decide whether and where a particular team may relocate.   The focus of

5   these NFL votes is on increased revenue to the entire cartel.   As noted above, since the Raiders

6   move to Las Vegas is estimated to increase the Raiders' franchise value by $1.6 billion, the

7   Raiders will share that increase in value by paying a little over 22% of that amount, or $378

8   million, to the other NFL Clubs.   Further, due to revenue sharing, all of the other Defendants will

9   reap enormous profits from the Raiders move to Las Vegas, a new geographic territory.

10          67.     A city that hopes to host an NFL team – or like Oakland, a city that wanted to keep

11   a team – is completely at the mercy of Defendants' collective, revenue-sharing, profit-maximizing

12   behavior.   In fact, although at least three U.S. cities now have no NFL Club but would like one

13   (Oakland, St. Louis, San Diego) – and many more have never had an NFL team but would like

14   one – the NFL has taken a "no" approach to further league expansion.   Just a few years back,

15   Robert Kraft made it clear why expansion is so rare:

16          Throughout the process of relocation and the various attempts to
        either bring football to Los Angeles or keep the St. Louis Rams, San
17      Diego Chargers and Oakland Raiders in their current markets, many
        have been left to wonder what would happen to team or city on the
18      outside looking in when it comes to this game of billion-dollar
        musical chairs.
19

20          It stands to reason that somebody is not going to get what they want,
        though it's still unclear which team or city that will be.   All three of
21      the current home markets could step up, or maybe none will.   In the
        many permutations of how it could all play out, somebody is
22      probably going to be left without a chair, or at least not the chair
        they most would like to sit in.
23
            That's left some questions about whether expansion would be a
24      possibility?   The answer, according to New England Patriots owner
        Robert Kraft, is no.
25
            "I think expansion would be very difficult," Kraft said.   "Look, I
26      know.   I bought my team 21 years ago, and I was so privileged to do
        it.   If any ownership group puts their heart and soul into it, the local
27      people will support it.   It's a product that the public wants, but they
        have to feel that you're serious and want to do what you want to do.
28

1   I don't see expansion being an option.   Any community that is
2   privileged to have a team, love them up."

3   *NFL Expansion Doesn't Look Like An Option*, ESPN.com, Mar. 25, 2015.

4   68.   The Raiders' estimated market value almost doubled because of the move to Las

5   Vegas.   That is the value of what Professor Vrooman calls the relocation "extortion."   And, in

6   fulfillment of the threat underlying that extortion, the NFL has refused even to consider a new

7   franchise for Oakland.   Oakland (and St. Louis and San Diego) has been made an example by the

8   NFL:   if you do not pay our extortion prices, you are out of the market.

9   69.   Defendants' decision to exclude Oakland, St. Louis, and San Diego makes perfect

10   anticompetitive sense.   The NFL cartel will not give these three cities new NFL franchises because

11   Defendants – as a revenue-sharing cartel – will not make enough money from the new teams.   For

12   example, in a competitive market place, a new NFL team in Oakland would thrive, but whatever

13   revenues it would bring into the collective pot (plus whatever marginal increase in television

14   rights that may result), will not exceed the loss each existing NFL Club will experience from

15   sharing revenues with a 33rd team.   Defendants – the suppliers – are determining supply.   *That is*

16   *not how competitive marketplaces operate*:   consumer demand is supposed to be the primary

17   driver of supply.

18   **B.   The NFL's Broken Relocation Promises**

19   70.   Defendants' market power and anticompetitive behavior have not gone unnoticed.

20   In particular, as to the issue of franchise relocation, Defendants have repeatedly been criticized for

21   ignoring the interests of fans and Host Cities in the name of extracting supra-competitive profits.

22   Accordingly, beginning in the 1980s, the NFL and its Clubs faced legal and political pressure to

23   change its tactics and factor into relocation decisions the considerations of fans and Host Cities.

24   71.   The *NFL's* answer?   The Relocation Policies.   For years, the NFL touted these

25   Policies as an answer to antitrust liability, proposed legislative action and the concerns of Host

26   Cities.   However, the NFL – recognizing the enormous value of relocation extortion – has

27   abandoned those Policies.   Indeed, in this action, the NFL now contends that its teams can relocate

28   without application of the Relocation Policies, that those Policies are discretionary and, to the

1    extent that anyone can enforce them, it is only the NFL itself.  This position is a convenient denial

2    of the NFL's promises to the communities that host their teams.  In order to appreciate why Host

3    Cities, like Oakland, are the intended beneficiaries of the Relocation Policies, in addition to the

4    express statements and actions of Defendants, the legislative history of those Policies provides

5    necessary context.

6           72.    As a result of Defendants' collective disregard and abandonment of the Policies

7    (and their own Constitution), so goes the antitrust protection they provided.

8                  1.     The 1980s:  Antitrust Liability and Federal Intervention

9           73.    In the early 1980s, the NFL violated federal antitrust laws in a well-known effort to

10   prevent the Raiders from leaving Oakland for Los Angeles.  In *Raiders I*, the Ninth Circuit

11   affirmed a decision finding that the NFL had violated federal antitrust laws by voting against the

12   Raiders' proposed relocation.  In its ruling, the Ninth Circuit suggested that the NFL adopt

13   policies that would guide relocation decisions in ways that comport with federal antitrust law:

14                 To withstand antitrust scrutiny, restrictions on team movement
                   should be more closely tailored to serve the needs inherent in
15                 producing the NFL "product" and competing with other forms of
                   entertainment.  An express recognition and consideration of those
16                 objective factors espoused by the NFL as important, such as
                   population, economic projections, facilities, regional balance, etc.,
17                 would be well advised.  [citation omitted]  Fan loyalty and location
                   continuity could also be considered.
18

19                 Some sort of procedural mechanism to ensure consideration of all
                   the above factors may also be necessary, including an opportunity
20                 for the team proposing the move to present its case.

21   *Raiders I*, 726 F.2d at 1397.[12]

22          74.    At the same time, the United States Congress began to react to the economic

23   damage inflicted by NFL Club relocations and threats of relocation.  In 1984, Senator Thomas

24   _____

25   [12] In *Raiders I*, the Ninth Circuit found that the NFL's vote to prevent the Raiders' relocation to
     Los Angeles was an unreasonable restraint of competition in violation of the Sherman Act because
26   it was intended to "control, if not prevent, competition among the NFL teams through territorial
     divisions."  726 F. 2d at 1391.  Here also, Defendants' conduct, including its final vote approving
27   the Raiders' move to Las Vegas, was intended to control and/or prevent competition among the
     NFL teams by directing the Raiders to Las Vegas, a territory without an NFL team.
28

Eagleton of Missouri, among others, submitted a bill (S. 259) that would have required the NFL to consider the interests of Host Cities in relocation decisions.  Later, Senator Slade Gorton of Washington and others submitted a similar bill (S. 287) that would have taken the relocation decision away from the NFL and given it to an arbitration board.  In February 1985, hearings were held before the Senate Commerce Committee on both bills.  Senator Gorton, in his opening remarks, stated:

> . . . I think we have to look at a number of questions as we approach this legislation.  First, the reason that there is so much interest in it is the extreme volatility of the location of sports franchises and the constantly increasing threats of moves of franchises from one city to another.  Teams threaten to move not because the present city is not supporting teams in a totally adequate fashion – very frequently at a profit – but simply because the artificial shortage of teams creates a great bidding war, and cities which are large enough and sophisticated enough to support professional sports franchises are unable to get them, without raiding, without taking them from other cities which may have supported those teams for long periods of time. . . .

> So, while I agree with the various professional sports leagues that the leagues themselves should have some control over franchise moves, it seems to me absolutely vital that the communities which are threatened with the loss of these franchises have some say in that movement. . . .

> My paramount concern in crafting legislation to address this issue is the protection of our cities, both cities which have professional sports franchises and wish to keep them, and cities which do not now have a franchise and wish to gain one.

(U.S. Sen. Hearings 99-36 (Feb. 4 & 20, 1985) ("1985 Sen. Hearings") at 2-4).

75.     The NFL, as would be expected, opposed Senator Gorton's legislation (although the NFL asked for, but did not receive, yet another antitrust exemption).  Further, in order to assuage the concerns of Senator Gorton and his committee, the NFL incorporated into its Relocation Policies *the same list of considerations that the proposed arbitration panel would have considered under S. 287.*

76.     Specifically, in a December 1984 memorandum to the owners of the NFL Clubs, Commissioner Pete Rozelle stated:

/ / /

Section 4.3 [of the NFL Constitution] requires prior approval by the affirmative vote of three-fourths of the member clubs of the League (the normal voting margin for League business) before a club may transfer its franchise or playing site to a different city outside its home territory.  Thus, before any club may transfer its franchise or playing site outside its home territory, the club must submit a proposal for such transfer to the League . . . .

[W]hile the League has analyzed many factors in making expansion and team-move decisions in the past, I will also give consideration to the attached listing of factors, among others, in reporting to the membership on any proposed transfer outside a home territory. These factors were contained in a bill reported by a Senate committee earlier this year; they essentially restate matters that the League has considered vital in connection with team location decisions in the past.  Accordingly, any club proposing to transfer should, in its submission to this office, present the club's position as to the bearing of these factors on its proposed transfer state specifically why such a move is regarded as justified on these standards. . . .

**ATTACHMENT TO MEMORANDUM OF DECEMBER 21, 1984**

(1) the adequacy of the stadium or arena in which the team played its home games in the previous season and the willingness of the stadium or arena authority to remedy any deficiencies in such facility;

(2) the extent to which fan support for the team has been demonstrated during the team's tenure in the community;

(3) the extent to which the team has, directly or indirectly, received public financial support by means of any publicly financed playing facility, special tax treatment and any other form of public financial support;

(4) the degree to which the owner or management of the team has contributed to any circumstance which might otherwise demonstrate the need for such relocation;

(5) whether the team has incurred net operating losses, exclusive of depreciation and amortization, sufficient to threaten the continued financial viability of the team;

(6) the degree to which the team engaged in good faith negotiations with members and representatives of the community concerning terms and conditions under which the team would continue to play its games in such community;

(7) whether any other team in its league is located in the community in which the team is currently located;

/ / /

(8)     whether the team proposes to relocate to a community in which no other team in its league is located; and

(9)     whether the stadium or arena authority, if public, is not opposed to such relocation.

(1985 Sen. Hearings at 70-71).

77.     These factors – lifted from S. 287, a bill explicitly designed to protect the rights of existing and potential Host Cities of NFL Clubs – became the first version of the Relocation Polices.  Clearly, the Relocation Policies were adopted for the benefit of Host Cities, including Oakland, and so that the NFL and its Clubs could retain control over the relocation process.

2.     The 1990s:  Placating Host Cities

78.     In 1996, in another attempt to avoid legislation, the NFL negotiated and entered into a "Statement of Principles" regarding team relocations with an organization that directly represented the interests of Host Cities:  the Mayors' Conference.

79.     The Statement of Principles was negotiated by the Honorable Marc Morial, Mayor of New Orleans and the Chairperson of the Mayors' Conference's Arts, Parks, Entertainment, and Sports Committee (the "Sports Committee"), and the Honorable Sharon Sayles Belton, Mayor of Minneapolis and Vice Chairperson of that Committee.  Oakland's current mayor sits, and past Oakland mayors have sat, on the Sports Committee.

80.     The Statement of Principles stated:

> **Preamble**:  The United States Conference of Mayors (USCM) and the National Football League (League) are committed to stable team-community relations.  Stability is good for fans, *good for home cities* and good for professional sports.  Communities, sports fans and taxpayers make a substantial and valuable financial, psychological and emotional investment in their professional sports team.  Professional sports teams are businesses which promote civic pride and generate jobs, revenues and other local economic development.  Communities, teams and the National Football League should *work together* to identify and resolve issues pertaining to team relocations, stadium improvements, and League expansions.
>
> **I.  Team Movement**
>
> *Communities, stadium authorities and team owners should deal with each other in equitable and fair ways.*  Teams should give a fair and reasonable opportunity and time frame, for example, six months to

FIRST AMENDED COMPLAINT FOR DAMAGES

communities to respond to economic and facility issues before filing for a possible relocation. Such a time frame should be sufficient to allow for reasonable negotiations and, where appropriate, political processes to occur that may obviate the need for a possible relocation.

*It is important that the League maintain rules and procedures to regulate the movement of teams consistent with this Statement of Principles. Such rules should recognize both the private interest of team owners to maintain a profitable business and public interest to enjoy the direct and indirect benefits of having a professional sports franchise. The League should have the ability to enforce its own rules and the obligation to follow a set process before the relocation of a team is permitted to occur.*

*Control of team location is a matter for the League members to determine jointly, according to rules established and applied by the League. On occasion, it will be necessary to permit a team to move; in many more instances, a move will not be justified. . . .*

(Exhibit 3 at 1 (emphasis added)). The Statement of Principles then listed ten considerations for a team relocation, most of which are part of the current Relocation Policies. Indeed, the Relocation Policies expressly state that the relocation factors listed therein "are also contained in a 'Statement of Principles' relating to franchise location developed by the League in consultation with the U.S. Conference of Mayors." (Exhibit 2 at p. 3 n.1).

81. A few years later, when the U.S. Senate was considering yet another bill impacting the NFL, Joe Brown, an NFL executive, wrote to Mayor Morial, touting the Statement of Principles and the Relocation Policies, which had just been amended to reflect the "understanding" reached in the Statement of Principles:

June 11, 1999

Hon. Marc Morial,
Mayor of New Orleans,
New Orleans, LA

Dear Mayor Morial:

The National Football League and the United States Conference of Mayors both wish to maintain the stability of economically viable franchises and to ensure a fair process to consider requests for franchise relocations. The NFL and the Conference have worked for many months to develop an approach to address these common concerns. A draft Statement of Principles was written to set forth our understanding.

Consistent with those discussions, and grounded in sound business policies, the NFL has amended its franchise movement guidelines.  The amendments bring to reality our mutual ideas on these issues, and are the direct result of our discussions.

The amended guidelines balance and protect the interest of the cities, the League and individual teams.  They establish an orderly process, ensuring municipal interests will be heard and addressed, and that franchise moves occur only after exhausting all reasonable options in a team's existing home territory.  They assert an active and appropriate role for the League in managing possible relocations.  They affirm the League's commitment that all obligations under stadium leases be fully honored.

We highly value our relationships with the Conference and with the communities that host NFL football.  The amended guidelines, and the cooperative discussions that preceded them, reflect the strengthened partnership between our two organizations.

. . .

Sincerely,

Joe Brown

(U.S. Sen. Hearings 106-484 (June 15, 22 & Sept. 13, 1999) ("1999 Sen. Hearings"), at 78 (emphasis added)).

82.    Several days later, Mayor Morial wrote the NFL Commissioner:

City of New Orleans
June 21, 1999

Paul Tagliabue, Commissioner,
National Football League,
New York, NY

Dear Commissioner:

The United States Conference of Mayors has worked closely with the National Football League to develop mutual positions on matters such as franchise movement and stadium financing.  Our discussions led to a draft Statement of Principles on these and related subjects.  Underlying these discussions was the idea that both cities and the League would be well served by open, frequent, and cooperative communications.

Accordingly, we are pleased to receive the news that the League has amended its franchise movement guidelines in a fashion consistent with our discussions.  We believe these amendments

FIRST AMENDED COMPLAINT FOR DAMAGES

improve upon past policies and should give city interests a greater measure of recognition and protection.

Similarly, we are gratified that the League has adopted stadium financing mechanisms that will lead to increased private contributions to stadium construction. The draft Statement of Principles acknowledged the importance of a public-private partnership in stadium financing. It called for exploring new funding mechanisms upon which to expand that partnership. The League's new stadium financing program is helpful to taxpayers and consistent with our mutual discussions and understandings.

We appreciate the League's good faith response to municipal and taxpayer concerns. We look forward to a continuation of this very constructive atmosphere as we work together on matters of common interest.

With best regards, I remain.

Yours very truly,

Marc H. Morial,
Mayor

(1999 Sen. Hearings at 79).

83. In short, the Mayors' Conference – a body that includes a representative from the City of Oakland, represents Host Cities of major league sports teams, and has the Sports Committee devoted to sports-related issues – helped draft the Relocation Policies to protect its cities from the extraordinary market power exerted by Defendants. And, the NFL promised to enforce those Relocation Policies in the interest of Host Cities in order to secure the massive investments by the Host Cities in NFL teams and stadia. Contending that the Relocation Policies were not drafted for the benefit of Host Cities (as Defendants are now trying to do in this case) is simply denying the reality of how those Policies came into being and express representations by Defendants.

84. Unfortunately, the "good faith" that Mayor Morial and others hoped for never came to pass. The economic incentives simply made relocations too lucrative to the cartel. As just one example, in 2002, when the U.S. Senate began debating another sports bill, senators referred to the Statement of Principles as an example of how major league sports leagues could work with cities and address relocation issues. Senator Paul Wellstone of Minnesota said:

1
2
3
4
5
6

> [M]ajor league owners and their economists will tell you that lifting major league baseball owners' antitrust exemption will promote league instability by fostering team relocation.  I challenge such a conclusion.  The National Football League fully subject to the antitrust laws was able to negotiate guidelines with the Conference of Mayors providing for community input on relocation decisions. The application of the antitrust laws does not prevent a league from working to keep a team in a city.  But insulating that league from the antitrust laws absolutely prevents cities, fans, and other interested parties from challenging a league decision to move a team.

7  (U.S. Sen. Hearing 107-427 (Feb. 13, 2002), at 14 (emphasis added)).

8      85.    As another example, in 2001, in a prepared statement before the U.S. House of

9  Representatives Committee on the Judiciary (which was considering the Fairness in Antitrust in

10  Sports ("FANS") Act), Donald M. Fehr, Executive Director of the Major League Baseball Players

11  Association, provided the following statement:

12
13
14
15
16
17
18
19

> Uncontrolled movement of teams if MLB does not have an absolute veto power has long been used as a scare tactic by MLB.  Citing the case Al Davis won against the NFL, the owners seek to pit cities that have teams against those that do not, but who seek them. What MLB fails to mention is that the courts have never held that the leagues have no control over relocations, just that they must have reasonable rules in deciding when to permit a relocation.  The NFL has worked with the U.S. Conference of Mayors (USCM) to develop a procedure and criteria by which to determine the appropriateness of proposed relocations.   And, the USCM, by a letter dated 20 November 2001, has invited MLB to meet with them and work toward a similar agreement, attaching the agreement with the NFL as an example.

20  (H.R. Hearings 3288 (Dec. 6, 2001), at 54).

21      86.    By adopting the Statement of Principles, and incorporating the Relocation Policies

22  into the NFL Constitution, the NFL convinced the world that it and its Clubs intended to play fair,

23  to protect the interests of Host Cities in relocation decisions, and to rein in the relocation extortion

24  threat inherent in its cartel structure.  Defendants, however, never followed through and, through

25
26
27
28

FIRST AMENDED COMPLAINT FOR DAMAGES

1   their conduct as alleged herein and Defendants' argument to this Court that they can choose to

2   ignore the Policies, have rendered those Policies pretextual.[13]

3                   3.     2000s:  A Trail of Broken NFL Promises

4          87.    In the last several years, the NFL has enthusiastically supported three team

5   relocations:  the Rams from St. Louis, Missouri to Los Angeles, California; the Chargers from San

6   Diego, California to Los Angeles, California; and the Raiders from Oakland, California to Las

7   Vegas, Nevada.  Given the profit-maximizing focus of the NFL and its Clubs – and the enormous

8   shared profits associated with each move – the NFL simply ignored its prior promises and

9   declared the Relocation Policies discretionary "guidelines" that could be ignored.  Further, the

10  NFL made a mockery out of its promise, set forth in the Statement of Principles, that it would, in

11  considering relocations, "recognize both the private interest of team owners to maintain a

12  profitable business and the public interest to enjoy the direct and indirect benefits of having a

13  professional sports franchise."  The NFL did no such thing.

14         88.    However, a review of the Relocation Policies makes clear that those Policies cannot

15  be ignored.  **First**, the Policies are *not* voluntary or discretionary:

16              Article 8.5 of the NFL Constitution and Bylaws vests in the

17              Commissioner the authority to "interpret and from time to time establish policy and procedure in respect to the provisions of the

18              Constitution and Bylaws and any enforcement thereof." Set forth below are policy and procedures to apply to future League

19              consideration, pursuant to Section 4.3 of the Constitution and Bylaws, of any proposed transfer of a club's home territory.

20

21  (Exhibit 2 at p. 1).

22  _____

23  [13] Defendants argue that *Raiders I* and thus the Relocation Policies are intended exclusively to

24  prevent moves, however, nothing in the Policies has explicit language so limiting them.  In fact, to the contrary, the Policies provide the framework **and requirements** for a NFL Club to relocate,

25  including but not limited to the express obligation to act in good faith.  Pursuant to the Policies, only when the processes and procedures set forth therein are followed should a team be permitted

26  to relocate.  Logically, if a Club fails to abide by the Policies, it should not be allowed to relocate.

27  Here, not only did the Raiders fail to negotiate in good faith, among other things, Defendants failed to consider the factors in the Policies in deciding to relocate the Raiders to Las Vegas at all.

28

                         39                         
**FIRST AMENDED COMPLAINT FOR DAMAGES**

89.   **Second**, despite the NFL's contentions to the contrary, the Relocation Policies place affirmative "obligations" on any NFL Club that is considering a relocation.  Again, the clear wording of the Policies make them obligatory and contractual.  For example:

> Article 4.3 confirms that each club's primary obligation to the League and to all other member clubs is to advance the interests of the League in its home territory.  This primary obligation includes, but is not limited to, maximizing fan support, including attendance, in its home territory.

> \* \* \*

> Because League policy favors stable team-community relations, clubs are obligated to work diligently and in good faith to obtain and to maintain suitable stadium facilities in their home territories, and to operate in a manner that maximizes fan support in their current home community.

> \* \* \*

> [Factors impacting a relocation decision include:]   The extent to which the club has satisfied, particularly in the last four years, its principal obligation of effectively representing the NFL and serving the fans in its current community; whether the club has previously relocated and the circumstances of such prior relocation[.]

90.   **Third**, any NFL Club seeking to relocate is also *required* (not recommended or requested) to file a notice with the NFL that, among other things, addresses each of the factors listed in the Relocation Policies, including those addressing the interest of home territories. (Exhibit 2 at p. 2).  The Relocation Policies – which, again, were negotiated between the NFL and Mayors' Conference – also require NFL team owners to consider the following factors, among others, with respect to voting on any relocation request:

> • The extent to which the club has satisfied, particularly in the last four years, its principal obligation of effectively representing the NFL and serving the fans in its current community; whether the club has previously relocated and the circumstances of such prior relocation;

> • The extent to which fan loyalty to and support for the club has been demonstrated during the team's tenure in the current community;

> • The adequacy of the stadium in which the club played its home games in the previous season; the willingness of the stadium authority or the community to remedy any deficiencies in or to replace such facility, including whether there are legislative or referenda proposals pending to address these issues; and the characteristics of the stadium in the proposed new community;

/ / /

- The extent to which the club, directly or indirectly, received public financial support by means of any publicly financed playing facility, special tax treatment, or any other form of public financial support and the views of the stadium authority (if public) in the current community;

- The club's financial performance, particularly whether the club has incurred net operating losses (on an accrual basis of accounting), exclusive of depreciation and amortization, sufficient to threaten the continued financial viability of the club, as well as the club's financial prospects in its current community;

- The degree to which the club has engaged in good faith negotiations (and enlisted the League office to assist in such negotiations) with appropriate persons concerning terms and conditions under which the club would remain in its current home territory and afforded that community a reasonable amount of time to address pertinent proposals;

- The degree to which the owners or managers of the club have contributed to circumstances which might demonstrate the need for such relocation; and

- Whether the proposed relocation, for example, from a larger to a smaller television market, would adversely affect a current or anticipated League revenue or expense stream (for example, network television) and, if so, the extent to which the club proposing to transfer is prepared to remedy that adverse effect.

91.     As shown below, the NFL breached these factors in approving the relocation of the Raiders to Las Vegas because the extortion value of the move was huge.  Oakland was tasked with paying an extraordinary anticompetitive price for continuing its hosting of the Raiders; in a desperate attempt to stay in the market for hosting NFL teams, Oakland offered a $1.3 billion stadium (which was an anticompetitive price in and of itself), but the offer was rejected (if it was ever considered at all).

92.     In a competitive market – without ubiquitous profit sharing – none of this would have taken place.  The Raiders would have stayed in Oakland and played in a renovated or new Coliseum because:  (a) without monopolistic profit sharing, their financial fortunes would have been tied much more significantly to their Oakland fan base, and (b) without the NFL's cartel structure and rigid control over output (league expansion), the Raiders would have had virtually no relocation "extortion" threat to exercise.  But in a profit-sharing cartel, where all value is communal, Host Cities and loyal fans are of diminished economic significance, and value can be more easily extracted through the behavior of the extortionist.

C.      **The Raiders' History in Oakland**

        1.      The Raiders' Identity is Inextricably Linked With its Oakland Fans

93.      The Raiders have been inextricably linked with Oakland since Oakland was awarded the franchise in 1960.  In fact, the Oakland community itself chose the club's name, "Raiders," because it reflects the history of Oakland, celebrating the rough-and-tumble merchant marines who came ashore on Oakland's blue-collar east side of the San Francisco Bay and their banter after off-loading cargo from their ships.

94.      Similarly, the Raiders' national identity and image reflect the grit and hard-nosed passion of their Oakland fans.  The now famous Raiders image originated in the 1960s and 1970s, and, in part, came from their renegade image cultivated in the old AFL.  The Raiders' tough play on the field followed.  The Oakland fans reflected their home club's toughness by dressing from head to toe in black and silver and coined the term "Raider Nation" to describe their unity.  An especially passionate contingent of the club's fans was infamously dubbed "The Black Hole" for dressing in costume and cheering with ferocity at games.  Today, Raiders fans are famous throughout popular culture for being some of the most devout, dedicated, loyal, and passionate fans in all of sports.  The Raiders and NFL, of course, have not been shy about monetizing the image created by, and through, the consistent passion of the Raiders' incredibly loyal Oakland fan base.

        2.      The Hectic Al Davis Years

95.      In the mid-1960s, Al Davis took an ownership stake in the Raiders and became one of three general partners of the club.  In 1966, the Raiders began playing in the Coliseum.  In 1972, he revised the partnership agreement to make himself the managing general partner of the Raiders with near-absolute control over franchise operations.

96.      No later than 1979, the Raiders began negotiating with the Los Angeles Coliseum to relocate the club.  In 1980, Al Davis signed a memorandum of agreement to move the Raiders to Los Angeles.  Up until Al Davis officially agreed to the relocation of the Raiders, Oakland had engaged in good faith negotiations to upgrade the Coliseum (in Oakland).  Oakland and the Raiders at one point came to terms on an agreement for the Raiders to stay, when the Raiders

1    suddenly submitted new demands that caused negotiations to collapse.  The NFL subsequently

2    rejected the Raiders' proposed move to Los Angeles, and the aforementioned *Los Angeles*

3    *Memorial Coliseum* litigation followed.  The Raiders officially moved to Los Angeles on

4    November 16, 1982.

5         97.    Soon after the relocation, history repeated itself when Al Davis and the Raiders

6    began bickering with their new Host City of Los Angeles.  By August 1987, Davis had agreed to

7    move the club out of the Los Angeles Coliseum to Irwindale, California for, in part, a $10 million

8    cash advance.  Despite ultimately not moving the team to Irwindale, he kept the advance.

9         98.    After the Irwindale deal fell through, Sacramento and Oakland became potential

10   cities for a Raiders move.  Following a series of negotiations with Los Angeles, Sacramento, and

11   Oakland, Al Davis conditionally agreed to move the club back to Oakland in March 1990.

12        99.    Even with the conditional agreement in place, Al Davis continued his flirtations

13   with other markets.  Within six months, he reneged and agreed to a 20-year lease in Los Angeles.

14   Eventually, that deal fell through.  Al Davis continued negotiating with a number of potential Host

15   Cities in California, including Los Angeles and Oakland, and Orlando, Florida.

16        100.   On January 17, 1994, the Northridge Earthquake struck Los Angeles, severely

17   damaging the Los Angeles Coliseum.  In May 1994, Al Davis signed a one-year contract with

18   Oakland.  The contract stipulated that the Raiders would play in Oakland if repairs to the Los

19   Angeles Coliseum were not completed in time for the following season.  The contract was later

20   extended to two years.

21        101.   In April 1995, Al Davis reached a tentative agreement with Hollywood Park to

22   build a stadium in Inglewood, California.  That deal also failed.

23        102.   In May 1995, Oakland officials met with the Raiders in an effort to bring the club

24   back to Oakland.  On June 23, 1995, the Raiders signed an agreement to play in the Coliseum.

25   The terms of the agreement included, among others:

26              •    A 16-year lease with an extremely low annual rent of $50,000;

27              •    Oakland offering a $31.9 million relocation and operating loan;

28   / / /

- Oakland committing up to $10 million to the construction of a new training facility;

- Oakland offering up to $85 million for stadium modernization efforts to be financed by bonds;

- Fans paying a one-time fee in the range of $250 to $16,000 for the right to buy season tickets for 10 years ("personal seat licenses");

- The Raiders receiving 100% of ticket and luxury suite revenue;

- The Raiders and the Coliseum sharing club seat and membership fees for the first 10 years, after which the Raiders would receive 100% of that revenue;

- The Raiders and the Coliseum sharing concessions, parking, and stadium naming rights revenue; and

- A $1 surcharge on all tickets sold to benefit Oakland schools and other public services.

103.    Despite having just signed a generous 16-year pact with Oakland, Al Davis almost immediately sought to break the Oakland lease.  As a result, in 1997, Oakland was forced to file a suit that, in part, sought to declare the agreement with the Raiders valid and enjoin the club from leaving Oakland.  The Raiders countersued, seeking to break the lease.  The countersuit was dismissed.  Nonetheless, rumors soon emerged that the Raiders were seeking to move to either Los Angeles or Chicago.

104.    Al Davis' never-ending series of lawsuits continued.  In 1999, he unsuccessfully sued the NFL for allegedly sabotaging his plans for a new stadium in Los Angeles.  In 2000, Al Davis again sued Oakland for supposedly fraudulently inducing the Raiders into moving back to Oakland.  The claims against Oakland were ultimately dismissed.

**D.     The Raiders' Unlawful Relocation From Oakland**

105.    Despite Al Davis' hectic ownership style, and a Raiders team that only managed 29 victories in 112 games from 2003 to 2009, the remarkably loyal Oakland community continued to passionately support their home team year after year.  However, unbeknownst to Plaintiff, the Raiders – with the NFL's full support – were plotting to leave.

106.    Tellingly, as early as 1998, Mark Davis, Al Davis' only child and the heir apparent to the Raiders, purchased the Internet domain name, "LasVegasRaiders.com."  He subsequently

1  renewed the domain name yearly.  Within two years, Mark Davis also purchased a cellphone

2  number with a Las Vegas area code.

3       1.  The Raiders and NFL Decide to Leave Oakland

4     107. In December 2008, NFL Commissioner Roger Goodell ("Goodell") announced that

5  the NFL wanted the Raiders to receive a new stadium.  Nonetheless, in November 2009, the

6  Raiders agreed to extend their lease to stay in the Coliseum.

7     108. Soon thereafter, however, Raiders officials began publicly discussing the

8  possibility of sharing a facility with the San Francisco 49ers in Santa Clara, California.  In

9  addition, in April 2010, Anschutz Entertainment Group, a sports and entertainment conglomerate,

10  proposed building a football stadium in downtown Los Angeles for several potential NFL Clubs,

11  including the Raiders.

12     109. On October 8, 2011, Mark Davis assumed control of the Raiders after his father, Al

13  Davis, passed away.

14     110. In June 2012, the NFL sent a memo to the NFL Clubs providing guidelines for any

15  potential relocation to Los Angeles.  The memo was believed to be largely addressed to the

16  Raiders, Rams, and Chargers, as it was widely believed that the NFL wanted those clubs to leave

17  their Host Cities.  In fact, the NFL had made it all but a foregone conclusion that those clubs

18  would be leaving their Host Cities.  Amazingly, even in a huge market like the Los Angeles

19  metropolitan area, the city – *i.e.*, the potential host of an NFL Club – had no negotiating power.

20  What happened in Los Angeles, if anything, was entirely dictated by the NFL.

21     111. The NFL's June 2012 memo made clear that two clubs would move into the Los

22  Angeles market – a new geographic territory – as the NFL advised teams that relocation approval

23  would be contingent on any proposed Los Angeles stadium "being able to host two teams."  The

24  Raiders, Rams, and Chargers would later apply to relocate to Los Angeles.

25     112. In 2014, the Raiders agreed to a short-term lease to remain in Oakland.  Soon

26  thereafter, Mark Davis began meeting with high-level NFL officials regarding where he would

27  relocate the Raiders.  In July 2014, he informed NFL Executive Vice President Grubman, "I'm

28  going to Vegas, baby!"  This declaration came despite the NFL's long-time stance against

1    gambling.  For example, in 2012, Goodell testified that gambling was number one on his list of

2    threats to the integrity of professional football in the United States.  And, in a May 14, 2018 press

3    release, the NFL reasserted its "long-standing and unwavering commitment to protecting the

4    integrity" of professional football against the threat of gambling.  Nevertheless, the NFL and its

5    owners would soon throw their full support behind moving one of its marquee teams to "Sin City"

6    and the heart of gambling:  Las Vegas, Nevada – another new geographic territory for the NFL.

7                 2.    The Raiders' Pretextual and Bad Faith Negotiations with Oakland

8         113.   Despite all his backdoor dealings and public maneuvering, Mark Davis claimed

9    that he was "trying everything possible to get something done in Oakland."  Mark Davis asserted

10   that "99 percent of my interests and energy are going towards getting something done [in

11   Oakland]."  In 2014, Oakland proposed donating[14] land to the Raiders for a new stadium even

12   though the city was still paying off the debt outstanding on upgrades to the Coliseum requested by

13   the Davis family.  Later, in early 2015, Oakland proposed a $500 million renovation of the

14   Coliseum (to which Oakland would have contributed significantly) in an effort to retain the

15   Raiders.

16        114.   On May 19, 2015, after the NFL's Spring Meeting, Mark Davis publicly announced

17   that he was willing to commit $500 million for a new $900 million stadium in Oakland.  He then

18   asserted that Oakland would be required to fill the $400 million funding gap.  Despite the

19   enormity of Mark Davis' demand, Oakland continued to negotiate with the Raiders.

20        115.   On January 4, 2016, as expected, the Raiders, Chargers, and Rams each officially

21   filed for relocation to Los Angeles.  Prior to these filings, an NFL.com reporter, Ian Rapoport,

22   reported that any NFL Club that relocated to Los Angeles would be required to pay a $550 million

23   relocation fee.  Since two teams were going to Los Angeles, the total relocation fee to be shared

24   with the other 30 NFL Clubs would be a staggering $1.1 billion.

25   / / /

26

27   [14] The fact that a municipality had to propose *donating* land to a successful, for-profit business is a
     direct consequence of Defendants' anticompetitive cartel.

28

116.    Less than two weeks later, the NFL Club owners voted 30 to 2 to allow the Rams to move to Los Angeles for the 2016 season.  As the NFL had already determined that two teams would leave their Host Cities for Los Angeles, the Chargers were given a one-year option to join the Rams in Los Angeles.  If the Chargers elected not to exercise that option, the Raiders would then be given a one-year option to relocate to Los Angeles.  Remarkably, prior to the vote, all three clubs signed a waiver, agreeing not to sue the NFL if their Los Angeles relocation proposal was rejected.

117.    On January 29, 2016, a few weeks after Mark Davis announced his commitment to Oakland at an NFL-sponsored town hall meeting, Mark Davis privately met with billionaire casino mogul Sheldon Adelson ("Adelson") to discuss funding for a $1.7 billion stadium for the Raiders in Las Vegas.  On April 28, 2016, while speaking before the Southern Nevada Tourism Infrastructure Committee, Mark Davis again announced his desire to move the Raiders from Oakland to Las Vegas and pledged to commit $500 million towards a new stadium, $200 million of which was an NFL loan.  Mark Davis said, "We're not using Las Vegas as a bargaining chip.  I would never do that.  This is real."

118.    By May 2016, multiple owners were publicly stating their support for a Raiders move to Las Vegas.  Mark Davis declared, "I've given my commitment to Las Vegas and if they can come through with what they're talking about doing, then we'll go to Las Vegas."  In August 2016, Adelson convinced the Nevada state legislature to create a bill that appropriated $750 million in public money, which had originally been intended to fund a public project, to a professional football stadium.[15]  Later that month, the Raiders filed a trademark application for the "Las Vegas Raiders."

_____

[15] Notably, Stanford University Economist Roger Noll called this deal "the worst I've ever seen" in terms of a publicly funded sports complex, and noted that the financial study purporting to justify the deal was "deeply flawed" because it assumes that one-third of the people attending games in Las Vegas will be tourists who also choose to stay more than three nights in Las Vegas. According to Noll, "Their financial welfare would depend on selling 22,500 tickets every single game to people following the visiting team" and "[t]here is no team in the NFL that comes anywhere near one-third of their fan base being tourists . . .  You take away all that, you take away (footnote continued)

119.    In September 2016, Goodell publicly stated that he hoped the Raiders would come to terms on a stadium in Oakland.  Yet, that very same month, Jerry Jones, the owner of the Dallas Cowboys and one of the most powerful and influential owners in the NFL, told Nevada lawmakers to be aggressive in landing the Raiders.  Of course, it is no surprise that Jerry Jones – and other NFL Club owners – would be supportive of the Raiders moving to Las Vegas.  As discussed *supra*, a Club moving to Las Vegas would result in extraordinary supra-competitive revenue for every member of the NFL cartel to share, including, but not limited to, revenue from television rights in a new geographic region that previously had no NFL Club and from the game receipts from an ultra-luxury stadium that will cost over $1.9 billion to build.

120.    Then, less than a month later at an NFL league meeting, Mark Davis stated, "I made a promise to [the Nevada Governor], and if he comes through with the financing, I'll push through with the relocation."

121.    Though the Raiders and NFL had given up on Oakland – in direct contravention of the Relocation Policies – Oakland had not given up on the Raiders.  In late November 2016, an investment group led by former NFL players Ronnie Lott ("Lott") and Rodney Peete, in partnership with Fortress Management Group, pledged $600 million to build a new stadium near the Coliseum.  This offer was $200 million more than the $400 million funding gap that Mark Davis claimed Oakland needed to fill.  Then, on December 13, 2016, Oakland officials voted to enter into negotiations with Lott's investment group on a proposed $1.3 billion stadium project.  A total of $350 million in public funds was earmarked for the proposal.  The plan was to have Lott's group contribute $400 million and the Raiders contribute the $500 million they had earlier promised to commit to a new stadium (the "Lott Proposal").

122.    The Lott Proposal also included the *possibility* (not a contingency, as later described by the NFL) that Mark Davis would eventually sell some part of the team to the Lott

_____

75 percent of the economic benefit of the stadium."  M. Gutierrez, *Nevada Senate Votes To Help Fund Stadium For Raiders*, SFGate, Oct. 11, 2016.  Of course, none of this matters to the Raiders or Defendants; the cartel got its supra-competitive price and will share in the supra-competitive revenues generated by this relocation.

1    group.  In a league marked by a lack of African-American representation in leadership positions,

2    this should have been heralded as a positive development.  Indeed, the NFL has long applied the

3    "Rooney Rule" to NFL Clubs, which rule requires each team to interview at least one minority

4    coaching candidate before filling a head coaching vacancy.

5        123.    Instead of taking the Lott Proposal seriously, Mark Davis passed off his

6    responsibility to deal with Oakland officials to an NFL representative, Grubman, while Mark

7    Davis followed through with his and the NFL's predetermined plan to move the Raiders to Las

8    Vegas.  Of course, Grubman almost immediately dismissed the Lott Proposal as "not yet a

9    proposal" and expressed his "doubts" regarding its workability.  Though Grubman told Mark

10   Davis that he had an "obligation" to listen to Oakland, no one actually listened.  In fact, at a

11   closed-door NFL meeting, Marc Badain, a high-level Raiders official, referred to the Lott Proposal

12   – a proposal that could have finally introduced African-American ownership into the NFL for the

13   first time in the league's history – as a "political, cover-your-ass joke."  Badain announced that "it

14   would have been better if [Oakland] offered nothing."  Contrary to that assertion, the Lott

15   Proposal was real.

16       124.    On January 19, 2017, as predetermined by Defendants, the Raiders officially filed

17   an application with the NFL to relocate to Las Vegas.  At the time of the filing, Jim Wunderman,

18   president and chief executive of the Bay Area Council, a business and public policy group,

19   summarized the sentiments of Oakland:

20          The Bay Area, millions of stalwart fans and the business community
            are not giving up on keeping the Raiders here where they belong[.]
21          We continue to believe that a deal can be reached to build a modern
            stadium complex that the Raiders deserve and that benefits Oakland.
22          We urge the Raiders, the NFL, and Oakland to work together to find
            an agreement that can benefit everyone and avoid the disruption and
23          pain of a costly move.  Relocating a franchise with the deep roots
            and storied history that the Raiders have here in the Bay Area would
24          be a disaster for the community.

25

26       3.    Defendants' Collusive Relocation Vote

27       125.    On March 6, 2017, Bank of America agreed to provide necessary financing for the

28   Raiders' Las Vegas stadium.  On that same day – a full 21 days before the NFL owners were set to

vote on the Raiders' proposed Las Vegas relocation – the NFL owners convened to determine the amount of the Raiders' relocation fee.  The meeting was effectively the other NFL Club owners determining how much their share of the $1.6 billion increase in the Raiders' franchise value should be: the relocation fee was bid up until NFL owners were satisfied with their personal payments to vote "yes."

126.    Revealingly, according to an ESPN report, one NFL owner who was opposed to the Raiders' Las Vegas relocation "wouldn't stop talking about how high the fee needed to be." Goodell eventually cut off the owner and stated, "[s]o let me make sure I understand: You're opposed to the relocation, but you want to vote on the relocation fee?"  Ultimately, the NFL Clubs agreed that their share of the increased franchise value of the Raiders upon a move to Las Vegas would be $378 million.

127.    Mark Cuban ("Cuban"), an entrepreneur and owner of the NBA's Dallas Mavericks, expressed the thoughts of many when he publicly stated that "[t]here's just no good reason" for the Raiders to move to Las Vegas.  If the NFL was a competitive market – and NFL teams looked to their home territories for most of their revenues – Oakland would be a far more economically attractive market than Las Vegas, as Oakland is based in the United States' 6th largest media market, whereas Las Vegas is in the 40th.  Additionally, as Cuban noted, Las Vegas is a transient vacation city.  Oakland, on the other hand, is an emerging metropolis located nearby the booming city of San Francisco (home of major tech companies Salesforce, Uber and Twitter), the East Bay area (which includes Fremont, home of Tesla Motors), and, of course, Silicon Valley. The NFL, as a revenue-sharing cartel, had a very different analysis of the value of the Raiders' relocation; extorting an almost $2 billion-dollar stadium, and filling in gaps in its national television coverage, among other boosts to its shared revenue, were far more valuable than Raiders' fans in Oakland.

128.    In March 2017, Oakland submitted final plans to the NFL regarding the Lott Proposal.  Oakland Mayor Libby Schaaf made a presentation to a joint meeting of the NFL's Stadium and Finance Committees that outlined the terms of the Lott Proposal, as well as

1  Oakland's significant financial and other contributions to the Raiders.  "We're not giving up in the

2  fourth quarter," Mayor Schaaf wrote in a statement.

3       129.   Unfortunately, the NFL and Raiders had fixed the game before it ever started,

4  negotiating in bad faith from the start.  The *same day* that Mayor Schaaf made her final

5  presentation, Goodell wrote to her, "the information sent today does not present a proposal that is

6  clear and specific, actionable in a reasonable timeframe, and free of major contingencies" and

7  "[a]ll of these efforts, ours and yours, have not yet identified a viable solution."  The Raiders – in

8  an agreement decided among the other NFL Clubs and in direct contravention of the Relocation

9  Policies – for all intents and purposes had already made the move to Las Vegas.

10       130.   The NFL went through the motions of voting on the Raiders' relocation at its

11  annual meeting in March 2017.  On March 23, 2017, Oakland Mayor Schaaf wrote Grubman and

12  Goodell of the NFL to provide further information regarding the Lott Proposal.  On March 26,

13  2017, Mayor Schaaf also wrote the NFL Club owners, urging them to consider Oakland's superior

14  market and plans for a new stadium.  Her plea revealed the true dedication of Oakland to the

15  Raiders:

16            I write to you on the eve of what may be one of the most critical

17            decisions in the National Football League's history.  While I write
   on behalf of my community, I also ask you to consider deeply the

18            lasting impact your choice will have on the future and legacy of the
   broader NFL community.  This decision will not just be the next

19            chapter in the history of one of the most storied franchises in the
   league, the Oakland Raiders, it will also impact the town where that

20            tradition was forged – Oakland, California.

21       131.   She also noted that if the NFL approved the Raiders' move, *"[t]his will be the first*

22  *time ever where the NFL has abandoned an existing market which is bringing a fully financed new*

23  *stadium to the table."*  (emphasis in original).  Although Mayor Schaaf recognized that Oakland

24  was "unable to provide the level of public subsidy Nevada offers," she publicly hoped for a

25  process that involved more than just money:

26            The NFL is more than a business.  You have an obligation to
   recognize that professional football teams are the lifeblood, culture

27            and identity of the places where they play.  Your own policies state
   you will not remove teams from their home markets when a viable

28

alternative to stay exists.  The trust of fans and the league's reputation have already been damaged by recent decisions on the Rams and Chargers.  Another betrayal in a community as valuable and deserving as the Bay Area will further destroy fan loyalty and the NFL's brand.  I know this because I hear it every day from NFL fans in my community, and others who care about the league and what it means to our national culture.

132.    Mayor Schaaf, Oakland and the Raider Nation were resoundingly disappointed.  The NFL Clubs voted 31 to 1 to approve the Raiders' relocation.  The NFL, indeed, is more than a business: it is an unlawful cartel violating its own Relocation Policies and abusing its complete control of the relevant market in the pursuit of anticompetitive profits.

133.    Further, the price Las Vegas paid was exorbitant, supra-competitive, and far above the marginal cost of running an NFL team.  The Raiders and the NFL extracted an extortionist price from Las Vegas and are currently sharing, and will continue to share, in the enormous profits from that extortion.  Oakland was unable, and unwilling, to pay that anticompetitive price.

134.    The lone dissenting vote, Dolphins' owner Stephen Ross, effectively admitted that the NFL had ignored the purpose of the Relocation Policies:

[W]e as owners and as a League owe it to the fans to do everything we can to stay in the communities that have supported us until all options have been exhausted. . . .  I believe when you own a team, you're a steward for the city . . . .  I just don't think everything was done to try and stay in Oakland.

135.    With the Las Vegas deal a *fait accompli*, the other NFL Clubs began to circle the wagons.  Jerry Jones, the owner of the Cowboys, told ESPN that he believed the NFL could be "successful" in Las Vegas.  Robert Kraft, owner of the Patriots, stated that a move to Las Vegas "would be good for the NFL.  I know Mark Davis has tried so hard in Oakland [sic] I want to support him."   Jim Irsay, owner of the Colts, claimed that "[t]here isn't any opportunity in Oakland" and that in Las Vegas, "[t]here is a real want and real enthusiasm from the powers that be that run that state to have an NFL team."   Again, considered in the light of the supra-competitive profits that these owners of NFL Clubs would share from the additional revenue generated by the Raiders' relocation, these statements can only be viewed as transparently self-

1   serving.  As summed up by Robert Kraft, "What I've learned over the last 21 years is the heart and

2   soul and strength of the NFL . . . is the partnership of the 32 teams."  Dahlberg, T., *In the end, the*

3   *NFL cartel is what matters most*, USA Today, May 20, 2015.

4        136.   Of course, no one associated with the NFL, including Mark Davis, "tried hard" to

5   keep the Raiders in Oakland.  In fact, the opposite occurred:  the Relocation Policies which had

6   been expressly adopted to protect the interests of the Host Cities, had been blatantly ignored

7   throughout the process because of the enormous, supra-competitive value that was going to be

8   shared by the NFL cartel with the Raiders' relocation to Las Vegas.  Las Vegas paid an enormous

9   price, far beyond what any host would pay in a competitive marketplace, and the Relocation

10   Policies – which were designed to constrain the NFL's anticompetitive behavior – got in the way

11   and were therefore disregarded.

12        137.   Tellingly, the NFL knew its conduct in moving the Raiders to Las Vegas exposed it

13   to antitrust liability and it therefore sought to limit that liability to the Raiders alone.  Before the

14   Raiders' move was approved, Mark Davis was required to sign an indemnification contract,

15   agreeing to reimburse the other NFL Clubs back for any liability they might face for their

16   collective conduct.  Although such an indemnity is most likely unenforceable, its mere existence

17   demonstrates that Defendants know:  (a) they are a cartel; (b) they use their cartel structure to

18   generate anticompetitive profits; and (c) such conduct is a clear violation of, among other things,

19   the antitrust laws.

20        138.   A recent economic analysis conducted by Dr. Daniel Rascher, Professor and

21   Director of Academic Programs for the Sport Management Program at the University of San

22   Francisco, commissioned by Oakland focused on which U.S. cities, currently without an NFL

23   team, best reflect the demographic and financial conditions of existing Host Cities and are the best

24   prospects for new NFL franchises.  The winner?  **Oakland**.  Focusing on total population, real

25   income, percentage of NFL "super fans," and existing stadia support, Oakland was the highest

26   rated city for NFL expansion.  And yet, Oakland will not receive a new NFL franchise, just like

27   St. Louis, San Diego, and many other suitable U.S. cities.  In competitive markets, consumer

28   preference dictates output and supply.  However, Defendants, as a revenue-sharing cartel, find no

1   benefit in allowing consumers to determine the size of the NFL.  So, Defendants determine that

2   size themselves – *i.e.*, classic antitrust behavior.

3       **E.**        **The NFL's Unlawful Treatment of Oakland**

4                 **1.**           Group Boycott/Refusal to Deal

5       139.    The NFL Clubs act to collect supra-competitive profits by limiting the numbers of

6   teams and thereby extorting value from relocations and relocation threats.  When a city like

7   Oakland loses an NFL Club, and is denied the opportunity to receive another one, that is

8   undeniably a collective action by all of the NFL Clubs.  Indeed, in negotiation with the Mayors'

9   Conference, even the NFL conceded that a relocation decision is a collective decision by its

10  members.

11      140.    The decision to remove a team from a Host City, combined with the decision to

12  deny that same City a new expansion franchise, constitutes a collective refusal to deal with, or a

13  group boycott of, the City:

14          Top tier American Teams use their respective leagues as cartels;
15          impeding entry by potential competitors (whether the competitors be
        teams or entire leagues), collaborating when seeking government
16          handouts, and keeping quantity low and prices high.  To avoid costly
        formation of an entire league, a would-be sporting franchise must
17          obtain the approval of the existing teams acting jointly through their
        league:  such acquiescence comes rarely and at a very high price.
18          The difficulty an American challenger had entering the industry
        without entering the incumbent league gives incumbents a credible
19          threat to withhold or withdraw all representation from cities that
        refuse to absorb much or all of the cost of cutting-edge facilities.
20          Not only can a franchise leave, but it can also be confident that no
        new team will soon replace it; therein lies the heart of its negotiating
21          power. . . .
22
        The decision to operate as a closed league presents an obvious
23          structural impediment to competition.  League cartels make new
        entry all but impossible and thus provide franchises with
24          extraordinary leverage over cities to negotiate for ever greater
        subsidies. . . .
25
26          Running a permanently closed shop is an optional feature designed
        to benefit incumbents and not in any way essential to maintaining a
27          sporting league.  Thus, aspects of league behavior toward their Host
        Cities that depend on a permanently closed shop may violate the
28

1
2
3

first mandate of antitrust law, § 1 of the Sherman Act, which prohibits unreasonable agreements between competitors to restrain trade.  Because existing teams determine whether new entry will be allowed, a threat by an individual team to relocate may comprise an implicit threat of a concerted boycott.

4   *Stadium Rent Seeking* at 3-7; *see also id.* at 49-50 ("The closed entry system in American sporting

5   leagues creates artificial scarcity of the most extreme kind:  it is, for example, literally impossible

6   for a city to procure an NFL team to play in its stadium without the permission of the majority of

7   existing NFL teams. . . .  [W]hen several economic actors agree between themselves to shut out

8   rivals or to refuse to deal with customers or suppliers, except on agreed terms, such concerted

9   action generally constitutes an unlawful horizontal restraint, specifically a collective boycott. . . .

10   Although the classic group boycott involves excluding competitors from a market, a boycott can

11   also be aimed at customers, suppliers, or both").

12   141.    As the authors of *Stadium Rent Seeking* recognize, a "relocation" scenario involves

13   two components:  a collective decision to move the team coupled with a collective decision to

14   deprive the losing Host City of another team.  It is a classic refusal to deal.

15   142.    Further, that the NFL's boycott of Oakland may not fall within the parameters of

16   *per se* antitrust violations does not in any way mean it is not an organized boycott subject to the

17   rule of reason analysis under Section 1 of the Sherman Act.  *See, e.g.*, *St. Paul Fire Marine Ins.*

18   *Co. v. Barry*, 438 U.S. 531, 544 (1978) (defining parameters of a group boycott and stating that

19   "'the Sherman Act makes it an offense for [businessmen] to agree among themselves to stop

20   selling to particular customers'") (quoting *Kiefer-Steward Co. v. Seagrams & Sons*, 340 U.S. 211,

21   214 (1951)) (alteration in original).

22   143.    The NFL – which makes virtually all financial decisions collectively – decided, as

23   a group, to move the Raiders from Oakland to Las Vegas.  The relocation decision is, under Rule

24   4.3 of the NFL Constitution, a collective one, and the economic upside expected by a relocation is

25   shared by all NFL Clubs.  To claim that the other NFL Clubs were essentially indifferent is to

26   ignore the enormous degree of revenue sharing in the NFL; when so much revenue is shared, each

27   NFL Club has a significant interest in where every other NFL Club is located, particularly as to

28   how those locations will affect future profits.

144.    The Raiders did not move to Las Vegas; the NFL owners collectively moved the Raiders to Las Vegas.  And Oakland did not lose an auction; Oakland, as a consumer, was shut out of the market for hosting an NFL team by the NFL Clubs *as a group* because it refused to pay the NFL's supra-competitive prices set by an agreement among 32 separate Clubs as to what they would charge a Host City to enter the market.  No Raiders, no team to host.  Defendants have effectively put Oakland, as an NFL Host City, out of business.  Collusive conduct which aims to eliminate, and succeeds in eliminating, a market participant is a fundamental example of both anticompetitive harm and antitrust injury.  Yet, that is the reality of the system of relocation extortion.  Oakland has been directly injured by Defendants' collective decision to boycott, and refusal to deal with, Oakland, exactly in the way the antitrust laws are designed to prohibit.

### 2.    Horizontal Price Fixing

145.    The NFL constrains the supply of NFL teams in order to drive up the price of hosting a team through relocation.  In a competitive market, demanding a new stadium would be a risky move for any team owner:  the Host City could reject the demand and seek out a new team willing to play in the existing stadium.  In addition, the demanding team and the Host City would face the prospect of "over building" in a market where stadium costs and ticket prices had reached an equilibrium.  However, by acting together, and constraining the supply of NFL teams, Defendants can demand enormous Host City subsidies (in the form of monies spent on stadiums, free or below-market price land, and other financial incentives) for new, needlessly expensive stadiums.  And, of course, pursuant to the NFL rules regarding revenue sharing, which includes relocation fees, every NFL team benefits from each new, supra-competitively priced stadium.

146.    This is a classic price-fixing scheme.  The NFL, as a cartel, is driving up the price of hosting an NFL team far beyond the marginal costs of operating an NFL team and far beyond the price that would be found in a competitive marketplace.  Such schemes have arisen in numerous situations where, as with the NFL, a relatively small group of enterprises control all or a significant portion of a particular industry.  *See, e.g.*, *Catalano v. Target Sales, Inc.*, 446 U.S. 643, 648-649 (1980) (beer distributors); *United States v. Masonite Corp.*, 316 U.S. 265, 274-276 (1942) (hardboard manufacturers/distributors); *Interstate Circuit, Inc. v. United States*, 306 U.S. 208,

226-227 (1939) (movie producers); *United States v. Apple, Inc.*, 791 F.3d 290, 316-317 (2d Cir. 2015) (publishing); *Toys "R" Us, Inc. v. Fed. Trade Comm'n*, 221 F.3d 928, 935-937 (7th Cir. 2000) (toy manufacturers); *In re Nexium (Esomeprazole) Antitrust Litig.*, 42 F. Supp. 3d 231, 254-255 (D. Mass. 2014) (drug manufacturers).

147.    Although NFL teams may have some pro-competitive reasons for cooperating with each other, such cooperation is unlawful where it seeks to "extract excessive profit":

> The NFL's structure has both horizontal and vertical attributes. *See, e.g.*, *Continental TV, Inc. v. GTE Sylvania, Inc.*, 433 U.S. 36, 97 S.Ct. 2549, 53 L.Ed.2d 568 (1977).  On the one hand, it can be viewed simply as an organization of 28 competitors, an example of a simple horizontal arrangement.  On the other, and to the extent the NFL can be considered an entity separate from the team owners, a vertical relationship is disclosed.  In this sense the owners are distributors of the NFL product, each with its own territorial division.  In this context it is clear that the owners have a legitimate interest in protecting the integrity of the League itself.  Collective action in areas such as League divisions, scheduling and rules must be allowed, as should other activity that aids in producing the most marketable product attainable.  *Nevertheless, legitimate collective action should not be construed to allow the owners to extract excess profits.*

*Raiders I*, 726 F.2d at 1391-1392 (emphasis added).

148.    Further, that the NFL and its teams have not entered into an explicit agreement to directly increase prices is – as the U.S. Supreme Court has made clear – "immaterial":

> Nor is it important that the prices paid by the combination were not fixed in the sense that they were uniform. . . .  An agreement to pay or charge rigid, uniform prices would be an illegal agreement under the Sherman Act.  But so would agreements to raise or lower prices whatever machinery for price-fixing was used. . . .  In this case, the result was to place a floor under the market—a floor which served the function of increasing the stability and firmness of market prices.  That was repeatedly characterized in this case as stabilization.  But in terms of market operations stabilization is but one form of manipulation.  And market manipulation in its various manifestations is implicitly an artificial stimulus applied to (or at times a brake on) market prices, a force which distorts those prices, a factor which prevents the determination of those prices by free competition alone. . . .
>
> As we have indicated, the machinery employed by a combination for price-fixing is immaterial.

1    *United States v. Socony-Vacuum Oil Co.*, 310 U.S. 150, 222-223 (1940).

2         149.    The NFL constricts supply and then drives up the price of hosting an NFL Team by

3    demanding excessively expensive stadiums and enormous Host City subsidies for those stadiums.

4    In a competitive marketplace, Host Cities would not have to arrange for the construction of $1.9

5    billion stadiums – and contribute $750 million and below-market priced land to that construction –

6    in order to participate in the market for hosting an NFL team.

7         150.    Victims of this anticompetitive conduct include Host Cities, like Oakland, that are

8    driven out of the NFL Club marketplace by the prohibitive, anticompetitive prices.

9         151.    The NFL restricted the supply of NFL teams and drove up the price to host one to

10   supra-competitive levels.  Las Vegas was able to pay that price.  Oakland was not.  Oakland has

11   been directly injured by Defendants' horizontal price fixing.

12                        3.    Breach of The Relocation Policies

13        152.    As described herein, the Relocation Policies were drafted with the assistance of

14   both the U.S. Senate and Mayors' Conference for the express purpose of ensuring that the NFL

15   would take an existing Host City's interests into serious account when the NFL was considering a

16   relocation of a team.  The Statement of Principles – a document negotiated by the NFL and the

17   Mayors' Conference – is expressly incorporated into the Relocation Policies and is an explicit

18   promise by the NFL that, in making relocation decisions, it will consider the significant interests

19   of Host Cities.  As summed up by Joe Brown, an NFL executive, the Statement of Principles was

20   an "understanding" between the NFL and the Mayors' Conference to "balance and protect the

21   interest of the cities, the League and individual teams," and "establish an orderly process, ensuring

22   municipal interests will be heard and addressed, and that franchise moves occur only after

23   exhausting all reasonable options in a team's existing home territory."  (*See supra* ¶ 81).  Clearly,

24   Host Cities are intended beneficiaries of those Policies.

25        153.    "A contract, made expressly for the benefit of a third person, may be enforced by

26   him at any time before the parties thereto rescind it."  Cal. Civ. Code § 1559.  Here, (1) a valid,

27   binding contract (the NFL Constitution with the annexed Relocation Policies) existed; (2)

28   Oakland, as a Host City, was an intended and actual third-party beneficiary of the contract; and (3)

1  Defendants breached the contract and Oakland has suffered and will suffer damages as a result of

2  Defendants' breach.

3       154.    Further, a third party may sue for breach of contract if it can show that the contract

4  was made with the "*express or implied intention* of the parties to the contract to benefit the third

5  party." *Barragan v. Nationstar Mortg. LLC*, No. 12-cv-01618, 2012 WL 12895717, at *2 (C.D.

6  Cal. Nov. 7, 2012) (citing *Klamath v. Patterson*, 204 F.3d 1206, 1210 (9th Cir. 1999)) (emphasis

7  added).  In order to establish standing as a third-party beneficiary, Oakland must establish each of

8  the following elements:

9            (1) whether the third party would in fact benefit from the contract,
10  but also (2) whether a motivating purpose of the contracting parties
          was to provide a benefit to the third party, and (3) whether
11  permitting a third party to bring its own breach of contract action
          against a contracting party is consistent with the objectives of the
12  contract and the reasonable expectations of the contracting parties.

13  *Goonewardene v. ADP, LLC*, 6 Cal. 5th 817, 830 (2019).  Oakland's allegations in this First

14  Amended Complaint establish the necessary facts to support its claim for breach of contract and its

15  standing as a third-party beneficiary.

16          (a)    *The NFL Constitution and the Relocation Policies Constitute a*
17               *Valid, Binding Contract*

18       155.    The NFL Constitution and the Relocation Policies are collectively a binding,

19  enforceable contract among the NFL and NFL Clubs.  Under California law, "the rights and duties

20  of the members as between themselves and in their relation to (a private voluntary) association, in

21  all matters affecting its internal government and the management of its affairs, are measured by

22  the terms of (its) constitution and by-laws." *California Dental Ass'n v. Am. Dental Ass'n*, 23 Cal.

23  3d 346, 353 (1979) (quotation omitted).

24       156.    The Relocation Policies are explicitly established pursuant to the NFL Constitution:

25  "The Commissioner **shall** interpret and from time to time establish policy and procedure in respect

26  to the provisions of the Constitution and Bylaws and any enforcement thereof."  (Exhibit 1 at

27  p. 32) (emphasis added).  "The policy and procedures that apply to any proposed transfer of a

28

1  club's home territory is promulgated pursuant to Section 4.3 of the NFL Constitution."  (Exhibit 2
2  at p. 2).

3       157.   There is no dispute that "the NFL Constitution and Bylaws contain the agreement"
4  under which Defendants operate.  *See Raiders I*, 726 F.2d at 1387.  Even the Raiders have
5  conceded "that the NFL's constitution and bylaws govern the NFL and constitute a contract to
6  which all member clubs agreed."  *Oakland Raiders v. Nat'l Football League*, 131 Cal. App. 4th
7  621, 639 (2005); *see also Raiders I*, 726 F.2d at 1391 ("Our rejection of the NFL's single entity
8  defense implicitly recognized the existence of the first element—the 28 member clubs have
9  entered an agreement in the form of the NFL Constitution and Bylaws").  There also can be no
10  dispute that the Commissioner has the power to interpret and establish policy as part of the
11  Constitution.  This executive authority is only invoked through and because of the Constitution.

12       158.   Defendants were obligated to operate under the NFL Constitution and Relocation
13  Policies and comply with the processes set forth therein.  The Relocation Policies were
14  promulgated after the Raiders decided to leave Oakland in the 1980s, and the NFL was found to
15  have violated the antitrust laws in trying to halt that relocation.  Those Policies were also
16  promulgated in an effort to forestall regulatory oversight of the NFL through a number of bills
17  proposed in the U.S. Senate and House of Representatives in the 1980s and 1990s.  Accordingly,
18  the NFL crafted the Relocation Policies not as discretionary considerations, but as a binding
19  contract to avoid antitrust liability, regulatory oversight and protect Host Cities from relocation
20  threats and actual relocations based solely on the greed of NFL Clubs.  Unfortunately for Oakland,
21  this latter goal of the Relocation Policies has been thrown by the wayside.  And again, the fact that
22  the Commissioner established the policies without a formal amendment of the Constitution does
23  not remove that exercise of power from the ambit of the Constitution.

24       159.   Based on the foregoing and the facts and circumstances more fully set forth above,
25  the NFL Constitution, the Relocation Policies, and the Commissioner's exercise of executive
26  power in establishing those policies, are collectively a binding, enforceable contract.

27  / / /

28  / / /

(b) *Oakland was an Intended and Actual Third Party Beneficiary*

160. The City of Oakland was an intended and actual third-party beneficiary of the NFL Constitution and the Relocation Policies. This point is underscored by the fact that the Relocation Policies first incorporated the same list of considerations from a U.S. Senate bill (S. 287) proposing to give relocation decisions to an arbitration panel and to take such decisions away from the NFL because of the "paramount concern" of "protect[ing] [] our cities, both cities which have professional sports franchises and wish to keep them, and cities which do not now have a franchise and wish to gain one." (*See supra* ¶¶ 73-77).

161. Perhaps more significantly, the Relocation Policies adopted and incorporated the same Statement of Principles negotiated between the NFL and Mayors' Conference, which, among other things, recognized that the Relocation Policies "should recognize both the private interest of team owners . . . and *public interest to enjoy the direct and indirect benefits of having a professional sports franchise*[,]" as "[c]ommunities, sports fans and taxpayers make a substantial and valuable financial, psychological and emotional investment in their professional sports team." (*See supra* ¶¶ 78-81) (emphasis added). It is also worthwhile to note that Oakland has always been a part of the Mayors' Conference and sits on the Sports Committee, which negotiated this Statement of Principles.

162. Further, the Relocation Policies repeatedly mention Host Cities as an identifiable set of intended beneficiaries: the phrases "home territory," "home community," "incumbent community" or "stadium authority (if any) in the incumbent community" are used throughout those Policies. (Exhibit 2 at pp. 1-5). This is no coincidence, as "home territory" is defined in Article 4 of the NFL Constitution as "the city in which [any NFL] club is located and for which it holds a franchise and plays its home games, and includes the surrounding territory to the extent of 75 miles in every direction from the exterior corporate limits of such city. . . ." (Exhibit 1 at p. 15). As alleged above, it is no surprise that Host Cities are expressly named as intended beneficiaries in the Policies given the Policies' legislative history, as well as Defendants' express representations that the Policies were intended to benefit existing Host Cities. Further, Oakland is

1  specifically mentioned by name in the NFL Constitution in relation to "Home Territory."  (*See*

2  Exhibit 1 at p. 12).

3      163.    Further, an intended beneficiary exists where "the beneficiary would be reasonable

4  in relying on the promise as manifesting an intention to confer a right" on the beneficiary.

5  Restatement (Second) of Contracts, § 302 (1981).  Oakland justifiably and reasonably relied on

6  the Relocation Policies, which prohibited Defendants from ignoring the interests of Oakland and

7  relocating a team simply to garner additional monies to the NFL and its member Clubs.  The

8  Policies were intended to offer certainty that NFL Clubs would stay committed to their home

9  markets and that Host Cities would be guaranteed a fair and level playing field in any negotiations

10  regarding stadia and/or relocations.  Given the history of the Relocation Policies (*see supra* ¶¶ 70-

11  86) – and the NFL's position that the Policies would govern its relocation decisions − Oakland

12  justifiably relied on the contract in structuring its relationship with the Raiders.

13      164.    Indeed, as established herein, Oakland was an intended and actual third party

14  beneficiary:  (1) Oakland, as an existing Host City, "would in fact benefit from the Relocation

15  Policies"; (2) "a motivating purpose . . . was to provide a benefit to [existing Host Cities, like

16  Oakland]"; and (3) permitting Oakland "to bring its own breach of contract action against

17  [Defendants] is consistent with the objectives of the [Relocation Policies] and the reasonable

18  expectations of [Defendants]."  *Goonewardene*, 6 Cal. 5th at 830.

19              (i)    Oakland Benefited from the Relocation Policies

20      165.    It is clear that Oakland, as an existing Host City, would benefit from the Relocation

21  Policies as the Policies were meant to restrict the ability of the Raiders to leave Oakland for a new

22  Host City.

23      166.    Indeed, the Relocation Policies affirmatively state that each NFL Club's "primary

24  obligation" is to "advance the interests of the NFL in its *home territory.*" (Exhibit 2 at p. 2

25  (emphasis added)).  The Relocation Policies also declare that because "League policy favors stable

26  team-community relations, clubs are *obligated to work diligently and in good faith* to obtain and to

27  maintain  suitable  stadium  facilities  in  their  home  territories,  and  to  operate  in  a  manner  that

28

1    maximizes fan support in their current home community." (*Id.* (emphasis added)).  The NFL's

2    interests in this regard are inextricably intertwined with the interests of the Host Cities.

3        167.    As alleged herein, the Relocation Policies require the NFL and its Clubs to consider

4    a number of factors *in good faith* that favor the team staying in the home territory, including, but

5    not limited to:

6    •   "[t]he extent to which fan loyalty and support for the club has been demonstrated
         during the team's tenure ***in the current community***;"

7    •   "***the willingness of the stadium authority or the community to remedy any
         deficiencies in or to replace such facility***, including whether there are legislative or

8        referenda proposals pending to address these issues; and the characteristics of the

9        stadium in the proposed new community";

10   •   "[t]he extent to which the club, directly or indirectly, ***received public financial
         support*** by means of any publicly financed playing facility, special tax treatment,

11       or any other form of public financial support and the views of the stadium authority

12       (if public) in the current community";

13   •   "[t]he club's financial performance, particularly whether the club has incurred net
         operating losses (on an accrual basis of accounting), exclusive of depreciation and

14       amortization, sufficient to threaten the continued financial viability of the club, as
         well as the club's financial prospects ***in its current community***"; and

15   •   "[t]he degree to which the club has engaged in good faith negotiations . . . with
         appropriate persons concerning terms and conditions under which the club would

16       ***remain in its current home territory and afforded that community a reasonable***

17       ***amount of time to address pertinent proposals***."

18   (Emphasis added).  Each of these factors supported the Raiders' continued presence in Oakland,

19   and show that the clear wording of the policies was intended to benefit Oakland.

20       168.    Further, the Relocation Policies require that the Host City and the public (the fans)

21   be given notice of the desire to move and a right to comment thereon:

22       1. The club must give the Commissioner written notice of the
            proposed transfer, including the date on which the proposed

23          relocation is to become effective, and **publish the notice in**
            **newspapers of general circulation within the incumbent**

24          **community.**  The notice must be filed no later than February 15 of
            the year in which the move is scheduled to occur.  **The League will**

25          **provide copies of the notice to governmental and business**
            **representatives of both the incumbent community** and the

26          community to which the team proposes to move, as well as the

27          stadium authority (if any) in the incumbent community (the

28          "interested parties").

2. **The notice must be accompanied by a "statement of reasons" in support of the proposed transfer.   The statement must address each of the factors outlined in Part C below**, and may also identify and discuss any other relevant business factors that the club believes support its request to move.  The Statement must also include all of the material noted in Appendix One. . . .

4. **Interested parties will have an opportunity to provide oral and/or written comments regarding the proposed transfer**, including at a public hearing conducted by the League in the community from which the team seeks to relocate; written comments may be submitted within 15 days of the conclusion of such hearing. . . .

6. After any League vote on a proposed relocation, the League will:

i. **publish, within 30 days of any relocation decision, a written statement of reasons in newspapers of general circulation within the incumbent community** setting forth the basis of its decision in light of the League's rules and procedures for evaluating franchise relocation; and

ii. deliver **copies of its written statement of reasons to the local governments of the community from which the club seeks to relocate** and any sports authority or similar entity with jurisdiction over the stadium or facility from which the club seeks to relocate.

(Exhibit 2 at pp. 2-3 (emphasis added)).

169.   The good faith consideration of these factors provided protections and a sense of security to Oakland.  Defendants failed to consider these factors in good faith (if at all) in their decision to relocate the Raiders to Las Vegas.

170.   Based on the foregoing, the Relocation Policies clearly provide a benefit to Oakland as an existing Host City.

> (ii)    <u>A Motivating Purpose Behind the Relocation Policies was to Benefit Oakland as an Existing Host City</u>

171.   As detailed in paragraphs 70 to 86 above, there can be no doubt that a motivating purpose behind the Relocation Polices was to benefit existing Host Cities like Oakland.

172.   Defendants adopted the Relocation Policies in order to avoid antitrust liability and regulation, but also to address the concerns expressed by U.S. Senators, Representatives and mayors that existing Host Cities were not adequately protected from the threat of relocation.  (*See supra* ¶¶ 70-86).

173.    In fact, Defendants admitted that a motivating purpose behind the incorporation of the Statement of Principles – which again was negotiated between the NFL and the Mayors' Conference – into the Relocation Policies was to "balance and protect the interest of the cities, the League and individual teams," and "establish an orderly process, ensuring municipal interests will be heard and addressed, and that franchise moves occur only after exhausting all reasonable options in a team's existing home territory." (*Supra* ¶ 81).

174.    These facts establish that a motivating purpose of the Relocation Policies was to benefit Oakland as an existing Host City.

(iii)    Enforcement of the Relocation Policies Against Defendants by Oakland is Consistent With the Objectives of the Relocation Polices and Defendants' Reasonable Expectations

175.    As alleged herein, and as admitted by Defendants, one of the objectives of the Relocation Polices (and of Defendants) was to protect the interests of existing Host Cities like Oakland.  Indeed, Defendants reaffirmed this objective in the Statement of Principles, where the NFL stated its "commit[ment] to stable team-community relations" because "[s]tability is good for fans, good for *home cities and good for professional sports*." (*See supra* ¶ 80) (emphasis added). Then in a letter submitted to the U.S. Senate, the NFL again states its "wish to maintain the stability of economically viable franchises and to ensure a fair process to consider requests for relocation." (*Supra* ¶ 81).  These are affirmative and contemporaneous statements by the NFL and its representatives about Defendants' stated objectives for the Relocation Policies, and cannot be refuted by Defendants' self-serving statements – after this lawsuit was brought – that their true objective was to simply avoid antitrust liability.  Clearly, these statements – made by Defendants when the Relocation Policies were adopted – make clear that enforcement by an existing Host City, like Oakland "will effectuate" Defendants' "performance objectives" of "balanc[ing] and protect[ing] the interest of the [existing Host] [C]ities, the League and individual teams." *Goonewardene*, 6 Cal. 5th at 830-831.

176.    Further, Defendants' own statements make clear that Defendants reasonably expected existing Host Cities like Oakland to bring suit when Defendants breached the Relocation Policies.  For example, in the Statement of Principles – again, a joint statement by the NFL and the

1  Mayors' Conference – the NFL expressly recognized that the Relocation Policies would
2  "recognize *both the private interest of team owners to maintain a profitable business and public*
3  *interest to enjoy the direct and indirect benefits of having a professional sports franchise.*"
4  (Exhibit 3 at 1 (emphasis added)).  If that public interest was not recognized, as it was not here,
5  Defendants must have reasonably expected that public interest – *i.e.*, the existing Host City – to
6  attempt to enforce its rights "to enjoy the direct and indirect benefits of having [an NFL team]."

7  177.    Indeed, the Statement of Principles, as well as the NFL's letter submitted to the
8  U.S. Senate, confirm that the NFL recognized existing Host Cities as having certain rights and
9  interests that needed to be protected, including:   the "substantial and valuable financial,
10  psychological and emotional investment in [the NFL team,]" and the "jobs, revenues and other
11  local economic development" generated by an NFL team."  (*See supra* ¶ 80).  If – by violating the
12  Relocation Policies that were the "direct result" of discussions between the NFL and the Mayors'
13  Conference – such rights and interests were harmed, Defendants must have expected the existing
14  Host Cities to bring suit.

15  178.    Given these facts, the benefit conferred on Host Cities and the motivating purpose
16  behind the Relocation Policies are clear.  As such, enforcement of the Policies by Host Cities on
17  Defendants is consistent with their objectives and reasonable.  Without the threat of enforcement,
18  the Policies are not worth the paper they are printed on.  And a contract should not be interpreted
19  to vitiate the very purpose for which it was formed.

20  179.    Of course, there is no better evidence that Defendants reasonably anticipated a suit
21  from Oakland for Defendants' violation of the Relocation Policies in relocating the Raiders to Las
22  Vegas than the fact that Defendants required the Raiders to fully indemnify them from any such
23  suit when they approved the Raiders' relocation to Las Vegas as alleged above.

24              (c)    *Defendants Breached the Relocation Policies and Oakland has*
                      *Suffered and Will Suffer Damages as a Result of that Breach*
25

26  180.    Despite the financial support and loyalty provided to the Raiders by Oakland and
27  Raider Nation, Defendants breached the Relocation Policies when they decided to relocate the
28  Raiders to Las Vegas.

181.  Pursuant to the NFL Constitution and the Relocation Policies, Defendants assumed direct obligations to Oakland.  The express terms of the document (Exhibit 2 at p. 2) contradict Defendants' assertion that the Relocation Policies are mere suggestions and not requirements:

> Article 4.3 also confirms that no club has an "entitlement" to relocate simply because it perceives an opportunity for enhanced club revenues in another location.  Indeed, League traditions disfavor relocations if a club has been well-supported and financially successful and is expected to remain so.  Relocation pursuant to Article 4.3 may be available, however, if a club's viability in its home territory is threatened by circumstances that cannot be remedied by diligent efforts of the club working, as appropriate, in conjunction with the League Office, or if compelling League interests warrant a franchise relocation.

182.  Further, pursuant to the NFL Constitution, and the Policies promulgated thereunder, Defendants are obligated to "work diligently and in good faith to obtain and to maintain suitable stadium facilities in [each NFL Club's] home territor[y], and to operate in a manner that maximizes fan support in their current home community."  That was not done here.

183.  As discussed in detail herein, the Relocation Policies heavily favor keeping an NFL team in its home territory.  Here, the factors counted against the Raiders relocating to Las Vegas, including that:

- Raider Nation is considered one of the most loyal fan bases in the NFL, and has demonstrated its fierce loyalty during the entire time that the Raiders have been in Oakland;

- Oakland was willing to remedy any deficiencies in the Coliseum and even submitted a proposal to replace the Coliseum with a new stadium;

- The Raiders received enormous public financial support, including through the publicly-financed Coliseum;

- The Raiders were financially successful with some of the best attendance in the NFL; and

- The Raiders did anything but engage in good faith negotiations with Oakland.

Defendants still decided to relocate the Raiders to Las Vegas in breach of the Relocation Policies.

184.  In vesting the Commissioner with authority to interpret the bylaws and "establish policy and procedure," (Exhibit 1, art. 8.5), the bylaws are amenable to interpretation under which

1    they bind member teams to the Commissioner's interpretations and policies, such that breach of a

2    policy established under article 8.5 can be enforced as a breach of the bylaws themselves.

3         185.    Defendants had contractual obligations, but instead, they colluded to facilitate the

4    Raiders' move before and during the time period in which negotiations (in which Oakland

5    participated in good faith) were taking place.  In contrast, Oakland made significant efforts to

6    satisfy the Relocation Policies' requirements, which should have disallowed the Raiders' move.

7         186.    After promising existing Host Cities that they would be rewarded for support and

8    loyalty, Defendants breached that promise and intentionally interfered with Oakland's economic

9    interests in hosting an NFL team.  Defendants' actions were undertaken with a conscious disregard

10   of the rights of Oakland, and – as a direct and proximate result of Defendants' breach of the

11   Relocation Policies – Oakland, as an intended beneficiary of those Policies, has been deprived of a

12   professional football franchise and all of its benefits, damaging Oakland in an amount to be

13   determined at trial.

14        187.    That breach has caused, and will cause, damages to Oakland, including, but not

15   limited to, the loss of its financial investment in the Raiders, the lost income generated by the

16   Raiders' games at the Coliseum, lost tax revenue and a devaluation of the Coliseum property.

17   Additionally, Oakland will be damaged by the increase in expenses it will incur as a direct result

18   of the Raiders' relocation.  For example, once the Raiders are gone and no longer generating

19   revenue within the City, Oakland will be responsible for the service of the debt incurred *solely for*

20   *the benefit of the Raiders*.

21        F.    **The Relevant Market Applicable To Defendants' Misconduct**

22        188.    Cities, counties, and other political jurisdictions spend considerable money and

23   effort trying to attract major professional sports teams in the belief that these teams will generate

24   direct payments to local government, economic benefits to the community, media impact

25   (effectively showcasing the community to other parts of the country and world), and provide a

26   public consumption benefit (quality of life offerings) or psychic impact for local residents.  This

27   often includes investments in the hundreds of millions of dollars to help construct state-of-the-art

28

1  stadiums and training facilities, and the necessary infrastructure to support these stadiums and

2  facilities.

3      189.   The relevant market in this action is the market for hosting NFL teams.  The

4  consumers in this market are all Host Cities offering, and all cities and communities that are

5  willing to offer (*i.e.*, potential Host Cities), home stadia and other support to major league

6  professional football teams in the geographic United States.  The product in this market is the NFL

7  team, as a hosted entity.

8      190.   This market has been recognized time and again by courts (*Raiders I*), legislative

9  bodies (*supra* ¶¶ 74, 75, and 84), economists (*supra* ¶¶ 53, 55, and 62) and the NFL itself in its

10  negotiations with the Mayors' Conference (*see* Exhibit 3).  For decades, courts, politicians and

11  other commentators have recognized that a market exists for hosting NFL teams and that cities and

12  communities are the consumers in that market.  Denying that a market exists here is denying what

13  many observers have seen with their own eyes since at least 1966.

14      191.   Moreover, the NFL agrees.  Not only did it negotiate with cities for the issuance of

15  the Statement of Principles, in *Raiders I*, it conceded that a hosting market exists.  The NFL

16  simply tried – and failed – to argue that the market should not be limited to just professional

17  football:

18          The L.A. Coliseum claims the relevant market is stadia offering
           their facilities to NFL teams (the product market) in the United
19          States (the geographic market).  *The NFL agrees with this*
           *geographic market, but argues the product market involves cities*
20          *competing for all forms of stadium entertainment, including NFL*
           *football teams*.
21

22  726 F.2d at 1393 (emphasis added).  As is the case here, the Los Angeles Coliseum was owned by

23  a political entity, the Los Angeles Coliseum Commission, Inc.  Here, the Oakland Coliseum is

24  jointly owned by two political entities, Oakland and Alameda County, and managed by the

25  Authority (which is controlled by Oakland and Alameda County).  In *Raiders I*, the owner of the

26  stadium sued; here also, the owner of the stadium has sued.

27      192.   As the Ninth Circuit recognized in *L.A. Mem'l Coliseum Comm'n v. Nat'l Football*

28  *League* ("*Raiders II*"), 791 F.2d 1356 (9th Cir. 1986), the jury in that case concluded that there are

FIRST AMENDED COMPLAINT FOR DAMAGES

1   no reasonably interchangeable products or services for NFL football teams in the Host City/stadia

2   market.  As the Ninth Circuit recently recognized (*In re Sunday Ticket Antitrust Litig.*, 2019 WL

3   3788253, at *12 (citing *Raiders II*)), NFL football is a unique product and no other form of sports

4   competition or entertainment competes with it.  There is no other major professional football

5   league in the United States, although some have tried and failed.  The Canadian Football League

6   ("CFL") is no substitute for the NFL and even to the extent the CFL has made limited attempts to

7   enter the United States, those efforts have failed.  NFL football is a unique product, as recognized

8   in *Los Angeles Memorial Coliseum*.  Defendants wholly control the process of establishing NFL

9   teams, their locations, and the stadia in which they play.  If a Host City, or a potential Host City,

10  does not abide by the process controlled by Defendants, then they stand to lose their franchise or

11  not get selected as a location.  Those Host Cities cannot go elsewhere.  For example, an NFL Host

12  City faced with the situation that Oakland now faces cannot shift its host status to another

13  professional sport like Major League Baseball because there is no substitute for NFL football.

14          193.    The relevant product in the Host City/stadia market is the presence of an NFL team.

15  As noted above, NFL teams need hosts, and actual or potential Host Cities (with existing or

16  potential stadia) need NFL teams.  The analogy to a landlord and tenant is not perfect, but it helps

17  to explain the relationship between the producer of the product (the NFL) and the host of the

18  product (here, Oakland).

19          194.    With respect to the geographic market, the vast majority of demand for the NFL is

20  in the United States, and the teams are located in the United States.  Despite some games now

21  being played abroad, no NFL team has based itself in a foreign city, and at the time of the

22  anticompetitive conduct alleged herein, the United States market dominated professional football,

23  and there was no substitute outside of the United States.  Moreover, the CFL's efforts to enter the

24  United States (including a Las Vegas team in the mid-1990s) have all fallen flat.  Even the

25  coverage of the CFL by U.S. networks is relegated to a far distant third behind NFL and college

26  football.

27  / / /

28  / / /

FIRST AMENDED COMPLAINT FOR DAMAGES

195.   *Saint Alphonsus Medical Center-Nampa Inc. v. St. Luke's Health System Ltd.*, 778 F.3d 775 (9th Cir. 2015) – a case decided after trial – does not figure into the market at issue here. In *Saint Alphonsus*, the Ninth Circuit recognized:

> A common method to determine the relevant geographic market, and the one used by the district court, is to find whether a hypothetical monopolist could impose a "small but significant nontransitory increase in price" ("SSNIP") in the proposed market. *See Theme Promotions,* 546 F.3d at 1002; *see also In re Se. Milk Antitrust Litig.,* 739 F.3d 262, 277-78 (6th Cir. 2014 (describing the relevant geographic market as one in which "buyers ... respond to a SSNIP by purchasing regardless of the increase"); U.S. Dep't of Justice & FTC, Horizontal Merger Guidelines ("Merger Guidelines") § 4 (2010).  If enough consumers would respond to a SSNIP by purchasing the product from outside the proposed geographic market, making the SSNIP unprofitable, the proposed market definition is too narrow.

778 F.3d at 784 (footnote and citation omitted).  How would Oakland attract a professional football team to the Coliseum from "outside the proposed geographic market" – *i.e.*, the United States?  There are no such teams.  The only premium professional football teams in the world are in the NFL, which is limited to the United States.  Further, the NFL controls entry into the league; even if a professional football team existed in Scotland and that team agreed to play in the Coliseum, whom would they play?

196.   The NFL has a monopoly in the market for choosing Host Cities for professional football teams.  As the Ninth Circuit has recently recognized, there are no market substitutes for NFL teams.  None of the business that Oakland might be able to attract to the Coliseum site is a substitute for, or reasonably interchangeable with, the Raiders.

**G.**   **Defendants' Conduct Has Injured Competition**

197.   In a competitive market, actual and potential Host Cities (often with investing private interests) could build or renovate stadia for the purposes of hosting professional football teams, and they would be able to compete to host an NFL club on a level playing field.  However, the NFL has complete control over professional football, and Defendants have agreed to strictly limit the number and location of NFL franchises to maintain that power.  Thus, even if a Host City and/or private investor built a new stadium and had the capital and infrastructure to operate an

1   NFL franchise, they could not obtain an NFL team without a collective decision by the cartel and

2   the requisite cartel payments to Defendants.  In fact, as Robert Kraft noted, it is highly unlikely

3   that the NFL will grant any more expansion teams to anyone.  (*See supra* ¶¶ 59, 67, and 135).

4        198.    As a result of the artificially restricted supply in the market of professional football

5   teams, Defendants have caused excess demand among actual and potential Host Cities for an NFL

6   franchise.    Defendants then capitalize on their complete market power by charging supra-

7   competitive prices to participate in the market.  Those who will not pay are boycotted.

8        199.    As a result of Defendants' conduct, many actual or potential Host City participants

9   cannot realistically participate in the professional football market even though there is, or would

10  be, considerable interest in their communities in hosting an NFL franchise.  In a consumer-driven,

11  competitive market, more teams would exist, and more cities would have the opportunity to host

12  an NFL team.  Competition has been directly impacted by Defendants' decision to restrict supply

13  and deny consumers, both host cities and fans, the ability to participate in the relevant NFL

14  market.

15       **H.    Defendants' Anticompetitive Conduct Has Injured Plaintiff**

16       200.    Defendants consciously joined and participated in the conspiracy by violating the

17  Relocation Policies, directing, supporting, and approving the Raiders' relocation to Las Vegas

18  (including but not limited to voting and collecting the relocation fee), and boycotting Oakland as a

19  Host City for an NFL Club.  Such collusive conduct has been enormously injurious to Oakland as

20  outlined below.

21            1.    Lost Investment Value

22       201.    Oakland, like any business entity, has invested monies in hosting the Raiders.

23  Now, with Defendants' decision to boycott, Oakland is effectively out of business.  Accordingly,

24  part of Oakland's damages is the loss of investments it made in a reasonable belief that the Raiders

25  would comply with applicable laws, and the Relocation Policies, and remain in Oakland.

26       202.    For example, Oakland has borrowed tens of millions of dollars to assist the Raiders

27  in their play at the Coliseum and to make necessary renovations to that Coliseum that are directly

28  associated with the Raiders' presence.  These investments were structured to be repaid through

1    revenues collected as result of the Raiders' presence, including rents for use of the Coliseum and

2    monies made at Raiders' home games.  Without these revenue sources, Oakland will now have to

3    repay these debts.

4         203.   Oakland has also provided the Raiders with tens of millions of dollars for the

5    construction of a training facility and for operating expenses.  These amounts were meant to be

6    paid back by monies earned during Raiders games from, among other things, parking and

7    concession revenues.

8                        2.    Lost Income

9         204.   Oakland collected monies from each Raiders ticket for the express purpose of

10   funding education in Oakland.  Oakland will also soon lose the rental monies it receives from the

11   Raiders for use of the Coliseum property.

12        205.   Further, as discussed *supra*, Oakland issued millions of dollars of bonds to renovate

13   the Coliseum at the request of Defendants and it was understood by Defendants and Oakland that

14   such bonds would be paid back by income generated from Raiders games at the Coliseum.  With

15   no such games, there is no income to pay back those bonds, and the remaining debt on those bonds

16   will be a complete loss for Oakland.

17                       3.    Lost Tax Revenues

18        206.   Oakland has collected and will now lose significant tax revenues associated with

19   Raiders games (*e.g.*, tax revenues from ticket sales, concessions, stadium parking, player

20   compensation, and merchandising).  To deny that a loss of tax revenues is proximately caused by

21   Defendants' conduct is to deny the reality of the entire Host City-NFL team relationship.

22   Numerous commentators have recognized that increased tax revenues are a direct benefit of

23   hosting a sports franchise.  *See, e.g.*, *Major League Losers*, at 152-153; John Wunderli, *Squeeze*

24   *Play: The Game of Owners, Cities, Leagues and Congress*, 5 MARQ. SPORTS L. J. 83, 91 (1994).

25        207.   It is therefore not surprising that the prospect of increased tax revenues is a core

26   consideration in the Host City-NFL team relationship and results in NFL teams receiving far better

27   public subsidy packages than they would otherwise receive.  For example, the Mayor of

28   Henderson, the city in which the Las Vegas stadium is currently being built for the Raiders, is a

1   big fan of expected "tax revenues" and has used tax revenues and job increases to justify the

2   subsidies and below-market rate land sale it has given to the Raiders.  *See* "The $6 million men:

3   Raiders get big discount on Henderson Land," *The Las Vegas Sun* (Jan. 3, 2018).

4         208.   Tax revenues impact the whole structure of a Host City-sports team relationship

5   and result in sports teams receiving significant financial benefits that they otherwise would not

6   have received.  To deny the recovery of lost tax revenues would allow professional sports teams,

7   like the Raiders, to reap the taxpayer-financed benefits derived from the prospects of tax revenues,

8   but then claim immunity from liability when their unlawful conduct injures the Host Cities that

9   provided those benefits.

10        209.   The decision in *Hawaii v. Standard Oil Co. of Calif.*, 405 U.S. 251 (1972) is not to

11  the contrary.  In fact, the majority opinion in that case never mentions "tax revenues" and never

12  reaches the issue of damages proximately caused by violations of the antitrust laws.  Instead,

13  *Hawaii* stands for a simple proposition:  political entities cannot sue in *parens patriae* for general

14  damages to their citizens or economies.  The issue in *Hawaii* was standing, not what damages

15  antitrust violations proximately cause:

16        Every violation of the antitrust laws is a blow to the free-enterprise
          system envisaged by Congress.  *See Northern Pacific R. Co. v.*
17        *United States*, 356 U.S. 1, 4, 78 S.Ct. 514, 517, 2 L.Ed.2d 545
          (1958).  This system depends on strong competition for its health
18        and vigor, and strong competition depends, in turn, on compliance
          with antitrust legislation.  In enacting these laws, Congress had
19        many means at its disposal to penalize violators.  It could have, for
          example, required violators to compensate federal, state, and local
20        governments for the estimated damage to their respective economies
          caused by the violations.  But, this remedy was not selected.
21        Instead, Congress chose to permit all persons to sue to recover three
          times their actual damages every time they were injured in their
22        business or property by an antitrust violation.  By offering potential
          litigants the prospect of a recovery in three times the amount of their
23        damages, Congress encouraged these persons to serve as 'private
          attorneys general.'  *See, e.g., Zenith Radio Corp. v. Hazeltine*
24        *Research, Inc.*, 395 U.S. 100, 130-131, 89 S. Ct. 1562, 1580-1581,
          23 L.Ed. 129 (1969); *Perma Life Mufflers, Inc. v. International*
25        *Parts Corp.*, 392 U.S. 134, 147, 88 S.Ct. 1981, 1988-1989, 20 L.Ed.
26        982 (1968) (Fortas, J., concurring in result).

27

28  / / /

Thus, § 4 permits Hawaii to sue in its proprietary capacity for three times the damages it has suffered from respondents' alleged antitrust violations.  The section gives the same right to every citizen of Hawaii with respect to any damage to business or property.  Were we, in addition, to hold that Congress authorized the State to recover damages for injury to its general economy, we would open the door to duplicative recoveries.

A large and ultimately indeterminable part of the injury to the 'general economy,' as it is measured by economists, is no more than a reflection of injuries to the 'business or property' of consumers, for which they may recover themselves under § 4.  Even the most lengthy and expensive trial could not in the final analysis, cope with the problems of double recovery inherent in allowing damages for harm both to the economic interests of individuals and for the quasi-sovereign interests of the State.  At the very least, if the latter type of injury is to be compensable under the antitrust laws, we should insist upon a clear expression of a congressional purpose to make it so, and no such expression is to be found in § 4 of the Clayton Act.

Like the lower courts that have considered the meaning of the words 'business or property,' we conclude that they refer to commercial interests or enterprises. . . . When the State seeks damages for injuries to its commercial interests, it may sue under § 4.  But where, as here, the State seeks damages for other injuries, it is not properly within the Clayton Act.

405 U.S. at 262-264 (footnote omitted).  *Hawaii* expressly states that Section 4 of the Clayton Act "permits Hawaii to sue in its proprietary capacity for three times the damages it has suffered from respondents' alleged antitrust violations." *Id.* at 262.  That is exactly what Oakland is doing here. *Hawaii* places no limitation whatsoever on what damages flow from antitrust injury to Hawaii, Oakland, or any other political entity suing in its "proprietary capacity."

210.    A blanket rule that a Host City could not recover lost tax revenues would provide professional sports teams with a huge anticompetitive advantage, and an additional incentive to violate the antitrust laws.  Proximate cause incorporates basic concepts of foreseeability and reasonable expectations.  The idea is that if a party engages in unlawful conduct, the parties injured by such conduct can recover their foreseeable damages.  Such rules deter unlawful conduct by sending the message that the perpetrator of unlawful conduct will have to pay, and pay fully, for that conduct.  Denying Oakland lost tax revenues would violate these basic proximate cause

1  considerations by allowing professional sports teams to avoid responsibility for an enormous part

2  of the foreseeable injury inflicted by their unlawful conduct in the Host City marketplace.

3                4.    Devaluation of the Coliseum Property

4       211.    Oakland has also suffered significant losses from the devaluation of the Coliseum

5  property; with no hope of ever hosting an NFL team, that property has lost considerable value.

6  Among other things, as a direct result of the Raiders' relocation, Oakland will suffer from

7  increased costs such as debt service (Oakland now must pay the debt service for the Authority in

8  the absence of the Raiders) and increased maintenance costs of the Coliseum.  As noted above, in

9  a competitive professional football market, the Raiders would still be playing in the Coliseum,

10 with negotiated renovations.

11      212.    Further, that Defendants' anticompetitive conduct compelled Oakland to propose a

12 new Coliseum does not change the analysis.  Oakland's proposal was a response to

13 anticompetitive demands.  Defendants cannot benefit from their own anticompetitive behavior.

14      213.    The "new" Coliseum was meant to occupy the same location and simply replace

15 the current Coliseum.  The Coliseum is more than just a building: it is a 155-acre property

16 specifically designed to host sports teams, which includes significant improvements for that

17 purpose (*e.g.*, parking and a dedicated BART (Bay Area Rapid Transit) stop).

18      214.    The Ninth Circuit Court of Appeals' decision in *City of Rohnert Park v. Harris*,

19 601 F.2d 1040 (9th Cir. 1979), does not limit Oakland's damages for the Coliseum property.  In

20 that case, the City of Rohnert Park, in an effort to develop a regional shopping center, designated

21 certain city land as a commercial zone suitable for development.  The City of Rohnert Park owned

22 two parcels within that commercial zone.  Defendants decided to construct a regional shopping

23 center in the neighboring town of Santa Rosa as part of an urban renewal project, and the City of

24 Rohnert Park alleged, *inter alia*, antitrust violations under sections 1 and 2 of the Sherman Act

25 based on defendants' "attempt to monopolize retail merchandise space in the Santa Rosa trade

26 area."  *Id.* at 1042-1043.  The Ninth Circuit held that Rohnert Park failed to allege a cognizable

27 injury because the City's proprietary interest in the commercial zone was speculative (*i.e.*, it was

28 not clear that the two parcels of land owned by the City would have actually been a part of a

shopping center because part of the property was designated for non-commercial purposes, including a library and a waste water facility). *Id.* at 1044-1045. Even if Rohnert Park did have a property interest, the court held that Rohnert Park failed to show proximate causation because it did not "ma[k]e a sufficient showing that, absent the alleged antitrust violations by appellees, its commercial area would have been selected as a site for shopping center development." *Id.* at 1045. The court reasoned that Rohnert Park could not rely on the "remote possibility, unsubstantiated by allegations of fact, that their situation might have been better had respondents acted otherwise." *Id.* (quoting *Warth v. Seldin*, 422 U.S. 490, 507 (1975)). *See also City of San Jose v. Office of the Comm'r of Baseball,* 2013 WL 5609346, at *11-12 (N.D. Cal. Oct. 11, 2013).

215. Here, there is no speculation. Oakland owns the Coliseum. The Raiders had already chosen the Coliseum as an appropriate home stadium in 1996 and played in the Coliseum for decades; indeed, the Raiders have chosen to continue to play at the Coliseum until the new stadium in Las Vegas is ready because Mark Davis had no other options. There is no speculation about the suitability of the Coliseum as a sports venue.

216. In addition, there is no speculation about what would have happened here if the NFL and Raiders had complied with their own relocation agreements. Under the Relocation Policies – Policies adopted for the express benefit of Host Cities like Oakland and to avoid anticompetitive behavior – there is no doubt that the Raiders would still be playing at the Coliseum property. Once again, there is no speculation here, only anticompetitive behavior.

217. Oakland, as an owner of the Coliseum and the Host City of the Raiders, is the party injured by Defendants' antitrust violations. The losses discussed above are losses that Oakland – and not any proxy like the Authority – suffered and will suffer directly. Oakland is losing the value of the Coliseum site; Oakland is losing tax revenues; Oakland is losing Raiders-generated income; and Oakland is losing the significant sums it has invested in the Raiders. Although the Authority manages the Coliseum site for Oakland, Oakland is the entity with the economic interest in that site and, accordingly, is the entity that suffers from losses related to that site.

/ / /

/ / /

VI.     **CAUSES OF ACTION**

**COUNT I:  Violation of the Sherman Act (15 U.S.C. § 1)**

218.    Plaintiff incorporates by reference the preceding paragraphs of this Complaint as if fully restated herein.

219.    There is a relevant market for the hosting of professional football teams in the United States, as alleged above.  Within this market, Defendants have violated Section 1 of the Sherman Act (15 U.S.C. § 1), by engaging in a contract, combination or conspiracy in restraint of trade and interstate commerce, the nature and effect of which is to restrict the ability of Plaintiff and other Host Cities to maintain and sponsor an NFL Club at competitive prices.

220.    Through their unlawful contract, combination or conspiracy to restrain trade and interstate commerce, Defendants have imposed anticompetitive prices and complete control on the market for hosting an NFL Club by offering Host Cities a Hobson's choice:  pay the enormous demands associated with publicly financed new and renovated stadia or lose your NFL Club.  These demands have forced municipalities like Plaintiff – cities and counties that cannot pay the supra-competitive price of the NFL's demands for new and renovated stadia – out of the market for NFL franchises, as evidenced by the Raiders' relocation to Las Vegas.  Indeed, as a result of Defendants' boycott, refusal to deal and unlawful price-fixing scheme, Oakland lost not only the Raiders, but also any chance to host an NFL team in the future.  In a competitive marketplace, Defendants could not have successfully demanded these supra-competitive prices and the Raiders would be staying in Oakland.

221.    Defendants' unlawful contract, combination or conspiracy in restraint of trade and interstate commerce operates as a group boycott (or refusal to deal) and unlawful horizontal price fixing scheme.

222.    Defendants' boycott and refusal to deal scheme constitute an unreasonable restraint of trade.  First, Defendants have complete control over the relevant market, the hosting of NFL Clubs.  Second, the clear objective of Defendants' misconduct is to freeze the number of competitive professional football teams and to increase Defendants' profits, voting in favor of relocations in direct opposition to the Relocation Policies in order to collect exorbitant relocation

1  fees and supra-competitive prices paid by wealthier Host Cities, as well as share in the supra-

2  competitive revenue generated by such relocations.  Third, Defendants' group boycott and refusal

3  to deal is not necessary for the production of professional football or the achievement of any pro-

4  competitive NFL objective.

5       223.   Defendants' conduct is also an unlawful horizontal price-fixing scheme.  By

6  artificially constraining the supply of NFL teams, Defendants create anti-competitive scarcity

7  which they then use to drive up the price for participating in the market for hosting NFL teams.

8  These supra-competitive prices include massive public subsidies for new or renovated stadia,

9  below market prices for land purchases for stadia, and below market rent for use of those stadia.

10      224.   Each of Defendants is a participant in this unlawful contract, combination, or

11  conspiracy.

12      225.   As a result of Defendants' violations of the Sherman Act, Plaintiff has suffered

13  injury from the impending loss of the Raiders and the income generated by the Raiders' presence

14  at the Coliseum.  These losses, as alleged above, current and future, are significant and were

15  directly caused by Defendants' unlawful restraint of trade.

16      226.   Further, Defendants' group boycott, refusal to deal and unlawful price-fixing

17  scheme has resulted in enormous profits for each of the NFL Clubs, including, but not limited to,

18  monetary concessions from Las Vegas and inflated stadium revenue enjoyed by the Raiders, and

19  all other NFL Clubs sharing in the relocation fee assessed on the Raiders, and the increased

20  revenue from television rights in a new geographic territory, new merchandising rights and game

21  receipts from a new ultra-luxury stadium.  The policies underlying the Sherman Act, and the

22  federal proscription of anticompetitive behavior (including group boycotts), demands that these

23  illicit profits be disgorged.

24      227.   Accordingly, Plaintiff is entitled to a judgment of damages against Defendants,

25  jointly and severally, in an amount to be determined at trial.  Further, under Section 15 of the

26  Sherman Act, Plaintiff seeks a trebling of their damages.

27      228.   In addition, or alternatively, Plaintiff is entitled to a judgment of disgorgement

28  against Defendants in an amount to be determined at trial.

229.   Further, Plaintiff, as a boycotted Host City, is entitled to an Order of this Court declaring that Defendants' (a) boycott of Oakland and refusal to comply with their own Relocation Policies, and (b) redistribution of the resulting ill-gotten supra-competitive gains through artificially set relocation fees to all NFL Clubs, and the supra-competitive revenue generated by the relocation, as a *quid pro quo* for breaching the terms of those Policies, amount to an unreasonable restraint on trade and interstate commerce and a violation of the antitrust laws.

### COUNT II:  Breach of Contract (Cal. Civ. Code § 1559)

230.   Plaintiff incorporates by reference the preceding paragraphs of this Complaint as if fully restated herein.

231.   Pursuant to California Civil Code section 1559, "[a] contract, made expressly for the benefit of a third person, may be enforced by him at any time before the parties thereto rescind it."

232.   The NFL Constitution (*see* Exhibit 1) and the Relocation Policies promulgated pursuant to Section 4.3 of the NFL Constitution (*see* Exhibit 2) are collectively a binding, enforceable contract among the NFL Clubs.  The Relocation Policies, as a binding contract, were made expressly for the benefit of Host Cities, and, as the Policies favor keeping NFL teams in home territories, Oakland benefited from the Relocation Policies.

233.   Oakland, as the Host City for the Raiders, is an express and intended beneficiary of the NFL Constitution and Relocation Policies.  Indeed, it is clear from the drafting history of the Relocation Policies and Defendants' public statements that a motivating purpose for the Relocation Policies was to protect the interests of existing Host Cities.  For example, in the Statement of Principles issued by the Mayors' Conference and the NFL, the parties stated that the Relocation Policies "should recognize both the private interest of team owners . . . and *public interest to enjoy the direct and indirect benefits of having a professional sports franchise*[,]" as "[c]ommunities, sports fans and taxpayers make a substantial and valuable financial, psychological and emotional investment in their professional sports team."   An NFL representative also confirmed that the Relocation Policies were adopted to "balance and protect the interest of the cities, the League and individual teams," and "establish an orderly process,

1   ensuring municipal interests will be heard and addressed, and that franchise moves occur only

2   after exhausting all reasonable options in a team's existing home territory."

3        234.   These statements, among others, also demonstrate that one of the NFL's objectives

4   in promulgating the Relocation Policies was to protect the interests and investments of existing

5   Host Cities, and thus, it would be reasonable to expect that existing Host Cities, like Oakland,

6   would bring claims against Defendants for breaches of these Policies.  Indeed, Defendants must

7   have expected this lawsuit by Oakland, as it required full indemnification from the Raiders prior to

8   voting for the relocation to Las Vegas.

9        235.   Pursuant to the NFL Constitution, and the Policies promulgated thereunder,

10  Defendants assumed direct obligations to Plaintiff, including, but not limited to, the obligation to

11  "work diligently and in good faith to obtain and to maintain suitable stadium facilities in [each

12  NFL Club's] home territor[y], and to operate in a manner that maximizes fan support in their

13  current home community."  As to the Raiders' desire to relocate, Defendants also had obligations

14  to consider:

- "[t]he extent to which fan loyalty and support for the club has been demonstrated during the team's tenure in the current community";

- "the willingness of the stadium authority or the community to remedy any deficiencies in or to replace such facility, including whether there are legislative or referenda proposals pending to address these issues; and the characteristics of the stadium in the proposed new community";

- "[t]he extent to which the club, directly or indirectly, received public financial support by means of any publicly financed playing facility, special tax treatment, or any other form of public financial support and the views of the stadium authority (if public) in the current community";

- "[t]he club's financial performance, particularly whether the club has incurred net operating losses (on an accrual basis of accounting), exclusive of depreciation and amortization, sufficient to threaten the continued financial viability of the club, as well as the club's financial prospects in its current community"; and

- "[t]he degree to which the club has engaged in good faith negotiations . . . with appropriate persons concerning terms and conditions under which the club would remain in its current home territory and afforded that community a reasonable amount of time to address pertinent proposals."

27  / / /

28  / / /

1  All of these factors supported the Raiders' continued presence in Oakland, including the Raiders

2  utter failure to negotiate with Oakland in good faith, and yet, Defendants decided to relocate the

3  Raiders to Las Vegas.  These acts constituted breaches of the Relocation Policies.

4  236.    As a direct and proximate result of Defendants' breach of the Relocation Policies,

5  Plaintiff – as an intended beneficiary of those Policies – has been deprived of a professional

6  football franchise and all of its benefits, damaging Plaintiff in an amount to be determined at trial.

7  **COUNT III:  Unjust Enrichment Under California Law**

8  237.    Plaintiff incorporates by reference the preceding paragraphs of this Complaint as if

9  fully restated herein.

10  238.    Alternatively, in the event that it is determined there was no valid contract, Plaintiff

11  brings the instant claim for Unjust Enrichment.

12  239.    As a result of their unlawful and inequitable conduct described above, Defendants

13  have and will continue to benefit and be unjustly enriched as a direct result of their collusive

14  actions to the detriment of Plaintiff.

15  240.    Plaintiff is entitled to the amount of Defendants' ill-gotten gains resulting from

16  their unlawful, unjust, and inequitable conduct, and are entitled to reimbursement thereof.

17  241.    The economic benefit Defendants derived is a direct and proximate result of

18  Defendants' unlawful practices.

19  242.    The financial benefits Defendants derived rightfully belong to Plaintiff.

20  Defendants have retained these benefits bestowed upon them under inequitable and unjust

21  circumstances at the expense of Plaintiff.  Defendants were enriched by their illegal activities at

22  the expense of Plaintiff and thus, Defendants should be ordered to make restitution for the benefit

23  of Plaintiff because it would be unjust to allow Defendants to retain the benefits.

24  **VII.    PRAYER FOR RELIEF**

25  WHEREFORE, Plaintiff City of Oakland respectfully requests that the Court enter

26  judgment against Defendants and grant the following relief:

27  1.    On Count One of the Complaint, (a) judgment in favor of Plaintiff and against

28  Defendants, jointly and severally, in an amount to be determined at trial and trebled pursuant to 15

1   U.S.C. § 15, and/or disgorgement in an amount to be determined at trial; and (b) an Order of the

2   Court declaring that Defendants': (i) boycott of Oakland and refusal to comply with their own

3   Relocation Policies, and (ii) redistribution of the resulting ill-gotten supra-competitive gains

4   through artificially set relocation fees to all NFL Clubs, and the supra-competitive revenue

5   generated by the relocation, as a quid pro quo for breaching the terms of those Policies, amount to

6   an unreasonable restraint on trade and interstate commerce and a violation of the antitrust laws;

7       2.      On Count Two of the Complaint, judgment in favor of Plaintiff and against

8   Defendants, jointly and severally, in amount to be determined at trial;

9       3.      On Count Three of the Complaint, a judgment in favor of Plaintiff and against

10  Defendants, jointly and severally, in amount to be determined at trial;

11      4.      An award to Plaintiff of its costs, including reasonable attorneys' fees, in

12  prosecuting this action; and

13      5.      Any other relief to which Plaintiff may be entitled as a matter of law or equity, or

14  which the Court determines to be just and proper.

15  / / /

16  / / /

17  / / /

18  / / /

19  / / /

20  / / /

21  / / /

22  / / /

23  / / /

24  / / /

25  / / /

26  / / /

27  / / /

28  / / /

1

## VIII.   __DEMAND FOR JURY TRIAL__

2        Pursuant to Federal Rule of Civil Procedure 38, Plaintiff hereby demands a jury trial on all

3 issues so triable.

4 DATED:  September 9, 2019

5

6 By:   _____*/s/ Barbara J. Parker*_____        By:   _____*/s/ James W. Quinn*_____
              BARBARA J. PARKER                              JAMES W. QUINN
7
8 BARBARA J. PARKER (Bar No. 69722)              JAMES W. QUINN
   bparker@oaklandcityattorney.org                  jquinn@bafirm.com
9 MARIA BEE (Bar No. 167716)                     DAVID BERG
   mbee@oaklandcityattorney.org                     dberg@bafirm.com
10 ERIN BERNSTEIN (Bar No. 231539)               MICHAEL M. FAY
   ebernstein@oaklandcityattorney.org               mfay@bafirm.com
11 **OAKLAND CITY ATTORNEY**                      JENNY H. KIM
   One Frank Ogawa Plaza, 6th Floor                 jkim@bafirm.com
12 Oakland, California  94612                      CHRIS L. SPRENGLE
   Telephone:   (510) 238-3601                      csprengle@bafirm.com
13 Facsimile:    (510) 238-6500                     BRONWYN M. JAMES
                                                    bjames@bafirm.com
14                                                 EMILY BURGESS (*pro hac vice* forthcoming)
                                                    eburgess@bafirm.com
15                                                 **BERG & ANDROPHY**
16                                                 120 West 45th Street, 38th Floor
                                                   New York, New York  10036
17                                                 Telephone:   (646) 766-0073
                                                   Facsimile:    (646) 219-1977
18 By:   _____*/s/ Clifford H. Pearson*_____
              CLIFFORD H. PEARSON
19
20 CLIFFORD H. PEARSON (Bar No. 108523)          BRUCE L. SIMON (Bar No. 96241)
   cpearson@pswlaw.com                              bsimon@pswlaw.com
21 DANIEL L. WARSHAW (Bar No. 185365)            BENJAMIN E. SHIFTAN (Bar No. 265767)
   dwarshaw@pswlaw.com                              bshiftan@pswlaw.com
22 MICHAEL H. PEARSON (Bar No. 277857)           **PEARSON, SIMON & WARSHAW, LLP**
   mpearson@pswlaw.com                            350 Sansome Street, Suite 680
23 MATTHEW A. PEARSON (Bar No. 291484)           San Francisco, California  94104
   mapearson@pswlaw.com                           Telephone:   (415) 433-9000
24 **PEARSON, SIMON & WARSHAW, LLP**              Facsimile:    (415) 433-9008
25 15165 Ventura Boulevard, Suite 400
   Sherman Oaks, California  91403
26 Telephone:   (818) 788-8300
   Facsimile:    (818) 788-8104
27
28 *Attorneys for Plaintiff City of Oakland*