1

KENNETH G. HAUSMAN (Bar No. 57252)
kenneth.hausman@arnoldporter.com
2  DANIEL B. ASIMOW (Bar No. 165661)
daniel.asimow@arnoldporter.com
3  **ARNOLD & PORTER KAYE SCHOLER LLP**
Three Embarcadero Center, 10th Floor
4  San Francisco, CA 94111-4024
Telephone:   415.471.3100
5  Facsimile:   415.471.3400

6  [*additional counsel listed on signature page*]

7  Attorneys for Defendant THE OAKLAND
RAIDERS, a California limited partnership

JOHN E. HALL (Bar No. 118877)
jhall@cov.com
**COVINGTON & BURLING LLP**
One CityCenter
850 Tenth Street, NW
Washington, DC 20001-4956
Telephone:   202.662.6000
Facsimile:   202.662.6291

[*additional counsel listed on signature page*]

Attorneys for Defendants THE NATIONAL
FOOTBALL LEAGUE and all NFL Clubs other
than The Oakland Raiders

8

9                        UNITED STATES DISTRICT COURT

10                  NORTHERN DISTRICT OF CALIFORNIA

11                       SAN FRANCISCO DIVISION

12

13  CITY OF OAKLAND,

14             Plaintiff,

15       vs.

16  THE OAKLAND RAIDERS, a California
limited partnership; ARIZONA CARDINALS
17  FOOTBALL CLUB LLC; ATLANTA
FALCONS FOOTBALL CLUB, LLC;
18  BALTIMORE RAVENS LIMITED
PARTNERSHIP; BUFFALO BILLS, LLC;
19  PANTHERS FOOTBALL, LLC; THE
CHICAGO BEARS FOOTBALL CLUB, INC.;
20  CINCINNATI BENGALS, INC.; CLEVELAND
BROWNS FOOTBALL COMPANY LLC;
21  DALLAS COWBOYS FOOTBALL CLUB,
LTD; PDB SPORTS, LTD; THE DETROIT
22  LIONS, INC.; GREEN BAY PACKERS, INC.;
HOUSTON NFL HOLDINGS, LP;
23  INDIANAPOLIS COLTS, INC.;
JACKSONVILLE JAGUARS, LLC; KANSAS
24  CITY CHIEFS FOOTBALL CLUB, INC.;
CHARGERS FOOTBALL COMPANY, LLC;
25  THE RAMS FOOTBALL COMPANY, LLC;
MIAMI DOLPHINS, LTD.; MINNESOTA
26  VIKINGS FOOTBALL, LLC; NEW
ENGLAND PATRIOTS LLC; NEW ORLEANS
27  LOUISIANA SAINTS, LLC; NEW YORK
FOOTBALL GIANTS, INC.; NEW YORK
28  JETS LLC; PHILADELPHIA EAGLES, LLC;

Case No.: 3:18-cv-07444-JCS

Action Filed: December 11, 2018

**DEFENDANTS' MOTION TO DISMISS
FIRST AMENDED COMPLAINT**

Date:     March 6, 2020
Time:    9:30 a.m.
Place:   Courtroom G, 15th Floor
Judge:  Hon. Joseph C. Spero

---

DEFENDANTS' MOTION TO DISMISS FAC                  CASE NO. 3:18-cv-07444-JCS

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

PITTSBURGH STEELERS LLC; FORTY
NINERS FOOTBALL COMPANY LLC;
FOOTBALL NORTHWEST LLC;
BUCCANEERS TEAM LLC; TENNESSEE
FOOTBALL, INC.; PRO-FOOTBALL, INC.;
and THE NATIONAL FOOTBALL LEAGUE,

Defendants.

# TABLE OF CONTENTS

**Page**

NOTICE OF MOTION AND MOTION TO DISMISS ..................................................................1

ISSUES TO BE DECIDED ............................................................................................................1

MEMORANDUM OF POINTS AND AUTHORITIES ..................................................................2

INTRODUCTION ...........................................................................................................................2

ALLEGATIONS OF THE FIRST AMENDED COMPLAINT .....................................................3

    A.    Structure Of The NFL And Its Member Teams ............................................4

    B.    The Raiders' Relocation To Las Vegas .........................................................4

    C.    The City Of Oakland As Alleged Third Party Beneficiary ............................5

    D.    The Alleged Harm To The City Of Oakland ..................................................5

ARGUMENT ...................................................................................................................................6

    I.    THE CITY OF OAKLAND FAILS TO STATE AN ANTITRUST
           CLAIM ...........................................................................................................6

        A.    Oakland Lacks Standing To Sue Under The Antitrust Laws. .........................6

           1.    Oakland Has Not Alleged Injury In Fact. ...........................................7

           2.    Oakland Has Not Alleged Antitrust Injury. ........................................8

           3.    Oakland Is Not A Proper Plaintiff......................................................9

               a.    Oakland Lacks Standing Because It Did Not Pay The
                    Alleged Overcharge Caused By The Challenged Conduct......9

               b.    Oakland Lacks Standing Because Any Injury Is Indirect......10

           4.    Oakland Lacks Antitrust Standing Because Its Alleged
               Injuries Are Not Cognizable Under The Antitrust Laws..................12

        B.    Oakland's Claims Fail As A Substantive Matter..........................................14

           1.    Oakland Fails Adequately To Allege A Relevant Market.................14

           2.    The NFL's 32-Team Structure And Required Vote To
               Admit New Teams Is Not Unlawful "Price Fixing." ........................16

           3.    Oakland Fails To Allege A Group Boycott. ......................................17

II.     THE CITY OF OAKLAND FAILS TO STATE A CONTRACT CLAIM .............. 18

        A.      The Relocation Policy Does Not Constitute A Contract ............................. 19

        B.      Oakland Is Not An Intended Third Party Beneficiary Of The
                Relocation Policy. ....................................................................................... 20

                1.      Providing A Benefit to Oakland Is Not The Relocation
                        Policy's Motivating Purpose. .......................................................... 20

                2.      Permitting Suit By Oakland Would Not Be Consistent With
                        The Reasonable Expectations Of The NFL And Its Member
                        Clubs. .............................................................................................. 23

        C.      Oakland Still Fails To Allege A Breach Of The Relocation Policy ............. 24

III.    THE CITY OF OAKLAND FAILS TO STATE AN UNJUST
        ENRICHMENT CLAIM ......................................................................................... 25

CONCLUSION ...................................................................................................................... 25

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Am. Needle, Inc. v. Nat'l Football League*,
    560 U.S. 183 (2010)............................................................................................................ 14

*Ass'n of Wash. Pub. Hosp. Dists. v. Philip Morris Inc.*,
    241 F.3d 696 (9th Cir. 2001)............................................................................................ 10

*Associated Gen. Contractors of Cal., Inc. v. Cal. State Council of Carpenters*,
    459 U.S. 519 (1983).......................................................................................................... 9

*Atl. Richfield Co. v. USA Petroleum Co.*,
    495 U.S. 328 (1990).......................................................................................................... 8

*Bell Atl. Corp. v. Twombly*,
    550 U.S. 544 (2007).......................................................................................................... 6

*Brunswick Corp. v. Pueblo Bowl-O-Mat, Inc.*,
    429 U.S. 477 (1977).......................................................................................................... 8

*Burgert v. Lokelani Bernice Pauahi Bishop Tr.*,
    200 F.3d 661 (9th Cir. 2000)............................................................................................ 6

*Cal. Dental Ass'n v. Am. Dental Ass'n*,
    23 Cal. 3d 346 (1979)...................................................................................................... 20

*Charley's Taxi Radio Dispatch Corp. v. SIDA of Haw., Inc.*,
    810 F.2d 869 (9th Cir. 1987)............................................................................................ 18

*City of Rohnert Park v. Harris*,
    601 F.2d 1040 (9th Cir. 1979)...................................................................................... 7, 12

*Daniels-Hall v. Nat'l Educ. Ass'n*,
    629 F.3d 992 (9th Cir. 2010)........................................................................................ 6, 11

*Deesen v. Prof'l Golfers' Ass'n of America*,
    358 F.2d 165 (9th Cir. 1966)............................................................................................ 17

*Durell v. Sharp Healthcare*,
    183 Cal. App. 4th 1350 (2010)........................................................................................ 25

*Goonewardene v. ADP, LLC*,
    6 Cal. 5th 817 (2019) ............................................................................ 18, 20, 22, 23, 24

*Hanover Shoe, Inc. v. United Shoe Mach. Corp.*,
    392 U.S. 481 (1968).......................................................................................................... 10

*Hawaii v. Standard Oil Co.*,
    405 U.S. 251 (1972)............................................................................................ 12

*Hicks v. PGA Tour, Inc.*,
    897 F.3d 1109 (9th Cir. 2018).................................................................... 14, 16

*High Tech. Careers v. San Jose Mercury News*,
    996 F.2d 987 (9th Cir. 1993)............................................................................ 15

*In re NFL's Sunday Ticket Antitrust Litig.*,
    933 F.3d 1136 (9th Cir. 2019).......................................................................... 14

*Innovation Marine Protein, LLC v. Pac. Seafood Grp.*,
    No. 6:17-CV-00815-MC, 2018 WL 1461501 (D. Or. Mar. 23, 2018)...................... 12

*Klamath Water Users Protective Ass'n v. Patterson*,
    204 F.3d 1206 (9th Cir. 1999).................................................................... 21, 22

*Klor's, Inc. v. Broadway-Hale Stores, Inc.*,
    359 U.S. 207 (1959)........................................................................................ 17

*Knevelbaard Dairies v. Kraft Foods, Inc.*,
    232 F.3d 979 (9th Cir. 2000).............................................................................. 6

*L.A. Mem'l Coliseum Comm'n v. Nat'l Football League*,
    791 F.2d 1356 (9th Cir. 1986)............................................................................ 8

*Ladas v. Cal. State Auto. Ass'n*,
    19 Cal. App. 4th 761 (1993)........................................................................ 19, 20

*Lambert v. Board of Comm'rs of Orleans Levee Dist.*,
    No. 05–5931, 2009 WL 152668 (E.D. La. Jan. 22, 2009)...................................... 10

*Lance Camper Mfg. Corp. v. Republic Indem. Co.*,
    44 Cal. App. 4th 194 (1996)............................................................................ 25

*Levine v. Blue Shield of Cal.*,
    189 Cal. App. 4th 1117 (2010).......................................................................... 25

*Los Angeles Mem'l Coliseum Comm'n v. Nat'l Football League*,
    726 F.2d 1381 (9th Cir. 1984).................................................................... 14, 15

*Los Angeles Mem'l Coliseum Comm'n v. NFL*,
    468 F. Supp. 154 (C.D. Cal. 1979)...................................................................... 7

*Martinez v. Socoma Cos.*,
    11 Cal. 3d 394 (1974)................................................................................ 21, 24

*Mid-South Grizzlies v. Nat'l Football League*,
    720 F.2d 772 (3rd Cir. 1983)............................................................................ 17

*Montreal Trading Ltd. v. Amax Inc.,*
    661 F.2d 864 (10th Cir. 1981) ............................................................................... 9, 10

*Newcal Indus., Inc. v. Ikon Office Sol.,*
    513 F.3d 1038 (9th Cir. 2008) ................................................................................. 15

*Nw. Wholesale Stationers, Inc. v. Pac. Stationery & Printing Co.,*
    472 U.S. 284 (1985) ................................................................................................ 17

*Prostar Wireless Grp., LLC v. Domino's Pizza, Inc.,*
    360 F. Supp. 3d 994 (N.D. Cal. 2018) .................................................................... 19

*R.C. Dick Geothermal Corp. v. Thermogenics, Inc.,*
    890 F.2d 139 (9th Cir. 1989) ................................................................................... 12

*Reiter v. Sonotone Corp.,*
    442 U.S. 330 (1979) ................................................................................................ 13

*Saint Alphonsus Med. Ctr.-Nampa Inc. v. St. Luke's Health Sys., Ltd.,*
    778 F.3d 775 (9th Cir. 2015) ................................................................................... 15

*Salerno v. Am. League of Prof'l Baseball Clubs,*
    429 F.2d 1003 (2d Cir. 1970) .................................................................................. 18

*Schwarzkopf v. IBM,*
    No. C 08-2715 JF (HRL), 2010 WL 1929625 (N.D. Cal. May 12, 2010) ................ 20

*Seattle Totems Hockey Club, Inc. v. Nat'l Hockey League,*
    783 F.2d 1347 (9th Cir. 1986) ................................................................................. 17

*Solinger v. A.&M. Records, Inc.,*
    718 F.2d 298 (9th Cir. 1983) ................................................................................... 11

*Somers v. Apple, Inc.,*
    729 F.3d 953 (9th Cir. 2013) ..................................................................................... 9

*StubHub, Inc. v. Golden State Warriors, LLC,*
    No. C 15-1436 MMC, 2015 WL 6755594 (N.D. Cal. Nov. 5, 2015) ....................... 16

*Supermarket of Homes, Inc. v. San Fernando Valley Bd. of Realtors,*
    786 F.2d 1400 (9th Cir. 1986) ................................................................................. 18

*Tawfilis v. Allergan, Inc.,*
    No. 8:15-cv-00307-JLS-JCG, 2017 WL 3084275 (C.D. Cal. June 26, 2017) ........... 10

*Vinci v. Waste Mgmt., Inc.,*
    80 F.3d 1372 (9th Cir. 1996) ................................................................................... 11

*Wall St. Network, Ltd. v. N.Y. Times Co.,*
    164 Cal. App. 4th 1171 (2008) ................................................................................ 24

DEFENDANTS' MOTION TO DISMISS FAC               CASE NO. 3:18-cv-07444-JCS

*Yould v. Barnard*,
   No. 5:18-cv-01255-EJD, 2018 WL 4105094 (N.D. Cal. Aug. 29, 2018) .................................... 3

**Statutes and Rules**

15 U.S.C.
   §1 ............................................................................................................................. 17
   §15b ......................................................................................................................... 10

Fed. R. Civ. P. 12(b)(6) ............................................................................................... 1, 6

**Other Authorities**

Joe Becker, *Coliseum loses money on Raiders, doesn't want team here in 2019*, S.J.
   Mercury News, Mar. 30, 2017 ................................................................................. 13

Herbert Hovenkamp, *The Indirect-Purchaser Rule and Cost-Plus Sales*, 103 Harv. L.
   Rev. 1717 (1990) ....................................................................................................... 9

Phillip E. Areeda & Herbert Hovenkamp, *Antitrust Law* (2012)
   §2214a ...................................................................................................................... 17
   §2214b ...................................................................................................................... 17

Jack Nicas, *The Beauty of America's Ugliest Ballpark*, N.Y. Times, Oct. 3, 2019 ......................... 25

*The Rams' $5 Billion Stadium Complex is Bigger than Disneyland*, Wash. Post,
   Jan. 26, 2019 .............................................................................................................. 4

**NOTICE OF MOTION AND MOTION TO DISMISS**

TO ALL PARTIES AND THEIR COUNSEL OF RECORD:

Please take notice that on March 6, 2020 at 9:30 a.m., or as soon thereafter as the matter may be heard, in the courtroom of the Honorable Joseph C. Spero, Courtroom G, 15th Floor, United States District Court, 450 Golden Gate Avenue, San Francisco, California, Defendants will and hereby do move the Court, pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure, for an order dismissing with prejudice Plaintiff's First Amended Complaint in its entirety. This motion to dismiss is brought on the ground that the Complaint fails to state a claim upon which relief can be granted.

This motion is based on this Notice of Motion and Motion, the accompanying Memorandum of Points and Authorities, the complete files and records in this action, oral argument of counsel, and such other and further matters as this Court may consider.

**ISSUES TO BE DECIDED**

(1) Whether Plaintiff City of Oakland has standing to assert a claim based on the fact that the NFL operates at any given time with a specified number of member clubs when Plaintiff does not allege (a) that any additional club has sought to join the NFL, (b) that any ownership group seeks to locate a new club in Oakland, (c) that Plaintiff paid any purported overcharge, (e) that Plaintiff suffered direct injury, or (f) that Plaintiff suffered any non-speculative harm;

(2) Whether Plaintiff's alleged harms, consisting of lost municipal investments, lost tax revenues, lost rental income in its capacity as a partial owner of the Raiders' landlord, and diminished value of the Coliseum, are sufficient to afford it standing;

(3) Whether Plaintiff has plausibly alleged a relevant market consisting of "hosting NFL teams" when it fails to allege any facts that, if proved, would establish that providing hosting services to NFL teams is distinct from providing services to other sports teams or any other businesses;

(4) Whether the antitrust laws permit a court to compel a membership joint venture to admit additional members;

(5) Whether Plaintiff has pled a group boycott or refusal to deal when it makes no allegation that any club other than the Raiders has declined to do business with Oakland; and

(6) Whether Plaintiff has pled an actionable breach of contract claim based upon its theory that it

is an intended third party beneficiary of the NFL's Relocation Policy when (a) the Policy is not a contract; (b) the Policy does not mention Plaintiff or any class of which Plaintiff is a member and on its face evidences an intent solely to benefit the NFL and its member clubs; (c) third party enforcement of the Policy would be highly disruptive and contrary to the reasonable expectations of the NFL and its member clubs; and (d) Plaintiff does not allege a breach of the Policy.

## MEMORANDUM OF POINTS AND AUTHORITIES

## INTRODUCTION

The First Amended Complaint (ECF 68, "FAC") filed by Plaintiff City of Oakland ("the City" or "Oakland") is louder and longer than its predecessor. But its basic claim—that the NFL should be compelled to admit additional clubs because one of those clubs might play in Oakland or the Raiders might have had no choice but to stay there—remains flawed at every level. Oakland has failed to follow any of the steps laid out in this Court's detailed roadmap of what allegations would be needed to survive a motion to dismiss. *See* Order Granting Motion to Dismiss (ECF 64, "Order") (July 25, 2019) at 18. Its lawsuit should now take the next available exit: dismissal with prejudice.

Most fundamentally, Oakland does not have standing to assert its antitrust claim. Oakland challenges the provision of the NFL Constitution requiring a vote to admit new clubs, but Oakland nowhere asserts that any new club has sought to join the NFL, much less that such a club wishes to play in Oakland. Even if there were such a prospective club, the economics of any arrangement between it and Oakland are a matter of pure speculation—where the team would play, who would own the stadium, how if at all Oakland might benefit. Equally unsupported is the alternative speculation that some number of hypothetical new clubs might have played in Las Vegas and every market more attractive than Oakland, thereby foreclosing the Raiders' move.

Oakland contends that the purportedly limited number of NFL clubs affords the clubs market power and allows them to overcharge the Host Cities with which they negotiate. FAC ¶64. Whatever else might be said about this purported overcharge, Oakland did not pay it. Antitrust standing to complain of overcharges is limited to purchasers of the overcharged item; non-purchasers (even those allegedly priced out of the market) do not have standing. Oakland's other alleged injuries—lost municipal investments, lost tax revenues, lost rent, and devaluation of the Coliseum property—are

legally insufficient to confer standing. As this Court previously recognized, these harms are too indirect, too speculative, and/or not harms to a commercial interest.

Even if Oakland were a proper plaintiff to challenge the NFL's membership rules, and even if it had suffered cognizable harm, its claims would fail. Oakland still has not alleged a proper relevant antitrust market. It now alleges a market for "hosting" NFL teams, but it does not allege any facts that, if proved, would establish that hosting NFL teams is different from hosting any other sports team or, for that matter, any other business. As a substantive matter, Oakland's "price fixing" claim fails because the antitrust laws do not require the NFL to admit new teams, and Oakland's group boycott claim fails because it identifies only a single alleged boycotter.

Oakland fares no better with its recycled breach of contract claim based on the NFL's Relocation Policy. The Court previously dismissed this claim but allowed leave to amend. Presented with this opportunity, Oakland pleads few additional new facts and none relevant to the claim. Oakland has appended to the FAC letters between the NFL and the United States Conference of Mayors that relate not to the NFL's Relocation Policy, but to a different document, a 1996 "Statement of Principles." FAC ¶78. Oakland is not suing for a breach of the Statement of Principles. And it is not news that some of the discretionary factors listed in the Relocation Policy overlap with factors identified in the Statement of Principles; the Relocation Policy says so explicitly. The contract claim should be dismissed for all of the same reasons as before: the Relocation Policy is not a contract, Oakland is not a third party beneficiary, and Oakland has not alleged a breach. Oakland's claim is particularly inapt in that the Policy concerns "home territories," not cities within a home territory (and does not even mention cities).

Oakland's final claim (Count III) is a claim for unjust enrichment based on the alleged receipt by Defendants of "ill-gotten gains." The same claim was previously dismissed, and should be again.

## ALLEGATIONS OF THE FIRST AMENDED COMPLAINT

The Court summarized the allegations of the original complaint in its Order. See Order at 2–8. While the FAC is almost twice as long as the original, much of what is added in the FAC consists of extended quotes from law review articles and legal argument that has no place in a complaint. *See Yould v. Barnard*, No. 5:18-cv-01255-EJD, 2018 WL 4105094, at *4 (N.D. Cal. Aug. 29, 2018)

(dismissing complaint that "contains extensive sections of legal argument which make it nearly impossible for a defendant or the court to sort out alleged facts from opinion or commentary"). More significant is what the FAC does not allege. Oakland does not allege that any team sought to join the NFL or that Oakland made any attempt to attract a new team. Oakland does not allege that it paid any purported overcharge as a result of the NFL's 32-team structure. Oakland does not allege that the Raiders' decision to relocate to Las Vegas was driven by anything other than ordinary economic competition. And Oakland does not allege any cognizable harm under the antitrust laws.

### A. Structure Of The NFL And Its Member Teams

The FAC complains that the NFL has created a "closed" sports league where everything that it produces is "not available in the marketplace absent the consent of the group itself." FAC ¶37. The FAC argues that it would be preferable if the NFL operated in the mode of open European soccer leagues. *Id.* ¶¶9, 37 n.2. The FAC alleges that the NFL's structure allows it to extract favorable terms from "Host Cities" in connection with new or renovated stadiums. *Id.* ¶62. Oakland includes a chart showing the locations of certain new and renovated stadia and the purported amount of public funding for each, but omits the new Los Angeles stadium that attracted two teams with $0 in public funding. *See The Rams' $5 Billion Stadium Complex is Bigger than Disneyland*, Wash. Post, Jan. 26, 2019 (discussing funding for Los Angeles Stadium). Oakland also complains that the NFL teams share certain revenue streams and that "everything the NFL sells" is too expensive. *Id.* ¶¶12–13, 14, 15, 38, 52–56.[1]  Oakland, however, does not ask the Court to restructure the NFL or find its revenue sharing unlawful; it admits that it made no contribution to the financing of a new or renovated stadium; and it does not assert any claims based on purchases from the NFL.

### B. The Raiders' Relocation To Las Vegas

As to the central event in the case—the relocation of the Raiders—the allegations remain unchanged. At bottom, the Raiders were presented with a more favorable economic opportunity in Las Vegas and the NFL did not stop the Raiders from taking that opportunity. The FAC acknowledges that moving to Las Vegas will "almost double the enterprise value of the Raiders."

---

[1] Ironically, but for revenue sharing, the Raiders likely would have relocated sooner from Oakland, where the team was consistently last or close to last among all NFL clubs in local revenue. The Raiders also were "next to last among NFL franchises" in enterprise value. FAC ¶63.

1     FAC ¶5.

2          The FAC continues to assert that the Raiders' payment of a relocation fee was anticompetitive,

3     but it does not assert that the fee was paid by Oakland. Any claim that the relocation fee made

4     relocation easier is belied by common sense and the Court's prior ruling. *See* Order at 15–16 ("It is

5     difficult to see how the relocation fee could have encouraged, rather than discouraged, the Raiders'

6     decision to relocate, and Oakland has not plausibly alleged that the Raiders would have been less

7     likely to seek relocation but for the fee.").

8          The FAC concedes that Oakland is not the sole owner of the Coliseum; it is jointly owned with

9     Alameda County, leased to a third party, which in turn assigned its right to a fourth party. FAC ¶29.

10    The FAC equivocates about where the Raiders would have played if they were to remain in Oakland,

11    alleging that "Oakland was willing to remedy any deficiencies in the Coliseum and even submitted a

12    proposal to replace the Coliseum with a new stadium," FAC ¶183, without ever specifically alleging

13    what Oakland offered to contribute or how the new stadium would be financed or built.[2]

14        **C.  The City Of Oakland As Alleged Third Party Beneficiary**

15         The FAC continues to assert claims based on the Relocation Policy. The FAC adds allegations

16    regarding a different document that it does not claim was breached, a Statement of Principles

17    developed from consultation between the NFL and the United States Conference of Mayors, and

18    notes that Congress considered (but did not pass) a bill regarding club relocations. *See, e.g.*, FAC

19    ¶¶20, 74–85, 152, 160–161, 173–177. The overlap between certain factors in the Relocation Policy,

20    the Statement of Principles, and the proposed bill was already acknowledged in the Policy itself and

21    does not provide third-party rights to anyone. Policy at 3 n.1. The FAC does not advance claims

22    under the Statement of Principles or any law addressing club relocations.

23        **D.  The Alleged Harm To The City Of Oakland**

24         Oakland alleges indirect harms resulting from the Raiders' relocation largely identical to those

25    asserted in the original Complaint. Oakland asserts that its damages consist of a "loss of investments

26    _____

27    [2] The speculative nature of this assertion is illustrated by Oakland's recent lawsuit against the County
      of Alameda regarding the County's proposed sale of its one-half interest in the Coliseum property to
      the A's. *See* Complaint, *City of Oakland v. County of Alameda*, Alameda Superior Court, Case No.
      RG19-36930 (filed Sept. 27, 2019). In that lawsuit, Oakland alleges that the Coliseum property
28    *cannot* be redeveloped but rather must be set aside under the Surplus Lands Act for "affordable
      housing, park and recreational, or open-space purposes." *See id.* ¶6.

DEFENDANTS' MOTION TO DISMISS FAC                                CASE NO. 3:18-cv-07444-JCS

it made in a reasonable belief that the Raiders would comply with applicable laws, and the Relocation Policies, and remain in Oakland." FAC ¶201. In addition, Oakland contends that it has lost income from ticket sales, rental money from use of the Coliseum property, and debt from bonds generated to finance the renovation of the Coliseum. *Id.* ¶204–205. Oakland also asserts, in a series of conclusory allegations and extended legal arguments, but in disregard of the Court's earlier Order, that it will "lose significant tax revenues associated with Raiders games." *Id.* ¶206. Finally, Oakland alleges it will suffer "significant losses from the devaluation of Coliseum property." *Id.* ¶211. Oakland does not allege that the Raiders failed to fulfill any obligation of their lease or that they are leaving prior to the expiration of the lease.

## ARGUMENT

Under Rule 12(b)(6), the Court should accept the complaint's well-pleaded factual allegations and draw all reasonable inferences in the plaintiff's favor. *See, e.g.*, *Burgert v. Lokelani Bernice Pauahi Bishop Tr.*, 200 F.3d 661, 663 (9th Cir. 2000). However, the Court is not "required to accept as true allegations that contradict exhibits attached to the Complaint or matters properly subject to judicial notice, or allegations that are merely conclusory, unwarranted deductions of fact, or unreasonable inferences." *Daniels-Hall v. Nat'l Educ. Ass'n*, 629 F.3d 992, 998 (9th Cir. 2010). To survive a motion to dismiss, a plaintiff's claims must allege "enough facts to state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555–56, 570 (2007). These principles apply with particular force in antitrust cases. *See id.* at 558–59.

## I.   THE CITY OF OAKLAND FAILS TO STATE AN ANTITRUST CLAIM

The Court's Order laid out a roadmap for what Oakland would need to allege to state an antitrust claim that would survive a motion to dismiss. Plaintiff has failed to follow that roadmap because it cannot allege facts that would establish either Oakland's standing to sue under the antitrust laws or a substantive antitrust violation.

### A.   Oakland Lacks Standing To Sue Under The Antitrust Laws.

An antitrust plaintiff must allege both injury-in-fact and "antitrust standing." Order at 14 (citing *Knevelbaard Dairies v. Kraft Foods, Inc.*, 232 F.3d 979, 987 (9th Cir. 2000)). Oakland's new theory attributing its injury to the NFL's current 32-team structure fares no better than its abandoned theory

1   attributing its harm to the relocation fee paid by the Raiders. Oakland's FAC does not and cannot

2   allege injury in fact, let alone antitrust standing.

3       **1.  Oakland Has Not Alleged Injury In Fact.**

4       The FAC challenges what it calls the "NFL's 32-team limit." FAC ¶45. There is no such limit.

5   Article III, §3.1(A) of the NFL Constitution and By-Laws (FAC Exhibit 1) provides that

6   "Membership in the League shall be limited to the thirty-two (32) member clubs specified in Section

7   4.5 hereof *and such new members as may be thereafter duly elected*." Having thirty-two teams is no

8   more a restraint of trade than having sixteen teams or five hundred teams. If Oakland is challenging

9   anything, it must be the requirement that current NFL members approve any expansion of the

10  League. Whether that requirement could ever cause injury-in-fact, it certainly cannot do so in the

11  absence of any allegation that a team unsuccessfully sought to join the NFL. There is no such

12  allegation here (and could not be), nor is there any allegation that Oakland would have avoided injury

13  even if one or more additional teams had been admitted. This failure to allege injury-in-fact mandates

14  dismissal. *See City of Rohnert Park v. Harris*, 601 F.2d 1040, 1045 (9th Cir. 1979) (dismissing claim

15  where city "ha[d] not made a sufficient showing that, absent the alleged antitrust violations by [the

16  defendants], its commercial area would have been selected as a site for shopping center

17  development," and "the question whether [the city] would have benefited but for [the defendants']

18  actions [was therefore] entirely speculative").

19      The Court dismissed the original Complaint on the ground that "Oakland has not alleged injury-

20  in-fact as a result of the NFL's thirty-two team structure." Order at 18 (citing *City of Rohnert Park*).

21  The Order further noted that Oakland's complaint did "not include allegations to render such a

22  conclusion plausible," and provided an "incomplete list of issues that might be relevant":

23      (1) whether there are additional potential owners willing to establish new teams if the NFL
        allowed them to do so; (2) whether such potential owners would have based a team in Las
24      Vegas before the Raiders decided to relocate there; (3) whether the Raiders would still have
        left Oakland for another city if the NFL allowed additional teams; (4) if the Raiders might
25      still have left, whether an additional team would have been established in Oakland to replace
        the Raiders; or (5) whether Oakland has made any effort to attract an existing team other
26      than the Raiders or to establish a new expansion team to replace the Raiders. (*Id*.[3])

27  _____
    [3] *See also* July 19 Hearing Tr. at 7:15-8:12 ("Tr.") (to avoid dismissal Oakland must allege "there are
28  people who are trying to make teams and they've said that they would have put a team here").
    Similarly, in *Los Angeles Memorial Coliseum Commission v. NFL*, 468 F. Supp. 154, 162 (C.D. Cal.
                                                            (Footnote Cont'd on Following Page)

The FAC does not include a single factual allegation addressing *any* of these issues. As the Court previously recognized, without an owner who was prevented from bringing a team to Oakland (or who would have brought a team to Las Vegas sooner, possibly forcing the Raiders to stay in Oakland), Oakland could not allege injury-in-fact. The FAC falls far short of doing so.

### 2. Oakland Has Not Alleged Antitrust Injury.

Unable to allege injury stemming from the NFL's 32-team structure, Oakland is left with only its disappointment at losing the Raiders to a city that offered more. The FAC itself alleges that moving to Las Vegas will "almost double the enterprise value of the Raiders." FAC ¶5. Oakland's loss of a team through the process of competition is not antitrust injury. Antitrust injury is injury "'of the type the antitrust laws were designed to prevent and that flows from that which makes defendants' acts unlawful.'" Order at 15 (quoting *Brunswick Corp. v. Pueblo Bowl-O-Mat, Inc.*, 429 U.S. 477, 489 (1977)). The *Brunswick* standard is satisfied only "on a showing that the injury was caused by a reduction, rather than an increase, in competition flowing from the defendant's acts." *L.A. Mem'l Coliseum Comm'n v. Nat'l Football League*, 791 F.2d 1356, 1364 (9th Cir. 1986) ("*Raiders II*").

The FAC's repeated characterization of the NFL as a cartel and its claim that the NFL "decided, as a group, to move the Raiders from Oakland to Las Vegas" (FAC ¶143), does not change the fact that the process here—the *Raiders* negotiated an arrangement with Las Vegas, the *Raiders* decided to accept that arrangement, and the NFL in turn *approved* a relocation—enabled Host Cities *to compete*. As the Order explained (at 16), the relocation fee and barriers to team movement "*favor[] the existing cities*," and "any harm Oakland may have suffered as an existing host city from procedures that tend to encourage NFL approval of teams' requests to relocate neither 'flows from that which makes the conduct unlawful' nor 'is of the type the antitrust laws were intended to prevent.'" *Id.* at 17 (quoting *Brunswick*). Loss of the Raiders to a city that made a better offer is not injury arising from a *reduction* in competition. *See generally Atl. Richfield Co. v. USA Petroleum Co.*, 495 U.S. 328, 334 (1990) ("[I]t is inimical to [the antitrust] laws to award damages for losses stemming from continued

---

1979), the district court dismissed a claim challenging the requirement that NFL owners approve an y expansion team, holding that the plaintiff was required to allege, *inter alia*, that it was "reasonably likely that an owner can be found for an expansion team in Los Angeles"; that it was "reasonably likely that an expansion team would decide to play in the Coliseum"; and that it was "reasonably likely that an expansion team and the Coliseum would be able to agree on lease terms."

1  competition.”).

2       **3.  Oakland Is Not A Proper Plaintiff.**

3       Even if Oakland had made plausible allegations of injury-in-fact and antitrust injury, it would not

4  be a proper plaintiff to pursue this claim. For a complaint to survive a motion to dismiss, “the court

5  must make a further determination whether the plaintiff is a proper party to bring a private antitrust

6  action.” *Associated Gen. Contractors of Cal., Inc. v. Cal. State Council of Carpenters*, 459 U.S. 519,

7  535 n. 31 (1983). This doctrine is called “antitrust standing,” and Oakland does not have it.

8            **a.  Oakland Lacks Standing Because It Did Not Pay The Alleged Overcharge
9                Caused By The Challenged Conduct.**

10      The Ninth Circuit requires “that ‘the injured party be a participant in the same market as the

11  alleged malefactors,’ meaning ‘the party alleging the injury must be either a consumer of the alleged

12  violator’s goods or services or a competitor of the alleged violator in the restrained market.’” *Somers*

13  *v. Apple, Inc.*, 729 F.3d 953, 963 (9th Cir. 2013) (citation omitted). Oakland is neither; it is not a

14  competitor of the defendants and it has not “consumed” defendants’ product. Moreover, Oakland

15  does not allege that it paid any overcharge; instead it alleges that it *refused* to pay an overcharge (in

16  the form of “enormous Host City subsidies,” FAC ¶145) and lost the Raiders as a result. The law is

17  clear that a firm that makes no purchases—even a firm that makes no purchases as a result of a price

18  inflated by anticompetitive conduct—lacks standing to sue. “Under existing law, direct purchasers of

19  a monopolized or cartelized product may not sue for damages based on units they did not purchase

20  from the cartel because of the illegal price increase.” Herbert Hovenkamp, *The Indirect-Purchaser*

21  *Rule and Cost-Plus Sales*, 103 Harv. L. Rev. 1717, 1722 & n.31 (1990).[4]

22      In *Montreal Trading Ltd. v. Amax Inc.*, 661 F.2d 864 (10th Cir. 1981), the Tenth Circuit held that

23  a plaintiff that had made no purchases because of anticompetitive conduct lacked standing. The

24  plaintiff there contended that defendants had conspired to raise potash prices and were so successful

25  that the plaintiff was unable to buy potash that it could have resold at a profit. The Tenth Circuit

26  _____

27  [4] The antitrust laws afford standing in certain circumstances to suppliers of inputs as well as
consumers of outputs, but a firm that is unable to or declines to supply (even on the basis that a cartel
28  suppressed the price it would pay for the input) has no standing for the same reasons as a non-
purchaser.

(Footnote Cont’d on Following Page)

- 9 -

1    rejected the claim, holding that "[i]f nonpurchasers who have never dealt with a defendant could

2    recover, a seemingly unlimited number of plaintiffs could assert a virtually unlimited quantity of lost

3    purchases, perhaps exceeding the potential output of the entire industry." *Id.* at 867–68.[5]  The Central

4    District of California recently cited *Montreal Trading* with approval in *Tawfilis v. Allergan, Inc.*, No.

5    8:15-cv-00307-JLS-JCG, 2017 WL 3084275 (C.D. Cal. June 26, 2017). The court noted that the

6    antitrust laws deny recovery to "those who did not actually purchase the good but would have

7    purchased it absent collusion." *Id.* at *12 (citing *Montreal Trading Ltd.*, 661 F.2d at 867–68).[6]

8    Because Oakland complains that it lost a team after it refused to pay an overcharge, not that it

9    actually paid an overcharge, it lacks standing under the antitrust laws.

10                      **b.  Oakland Lacks Standing Because Any Injury Is Indirect.**

11          Any injury suffered by Oakland relating to the NFL's 32-team structure is too indirect to confer

12   standing. The only party "directly" affected by an agreement to limit the number of teams would be

13   an ownership group that unsuccessfully sought to join the NFL joint venture. Any harm to Oakland

14   from such an agreement would be derivative of that harm—without injury to the hypothetical

15   ownership group, Oakland would not be injured. Derivative harm does not afford standing. *Hanover*

16   *Shoe, Inc. v. United Shoe Mach. Corp.*, 392 U.S. 481, 490 n.8 (1968). For instance, health plans that

17   paid higher costs to treat smokers lacked standing to challenge an alleged conspiracy among tobacco

18   companies to suppress safer cigarettes because any insurer's harm was derivative of that suffered by

19   smokers. *See, e.g.*, *Ass'n of Wash. Pub. Hosp. Dists. v. Philip Morris Inc.*, 241 F.3d 696, 703 (9th

20   Cir. 2001).

21          In addition, Oakland acknowledges that it jointly owns the Coliseum with Alameda County and

22   that the Coliseum is leased to the Oakland-Alameda County Coliseum Financing Corporation

23   ("Financing Corporation"), which has assigned its rights under the lease to the Oakland-Alameda

24   County Coliseum Authority ("OACCA"). FAC ¶29. Oakland does not allege that the Raiders pay rent

---

[5] The decision refers to plaintiffs "who have never dealt with a defendant," but the same principle
would apply to a purchaser whose last purchase was outside the limitations period. Any claims
arising from the Raiders' commencement of play in Oakland in 1960 or their return to Oakland in
1995 are long-barred by the antitrust laws' four-year statute of limitations. 15 U.S.C. §15b.

[6] *See also Lambert v. Board of Comm'rs of Orleans Levee Dist.*, No. 05–5931, 2009 WL 152668, at
*7 (E.D. La. Jan. 22, 2009) ( "[a]llowing nonpurchasers to recover would unduly broaden the
spectrum of potential plaintiffs with price fixing and monopolization claims.").

directly to it (as opposed to the Financing Corporation or OACCA). Even if a stadium (rather than a foreclosed team) could be a proper plaintiff, Oakland's injury would still be too indirect to afford antitrust standing. *See Vinci v. Waste Mgmt., Inc.*, 80 F.3d 1372, 1375 (9th Cir. 1996) ("'[a] shareholder of a corporation injured by antitrust violations has no standing to sue in his or her own name.'") (quoting *Solinger v. A.&M. Records, Inc.*, 718 F.2d 298, 299 (9th Cir. 1983)).

The Court's Order did not "resolve the issue of whether Oakland's 'indirect' relationship with the Raiders bars its antitrust claims." Order at 20 n.12. The Court noted that "Oakland alleges that it sought to build a new stadium in partnership with the Raiders and other investors, with no allegation that the OACCA or any other intermediary would be involved in the relationship." *Id*. FAC ¶121 alleges that "on December 13, 2016, Oakland officials voted to enter into negotiations with Lott's investment group on a proposed $1.3 billion stadium project." In fact, the nonbinding term sheet approved by the Oakland City Council provided that the Lott Group would build the new stadium, the City would invest in infrastructure, the County (which is not a party to this action) and the City would convey real property, and that "Stadium Ownership" was "[t]o be determined").[7] The possibility that the City *might* contribute infrastructure costs for a stadium that *might* be built by a third party, with ownership "to be determined" is not only too speculative to confer standing, it is also not the "direct" injury required for standing. The current litigation between the City and County (*see* note 2, *supra*) over which entity controls the Coliseum site also shows that fundamental issues remain unresolved *three years later* and that the theoretical new football stadium in Oakland was unlikely ever to have been built, much less with the City of Oakland as its lessor.

In any event, Oakland would lack standing even if it could allege that it would have been the direct landlord of a team that would have played in the Coliseum absent the conduct alleged in the FAC. A potential landlord of some hypothetical 33rd or 34th team that might play in Oakland lacks standing. A plaintiff whose "only direct, identifiable damages are those of a landlord whose rent has not been paid" lacks standing because "[m]ere injury as a landlord or lessor entitled to royalties

---

[7] *See* Term Sheet Exhibit A, Attached to Oakland City Council Agenda Report filed Dec. 9, 2016, *at* http://oakland.legistar.com/gateway.aspx?M=F&ID=63738e7e-d10b-4872-baa4-265a0041a661.pdf.) Documents on government websites are properly subject to judicial notice. *See, e.g.*, *Daniels–Hall v. National Education Association*, 629 F.3d 992, 999 (9th Cir. 2010).

would not by itself be the kind of injury to competition that the antitrust laws are designed to prevent." *R.C. Dick Geothermal Corp. v. Thermogenics, Inc.*, 890 F.2d 139, 148 (9th Cir. 1989); *see also Innovation Marine Protein, LLC v. Pac. Seafood Grp.*, No. 6:17-cv-00815-MC, 2018 WL 1461501, at *7 (D. Or. Mar. 23, 2018) (developer and landlord lacks standing). In its Order, the Court noted that a landlord might have standing in the case of a renter cartel designed to suppress rents where the market at issue is "the market for rental transactions." Order at 20. The Court also noted, however, that "the principle that landlords might in some circumstances be able to claim antitrust damages for lost or reduced rent does not clearly apply to Oakland's claims here, because Oakland has not specifically alleged damages based specifically on rent (although it is perhaps conceivable that it could amend to do so)." *Id.* The FAC does not cure this defect and the exception noted by the Court does not apply here. The FAC does not allege a market for rental transactions or a conspiracy to suppress the rent paid to stadium lessors, or even that the Raiders paid or would pay rent to Oakland.

> **4.  Oakland Lacks Antitrust Standing Because Its Alleged Injuries Are Not Cognizable Under The Antitrust Laws.**

As the Court noted in its Order (at 20–21), the Ninth Circuit's decision in *City of Rohnert Park*, 601 F.2d at 1042–43, "forecloses the claim for lost municipal investments" or "sunk investments." Oakland therefore cannot recover damages based on investment in stadium development comparable to the municipal investment at issue in Rohnert Park." The FAC's claims of injury from "lost investment value" (FAC ¶¶201–203) are therefore insufficient to afford standing.

Oakland also claims injury from "lost tax revenues." FAC ¶¶206–210. Those claims are foreclosed by *Hawaii v. Standard Oil Co.*, 405 U.S. 251 (1972), where the Supreme Court held that a government entity may bring an antitrust action only for "damages for injuries to its commercial interests." *Id.* at 264; *see id.* at 265 ("in its capacity as a consumer of goods and services"). "[W]here, as here, the State seeks damages for other injuries, it is not properly within the Clayton Act." *Id.* at 264. While the Court noted that "there could perhaps be circumstances where a tax specifically negotiated as part of an agreement between a local government and a private entity could take on a 'commercial' instead of—or as well as—'sovereign' character," Order at 22, no such taxes negotiated

between the City and the Raiders are alleged in the FAC.

Oakland claims "lost income" from the loss of "rental monies it receives from the Raiders for use of the Coliseum property" and monies it collected "from each Raiders ticket for the express purpose of funding education in Oakland." FAC ¶204. As described above, "rental monies" are not paid to Oakland, and Oakland's derivative receipt of such funds paid to the lessor of the Coliseum does not afford standing. The FAC does not describe the monies collected from the sale of Raiders tickets to pay for education, but whatever that tax or fee is and to whatever sovereign purpose it is put, it does not represent a commercial transaction between Oakland and the Raiders or any other defendant that would afford standing. *See Reiter v. Sonotone Corp.*, 442 U.S. 330, 341–42 (1979) ("The phrase 'commercial interests' was used [in *Hawaii* ] as a generic reference to the interests of the State of Hawaii as a party to a commercial transaction.").[8]

Finally, Oakland claims injury from "devaluation of the Coliseum property." FAC ¶¶211–217. The Court correctly rejected those claims in its Order (at 23), and nothing in the FAC cures the defects of the original Complaint. As the Court noted,

> a damages theory based entirely on diminution of value of the Coliseum after the Raiders' departure would require Oakland to plausibly allege not only that the Raiders would have remained in Oakland but for Defendants' purported antitrust violation, but also that the Raiders would have remained at the Coliseum, rather than a new stadium such as envisioned by the proposal involving Ronnie Lott's investment group, because in the latter scenario the Coliseum would no longer host an NFL team regardless of whether the Raiders relocated to Las Vegas or to a new stadium in Oakland. (Order at 23)

The FAC largely abandons any contention that the Raiders would have continued to play in the Coliseum indefinitely. Rather, Oakland alleges that in a "competitive market" the "Raiders would have stayed in Oakland and played in a renovated or new Coliseum." FAC ¶92. Accordingly, there is no factual basis for any claim that Defendants' conduct caused the alleged "devaluation" of the Coliseum; the FAC itself alleges that the Coliseum might no longer exist even in a "competitive market." Nothing required the Raiders to continue to play in the Coliseum after their lease expired,

---

[8] Oakland's claims are rather remarkable in light of the regular representation of public officials that the Coliseum *lost* money on the Raiders. *See, e.g.*, Joe Becker, *Coliseum loses money on Raiders, doesn't want team here in 2019*, S.J. Mercury News, Mar. 30, 2017 ("It's actually financially to our benefit if they didn't exercise the options and play here.").

1   and the FAC identifies no reason why—even in Plaintiff's purported "competitive market"—the

2   Raiders might not have moved elsewhere in Oakland or the Bay Area. Oakland would suffer exactly

3   the same "diminished value" of the Coliseum if the Raiders had moved a few miles down the road,

4   just as the Warriors moved to San Francisco and just as the Oakland A's say they will move to the

5   Howard Terminal site in 2023.

6       **B.   Oakland's Claims Fail As A Substantive Matter.**

7           **1.   Oakland Fails Adequately To Allege A Relevant Market.**

8       The NFL's rules and Defendants' conduct in this case are governed by the antitrust rule of reason.

9   Order at 14; *Am. Needle, Inc. v. Nat'l Football League*, 560 U.S. 183, 203 (2010) (collective

10  decisions of NFL clubs generally analyzed under the rule of reason); *Los Angeles Mem'l Coliseum*

11  *Comm'n v. Nat'l Football League*, 726 F.2d 1381, 1386–90 (9th Cir. 1984) ("*Raiders I*") (rule of

12  reason applies to relocation). Under the rule of reason, Oakland must prove anticompetitive effects in

13  a relevant market, and "failure to plead a relevant market for a rule of reason antitrust claim warrants

14  dismissal." Order at 23 (citing *Hicks v. PGA Tour, Inc.*, 897 F.3d 1109, 1120 (9th Cir. 2018)).

15      The Court's Order characterized the original Complaint's alleged relevant market of "Host

16  Cities" as "somewhat unorthodox." Order at 23. The FAC uses somewhat different verbiage, but

17  alleges essentially the same relevant market, one for "hosting NFL teams;" according to the FAC,

18  "Host Cities" are the "consumers in this market" and the "product in this market is the NFL team, as

19  a hosted entity." FAC ¶189; *see also* FAC ¶190 ("a market exists for hosting NFL teams and . . .

20  cities and communities are the consumers in that market.").[9]

21      The FAC's relevant market allegations remain nonsensical. If an NFL team is the "product" and

22  the cities are the "consumers," then the Defendants—which "supply" NFL teams to cities—must be

23  the competitors in the market. *See* FAC ¶193 (the NFL is the "producer of the product"). But

24  Defendants do not compete with each other in the alleged relevant market of "hosting NFL teams"—

25

26  ────────────────────
    [9] Inconsistently, the FAC also alleges "a relevant market for the hosting of professional football
27  teams in the United States," FAC ¶219, which would include hosting non-NFL professional teams.
    This market would suffer from the same defects as a market for hosting NFL teams. We also note that
    despite its multiple references to *In re NFL's Sunday Ticket Antitrust Litig.*, 933 F.3d 1136 (9th Cir.
28  2019), the FAC does *not* allege a market consisting of professional football games or their telecasts.

(Footnote Cont'd on Following Page)

DEFENDANTS' MOTION TO DISMISS FAC                           CASE NO. 3:18-cv-07444-JCS

they do not compete to supply stadia or other services for professional football. Cities and stadia, not the NFL and its teams, would be the competitors in any "hosting" market; they compete to offer their services to NFL teams.[10]  *See Raiders I*¸ 726 F.2d at 1393 (L.A. Coliseum argued that the market was "stadia offering their facilities to NFL teams," while the NFL argued that "the product market involves cities competing for all forms of stadium entertainment"). "Defining the relevant market requires identifying those competitors who have the actual or potential ability to deprive each other of significant levels of business." *High Tech. Careers v. San Jose Mercury News*, 996 F.2d 987, 990 (9th Cir. 1993). A complaint in which the plaintiff cannot properly identify the competitors and consumers in the market does not allege a relevant market that can survive dismissal.

The FAC's confusion regarding who competes and who consumes in the relevant market seems to reflect an attempt to avoid the Ninth Circuit's command that relevant markets cannot be defined by the identity of the customer. A market definition based upon the identity of consumers of a product and not the product itself is "facially unsustainable." *Newcal Indus., Inc. v. Ikon Office Sol.*, 513 F.3d 1038, 1045 (9th Cir. 2008) ("First and foremost, the relevant market must be a *product* market. The consumers do not define the boundaries of the market; the products or producers do.") (emphasis in original; footnote omitted); *see also* Order at 23. A "market" in which cities are competing to offer hosting only to NFL teams is foreclosed by *Newcal*. The Court made clear to Oakland that if it wished to avoid the rule in *Newcal* it would need to "allege specific forms of 'support' that happen to be unique to NFL teams." Order at 23. The FAC lacks any such allegations. On that ground alone, the FAC should be dismissed.

Oakland likewise ignores the Court's instruction that any amended complaint should address the "test of whether a hypothetical monopolist could impose a small but significant nontransitory increase in price (SSNIP) in the proposed market or whether potential host cities would respond to such an increase by substituting other products." Order at 24 (internal quotation marks omitted) (citing *Saint Alphonsus Med. Ctr.-Nampa Inc. v. St. Luke's Health Sys., Ltd.*, 778 F.3d 775, 784 (9th Cir. 2015)). Even if, as Oakland cursorily alleges, "NFL football is a unique product" (FAC ¶192), that does not explain why hosting NFL teams is a proper market any more than selling computers to

---

[10] None of the legislative bodies or economists cited in the relevant paragraphs of the FAC (*see* FAC ¶190) describes a "market for hosting NFL teams" in which NFL teams are competitors.

NFL teams would be a proper market. Cities can generate tax revenues and economic activity through many means, and nothing in the FAC explains why cities cannot or do not consider those alternatives if the cost of hosting an NFL team is unattractive.

In *Hicks*, the Ninth Circuit affirmed dismissal of a gerrymandered market limited to advertising on golf caddies' bibs because it was obvious that advertisers had other options, such as television, radio, websites, and social media. 897 F.3d at 1121 (characterizing plaintiffs' relevant market as "not natural, artificial, and contorted to meet their litigation needs") (internal quotation marks omitted). Plaintiff's relevant market here is no more "natural" than the market definition rejected on a motion to dismiss in *Hicks*. *See also StubHub, Inc. v. Golden State Warriors, LLC*, No. C 15-1436 MMC, 2015 WL 6755594, at *3 (N.D. Cal. Nov. 5, 2015) (dismissing antitrust claim because plaintiffs' market definition, which ignored reasonable interchangeability from the perspective of consumers, was "not cognizable as a matter of law").

### 2. The NFL's 32-Team Structure And Required Vote To Admit New Teams Is Not Unlawful "Price Fixing."

Even if Oakland had standing to pursue its antitrust claims, the new theory of harm advanced in the Amended Complaint rests on a profoundly mistaken legal premise: Oakland's unfounded contention that the NFL's failure to expand beyond 32 member clubs violates the Sherman Act. This contention, which appears now to be the centerpiece of Plaintiff's antitrust claims, was repeatedly disavowed by Plaintiff's counsel at oral argument. (Tr. 13–14, 29). And for good reason. As a matter of antitrust law a closed-membership joint venture like a sports league has no obligation whatsoever to admit additional participants.

Antitrust law does not govern or second guess a sports league's decisions about the number of its member clubs. That is true for several reasons, among them the absence of limiting principles by which an antitrust court could determine the league's "correct" size. Recognizing that fundamental issue, this Court asked Plaintiff's counsel whether "the antitrust laws require the NFL to admit any team interested in joining?" "If not," the Court continued, "what number would be an allowable limit . . . ?" Order at 18. The Amended Complaint offers no answers to these key questions.

Those questions are, however, answered by the country's leading antitrust treatise. As to whether

1    the antitrust laws require a sports league to expand to admit new members, "it is clearly not

2    antitrust's job to determine the appropriate size of a sports league." Phillip E. Areeda & Herbert

3    Hovenkamp, *Antitrust Law* ¶2214a (2012). And as to how a court could determine an allowable or

4    principled limit on such admissions: once an antitrust court opens the door to the required admission

5    of one team, "there is no obvious way to limit the number of teams entitled to come in." *Id.* ¶2214b.

6         This Court's (and Areeda & Hovenkamp's) well-founded skepticism about the central premise of

7    plaintiff's new theory is reflected in precedent that uniformly rejects antitrust challenges by teams

8    seeking entry into professional sports leagues. In *Mid-South Grizzlies v. National Football League*,

9    for example, an "established, functioning professional football enterprise," a former member of the

10   World Football League, sought admission to the NFL and was unanimously turned down. 720 F.2d

11   772, 776–77 (3rd Cir. 1983). The Third Circuit rejected the team's argument that the NFL was

12   required to admit members, holding that the decision not to expand the League into the Memphis area

13   did not constitute an antitrust violation. *Id.* at 787. The Ninth Circuit reached a similar conclusion in

14   *Seattle Totems Hockey Club, Inc. v. National Hockey League*, holding that the NHL's refusal to admit

15   a new team did not injure competition. 783 F.2d 1347, 1350 (9th Cir. 1986). And in *Deesen v.*

16   *Professional Golfers' Ass'n of America*, the same court rejected a claim by a golfer who had

17   challenged the closed structure of PGA tournaments, holding that this structure did not "destroy

18   competition." 358 F.2d 165, 170 (9th Cir. 1966).

19        **3.   Oakland Fails To Allege A Group Boycott.**

20        FAC ¶226 characterizes the defendants' conduct as a "group boycott" or concerted refusal to deal

21   that violates Section 1 of the Sherman Act, 15 U.S.C. §1. These two claims are identical: a group

22   boycott *is* a concerted refusal to deal. *See, e.g.*, *Nw. Wholesale Stationers, Inc. v. Pac. Stationery &*

23   *Printing Co.*, 472 U.S. 284, 293 (1985) (using "group boycott" and "concerted refusal to deal"

24   interchangeably); *Klor's, Inc. v. Broadway-Hale Stores, Inc.*, 359 U.S. 207, 212 (1959).

25        The Court previously rejected Oakland's boycott claim, holding that "Oakland has not alleged a

26   'group boycott' where Oakland claims only that Defendants jointly allowed the Raiders to relocate,

27   not an agreement that no team could be located in or do business with Oakland." Order at 14 n.7

28   (emphases omitted). The FAC does not remedy this defect. It fails to allege any facts to support a

boycott claim because there is no allegation that the NFL or any team other than the Raiders agreed not to deal with Oakland. "[A] unilateral refusal by one trader to deal with another is not a group boycott. An agreement, some concerted effort, is required before a group boycott exists." *Supermarket of Homes, Inc. v. San Fernando Valley Bd. of Realtors*, 786 F.2d 1400, 1405 (9th Cir. 1986). The Raiders decided unilaterally to leave Oakland. But neither the NFL nor any of its other member clubs is alleged to have agreed either that the Raiders *could not* stay in Oakland or that any other club *would not* play its home games in Oakland.[11] That is fatal to both Counts because, "[i]n order to have a group boycott, there must be more than one boycotter." *Charley's Taxi Radio Dispatch Corp. v. SIDA of Haw., Inc.*, 810 F.2d 869, 877 n.7 (9th Cir. 1987). The assent of the NFL and its teams to the Raiders' decision to relocate does not render the NFL or another team a boycotter or transform the Raiders' decision regarding the site of their home games into a group boycott. *See, e.g.*, *Salerno v. Am. League of Prof'l Baseball Clubs*, 429 F.2d 1003, 1005 (2d Cir. 1970) (consent of Commissioner of Baseball to firing of umpires by the American League did not convert the dismissal into a group boycott).

## II.  THE CITY OF OAKLAND FAILS TO STATE A CONTRACT CLAIM

Count II of the Amended Complaint seeks damages for breach of contract. In its July 25 Order, this Court dismissed Oakland's contract claim, holding that Oakland was not a third party beneficiary permitted to enforce the Relocation Policy. Order at 24–28. This Court also found that the Relocation Policy lacked "a sufficiently definite promise to be enforceable," and that even if Oakland could identify a provision containing an enforceable promise, Oakland failed to "plausibly allege[] a breach of that provision." Order at 28. Plaintiff's amended contract claim fares no better.

Oakland's new allegations relate to the circumstances surrounding footnote 1 in the Relocation Policy.[12]  That some of the Relocation Policy's non-mandatory factors also appeared in a failed

---

[11] The FAC alleges that "[t]he decision to remove a team from a Host City, combined with the decision to deny that same City a new expansion franchise, constitutes a collective refusal to deal with, or a group boycott of, the City." FAC ¶140; *see also id.* ¶144. This conclusory allegation carries no weight. The NFL did not "remove" the Raiders; rather the Raiders chose to move and the NFL did not block the relocation. Likewise, the NFL did not "deny" Oakland an expansion franchise; no one sought an expansion franchise.

[12] Footnote 1 reads as follows: "Most of the factors were contained in a bill reported by a Senate committee in 1984, they essentially restate matters that the League has considered important in
<span style="float:right">(Footnote Cont'd on Following Page)</span>

Senate bill from the 1980s and a "Statement of Principles" developed in discussions with the

Conference of Mayors in the 1990s does not save Oakland's third party beneficiary claim from

dismissal under *Goonewardene v. ADP, LLC*, 6 Cal. 5th 817, 830 (2019) and this Court's July 25

Order. In fact, the language that Oakland quotes throughout its Amended Complaint confirms that

"Defendants did not promulgate the policy to protect host cities and that allowing host cities to

enforce the policy is not consistent with the objectives of the contract and the reasonable expectations

of the contracting parties." Order at 28 (internal quotation marks omitted).

### A.  The Relocation Policy Does Not Constitute A Contract.

Plaintiff's contract claim fails because the Relocation Policy is not a contract. Instead, as this

Court previously recognized, the Relocation Policy identifies certain factors that NFL owners *may*

*consider* in deciding whether to permit a club to relocate. *See* Order at 28; Tr. 12:20–23 ("THE

COURT… [The Relocation Policy] "is, with respect to the relevant things for which a breach is

sought, a guideline. They are factors that 'may' be considered by the members. That's the word that's

used. They do not appear to be mandatory."). A promise to *consider* certain factors when making a

decision does not create an enforceable contract. *See, e.g.*, *Ladas v. Cal. State Auto. Ass'n*, 19 Cal.

App. 4th 761, 771 (1993) ("An amorphous promise to 'consider' what employees at other companies

are earning cannot rise to the level of a contractual duty."). That is because an obligation to consider

certain factors "provides no rational method for determining breach or computing damages." *Id.*; *see*

*also Prostar Wireless Grp., LLC v. Domino's Pizza, Inc.*, 360 F. Supp. 3d 994, 1012 (N.D. Cal. 2018)

("A promise is too amorphous to rise to the level of a contractual duty when it provides no standard

by which a fact finder could decide on whether the parties met their obligations.").[13]

connection with team location decisions in the past. Certain factors included in the Senate bill have
been modified, and certain new factors have been added, to reflect changed circumstances and the
League's historical experience since 1984. These factors are also contained in a 'Statement of
Principles' relating to franchise location developed by the League in consultation with the U.S.
Conference of Mayors." Policy at 3 n.1.

[13] Plaintiff's reference to a 1984 memorandum from then-Commissioner Pete Rozelle is instructive.
After a team applies for relocation and submits an application putting forth its reasons in support of
relocation, the Commissioner "will also give consideration to the attached listing of factors, among
others, in reporting to the membership on any proposed transfer outside a home territory. These
factors . . . essentially restate matters that the League has considered vital in connection with team
location decisions in the past." FAC ¶76. The NFL owners ultimately consider the Commissioner's
report and the team's application, and make individual business judgments in determining whether to

(Footnote Cont'd on Following Page)

DEFENDANTS' MOTION TO DISMISS FAC                          CASE NO. 3:18-cv-07444-JCS

Oakland has not corrected this defect. Rather, it simply reasserts that "Defendants were obligated to operate under the NFL Constitution and Relocation Policies and comply with the processes set forth therein." FAC ¶158.[14] In fact, Plaintiff relies on a quote from a case that ultimately cautions courts from becoming involved in interpreting the internal rules and policies of private associations. *Cal. Dental Ass'n v. Am. Dental Ass'n*, 23 Cal. 3d 346, 353 (1979) ( "judicial attempts to construe ritual or obscure rules and laws of private organizations may lead the courts into . . . the 'dismal swamp'"); *see also Ladas*, 19 Cal. App. 4th at 772 (cautioning courts against "unwarranted intrusion[s] on the ability of business enterprises to manage internal affairs"). The FAC does not identify a definite promise that could be enforceable as a matter of law. *See* FAC ¶¶155–159.[15]

**B. Oakland Is Not An Intended Third Party Beneficiary Of The Relocation Policy.**

Even if the Relocation Policy were enforceable as a contract, it would not be enforceable by Oakland. Under California law, a party has standing as a third party beneficiary to enforce a contract only where the complaint alleges facts establishing:

> not only (1) that it is likely to benefit from the contract, but also (2) that a motivating purpose of the contracting parties is to provide a benefit to the third party, and further (3) that permitting the third party to bring its own breach of contract action against a contracting party is consistent with the objectives of the contract and the reasonable expectations of the contracting parties. (*Goonewardene*, 6 Cal. 5th at 821 (2019))

As this Court ruled, "dismissal at the pleading stage is appropriate where it is clear from the terms of the contract and the circumstances alleged in the complaint that the plaintiff was not a third-party beneficiary." Order at 25 (citing *Goonewardene*).

**1. Providing A Benefit to Oakland Is Not The Relocation Policy's Motivating Purpose.**

Nothing in the Relocation Policy shows that its "motivating purpose" was to benefit Oakland or other cities that hosted teams when the Policy was adopted. As an initial matter, the Relocation Policy is concerned with moves to a new *home territory*, not moves between particular *cities*. "Home

---

vote for or against the proposed relocation.

[14] Despite this allegation, the FAC asserts no violation of the NFL Constitution.

[15] The Relocation Policy also is unenforceable as a contract because it was adopted unilaterally and can be changed at any time by the Commissioner. *See Schwarzkopf v. IBM*, No. C 08-2715 JF (HRL), 2010 WL 1929625, at *8 (N.D. Cal. May 12, 2010) ("contract formation does not occur when an employer retains absolute discretion or a unilateral right to modify or cancel employee commission").

(Footnote Cont'd on Following Page)

DEFENDANTS' MOTION TO DISMISS FAC                    CASE NO. 3:18-cv-07444-JCS

territory" is a defined term in Article 4.1 of the NFL Constitution, and it generally encompasses a geographic region spanning a 75 mile radius. A team may relocate within its home territory (even between cities) without regard to the Relocation Policy unless the Commissioner chooses to apply "some or all" of its procedures to such a relocation.[16] Oakland would suffer the same harm alleged in the FAC had the Raiders relocated elsewhere within their home territory, just as San Francisco did when the 49ers moved to Santa Clara.[17] Even accepting the FAC's misguided theory that a motivating purpose of the Policy was to benefit third parties—which is belied by the Policy's unambiguous language—it can only be with respect to broad home territories, not cities, counties, businesses, taxpayers, fans or other individuals within the home territory.[18]

Courts reject claims that a contract providing a benefit to an overall region confers third party beneficiary status on members of the public within that region. Even the fact that certain third parties are "in a position to benefit more directly than certain other members of the public from performance of the contract does not alter their status as incidental beneficiaries." *Martinez v. Socoma Cos.*, 11 Cal. 3d 394, 406 (1974). For example, in *Martinez*, the California Supreme Court held that dissatisfied trainees could not enforce a series of contracts where, among other factors, "the contracts . . . were designed not to benefit individuals as such but to . . . improv[e] the East Los Angeles neighborhood." *Id.* Similarly, in *Klamath Water Users Protective Ass'n v. Patterson*, 204 F.3d 1206 (9th Cir. 1999), the Ninth Circuit held that a group of irrigators in the Klamath Basin were not intended third party beneficiaries to a contract between the United States and a power company

---

[16] The Relocation Policy notes that "a transfer of a club's playing site to a different location within its home territory *may* also raise issues of League-wide significance. Accordingly, while these procedures apply to any proposed move to a new home territory, the Commissioner *may* also require that some or all of these procedures be followed with respect to a proposed move within a club's existing home territory" Policy at 2 (emphasis added). A move to a different site within a home territory also requires approval of the NFL and its clubs under Article 4.3 of the NFL Constitution.

[17] In addition to the 49ers, many franchise moves within the same "home territory" have inflicted the same alleged "harm" on individual cities that Oakland cites; none were within the purview of the Relocation Policy: the Lions moved from Pontiac to Detroit, Michigan; the Cowboys moved from Irving to Arlington, Texas; the Cardinals moved from Tempe to Glendale, Arizona. Even though the cities of San Francisco, Pontiac, Irving, and Tempe suffered the same "harm" alleged by Oakland, the Relocation Policy did not protect any of their interests. The Policy refers to "home territories;" it is not intended to protect individual cities or their stadium deals.

[18] The FAC asserts that "the Relocation Policies repeatedly mention Host Cities" (FAC ¶162), but this allegation is false. Neither the term "host" nor "cities" appears anywhere in the Policy. The word "city" appears once on page 1 of the Policy in describing Article 4.3 of the NFL Constitution.

- 21 -

that governed the management of a dam in the Klamath Basin. Although "[t]he parties [did] not dispute that the Dam was built to help the United States satisfy its contractual obligations to water users in the basin, including the Irrigators" (*id.* at 1209), the Ninth Circuit concluded that the "recitation of constituencies whose interest bear on a government contract [did] not grant these incidental beneficiaries enforceable rights." *Id.* at 1212.

Regardless, the terms of the Policy and the allegations in the FAC regarding the circumstances under which it was issued show that there was no motivating purpose to benefit any third party. In an attempt to meet the "motivating purpose" element of *Goonewardene*, Oakland has added allegations concerning the circumstances under which the Commissioner issued and revised the Relocation Policy, but none of these allegations changes the analysis. Oakland alleges that "Defendants adopted the Relocation Policies in order to avoid antitrust liability and regulation, but also to address the concerns expressed by U.S. Senators, Representatives and mayors that existing Host Cities were not adequately protected from the threat of relocation." FAC ¶172. That the Ninth Circuit's decision in *Raiders I* motivated the NFL to enact the Relocation Policy "only reinforces the conclusion that it was intended *solely to benefit the NFL and its member teams, not existing host cities*." Order at 26 (emphasis added). The same holds true for Plaintiff's allegations related to the failed 1984 Senate bill and the "Statement of Principles" developed by the League in consultation with the U.S. Conference of Mayors. Oakland does not suggest that either of those documents reflects a contract to which it is a third-party beneficiary. The fact that the Policy acknowledges the relationship between the factors listed in the Policy and the proposed bill and Statement of Principles, and has language in common with those documents, does not make anyone a third party beneficiary of the Policy.

Moreover, the Policy itself contains a very clear statement of its motivating purpose: to advance "the League's collective interests." Policy at 2. This Court concluded that "the factors [outlined in the Policy] are intended to inform Defendants' determination of their own best business interests," and that the Policy "repeatedly reinforces the conclusion that its overriding motivation is the NFL's business interests." Order at 25, 27–28. Oakland does not offer in the FAC an interpretation of the Policy suggesting that its "motivating purpose" was to benefit a third party like Oakland.[19]

---

[19] *See also* Tr. 34:15–18 ("Isn't the reason [behind the Relocation Policy] obvious from the face of

### 2. Permitting Suit By Oakland Would Not Be Consistent With The Reasonable Expectations Of The NFL And Its Member Clubs.

The third *Goonewardene* "element calls for a judgment regarding the potential effect that permitting third party enforcement would have on the parties' contracting goals," focusing on the parties' capabilities of effectuating the contract's objectives and the consequences of allowing suit by a third party. 6 Cal. 5th at 831. As this Court already recognized, allowing Oakland to sue the NFL and its member clubs for breach of the Relocation Policy would not be consistent with the League's reasonable expectations.[20] To the contrary, such an approach could lead to a multitude of suits with no limitation on the parties who could challenge a relocation. Indeed, Oakland itself now apparently contends that all members of the public should be recognized third party beneficiaries under the Policy. *See* FAC ¶161 (alleging that Oakland is a third party beneficiary because the Relocation Policy adopted the Statement of Principles which "recognized that the [Policy] should recognize both the private interest of team owners and *public interest* to enjoy the direct and indirect benefits of having a professional sports franchise, as *communities, sports fans and taxpayers* make a substantial and valuable . . . investment[s] in their professional sports team[s]") (alterations and emphasis altered). That is plainly not consistent with the reasonable expectations of the NFL and its member clubs.

In *Goonewardene*, the Court found that permitting employees to enforce their employers' contract with a payroll company was unnecessary to ensure enforcement of the agreement and would be inconsistent with the employers' reasonable expectations because "such an interpretation would clearly impose substantial [litigation] costs . . . [from] defending the numerous wage and hour disputes that regularly arise between employees and employers." 6 Cal. 5th at 836. Here too, the

the document?  The reason is because they think that benefits the NFL and its interests.").

[20] *See* Order at 28 ("Oakland's conclusory assertion that enforcement of the Policies [by a host city against] Defendants is consistent with their objectives and reasonable because the policy implicates the investment and distribution of hundreds of millions of dollars of public funds does not establish either that *Defendants*, as the contracting parties, intended that host cities should be able to sue for breach of the relocation policy, or that allowing such lawsuits would promote *Defendants'* own purposes of protecting their business interests and avoiding antitrust liability.") (internal quotation marks omitted); *see also* Tr 12:5–11 ("enforcement of this contract by Oakland does not further the objective of the contract . . . [which] is to promote, as [the Policy] says over and over again, the business interests of the clubs and the League. . . . [It's] pretty clear that . . . adding enforcement by a potential host against the clubs and the League is not what these people envisioned in deciding that.").

| DEFENDANTS' MOTION TO DISMISS FAC | CASE NO. 3:18-cv-07444-JCS |

League and teams are available and capable of effectuating the objectives of the Policy. The Relocation Policy "lays out a process to resolve whether a proposed relocation satisfies the NFL teams' business interests:  the vote of the NFL's member teams themselves." Order at 28.

Indeed, even the Statement of Principles on which Plaintiff now relies affirms the importance of the League's own internal processes:  "The League should have the ability to enforce its own rules and the obligation to follow a set process before the relocation of a team is permitted to occur. . . . Control of team location is a matter for the league members to determine jointly, according to rules established and applied by the League." *See* FAC ¶80. Allowing Oakland to sue for breach of the Relocation Policy would frustrate the purpose of the Policy and is "not necessary to effectuate the objectives of the contract." *Goonewardene*, 6 Cal. 5th at 836; *see also Martinez*, 11 Cal. 3d at 400–02 (denying third party beneficiary the right to sue where the contracting parties had implemented an administrative process to resolve internal disputes).

### C.  Oakland Still Fails To Allege A Breach Of The Relocation Policy

Even if Oakland could enforce the Relocation Policy as a contract, it has not plausibly alleged a breach. A necessary element of any contract claim is an alleged breach of the contract. *Wall St. Network, Ltd. v. N.Y. Times Co.*, 164 Cal. App. 4th 1171, 1178 (2008). Plaintiff asserts the same theories of breach previously rejected by this Court—namely, that Defendants failed to work in good faith with Oakland and that the factors listed in the Policy required a decision by the member clubs forcing the Raiders to remain in Oakland. FAC ¶¶182–183.

First, Oakland ignores the plain language of the Policy, and instead, doubles down on its assertion that the Raiders violated the Policy by engaging other potential hosts while continuing to negotiate with Oakland. FAC ¶23. The Relocation Policy states that "[t]he League's policy and procedures on franchise relocation do not restrict any club's ability to discuss a possible relocation, or to negotiate a proposed lease or other arrangements, with a community outside of its home territory." Policy at 2.

Second, this Court concluded that Oakland's theory of breach fails insofar as it rests on Oakland's subjective view that "the factors counted against the Raiders relocation to Las Vegas." *See* FAC ¶183. At the July  hearing, this Court briefly considered whether Defendants would have breached the Relocation Policy by failing to consider any of the factors, concluding that "even so, [the

Relocation Policy] says they may consider it. It's not the sort of thing that they have to consider." Tr. 12:12–13:3. Oakland does not and cannot allege that Defendants failed to consider any of the factors. Instead, Oakland recycles its assertion that some of the twelve non-exclusive, non-mandatory factors, in their opinion, favored the Raiders staying in Oakland and that Defendants should not have approved the move as a result. *Compare* Compl. ¶78 *with* FAC ¶183 (listing same factors that supposedly counted against the Raiders relocation).[21]   This is not enough to plausibly allege a breach of contract claim.

### III.   THE CITY OF OAKLAND FAILS TO STATE AN UNJUST ENRICHMENT CLAIM

In Count III of the FAC, Oakland continues to assert a stand-alone claim for unjust enrichment. As before, this claim should be dismissed. Most California authorities indicate that there is no free-standing claim for unjust enrichment under California law. *See Levine v. Blue Shield of Cal.*, 189 Cal. App. 4th 1117, 1138 (2010); *Durell v. Sharp Healthcare*, 183 Cal. App. 4th 1350, 1370 (2010) ("[t]here is no cause of action in California for unjust enrichment."). Previously Oakland asked the Court to recast its claim as one arising in quasi-contract. But there is no claim in quasi-contract if the parties have a written contract on the subject matter at issue. *See Lance Camper Mfg. Corp. v. Republic Indem. Co.*, 44 Cal. App. 4th 194, 203 (1996) ("it is well settled that an action based on an implied-in-fact or quasi-contract cannot lie where there exists between the parties a valid express contract governing the same subject matter."). Here, they do have such a contract: the lease, which prescribes when the Raiders are free of their obligation to play in the Coliseum. Oakland nowhere alleges any breach of the lease.

### CONCLUSION

For the foregoing reasons, the First Amended Complaint should be dismissed with prejudice.

---

[21] The FAC acknowledges that the Coliseum is not an adequate stadium. *See* FAC ¶183 ("Oakland was willing to remedy any deficiencies in the Coliseum"). This concession rather understates the Coliseum's inadequacies. *See, e.g.*, Jack Nicas, *The Beauty of America's Ugliest Ballpark*, N.Y. Times, Oct. 3, 2019 (The Coliseum "is perhaps America's most hated sports stadium. Players and coaches deride it. The Oakland Raiders are fleeing it. The lights are breaking, mice are dying in the soda machines, and the sewage that sometimes floods the dugouts has its own Twitter account.").

1    DATED:  October 25, 2019.

2                                      Respectfully submitted,

3    **ARNOLD & PORTER KAYE SCHOLER LLP**    **COVINGTON & BURLING LLP**
     KENNETH G. HAUSMAN (Bar No. 57252)        JOHN E. HALL (Bar No. 118877)
4    kenneth.hausman@arnoldporter.com          jhall@cov.com
     DANIEL B. ASIMOW (Bar No. 165661)         GREGG H. LEVY (*pro hac vice*)
5    daniel.asimow@arnoldporter.com            glevy@cov.com
     DAVID J. REIS (Bar No. 155782)            DEREK LUDWIN (*pro hac vice*)
6    david.reis@arnoldporter.com               dludwin@cov.com
     Three Embarcadero Center, 10th Floor      BENJAMIN J. RAZI (*pro hac vice*)
7    San Francisco, CA 94111-4024              brazi@cov.com
     Telephone:    415.471.3100                One CityCenter
8    Facsimile:    415.471.3400                850 Tenth Street, NW
                                               Washington, DC  20001-4956
9    WILLIAM J. BAER (*pro hac vice*)          Telephone:    202.662.6000
     bill.baer@arnoldporter.com                Facsimile:    202.662.6291
10   JONATHAN I. GLEKLEN (*pro hac vice*)
     jonathan.gleklen@arnoldporter.com
11   601 Massachusetts Ave, NW                 By:  /s/ John E. Hall
     Washington, D.C. 20001-3743                    JOHN E. HALL
12   Telephone:    202.942.5000
     Facsimile:    202.942.5999                *Attorneys for Defendants*
13                                             THE NATIONAL FOOTBALL LEAGUE and
     By:  /s/ Daniel B. Asimow                 all NFL clubs other than The Oakland Raiders
14        DANIEL B. ASIMOW

15   *Attorneys for Defendant*
     THE OAKLAND RAIDERS

16

17

18

19

20

21

22

23

24

25

26

27

28

DEFENDANTS' MOTION TO DISMISS FAC                              CASE NO. 3:18-cv-07444-JCS

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

## **SIGNATURE ATTESTATION**

I, Daniel B. Asimow, am the ECF user whose user ID and password are being utilized to electronically file this **Defendants' Motion to Dismiss First Amended Complaint**. Pursuant to Local Rule 5-1(i)(3), I hereby attest that the other signatory to the Consent, John E. Hall, has concurred in this filing.

Dated: October 25, 2019.                    ARNOLD & PORTER KAYE SCHOLER LLP

                                   By:   */s/ Daniel B. Asimow*_____
                                         DANIEL B. ASIMOW

                                         Attorneys for Defendant
                                         THE OAKLAND RAIDERS