BARBARA J. PARKER (Bar No. 69722)
  bparker@oaklandcityattorney.org
MARIA BEE (Bar No. 167716)
  mbee@oaklandcityattorney.org
ERIN BERNSTEIN (Bar No. 231539)
  ebernstein@oaklandcityattorney.org
**OAKLAND CITY ATTORNEY**
One Frank Ogawa Plaza, 6th Floor
Oakland, California  94612
Telephone:  (510) 238-3601
Facsimile:   (510) 238-6500

CLIFFORD H. PEARSON (Bar No. 108523)
  cpearson@pswlaw.com
DANIEL L. WARSHAW (Bar No. 185365)
  dwarshaw@pswlaw.com
MICHAEL H. PEARSON (Bar No. 277857)
  mpearson@pswlaw.com
MATTHEW A. PEARSON (Bar No. 291484)
  mapearson@pswlaw.com
**PEARSON, SIMON & WARSHAW, LLP**
15165 Ventura Boulevard, Suite 400
Sherman Oaks, California  91403
Telephone:  (818) 788-8300
Facsimile:   (818) 788-8104

JAMES W. QUINN (*pro hac vice*)
  jquinn@bafirm.com
DAVID BERG (*pro hac vice*)
  dberg@bafirm.com
MICHAEL M. FAY (*pro hac vice*)
  mfay@bafirm.com
JENNY H. KIM (*pro hac vice*)
  jkim@bafirm.com
CHRIS L. SPRENGLE (*pro hac vice*)
  csprengle@bafirm.com
BRONWYN M. JAMES (*pro hac vice*)
  bjames@bafirm.com
EMILY BURGESS (*pro hac vice*)
  eburgess@bafirm.com
**BERG & ANDROPHY**
120 West 45th Street, 38th Floor
New York, New York  10036
Telephone:  (646) 766-0073
Facsimile:   (646) 219-1977

[Additional Counsel Listed on Signature Page]

*Attorneys for Plaintiff City of Oakland*

## UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA, SAN FRANCISCO DIVISION

CITY OF OAKLAND,

　　　　Plaintiff,

　　v.

THE OAKLAND RAIDERS, A CALIFORNIA
LIMITED PARTNERSHIP; ARIZONA
CARDINALS FOOTBALL CLUB LLC;
ATLANTA FALCONS FOOTBALL CLUB,
LLC; BALTIMORE RAVENS LIMITED
PARTNERSHIP; BUFFALO BILLS, LLC;
PANTHERS FOOTBALL, LLC; THE
CHICAGO BEARS FOOTBALL CLUB, INC.;
CINCINNATI BENGALS, INC.;
CLEVELAND BROWNS FOOTBALL

CASE NO. 3:18-cv-07444-JCS

**PLAINTIFF CITY OF OAKLAND'S
OPPOSITION TO DEFENDANTS'
MOTION TO DISMISS THE FIRST
AMENDED COMPLAINT**

Date:     March 6, 2020
Time:    9:30 a.m.
Place:    Courtroom G, 15th Floor

Assigned to the Honorable Joseph C. Spero

COMPANY LLC; DALLAS COWBOYS
FOOTBALL CLUB, LTD.; PDB SPORTS,
LTD.; THE DETROIT LIONS, INC.; GREEN
BAY PACKERS, INC.; HOUSTON NFL
HOLDINGS, LP; INDIANAPOLIS COLTS,
INC.; JACKSONVILLE JAGUARS, LLC;
KANSAS CITY CHIEFS FOOTBALL CLUB,
INC.; CHARGERS FOOTBALL COMPANY,
LLC; THE RAMS FOOTBALL COMPANY,
LLC; MIAMI DOLPHINS, LTD.;
MINNESOTA VIKINGS FOOTBALL, LLC;
NEW ENGLAND PATRIOTS LLC; NEW
ORLEANS LOUISIANA SAINTS, LLC; NEW
YORK FOOTBALL GIANTS, INC.; NEW
YORK JETS LLC; PHILADELPHIA EAGLES,
LLC; PITTSBURGH STEELERS LLC;
FORTY NINERS FOOTBALL COMPANY
LLC; FOOTBALL NORTHWEST LLC;
BUCCANEERS TEAM LLC; TENNESSEE
FOOTBALL, INC; PRO-FOOTBALL, INC.;
and THE NATIONAL FOOTBALL LEAGUE,

Defendants.

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

## **TABLE OF CONTENTS**

**Page**

I.   INTRODUCTION ................................................................................................1

II.  BACKGROUND ................................................................................................3

   A.   THE ORDER ...........................................................................................3

   B.   THE AMENDED COMPLAINT .............................................................3

      1.   The 32-Team Cartel ....................................................................3

      2.   Oakland's Standing And Injury ...................................................4

      3.   The Relocation Policies' Purpose Is To Benefit Host Cities ......................................5

III. LEGAL ARGUMENT ........................................................................................5

   A.   STANDARD ON MOTION TO DISMISS ...............................................5

   B.   OAKLAND HAS SUFFICIENTLY ALLEGED ANTITRUST CLAIMS ..................5

      1.   Oakland Has Alleged Facts Sufficient To Demonstrate Standing ...........................5

         (a)   Defendants' Anticompetitive Conduct Directly Injured Oakland ................7

         (b)   Oakland Has Sufficiently Alleged Injury Arising From Defendants' Anticompetitive Misconduct........................................10

         (c)   Oakland Is A Proper Plaintiff Under The Sherman Act ...............................11

         (d)   Oakland's Injuries Are Not "Indirect"..........................................13

         (e)   Oakland's Damages Are Recoverable ..........................................14

      2.   Oakland Sufficiently Alleges A Section 1 Violation And A Relevant Market ........16

         (a)   Oakland Has Adequately Alleged A Market ................................17

         (b)   Oakland Has Adequately Pled A Price-Fixing Scheme..............................18

         (c)   Oakland Has Adequately Alleged A Group Boycott...................................20

   C.   OAKLAND HAS SUFFICIENTLY ALLEGED A BREACH CLAIM .............................20

      1.   The Relocation Policies Are Part Of An Enforceable Contract..............................21

      2.   Oakland Is A Third-Party Beneficiary To The Relocation Policies ........................22

i
PLAINTIFF'S OPPOSITION TO DEFENDANTS' MOTION TO DISMISS THE FIRST AMENDED COMPLAINT

3.    Oakland Has Alleged A Viable Claim Under The Relocation Policies....................25

D.    OAKLAND'S UNJUST ENRICHMENT CLAIM IS SUFFICIENTLY PLED.................25

IV.    CONCLUSION.................................................................................................................25

PLAINTIFF'S OPPOSITION TO DEFENDANTS' MOTION TO DISMISS THE FIRST AMENDED COMPLAINT

# TABLE OF AUTHORITIES

Page(s)

**Cases**

*Albert v. Postmates Inc.*,
No. 18-cv-07592-JCS, 2019 WL 1045785 (N.D. Cal. Mar. 5, 2019)...................................... 5

*Amaral v. Cintas Corp. No. 2*,
163 Cal. App. 4th 1157 (2008) ........................................................................................ 21

*Amarel v. Connell*,
102 F.3d 1494 (9th Cir. 1996) ........................................................................................ 13

*Apple Inc. v. Pepper*,
139 S. Ct. 1514 (2019)...................................................................................................... 6

*Ashcroft v. Iqbal*,
556 U.S. 662 (2009).......................................................................................................... 5

*Ass'n of Wash. Pub. Hosp. Dists. v. Philip Morris, Inc.*,
241 F.3d 696 (9th Cir. 2001) .......................................................................................... 15

*Associated Gen. Contractors of Cal., Inc. v. Cal. State Council of Carpenters*,
459 U.S. 519 (1983).......................................................................................................... 5

*Bell Atl. Corp. v. Twombly*,
550 U.S. 544 (2007).......................................................................................................... 5

*Carpa, Inc. v. Ward Foods, Inc.*,
536 F.2d 39 (5th Cir. 1976) ............................................................................................ 12

*Cent. Telecomms., Inc. v. TCI Cablevision, Inc.*,
800 F.2d 711 (8th Cir. 1986) .......................................................................................... 10

*City of Rohnert Park v. Harris*,
601 F.2d 1040 (9th Cir. 1979) ................................................................................. *passim*

*City of San Jose v. Office of the Comm'r of Baseball*,
No. C–13–02787 RMW, 2013 WL 5609346 (N.D. Cal. Oct. 11, 2013) ........................... 7, 8

*Deesen v. Prof'l Golfers' Ass'n of Am.*,
358 F.2d 165 (9th Cir. 1966) .......................................................................................... 19

*Fine v. Barry & Enright Prods.*,
731 F.2d 1394 (9th Cir. 1984) ........................................................................................ 10

*Glen Holly Entm't Inc. v. Tektronix Inc.*,
352 F.3d 367 (9th Cir. 2003) .......................................................................................... 11

PLAINTIFF'S OPPOSITION TO DEFENDANTS' MOTION TO DISMISS THE FIRST AMENDED COMPLAINT

*Goonewardene v. ADP, LLC*,
  434 P.3d 124 (Cal. 2019) .................................................................. 22, 23, 24, 25

*Hanover Shoe, Inc. v. United Shoe Mach. Corp.*,
  392 U.S. 481 (1968) .......................................................................... 15

*Hawaii v. Standard Oil Co. of Calif.*,
  405 U.S. 251 (1972) .................................................................. 3, 6, 14, 15

*Hawthorne v. Umpqua Bank*,
  No. C–11–6700 YGR, 2012 WL 1458194 (N.D. Cal. Apr. 26, 2012) ................................. 25

*Hickcox-Huffman v. US Airways, Inc.*,
  855 F.3d 1057 (9th Cir. 2017) ................................................................ 25

*Hicks v. PGA Tour, Inc.*,
  897 F.3d 1109 (9th Cir. 2018) ................................................................ 18

*In re High Tech Emp. Antitrust Litig.*,
  856 F. Supp. 2d 1103 (N.D. Cal. 2012) ......................................................... 16

*Innovation Marine Protein, LLC v. Pac. Seafood Grp.*,
  No. 6:17–cv–00815–MC, 2018 WL 1461501 (D. Or. Mar. 23, 2018) ................................. 14

*Jerrold Elecs. Corp. v. Westcoast Broad. Co.*,
  341 F.2d 653 (9th Cir. 1965) ................................................................. 12

*Karseal Corp. v. Richfield Oil Corp.*,
  221 F.2d 358 (9th Cir. 1955) ................................................................. 15

*Kendall v. Visa USA, Inc.*,
  518 F.3d 1042 (9th Cir. 2008) ................................................................ 16

*Klamath Water Users Protective Ass'n v. Patterson*,
  204 F.3d 1206 (9th Cir. 1999) ................................................................ 23

*Ladas v. Cal. State Auto. Ass'n*,
  19 Cal. App. 4th 761 (1993) .................................................................. 21

*Los Angeles Memorial Coliseum Com'n v. National Football League*,
  726 F.2d 1381 (9th Cir. 1984) ............................................................ 2, 14, 17

*Los Angeles Memorial Coliseum Com'n v. National Football League*,
  791 F.2d 1356 (9th Cir. 1986) ............................................................ 2, 5, 10

*Martinez v. Socoma Cos.*,
  521 P.2d 841 (Cal. 1974) ..................................................................... 23

*Maya v. Centex Corp.*,
  658 F.3d 1060 (9th Cir. 2011) ................................................................ 15

PLAINTIFF'S OPPOSITION TO DEFENDANTS' MOTION TO DISMISS THE FIRST AMENDED COMPLAINT

*McNeary-Calloway v. JP Morgan Chase Bank, N.A.*,
    863 F. Supp. 2d 928 (N.D. Cal. 2012) ............................................................. 25

*Meridian Project Sys., Inc. v. Hardin Constr. Co., LLC*,
    No. Civ.S-04-2728FCDDAD, 2005 WL 2615523 (E.D. Cal. Oct. 14, 2005) ........................ 9

*Mid-S. Grizzlies v. NFL*,
    720 F.2d 772 (3d Cir. 1983) ................................................................... 19

*Montreal Trading Ltd. v. Amax Inc.*,
    661 F.2d 864 (10th Cir. 1981) ............................................................. 6, 12

*In re NCAA Student-Athlete Name & Likeness Lic. Litig.*,
    990 F. Supp. 2d 996 (N.D. Cal. Oct. 25, 2013) ................................................ 19

*NCAA v. Bd. of Regents of Univ. of Okla.*,
    468 U.S. 85 (1984) ....................................................................... 11, 18

*Newcal Indus., Inc. v. Ikon Office Solution*,
    513 F.3d 1038 (9th Cir. 2008) ............................................................ 16, 17

*Oakland Raiders v. NFL*,
    131 Cal. App. 4th 621 (2005) ................................................................. 21

*Oltz v. St. Peter's Comm. Hosp.*,
    19 F.3d 1312 (9th Cir. 1994) ................................................................. 12

*In re Packaged Seafood Prods. Antitrust Litig.*,
    338 F. Supp. 3d. 1118 (S.D. Cal. 2018) ....................................................... 10

*Parks v. Watson*,
    716 F.2d 646 (9th Cir. 1983) .................................................................. 9

*Provost v. Regents of Univ. of Cal.*,
    135 Cal. Rptr. 3d 591 (Cal. Ct. App. 2011) ................................................... 23

*R.C. Dick Geothermal Corp. v. Thermogenics*,
    890 F.2d 139 (9th Cir. 1989) ................................................................. 14

*Rebel Oil Co. v. Atl. Richfield Co.*,
    51 F.3d 1421 (9th Cir. 1995) .................................................................. 9

*Retrophin, Inc. v. Questcor Pharm., Inc.*,
    41 F. Supp. 3d 906 (C.D. Cal. 2014) .......................................................... 10

*Reyes v. Saxon Mortg. Servs.*,
    No. 09cv1366 DMS (WMC), 2009 WL 3738177 (S.D. Cal. Nov. 5, 2009) ........................... 24

*Saint Alphonsus Med. Ctr.-Nampa Inc. v. St. Luke's Health Sys. Ltd.*,
    778 F.3d 775 (9th Cir. 2015) ................................................................. 18

*Schachar v. Amer. Acad. of Ophthalmology, Inc.*,
    870 F.2d 397 (7th Cir. 1989) ............................................................................... 11

*Seattle Totems Hockey Club, Inc. v. NHL*,
    783 F.2d 1347 (9th Cir. 1986) .............................................................................. 19

*Spinks v. Equity Residential Briarwood Apartments*,
    171 Cal. App. 4th 1004 (2009) ............................................................................. 23

*St. Louis Reg'l Convention and Sports Complex Auth. v. NFL*,
    No. 1722-CC00976, 2017 WL 6885089 (Mo. Cir. Dec. 27, 2017) ...................... 21

*St. Paul Fire Marine Ins. Co. v. Barry*,
    438 U.S. 531 (1978) .............................................................................................. 20

*StubHub, Inc. v. Golden State Warriors, LLC*,
    No. C 15-1436 MMC, 2015 WL 6755594 (N.D. Cal. Nov. 5, 2015) .................. 18

*In re Sunday Ticket Antitrust Litig.*,
    933 F.3d 1136 (9th Cir. Aug. 13, 2019) ........................................................... 2, 17

*Tawfilis v. Allergan, Inc.*,
    157 F. Supp. 3d 853 (C.D. Cal. 2015) .................................................................. 10

*Tawfilis v. Allergan, Inc.*,
    No. 8:15-cv-00307-JLS-JCG, 2017 WL 3084275 (C.D. Cal. June 26, 2017) ...................... 12

*United States v. LSL Biotechnologies*,
    379 F.3d 672 (9th Cir. 2004) ................................................................................ 12

*United States v. Microsoft Corp.*,
    253 F.3d 34 (D.C. Cir. 2001) .................................................................................. 8

*United States v. Realty Multi-List, Inc.*,
    629 F.2d 1351 (5th Cir. 1980) .............................................................................. 19

*United States v. Socony-Vacuum Oil Co.*,
    310 U.S. 150 (1940) .............................................................................................. 19

*US Airways, Inc. v. Sabre Holdings Corp.*,
    105 F. Supp. 3d 265 (S.D.N.Y. 2015), *aff'd in relevant part*, 938 F.3d 43 (2d Cir. 2019) ...................... 8

*Yount v. Salazar*,
    No. CV11–8171–PCT DGC, 2013 WL 93372 (D. Ariz. Jan. 8, 2013) ................ 14

**Other Authorities**

15 U.S.C. § 15 ............................................................................................................... 12

Cal. Gov't Code § 54222 .............................................................................................. 14

PLAINTIFF'S OPPOSITION TO DEFENDANTS' MOTION TO DISMISS THE FIRST AMENDED COMPLAINT

Fed. R. Civ. Proc. 8 ........................................................................................................... 25

Herbert Hovenkamp & Phillip E. Areeda, FUNDAMENTALS OF ANTITRUST LAW, § 22.04[a]
   (Supp. 2014) ................................................................................................................... 19

I.    **INTRODUCTION**

On July 25, 2019, this Court dismissed the City of Oakland's complaint ("Complaint"), with leave to amend.  Among other things, this Court held that Oakland failed to sufficiently allege that Defendants' restraint on the supply of professional football teams resulted in any anticompetitive injury to Oakland.  Oakland then filed the First Amended Complaint ("FAC," ECF No. 68),[1] addressing this holding and providing significant factual detail about the history and economic structure of the NFL, how the NFL uses its control over teams to constrain supply and drive hosting costs to supra-competitive levels, and how Oakland was injured by this anticompetitive conduct.  Describing it as an "extortion," a "sabotage," and an "exploitation," numerous economists have recognized that the NFL, as a "closed" sports league, artificially restricts the supply of teams to force cities to make a Hobson's Choice:  pay Defendants' anticompetitive price or lose your team.

In addition, the FAC alleges that a relocation decision – which directly impacts the significant revenues that all NFL teams share – is a collective decision both economically and under the terms of the NFL Constitution.  As alleged in the FAC, the Raiders did not, as Defendants claim, "unilaterally" move to Las Vegas.  (FAC ¶¶ 22-23, 55, 66, 139-144).

The FAC also provides factual detail as to how the NFL accomplishes this anticompetitive scheme:  through insurmountable barriers to entry.  No new team, and no new Host City, can ever exist without permission from ¾ of the NFL Clubs, permission that Defendants contend they can deny for any reason.  Investors can build the best of teams – and a city can build the best of football stadiums, with plenty of excited fans – but it is all for naught without the NFL's unilateral blessing.  Absent this restraint, economists estimate that the market for professional football teams could easily accommodate at least 40 teams around the United States (as opposed to the existing 32).

The FAC also alleges facts demonstrating that – in a bid to avoid antitrust liability and prevent federal regulation – the NFL adopted the Relocation Policies specifically to benefit Host Cities like Oakland and negotiated with a representative of Host Cities, the Mayors' Conference, in doing so.  This Mayors' Conference included the mayor of Oakland.

---

[1]  Capitalized terms not defined herein shall have the same meaning as in the FAC.

PLAINTIFF'S OPPOSITION TO DEFENDANTS' MOTION TO DISMISS THE FIRST AMENDED COMPLAINT

1   In their motion to dismiss ("MTD," ECF No. 73), Defendants barely mention the FAC's

2   significant economic analysis – or the NFL's history with respect to the Relocation Policies – and, instead,

3   argue primarily that Oakland does not have standing to sue.  Indeed, Defendants' arguments, which defy

4   economic reality, interpret antitrust standing so narrowly that if this Court were to rule in their favor:  (a)

5   the decisions in *Los Angeles Memorial Coliseum Com'n v. National Football League*, 726 F.2d 1381 (9th

6   Cir. 1984) ("*Raiders I*") and *Los Angeles Memorial Coliseum Com'n v. National Football League*, 791

7   F.2d 1356 (9th Cir. 1986) ("*Raiders II*") would effectively be overruled; and (b) as to issues of team

8   relocation and expansion, the NFL would forevermore have a *de facto* exemption from the antitrust laws.

9   However, the antitrust laws are not so narrowly defined, and Defendants' cited standing cases

10   address concerns that do not arise in this case, *e.g.*, the possibility of overlapping claims, an infinite

11   number of plaintiffs, or damages remote from the alleged misconduct.  Here, Defendants' misconduct

12   intentionally harmed a finite group of entities (Oakland, Alameda County (the "County"), and Las Vegas)

13   whose distinct injuries do not raise any possibility of overlapping claims, and Oakland is suing for

14   damages directly caused to its proprietary interest as a Host City.[2]

15   Defendants also contend that Oakland has no standing to sue under the contract formed by the

16   NFL Constitution and Relocation Policies.  These arguments are made in striking contradiction to the facts

17   underlying the NFL's adoption of the Relocation Policies, including its negotiations with the Mayors'

18   Conference (of which Oakland's mayor is a member).  As discussed below, protecting the interests of

19   Host Cities was a primary motivating purpose for the adoption of the Relocation Policies.

20   In the end, Defendants' motion to dismiss is unhinged from antitrust and contract law and in direct

21   defiance of the standard on a Rule 12(b)(6) motion.  Oakland has plausibly alleged each of the elements

22   necessary for its claims, and Defendants' motion to dismiss should be denied.

23   / / /

24   / / /

25

26   [2]   Defendants also argue that Oakland has failed to allege a market or a substantive claim under the
     Sherman Act, but these contentions fail to consider:  (a) the Ninth Circuit's pronouncement on pleading
27   the elements of Section 1 claims; and (b) the Ninth Circuit's findings in *Raiders I* and *Raiders II* and,
     more recently, in *In re Sunday Ticket Antitrust Litig.* ("*In re Sunday Ticket*"), 933 F.3d 1136 (9th Cir.
28   Aug. 13, 2019), regarding the NFL and markets.  (*See infra* Section III.B.2).

1  ## II.   BACKGROUND

2  ### A.   THE ORDER

3  In its July 25, 2019 Order ("Order," ECF No. 64), this Court held that, to the extent Oakland was

4  claiming antitrust standing and injury arising from the NFL's 32-team structure, the Complaint did not

5  sufficiently allege facts to support that claim.   However, this Court granted Oakland leave to amend,

6  finding it was "possible" and "conceivable" that Oakland could "plausibly allege" such a claim.   (*Id.* at

7  18).   In discussing the 32-team structure, this Court also provided "an incomplete list of issues that might

8  be relevant," including whether owners existed willing to start new football teams and whether any teams

9  were willing to play at the Coliseum property.   (*Id.* at 15-18).

10  In addition, this Court offered Oakland guidance as to other issues.   With respect to damages, this

11  Court stated that Oakland had failed to respond to the decision in *City of Rohnert Park v. Harris*

12  ("*Rohnert Park*"), 601 F.2d 1040 (9th Cir. 1979).   This Court also stated that Oakland could not recover

13  damages "based on lost tax revenue from the broader scope of economic activity" based on the Supreme

14  Court's holding in *Hawaii v. Standard Oil Co. of Calif.*, 405 U.S. 251 (1972).   This Court then questioned

15  Oakland's diminution of value claim and recommended that Oakland consider Defendants' arguments

16  regarding the relevant market.   (Order at 20-24).

17  As to Oakland's contract claims for breach of the Relocation Policies, this Court held that

18  Oakland's allegations failed to demonstrate that Defendants' motivating purpose in adopting the

19  Relocation Policies was to provide a benefit to Host Cities like Oakland.   (*Id.* at 26-28).

20  As demonstrated below, the FAC has adequately addressed the issues raised in the Order.

21  ### B.   THE AMENDED COMPLAINT

22  #### 1.   The 32-Team Cartel

23  In response to the Order, Oakland added significant additional facts to its FAC.   First, Oakland

24  included detailed facts and economic analyses regarding the "closed" sports leagues in the United States

25  in general and the NFL's closed structure specifically.   These facts and analyses explain that through an

26  artificial restraint on the supply of professional football teams – and an extraordinary level of revenue

27  sharing – Defendants have created a professional football market that defies basic competitive principles.

28  (FAC ¶¶ 1-16, 36-56).

PLAINTIFF'S OPPOSITION TO DEFENDANTS' MOTION TO DISMISS THE FIRST AMENDED COMPLAINT

The FAC also explains *why* the NFL constrains the supply of football teams: to support anticompetitive pricing in the hosting market. As numerous economists have recognized, the NFL and similar "closed" sports leagues restrict the supply of teams to ensure that cities with the potential to host a professional sports team – but remain without one – exist. This preservation of cities without teams gives Defendants a real relocation threat when negotiating for stadiums and other benefits with existing Host Cities, allowing them to demand supra-competitive prices. (*Id.* ¶¶ 45, 47, 54, 57-69).

2.   Oakland's Standing And Injury

The FAC demonstrates that Oakland engaged in extraordinary efforts to keep the Raiders from relocating, including offering viable plans to renovate the existing Coliseum property – offers that necessarily involved paying a supra-competitive price for the ability to continue hosting the Raiders. (*Id.* ¶¶ 105-138). Defendants rejected these offers without truly considering them because Defendants knew that relocation to Las Vegas would result in even greater supra-competitive revenue to be shared by Defendants. (*Id.* ¶¶ 123, 128-129, 134-136). Both Las Vegas and Oakland were losers – Las Vegas because it was forced to pay a supra-competitive price to host the Raiders and Oakland because it was unable to pay that exorbitant price and thereby lost its status as a Host City. The winners? Defendants. Oakland's relocation to Las Vegas doubled the Raiders' enterprise value, resulted in a $378 million relocation fee to be shared by Defendants, and will result in additional supra-competitive revenue that will be shared by Defendants, including, but not limited to, television rights in a new territory and new intellectual property rights. (*Id.* ¶¶ 24, 56, 66).

In a competitive market – one without Defendants' barriers to entry and market-distorting revenue sharing – the Raiders would have stayed in Oakland or, at the very least, Oakland could have attracted another team to its new or renovated stadium as the "highest rated city for NFL expansion." (*Id.* ¶ 138; *see also id.* ¶¶ 47-49, 55-56, 127).

Oakland also: (a) alleges in detail how Defendants' restraint of the supply of teams – and use of that restraint to wield their relocation threat and collect supra-competitive prices – directly and intentionally harmed Oakland and caused Oakland to incur significant losses; and (b) distinguishes the decision in *Rohnert Park*. (*Id.* ¶¶ 200-217).

/ / /

### 3. The Relocation Policies' Purpose Is To Benefit Host Cities

The FAC demonstrates that the Relocation Policies are part of a valid, binding contract enforceable against the NFL and the 32 NFL Clubs. (*Id.* ¶¶ 87-92). The FAC also provides detailed factual allegations about how the Relocation Policies were created – first from a proposed federal statute meant to protect the interests of Host Cities, and second from a "Statement of Principles" that the NFL negotiated with the Mayors' Conference, a Host City representative of which Oakland is a member. (*Id.* ¶¶ 70-86). These facts demonstrate that a motivating purpose for the Relocation Policies was to provide a benefit to Host Cities, including Oakland. (*See infra* Section III.C.2).

## III. LEGAL ARGUMENT

### A. STANDARD ON MOTION TO DISMISS

"Generally, a plaintiff's burden at the pleading stage is relatively light." *Albert v. Postmates Inc.*, No. 18-cv-07592-JCS, 2019 WL 1045785, at *3 (N.D. Cal. Mar. 5, 2019) (Spero, J.). To survive such a motion, a plaintiff need only allege "enough facts to state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). Under this "plausibility standard," a plaintiff must allege facts that add up to "more than a sheer possibility that a defendant has acted unlawfully." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).

### B. OAKLAND HAS SUFFICIENTLY ALLEGED ANTITRUST CLAIMS

### 1. Oakland Has Alleged Facts Sufficient To Demonstrate Standing

In the first two sections of their brief, Defendants argue that Oakland, as a Host City that lost an NFL Club, does not have standing to sue under the antitrust laws. Defendants' arguments, taken together, would mean that no private party could ever enforce the Sherman Act for what economists have labeled the economic "extortion," "sabotage," and "exploitation" involved in Defendants' collective relocation threats. (*See, e.g.*, FAC ¶¶ 47, 54, 62, 68).

As this Court recognized in the Order, antitrust standing is governed by the factors discussed in *Associated Gen. Contractors of Cal., Inc. v. Cal. State Council of Carpenters*, 459 U.S. 519 (1983). (Order at 14-15). *See also Raiders II*, 791 F.2d at 1363. In the FAC, Oakland has alleged facts demonstrating each of the *Associated Gen. Contractors* factors:

/ / /

- Defendants intentionally acted to harm Oakland through a collective scheme to demand supra-competitive pricing for hosting the Raiders and a punitive boycott when Oakland failed to pay those prices (*see* FAC ¶¶ 36-69, 105-138);

- Oakland's injuries were directly caused by Defendants' anticompetitive scheme and are exactly what the antitrust laws are meant to prevent (*id.* ¶¶ 139-151, 197-217); and, thus,

- A direct causal connection exists between the alleged conduct and injury (*see id.*; *see also* ¶¶ 10, 27), there is no abstract speculation about the injury (*see id.* ¶¶ 144, 151, 199-206, 211, 217), and there is no risk of duplicate recoveries (since Oakland, as a market participant in this case, is the victim of this antitrust injury (*id.* ¶¶ 105-138, 197-217)).

Nonetheless, Defendants raise a number of issues based primarily on: *Hawaii*, 405 U.S. at 264-265; *Montreal Trading Ltd. v. Amax Inc.* ("*Montreal Trading*"), 661 F.2d 864, 867-868 (10th Cir. 1981); and *Rohnert Park*, 601 F.2d at 1042-1045. These decisions address proximate cause, foreseeability, and remoteness, reoccurring themes in both antitrust and tort law. Specifically, these decisions address issues regarding overlapping, potentially infinite, or overly remote claims.

There are no such issues here. As the FAC alleges, Defendants' anticompetitive conduct was directed at, and meant to punish, Oakland in its proprietary capacity as an owner of the Coliseum property and Host City of the Raiders. Further, Defendants' anticompetitive conduct injured a limited number of parties (*i.e.*, Oakland, the County, and Las Vegas), and the damages suffered by those parties are not even theoretically overlapping. Indeed, if Defendants' arguments were to prevail, Defendants' anticompetitive conduct with respect to both team expansion and relocation would be effectively exempt from the antitrust laws since Defendants contend no Host City or surrounding area (*i.e.*, county), current or prospective, can sue them. Further, the Ninth Circuit's holdings in *Raiders I* and *Raiders II* would be effectively overruled.

Defendants' mischaracterization of the antitrust laws is based on arguments that are detached from economic reality. As the Supreme Court recently recognized in *Apple Inc. v. Pepper*, antitrust defendants should not be allowed to "gerrymander" their way out of liability with arguments that "do[] not make a lot of sense." 139 S. Ct. 1514, 1522 (2019). Congress has denied Defendants an antitrust exemption for their relocation activities and left in place the system by which injured parties, like Oakland, can commence antitrust actions for those activities. Defendants should not be allowed to manufacture a *de facto* exemption where Congress has declined to create one.

/ / /

(a)     *Defendants' Anticompetitive Conduct Directly Injured Oakland*

Defendants first argue that Oakland has not alleged antitrust standing because it supposedly does not have any "injury-in-fact," citing the decision in *Rohnert Park*.  (MTD at 7-8).  However, it is clear *Rohnert Park* is factually distinguishable from this action.

In *Rohnert Park*, the City of Rohnert Park, in an effort to develop a regional shopping center, designated certain city land as a commercial zone suitable for development.  Rohnert Park owned two parcels within that commercial zone.  Defendants constructed a shopping center in the neighboring town of Santa Rosa and Rohnert Park sued, alleging, among other things, antitrust violations under Sections 1 and 2 of the Sherman Act based on defendants' "attempt to monopolize retail merchandise space in the Santa Rosa trade area."  601 F.2d at 1042-1043.

The Ninth Circuit first held that Rohnert Park could not sue as *parens patriae* "on behalf of its property owners, taxpayers, and inhabitants" for their losses "if the [shopping] center is not built in Rohnert Park."  *Id.* at 1044.  The Ninth Circuit then held that Rohnert Park's alternative argument – that it had a proprietary interest in a specific portion of the commercial zone – failed to allege a cognizable injury because damages were speculative (*i.e.*, it was not clear that Rohnert Park's specific portion of land could even be used for a shopping center).  *Id.* at 1044-1045.  The court held that Rohnert Park, under Article III standing considerations, did not "ma[k]e a sufficient showing that, absent the alleged antitrust violations . . ., its commercial area would have been selected as a site for shopping center development."  *Id.* at 1045.

This case, unlike *Rohnert Park*, does not involve speculation.  Oakland owns the Coliseum property and Defendants have, through their prior conduct, shown that the Coliseum is an appropriate home stadium in which to play football.  Indeed, the Raiders have played in the Coliseum for decades and have chosen to renew the lease and continue playing at the Coliseum until their new stadium in Las Vegas is ready.  Further, as detailed in the FAC, a recent economic analysis demonstrates that if the NFL were to end its anticompetitive restraint on the supply of new professional football teams, the most suitable city for a new team in the United States would be Oakland.  (FAC ¶ 138).

The decision in *City of San Jose v. Office of the Comm'r of Baseball* ("*San Jose*"), No. C–13–02787 RMW, 2013 WL 5609346 (N.D. Cal. Oct. 11, 2013) is illustrative here.  Although the *San Jose*

court ultimately dismissed that action based on baseball's unique antitrust exemption, before doing so, it

distinguished *Rohnert Park*:

> Unlike in *Rohnert Park*, where the city's property interest was speculative, here, the
> complaint alleges that the City of San José owns the parcels of land set aside for the A's
> Stadium pursuant to the Option Agreement (the "Diridon land").  Also unlike in *Rohnert
> Park*, where there was no indication that the Rohnert Park [land] would have been selected
> for the urban renewal project but for some antitrust violation, here, the A's have already
> selected the Diridon land as the prospective site for a new stadium.

*Id.* at *12 (citation and footnote omitted).  Again, as in *San Jose*, Oakland owns the Coliseum property

and that property has historically served – and, in fact, still serves – as a venue for professional football.

Under Defendants' analysis:  (a) even if the commercial area in *Rohnert Park* had a history of hosting

shopping centers – and was hosting a shopping center as the case was in progress – proximate cause

would still be lacking; and (b) Defendants' own anticompetitive behavior in erecting barriers to entry, and

refusing to deal with Oakland, would preclude any showing of proximate cause (*i.e.*, you can't show that

another team would play in the Coliseum because we have not allowed another team to join the NFL in

over twenty years).  These arguments are circular, economically irrational, and contrary to the purpose of

the antitrust laws.

Indeed, the "argument that [an antitrust plaintiff] needs to point to a specific 'dead body' in order

to show that barriers to entry exist is incorrect, and equivalent to saying that a [defendant] will be immune

from antitrust scrutiny if it can erect sufficiently high barriers to entry."  *US Airways, Inc. v. Sabre

Holdings Corp.*, 105 F. Supp. 3d 265, 282 (S.D.N.Y. 2015), *aff'd in relevant part*, 938 F.3d 43 (2d Cir.

2019).  In other words, Defendants cannot rely on their anticompetitive refusal to allow a single new team

to join the NFL in over twenty years to deny Oakland antitrust standing.  *See also United States v.

Microsoft Corp.*, 253 F.3d 34, 79 (D.C. Cir. 2001) (requiring antitrust "liability [to] turn on a plaintiff's

ability or inability to reconstruct the hypothetical marketplace absent a defendant's anticompetitive

conduct would only encourage monopolists to take more and earlier anticompetitive action").  No rational

investor or city would put together a team or build a football stadium without Defendants' prior approval

because Defendants have created almost insurmountable barriers to entry by, among other things,

requiring a ¾ vote of NFL owners to approve a new team.

/ / /

When this Court posed its questions about potential alternative football teams in the Order, Oakland had not pleaded the factual details of the significant barriers to entry that Defendants have erected.  However, as the FAC now alleges, unlike just about any other market in this country, entry into the NFL does not and cannot occur unless the proposed new NFL team's *competitors* vote to allow it, permission Defendants claim they can deny for any reason.  (MTD at 16).  The Ninth Circuit has recognized that in antitrust cases based on barriers to entry, plaintiffs are required to demonstrate those barriers to entry and their impact, which the FAC sufficiently does here.  *See Rebel Oil Co. v. Atl. Richfield Co.*, 51 F.3d 1421, 1439 (9th Cir. 1995) (entry barriers include "factors in the market that deter entry while permitting incumbent firms to earn monopoly returns"); *see also Meridian Project Sys., Inc. v. Hardin Constr. Co., LLC*, No. Civ.S-04-2728FCDDAD, 2005 WL 2615523, at *6 (E.D. Cal. Oct. 14, 2005) (finding plaintiffs stated an antitrust claim based on "significant barriers" that demonstrated "a dangerous probability of achieving monopoly power").  Defendants cite no case that requires plaintiffs to identify specific entities that would compete if barriers to entry did not exist because there are none.

Further, to the extent that Defendants are somehow arguing that Oakland is a potential new entrant into the Host City market, and thus, can only allege injury-in-fact with "an[] allegation that a team unsuccessfully sought to join the NFL," Defendants are again wrong.  (MTD at 7).  In fact, the Ninth Circuit has held that a "potential new entrant[] into a market . . . 'who has taken substantial demonstrable steps to enter an industry and who is thwarted in that purpose by antitrust violations, has suffered a possible ascertainable loss.'"  *Parks v. Watson*, 716 F.2d 646, 659-660 (9th Cir. 1983) (quoting *Solinger v. A&M Records, Inc.*, 586 F.2d 1304, 1309 (9th Cir. 1976)).  (*See also* Order at 15).  In determining whether a plaintiff has taken such steps, the Ninth Circuit has applied the "intention and preparedness" test, which focuses on the following four factors:

1. The background and experience of plaintiff in his prospective business….
2. Affirmative action on the part of plaintiff to engage in the proposed business….
3. The ability of plaintiff to finance the business and the purchase of equipment and facilities necessary to engage in the business….
4. The consummation of contracts by plaintiff….

*Id.* (noting that "the four *Solinger* factors are neither exclusive nor necessarily applicable in every case").
Here, Oakland easily satisfies all four factors as it currently serves – and has served for nearly 60 years –

as a Host City to the Raiders (FAC ¶ 94).  *See Tawfilis v. Allergan, Inc.*, 157 F. Supp. 3d 853, 866-868 (C.D. Cal. 2015); *Fine v. Barry & Enright Prods.*, 731 F.2d 1394, 1397 (9th Cir. 1984) (finding "actual participation . . . is equivalent to 'consummation of contracts'"); *Retrophin, Inc. v. Questcor Pharm., Inc.*, 41 F. Supp. 3d 906, 915 (C.D. Cal. 2014).  Because Oakland "had experience and expertise" as a Host City, "had raised . . . capital" and "secured financing commitments" of additional capital, "submitted detailed feasible plans," and secured the support of Mayor Schaaf for those plans (FAC ¶¶ 128, 130-131), Oakland has adequately alleged that it has suffered an antitrust injury even if Oakland is viewed as a prospective "new" entrant.  *Cent. Telecomms., Inc. v. TCI Cablevision, Inc*., 800 F.2d 711, 729 (8th Cir. 1986).

"Antitrust claims must make economic sense."  *In re Packaged Seafood Prods. Antitrust Litig*., 338 F. Supp. 3d. 1118, 1178 (S.D. Cal. 2018) (quoting *Adaptive Power Sols., LLC v. Hughes Missile Sys. Co.*, 141 F.3d 947, 952 (9th Cir. 1998)).  And so should antitrust defenses.  It defies economic sense that anyone would incur the enormous cost of building a professional team to play in the NFL when there is no real chance that Defendants will agree to allow that team to play in the NFL.  In over fifty years – while the United States population has grown substantially and the number of cities capable of hosting an NFL team has tripled – the NFL has allowed only four new teams, and no new team has been allowed to join the NFL in over twenty years.  (FAC ¶¶ 9, 67).  Oakland has alleged these and other facts demonstrating: (a) Defendants have used their market power to erect enormous barriers to entry; and (b) that without those barriers, market forces would result in additional teams available to play in cities, like Oakland, seeking to host NFL teams.  (*Id.* ¶¶ 42-49, 57, 127, 197-199).  These plausible allegations are sufficient to establish antitrust standing.

>           (b)      *Oakland Has Sufficiently Alleged Injury Arising From Defendants'*
>                    *Anticompetitive Misconduct*

Defendants next argue that since Oakland tried to get the Raiders to stay, "competition" supposedly took place (MTD at 8), once again citing *Raiders II* for the proposition that antitrust injury requires "a showing that the injury was caused by a reduction, rather than increase, in competition flowing from the defendant's acts."  791 F.2d at 1364.  By Defendants' reasoning, if the manufacturers of asthma inhalers colluded to restrain the supply of inhalers and then auctioned them off to desperate asthma

1   sufferers for the highest price, there would be no anticompetitive activity because all those sufferers would

2   be "competing" for the precious few inhalers.  Creating a bidding war by artificially restricting output is

3   not competition.

4           Rather, as noted by the Supreme Court, "a restraint that has the effect of reducing the importance

5   of consumer preference in setting price and output is not consistent with th[e] fundamental goal of

6   antitrust law.  Restrictions on price and output are the paradigmatic examples of restraints of trade that the

7   Sherman Act was intended to prohibit."  *NCAA v. Bd. of Regents of Univ. of Okla.*, 468 U.S. 85, 107

8   (1984).  Here, as detailed in the FAC, Defendants artificially constrain the supply of NFL teams, which

9   forces Host Cities to pay supra-competitive prices to keep their NFL team or lose their ability to host that

10  (or any other) team.  (FAC ¶¶ 36-69, 105-138).  Antitrust law condemns such "reductions in output that

11  drive up prices as consumers bid for the remaining supply," *Schachar v. Amer. Acad. of Ophthalmology,*

12  *Inc.*, 870 F.2d 397, 399 (7th Cir. 1989), and to argue that such bidding is the equivalent of competition is

13  truly a perversion of antitrust law.

14          The Ninth Circuit has defined five elements of "antitrust injury":  "(1) unlawful conduct, (2)

15  causing an injury to the plaintiff, (3) that flows from that which makes the conduct unlawful, . . . (4) that is

16  of the type the antitrust laws were intended to prevent," and (5) that involves a plaintiff who is a

17  "participant in the same market as the alleged malefactors."  *Glen Holly Entm't Inc. v. Tektronix Inc.*, 352

18  F.3d 367, 372 (9th Cir. 2003) (quotations and citations omitted).  As to the last of these elements, "the

19  party alleging the injury must be either a consumer of the alleged violator's goods or services or a

20  competitor of the alleged violator in the restrained market."  *Id.* (quotations and citation omitted).  Here,

21  Oakland has alleged in detail how Defendants use their cartel-like control of professional football teams to

22  constrain the supply of those teams, force Host Cities to pay supra-competitive prices for hosting rights,

23  and boycott Host Cities which fail to pay.  (FAC ¶¶ 36-69, 105-138).  These plausible allegations more

24  than sufficiently plead antitrust injury.

25          (c)     *Oakland Is A Proper Plaintiff Under The Sherman Act*

26          Defendants next argue that Oakland cannot allege standing because the antitrust laws limit

27  damages to when a party has paid a supra-competitive price.  (MTD at 9-10).  Defendants are wrong.

28  / / /

PLAINTIFF'S OPPOSITION TO DEFENDANTS' MOTION TO DISMISS THE FIRST AMENDED COMPLAINT

Damages recoverable under the antitrust laws are, in part, defined, by principles of proximate cause, *see, e.g.*, *United States v. LSL Biotechnologies*, 379 F.3d 672, 693-694 (9th Cir. 2004), and can include injuries to a plaintiff's "business or property." 15 U.S.C. § 15. Accordingly, antitrust damages can and do include injury to an existing business (*i.e.*, Oakland's business as a Host City), including lost investment amounts. *See Carpa, Inc. v. Ward Foods, Inc.*, 536 F.2d 39, 51 (5th Cir. 1976); *Jerrold Elecs. Corp. v. Westcoast Broad. Co.*, 341 F.2d 653, 665 (9th Cir. 1965). Indeed, when antitrust activity puts a plaintiff, like Oakland, out of business as a Host City, the plaintiff can sue for "all damages resulting from the destruction of [its] business." *Oltz v. St. Peter's Comm. Hosp.*, 19 F.3d 1312, 1314 (9th Cir. 1994).

Defendants' reliance on *Montreal Trading* is misplaced.[3] Concerned about the directness of alleged injury, *Montreal Trading* sought to draw a line as to which parties can claim antitrust injury when a purchase is not made. In that case, the Tenth Circuit held that an antitrust plaintiff lacks standing where it sues based on goods it never purchased, where the plaintiff "*has no prior course of dealing with any defendant*" because "a seemingly unlimited number of plaintiffs could assert a virtually unlimited quantity of lost purchases," and courts would be unsure about "whether the purchase would have been made from one of the conspirators or from one of their competitors; what quantity would have been purchased; what price would have been paid; and at what price resale would have occurred." 661 F.2d at 868. The court recognized, however, that where, as here, a prior course of dealing exists between plaintiff and defendant, injuries are not "inherently speculative." *Id.*

The FAC pleads Oakland's long and intricate course of dealing and business relationship with Defendants. (FAC ¶¶ 93-138). Given this relationship, there is no specter of an "unlimited number of plaintiffs," and indeed, as alleged in the FAC, Defendants have directly injured a very limited number of Plaintiffs (*i.e.*, Oakland, the County, and Las Vegas). (*Id.* ¶¶ 16, 133, 191). Further, this relationship – which was only cut short by Defendants' anticompetitive conduct – alleviates any concern over the "uncertainties" enumerated by the *Montreal Trading* court. (*Compare* 661 F.2d at 868, *with* FAC ¶¶ 93-94, 130-132). Oakland also alleges that Defendants' anticompetitive conduct was directed specifically at

---

[3]  Defendants also misleadingly cite *Tawfilis v. Allergan, Inc.*, No. 8:15-cv-00307-JLS-JCG, 2017 WL 3084275 (C.D. Cal. June 26, 2017), which only discusses *Montreal Trading* in granting class certification. Coincidentally, an earlier decision in that same case found plaintiff had suffered antitrust injury. (*See supra* Section III.B.1(a)).

1   Oakland, was meant to punish Oakland, and amounted to a concerted refusal to deal and/or group boycott.

2   (*See* FAC ¶¶ 140-144, 220-222).  These allegations are sufficient at the pleading stage.  *See Amarel v.*

3   *Connell*, 102 F.3d 1494, 1512 (9th Cir. 1996) ("[F]or purposes of standing analysis, the antitrust laws are

4   concerned with the effect on direct victims of boycotts…").

5   (d)   *Oakland's Injuries Are Not "Indirect"*

6   Next, Defendants argue that Oakland – a Host City with which Defendants directly negotiated –

7   has injuries that are too "indirect" to bring an antitrust action.   (MTD at 10-12). This remarkable

8   contention raises the question, who suffered the direct injury?  According to Defendants, as to Host Cities

9   and relocation decisions, nobody.[4]

10   Defendants first contend that any injury to Oakland is "derivative" of the injury to the hypothetical

11   team or teams that Defendants will not allow to play in the NFL.  (*Id.* at 10).  Pushed to its illogical end,

12   Defendants' argument would overrule every consumer price-fixing case based on barriers to entry since

13   those consumers would supposedly have "indirect" injuries, "derivative" of the hypothetical suppliers who

14   cannot enter the market.  In short, Defendants' argument is absurd, and Defendants provide no relevant

15   authority to support it.  Oakland's injuries were the direct result of Defendants' anticompetitive conduct.

16   Second, ignoring the specific allegations of the FAC (*see* ¶¶ 105-138, 200-217), Defendants

17   engage in what can only be described as factual conjecture over whether Oakland is really an owner of the

18   Coliseum property, or whether, just possibly, the Authority should be the plaintiff here, or maybe the

19   proposals that Oakland made to keep the Raiders at the Coliseum were too "speculative."  Defendants

20   even resort to citing a document beyond the face of the FAC – a "term sheet" – for the proposition that

21   somehow, under some potential factual scenario, Oakland's Coliseum proposals might not have been

22   viable or Oakland's contribution to that proposal insignificant.  (MTD at 11, n.7).  These are, at most,

23   factual issues *for trial*, not grounds for a Rule 12(b)(6) motion.[5]

24

25   [4]   To the extent Defendants attempt to argue that the Authority is the "better" plaintiff, Defendants'
26   argument must fail.  (*See* MTD at 10-11).  "Although the Authority manages the Coliseum site for
    Oakland, Oakland is the entity with the economic interest in that site and, accordingly, is the entity that
    suffers from losses related to that site."  (FAC ¶ 217).
27   [5]   Further, Defendants mischaracterize a now settled litigation (MTD at 11), which was not about who
28   owns the Coliseum property, but rather about whether one of the owners, the County, could sell its interest

1    Lastly, Defendants retreat to their already rejected argument that "landlords" can never sue for

2    antitrust liability. (MTD at 11-12; Order at 19-20). First, although a landlord-tenant paradigm might be

3    of some use here, Oakland is not a landlord in the traditional sense. As the FAC alleges repeatedly, a

4    market for Host Cities exists, and the relationship between a Host City and the hosted football team is

5    much more complex than that of a landlord and tenant. (*See* FAC ¶¶ 57-86, 188-196). *See also Raiders I*,

6    726 F.2d at 1394. In fact, Defendants try to force Oakland into a landlord/tenant box so that they can

7    falsely contend that only "rents" are at issue here.[6] Oakland's fulsome allegations regarding its damages

8    (FAC ¶¶ 200-217) make clear that Oakland has suffered far more than "[m]ere injury as a landlord or

9    lessor." *R.C. Dick Geothermal Corp.*, 890 F.2d at 148.

10                    (e)     *Oakland's Damages Are Recoverable*

11    Defendants next argue that between the decision in *Rohnert Park* and the Supreme Court's

12    decision in *Hawaii*, a spurned Host City like Oakland has no damages that it can recover. (MTD at 12-

13    14). As demonstrated above, Defendants misconstrue *Rohnert Park* (*supra* at 6-8), and *Hawaii* does not

14    preclude Oakland from recovering its alleged damages.

15    *Hawaii* expressly stated that under Section 4 of the Clayton Act, Hawaii could have sued in its

16    "proprietary capacity." 405 U.S. at 262. That is exactly what Oakland is doing here. *Hawaii* places no

17    limitation whatsoever on what damages flow from antitrust injury to Hawaii, Oakland, or any other

18    governmental entity suing in its "proprietary capacity." Indeed, "a local government's proprietary

19    interests can include . . . its powers of revenue and taxation." *Yount v. Salazar*, No. CV11–8171–PCT

20    DGC, 2013 WL 93372, at *11-13 (D. Ariz. Jan. 8, 2013) (finding county had standing because there was a

21    "causal connection between the loss to its tax base and its alleged inability to carry out its comprehensive

22    [land use] plan"). As in *Yount*, Oakland is seeking the recovery of tax revenues that are directly linked to

23

24    without first offering that interest to various entities covered by the California Land Surplus Act, which
25    includes Oakland. *See* Cal. Gov't Code § 54222.

26    [6]  Defendants' "landlord" cases involve no general prohibition of antitrust actions by landlords. Instead,
      they conclude that the plaintiffs in those actions were not participants in the markets at issue. *See R.C.*
      *Dick Geothermal Corp. v. Thermogenics*, 890 F.2d 139, 146-148 (9th Cir. 1989); *Innovation Marine*
27    *Protein, LLC v. Pac. Seafood Grp.*, No. 6:17–cv–00815–MC, 2018 WL 1461501, at *5-8 (D. Or. Mar. 23,
      2018).

28

1  the Raiders' presence at the Coliseum property, the loss of which is proximately caused by Defendants'

2  anticompetitive behavior.[7]  (FAC ¶¶ 200-210).

3        *Hawaii*'s principal holding is that political entities cannot sue as *parens patriae* for general

4  damages to their citizens or economies.  The Supreme Court reached this holding because "[a] large and

5  ultimately indeterminable part of the injury to the 'general economy' . . . , is no more than a reflection of

6  injuries to the 'business or property' of consumers, for which they may recover themselves" under the

7  antitrust laws.  405 U.S. at 264.  However, Oakland is not suing as *parens patriae* and is not seeking

8  damages arising from the "general economy" of Oakland, or damages that are "a reflection of injuries to

9  the 'business or property' of consumers for which they may recover themselves."  The *Hawaii* Court's

10  concerns about overlapping claims are simply not present here.

11        Finally, Defendants argue that Oakland cannot recover for diminution in the value of the Coliseum

12  because the FAC "largely abandons any contention that the Raiders would have continued to play in the

13  Coliseum indefinitely."  (MTD at 13).  The FAC does nothing of the sort; rather, it alleges that if

14  Defendants had not violated the antitrust laws and had complied with the Relocation Policies, the Raiders

15  would have stayed in Oakland.  (*See, e.g.*, FAC ¶ 92).  Further, Defendants also suggest that since the

16  Coliseum building was likely to have been renovated, or even replaced, a diminution-of-value claim is

17  barred.  No authority is cited for this proposition as none exists.  There is no special provision in the

18  antitrust laws for pleading damages, and general pleading is sufficient.  *Karseal Corp. v. Richfield Oil*

19  *Corp.*, 221 F.2d 358, 362 (9th Cir. 1955).  Oakland has pleaded diminution in the value of the Coliseum

20  property, not merely the Coliseum building (*see* FAC ¶¶ 27, 211, 217), and under principles of proximate

21  cause, Defendants are liable for the "present decrease in the economic value of" that property related to

22  their anticompetitive conduct:  *i.e.*, their boycott of the Coliseum property as a site for hosting NFL teams.

23  *Maya v. Centex Corp.*, 658 F.3d 1060, 1071 (9th Cir. 2011) ("[T]he portion of the diminution in the value

24  of plaintiffs' property attributable to defendants' acts remains.  To be sure, plaintiffs would need to

---

25  [7]  Because Defendants' conduct directly and proximately caused Oakland's damages (*see supra* at 11-12), Defendants' citations to cases (MTD at 10) discussing the general principle that a defendant may only be

26  "liable if proximately the plaintiff has suffered a loss" actually support Oakland's claims.  *Hanover Shoe, Inc. v. United Shoe Mach. Corp.*, 392 U.S. 481, 490 n.8 (1968); *see also Ass'n of Wash. Pub. Hosp. Dists.*

27  *v. Philip Morris, Inc.*, 241 F.3d 696, 701 (9th Cir. 2001) (noting that in antitrust actions, the "alleged violations…be the 'proximate cause' of the injury suffered").

28

1  quantify the damages resulting from decreased value in order to recover, but that is not necessary to

2  establish injury at the pleading stage").

3                   2.    <u>Oakland Sufficiently Alleges A Section 1 Violation And A Relevant Market</u>

4         Defendants also argue that Oakland has failed to allege substantive elements of a claim under

5  Section 1 of the Sherman Act.   In so doing, however, Defendants once again ignore the pleading

6  requirements applicable to such elements.   First, the Ninth Circuit has made it clear that allegations of

7  market and market power are factual, and typically survive motions to dismiss:

8         There is no requirement that these [market and market power] elements of the antitrust
       claim be pled with specificity.  An antitrust complaint therefore survives a Rule 12(b)(6)

9         motion unless it is apparent from the face of the complaint that the alleged market suffers a
       fatal legal defect. And since the validity of the "relevant market" is typically a factual

10        element rather than a legal element, alleged markets may survive scrutiny under Rule

11        12(b)(6) subject to factual testing by summary judgment or trial.

12 *Newcal Indus., Inc. v. Ikon Office Solution*, 513 F.3d 1038, 1045 (9th Cir. 2008) (citations omitted).

13 Indeed, on a Rule 12(b)(6) motion, the plaintiff's alleged market should be sustained if the market is based

14 on a product (here, NFL teams) and includes consideration of all reasonable substitutes.  *Id.* at 1045-1046.

15 As the Ninth Circuit has recognized, *see infra* n.8, and as Oakland has alleged (FAC ¶¶ 191-192), there

16 are no reasonable substitutes here.

17        Second, pleading a substantive Section 1 violation requires a plaintiff to allege facts

18 demonstrating:   "(1) a contract, combination or conspiracy among two or more persons or distinct

19 business entities; (2) by which the persons or entities intended to harm or restrain trade or commerce

20 among the several States, or with foreign nations; (3) which actually injures competition." *Kendall v. Visa*

21 *USA, Inc*., 518 F.3d 1042, 1047 (9th Cir. 2008).  *See In re High Tech Emp. Antitrust Litig*., 856 F. Supp.

22 2d 1103, 1115-1117 (N.D. Cal. 2012) (*Kendall* test met where antitrust plaintiff alleged facts

23 demonstrating "who, did what, to whom (or with whom), where, and when?").  Here, Oakland sufficiently

24 alleges who (Defendants) (*see* FAC ¶¶ 117-120) did what (artificially restricted the supply of NFL teams

25 in order to charge supra-competitive hosting prices) (*see id.* ¶¶ 124-125, 132), to whom (Oakland) (*see id.*

26 ¶¶ 121, 123, 128-129), where (in Oakland and at meetings of Defendants), and when (throughout 2016

27 and 2017 and in a final March 2017 vote) (*id.* ¶¶ 117, 120, 125-126).

28 / / /

(a)     *Oakland Has Adequately Alleged A Market*

Defendants contend that there is no market for hosting NFL teams (MTD at 14-16), but thirty years of pronouncements and actions by the Ninth Circuit, Congress, the Mayors' Conference, and the NFL itself clearly demonstrate otherwise.  (FAC ¶¶ 70-86, 188-192).  Since the 1980s, the NFL has been responding to the concerns of Host Cities, first adopting the Relocation Policies proposed by Congress in order to protect Host Cities, and then amending those Policies in light of the NFL's negotiations with the Mayors' Conference.  (*Id*. ¶¶ 78-86; *see also* Order at 24 ("[T]he massive public subsidies of NFL stadiums and the competition among cities alleged in the [C]omplaint tend to suggest a market at least similar to Oakland's proposed definition")).

Further, as noted in the FAC (¶ 191), Defendants have previously agreed that there is a market for cities hosting stadium activities.  In *Raiders I*, the NFL recognized such a market, arguing only that the market should not be limited to just professional football:[8]

> The L.A. Coliseum claims the relevant market is stadia offering their facilities to NFL teams (the product market) in the United States (the geographic market).  The NFL agrees with this geographic market, but argues the product market involves cities competing for all forms of stadium entertainment, including NFL football teams.

726 F.2d at 1393.  The Ninth Circuit noted that "the exceptional nature of the [NFL] industry makes precise market definition especially difficult," and thus, "market evidence, while important, should not become an end in itself."  *Id*. at 1394.

Undeterred, Defendants reject the supplier/consumer understanding of the Host City marketplace set forth in the FAC (the NFL supplies teams; Host Cities, as the consumers, host them) (FAC ¶¶ 188-196), and accuse Oakland of improperly defining the market based on consumers, rather than a product. This is a baseless contention.  The market for hosting NFL teams is a market defined by "the products or producers" of a product.  *Newcal Indus*., 513 F.3d at 1045.  (*See also* FAC ¶ 193 ("The relevant product . . . is the presence of an NFL team" and "the producer of the product . . .[is] the NFL").

---

[8]  Of course, the NFL lost its "all forms of stadium entertainment" argument before the *Raiders I* jury, 726 F.2d at 1394, and, the Ninth Circuit has recently reaffirmed the lack of substitutes for NFL football.  *See In re Sunday Ticket*, 933 F.3d at 1155 ("Given that professional football games have no substitutes (as fans do not consider NFL games to be comparable to other sports or forms of entertainment) . . . , the defendants in this case have effective control over *the entire market* for telecasts of professional football games") (emphasis added).

1   Amazingly, Defendants actually admit that "Defendants do not compete with each other in the alleged

2   relevant market of 'hosting NFL teams.'" (MTD at 14).  Of course they don't.  As alleged in the FAC,

3   Defendants have artificially restricted the number of teams in the marketplace so that they will not have to

4   compete for "stadia or other services for professional football." (*Id.* at 15; *see also* FAC ¶¶ 197-198).

5   Although the NFL Clubs are supposed to be competitors in the market for Host Cities (FAC ¶ 188),

6   because of Defendants' collusion, revenue sharing, and insurmountable barriers to entry (*id.* ¶¶ 198-199,

7   220, 223), Defendants look like competitors only on the field.

8       Defendants also falsely contend that Oakland did not address the "SSNIP" test discussed in *Saint*

9   *Alphonsus Med. Ctr.-Nampa Inc. v. St. Luke's Health Sys. Ltd*., 778 F.3d 775, 784 (9th Cir. 2015).  Here,

10  Oakland's defined geographic market – the United States (FAC ¶¶ 194-196) – meets the SSNIP test

11  because there are no NFL teams outside of the United States.  In fact, the only professional football teams

12  in the world are in the NFL.[9]

13          (b)      *Oakland Has Adequately Pled A Price-Fixing Scheme*

14      Defendants next argue that their decision to limit the NFL to 32 teams does not necessarily amount

15  to a price-fixing scheme.  (MTD at 16-17).  That is true:  although the antitrust laws favor markets in

16  which supply is determined by demand, *NCAA*, 468 U.S. at 107,[10] it is at least theoretically possible that a

17  group of competitors could constrain supply in a market and not, as a result, charge or seek to charge

18  supra-competitive prices.  However, that is not what happened here.

19      As the FAC alleges, Defendants restrain the supply of teams so that they can demand supra-

20  competitive prices from Host Cities.  (FAC ¶¶ 36-38, 40-41, 133-137).  Indeed, without Defendants'

21  artificial barriers to entry, many more professional football teams and Host Cities would exist in the

22

---

23  [9]  As in their motion to dismiss the Complaint (*see* Defendants' Mot. to Dismiss, ECF No. 41, at 14),
    Defendants cite *Hicks v. PGA Tour, Inc*., 897 F.3d 1109, 1121 (9th Cir. 2018) and *StubHub, Inc. v.*
24  *Golden State Warriors, LLC*, No. C 15-1436 MMC, 2015 WL 6755594, at *3 (N.D. Cal. Nov. 5, 2015)
    (*see* MTD at 16), but both of those cases involved attempts to manufacture a market to fit an antitrust
25  claim.  In *Hicks*, a group of golf caddies tried to carve up golf advertisement into nonsensical "markets" to
    suit their particular litigation, and in *StubHub*, the plaintiff attempted to argue that there were different
26  markets for the same tickets based on where they were purchased.

27  [10]  (*See also* Order at 14 n.7 ("[C]ourts have recognized that restrictions on supply can have an equivalent
    effect to fixing prices") (citing *Westinghouse Elec. Corp. v. Gulf Oil Corp.*, 588 F.2d 221, 226 (7th Cir.
28  1978)).

1    United States, and Defendants would not be able to charge supra-competitive prices.  (*Id.* ¶¶ 39, 42-49,

2    138).  As the Supreme Court has held, the fact that this supply-restraining conduct did not set specific

3    prices is immaterial.  *United States v. Socony-Vacuum Oil Co.*, 310 U.S. 150, 222-223 (1940).

4         Oakland agrees that it is not the purpose of the antitrust laws to "determine the appropriate size of

5    a sports league."  (MTD at 18).  However, it is also not Defendants' province to make that determination

6    when the purpose of their decision is an anticompetitive restraint of trade.  Professors  Hovenkamp and

7    Areeda, whom Defendants cite (*see id.* at 17), make it clear that sports leagues' exclusionary decisions are

8    illegitimate when they "are intended to reinforce price-fixing or another output limitation."  Herbert

9    Hovenkamp & Phillip E. Areeda, FUNDAMENTALS OF ANTITRUST LAW, § 22.04[a] (Supp. 2014); *see also*

10   *United States v. Realty Multi-List, Inc.*, 629 F.2d 1351, 1385-1386 (5th Cir. 1980) ("[T]he unrestricted

11   power to set an entrance fee which is unrelated to either the cost of the service provided or the cost of

12   maintaining the service as a going concern is the power to exclude, and hence to destroy competition").

13        The cases that Defendants cite (*see* MTD at 17) are inapposite for several reasons, but principally

14   because none of the plaintiffs in those cases alleged any harm to competition.  *See Seattle Totems Hockey*

15   *Club, Inc. v. NHL*, 783 F.2d 1347, 1350 (9th Cir. 1986); *Deesen v. Prof'l Golfers' Ass'n of Am.*, 358 F.2d

16   165, 171 (9th Cir. 1966); *Mid-S. Grizzlies v. NFL*, 720 F.2d 772, 787 (3d Cir. 1983).  Put another way, in

17   each of those cases, plaintiffs failed to plead how denying one more team, or one more player, a space in a

18   league harmed competition in those leagues.   Here, by contrast, Oakland has set forth significant

19   allegations demonstrating the harm to competition caused by Defendants' constraint on the supply of NFL

20   teams and the price-fixing that arises from that "output limitation."  (FAC ¶¶ 39-41, 49-50, 127, 138, 145-

21   146, 149-151, 197-199)

22        In short, Defendants cannot limit the number of NFL teams for the purpose of charging

23   anticompetitive prices in the hosting market.  That is the very conduct that is alleged in the FAC, and

24   Oakland's plausible and well-supported allegations control on Defendants' Rule 12(b)(6) motion.  *In re*

25   *NCAA Student-Athlete Name & Likeness Lic. Litig*., 990 F. Supp. 2d 996, 1005 (N.D. Cal. Oct. 25, 2013)

26   ("Although it is possible that the NCAA's ban on student-athlete pay serves some procompetitive purpose

27   . . . , Plaintiffs' plausible allegations to the contrary must be accepted as true at the pleading stage").  (*See*

28   *also* Order at 16 n.9 (noting that an "entity seeking to attract [an NFL team] . . . might experience a

1    cognizable antitrust injury if . . . the [relocation fee] is in fact arbitrary and not tied to procompetitive

2    goals").

3                              (c)    *Oakland Has Adequately Alleged A Group Boycott*

4           Although this Court expressed skepticism about Oakland's original allegations of group

5    boycott/refusal to deal, the FAC's new allegations more than sufficiently plead a plausible claim for a

6    group boycott/refusal to deal (governed by a rule of reason analysis).  As the FAC alleges, the NFL and its

7    Clubs' collective decision to remove a team from, and deny a new expansion franchise to, a Host City

8    constitutes a refusal to deal with, or a group boycott of, that Host City:

9           Running a permanently closed shop [league] is an optional feature designed to benefit
            incumbents and not in any way essential to maintaining a sporting league.  Thus, aspects of
10          league behavior toward their Host Cities that depend on a permanently closed shop may
            violate the first mandate of antitrust law, § 1 of the Sherman Act, which prohibits
11          unreasonable agreements between competitors to restrain trade.  Because existing teams
            determine whether new entry will be allowed, a threat by an individual team to relocate
12          may comprise an implicit threat of a concerted boycott. . . . .  [W]hen several economic
            actors agree between themselves to shut out rivals or to refuse to deal with customers or
13          suppliers, except on agreed terms, such concerted action generally constitutes an unlawful
            horizontal restraint, specifically a collective boycott . . . .
14

15   (FAC ¶ 140 (quoting David Haddock *et al.*, *League Structure & Stadium Rent-Seeking – The Role of*

16   *Antitrust Revisited*, 65 FLA. LAW REV. 1, 3-7, 49-50 (2013)).  That the boycott is of a consumer, and not a

17   competitor, is of no moment.  *See St. Paul Fire Marine Ins. Co. v. Barry*, 438 U.S. 531, 544 (1978)

18   (defining group boycotts and stating that "the Sherman Act makes it an offense for [businessmen] to agree

19   among themselves to stop selling to particular customers").  Oakland's allegations set forth a plausible

20   boycott case. [11]  (FAC ¶¶ 52-56, 80, 138-144).

21   **C.    OAKLAND HAS SUFFICIENTLY ALLEGED A BREACH CLAIM**

22          In a continuation of Defendants' broken promises to Congress, the Mayors' Conference, and Host

23   Cities (*see id.* ¶¶ 70-92), Defendants effectively argue that, despite their numerous past representations

24   regarding the good faith that would accompany relocation decisions and the loyalty that would be paid to

25   existing Host Cities, the Relocation Policies are not worth the paper they are written on.  Defendants claim

26   _____
     [11]  The NFL has conceded that relocation decisions are collective decisions made by all NFL Clubs.  (FAC
27   ¶ 80 ("Control of team location is a matter for the League members to determine jointly . . .") (quoting *id.*
     Ex. 3 at 1)).  Thus, Defendants' argument that the Raiders unilaterally decided to relocate to Las Vegas is
28   without merit.  (MTD at 18).

1   that nobody can enforce those Policies except Defendants themselves and, as the FAC establishes,

2   Defendants have absolutely no incentive to do so (*see, e.g.*, FAC ¶¶ 53-56).  The effect of this revisionist

3   argument is that no one would have standing to sue under the Relocation Policies.  The Court should

4   reject Defendants' attempt to re-cast the facts and the allegations in the complaint in order to insulate their

5   anticompetitive behavior from any further legal challenges.  Not surprisingly, California law does not

6   support this self-serving effort.[12]

7                    1.      The Relocation Policies Are Part Of An Enforceable Contract

8           The NFL Constitution and the Relocation Policies, collectively, constitute an enforceable contract

9   among the NFL and the NFL Clubs.  (*Id.* ¶ 155).  The Relocation Policies are promulgated pursuant to the

10  Commissioner's authority to "establish policy and procedure" under Article 8.5 of the NFL Constitution

11  (*see id*. Ex. 2 at 1), which – along with the NFL bylaws – the Raiders concede "constitute a contract to

12  which all member clubs agreed."  *Oakland Raiders v. NFL*, 131 Cal. App. 4th 621, 639 (2005).  As the

13  NFL Constitution and bylaws bind the Clubs to the Commissioner's policies, the Relocation Policies

14  established under Article 8.5 are a valid part of that contract.  *See St. Louis*, 2017 WL 6885089, at *1

15  (finding Relocation Policies constitute an enforceable contract).

16          The Relocation Policies are not a "promise to consider" as Defendants argue (MTD at 19), but

17  even if they could be construed as such, the Policies would still considered an enforceable contract under

18  Defendants' own cited cases.  For example, the court in *Ladas v. Cal. State Auto. Ass'n*, 19 Cal. App. 4th

19  761, 771 (1993) noted that a "promise to consider" would be enforceable where it was sufficiently certain

20  that the parties' intention can be ascertained.  Here, as alleged in the FAC (¶¶ 75-83), Defendants'

21  intentions and obligations under the Relocation Policies were clearly understood.  *Amaral v. Cintas Corp.*

22  *No. 2*, 163 Cal. App. 4th 1157, 1192 (2008).

23  / / /

---

24  [12]  Accepting Defendants' interpretation of the Policies would also run afoul of the "fundamental rule that

25  courts must interpret the allegations and factual disputes in favor of the plaintiff at the pleading stage."
    *Khoja v. Orexigen Therapeutics, Inc.*, 899 F.3d 988, 1014 (9th Cir. 2018).  Further, the Missouri court

26  overseeing the action by the City of St. Louis against Defendants for the relocation of the Rams has
    rejected the very same Relocation Policy arguments made by Defendants here using the same pleading

27  standard.  *See St. Louis Reg'l Convention and Sports Complex Auth. v. NFL* ("*St. Louis*"), No. 1722-
    CC00976, 2017 WL 6885089, at *1 (Mo. Cir. Dec. 27, 2017).

28

2.     Oakland Is A Third-Party Beneficiary To The Relocation Policies

Under California's third-party beneficiary doctrine, "a third party . . . may bring a breach of contract action against a party to the contract" if it alleges facts sufficient to show:

> (1) that it is likely to benefit from the contract, . . . (2) that a motivating purpose of the contracting parties is to provide a benefit to the third party, and . . . (3) that permitting the third party to bring its own breach of contract action against a contracting party is consistent with the objectives of the contract and the reasonable expectations of the contracting parties.

*Goonewardene v. ADP, LLC*, 434 P.3d 124, 126-127 (Cal. 2019).  The "motivating purpose" element has been referred to as a "requirement that there be 'an intent to benefit' the third party," *id*. at 133, and in evaluating this "motive" element, courts consider "the language of the contract and all of the relevant circumstances under which the contract was entered into," *id*. at 134 (citation and quotations omitted). The FAC sufficiently alleges the elements required to sue as a third-party beneficiary.

First, as this Court has noted, "Oakland would benefit from policies that restrict the ability of the Raiders to leave Oakland for a new city."  (Order at 25; *see also* FAC ¶¶ 165-70).  Defendants do not argue otherwise.

Second, the express contract language reflects an intent to benefit Host Cities.  For example, the Relocation Policies repeatedly refer to "home territories" and "home communities" and "obligate" NFL Clubs "to work diligently and in good faith to obtain and maintain suitable stadium facilities in their *home territories* and to operate in a manner that maximizes fan support in their current *home community*." (FAC ¶ 89 (quoting *id.* Ex. 2 at 1 (emphases added)).  Prior to any proposed relocation, an NFL Club is required to provide the Commissioner with a supporting "Statement of Reasons" that "must address each of the factors outlined in" the Relocation Policies, several of which expressly require consideration of conditions in the Club's "current community."  (*Id.* ¶ 167 (quoting *id.* Ex. 2 at 4)).  The NFL must notify "interested parties" of any relocation possibility, including "governmental and business representatives of . . . the *incumbent community*" and "provide those parties with an opportunity to provide oral and written comments regarding the proposed transfer."  (*Id.* Ex. 2 at 2 (emphasis added)).  This "home community" language provides an express benefit to Host Cities – and because Defendants "made . . . promise[s] which, if performed, would have benefitted [Host Cities]," Defendants "are presumed to intend the

1    consequences of a performance of the contract." *Provost v. Regents of Univ. of Cal.*, 135 Cal. Rptr. 3d

2    591, 601 (Cal. Ct. App. 2011).[13]

3          Of course, the circumstances surrounding the adoption of the Relocation Policies provide

4    significant and compelling evidence of an intent to benefit Host Cities. As the FAC makes clear,

5    Defendants adopted the Relocation Policies in an express effort to address Host Cities' concerns about the

6    relocation process. The first iteration of the Relocation Policies was lifted directly from a bill drafted by

7    Senator Slade Gorton to address his "*paramount concern*" of "the *protection of our cities*, both cities

8    which have professional sports franchises and wish to keep them, and cities which do not now have a

9    franchise and wish to gain one." (FAC ¶¶ 74-75 (emphases added)). When the Relocation Policies were

10   amended in 1999 after the Statement of Principles was negotiated with the Mayors' Conference, an NFL

11   executive expressly stated that "the amended [Relocation Policies] protect the interest of *the cities*" and

12   "establish an orderly process [for considering team relocations], ensuring that *municipal interests* will be

13   heard and addressed." (*Id.* ¶ 81 (emphases added)).[14]

14         Defendants suggest that benefitting Host Cities cannot be a motivating purpose of the contract

15   because Defendants were motivated by "business interests" and "the League's collective interests."

16   (MTD at 22). Specifically, Defendants refer to the fact that they purportedly adopted the Relocation

17   Policies in order to protect themselves from antitrust liability and federal regulation. However, California

18   law requires only that the intent to benefit the third party be "*among* the motivating purposes of a

19   contract;" it need not be the *sole* purpose. *Goonewardene*, 434 P.3d at 138 (emphasis added). Because

20   Oakland alleges facts sufficient to show that one of Defendants' primary motivations was "to benefit the

21   [H]ost [C]ity," Oakland has satisfied this element. (Tr. of Oral Arg., ECF No. 65, at 39:6-9). *See also*

22   _____

23   [13]  Unsurprisingly, Defendants completely ignore the "home community" language in the Relocation
     Policies. Instead, Defendants try to argue that the term "home territory" is not a reference to a Host City,
     because the term "home territory" supposedly "encompasses a geographic region spanning a 75-mile
24   radius." (MTD at 20-21). But this argument ignores the fact that the NFL Constitution expressly defines
     a "home territory" to include "the *city* in which [an NFL] club is located." (FAC, Ex. 3, art. 4, § 4.1
25   (emphasis added)). Thus, Oakland is an express beneficiary of the contract because it is plainly a
     "member of a class…for whose benefit [the contract] was made" (*i.e.*, Host Cities). *Spinks v. Equity*
26   *Residential Briarwood Apartments*, 171 Cal. App. 4th 1004, 1022-23 (2009).

27   [14]  Since Host Cities are intended beneficiaries, the cases that Defendants cite involving incidental
     beneficiaries are inapposite. *See, e.g., Klamath Water Users Protective Ass'n v. Patterson*, 204 F.3d 1206,
     1212 (9th Cir. 1999); *Martinez v. Socoma Cos.*, 521 P.2d 841, 847 (Cal. 1974).

28

1   *Reyes v. Saxon Mortg. Servs*., No. 09cv1366 DMS (WMC), 2009 WL 3738177, at *2 (S.D. Cal. Nov. 5,

2   2009).  It would be a distortion of California law if Defendants' fear of liability could now be used to

3   protect them from that same liability.  At the very least, the FAC raises questions of fact that cannot be

4   resolved at this juncture.

5       <u>Third</u>, in determining whether "third party enforcement [will] be consistent with 'the objectives of

6   the contract,'" courts consider "the objectives of the enterprise embodied in the contract, read in light of

7   the surrounding circumstances."  *Goonewardene*, 434 P.3d at 133 (citation omitted).  Here, at the time the

8   Relocation Policies were amended, an NFL executive expressly stated that the NFL "wish[es] to maintain

9   the stability of economically viable franchises and to ensure a fair process to consider requests for

10  franchise relocations."  (FAC ¶ 81).  The NFL executive also stated that "[t]he amendments [to the

11  Relocation Policies] . . . are the direct result of . . . discussions" reflected in the Statement of Principles

12  jointly issued by the NFL and the Mayors' Conference, which represents Host Cities.  (*Id*.)  In the

13  Statement of Principles, the NFL stated that it was "committed to stable team-community relations"

14  because "[s]tability is good for fans, *good for home cities*, and good for professional sports."  (FAC ¶ 80

15  (quoting *id*. Ex. 3 at 1 (emphasis added)).[15]

16      The NFL also acknowledged that Host Cities make a "substantial and valuable financial,

17  psychological and emotional investment" in NFL teams and that there is a "public interest to enjoy the

18  direct and indirect benefits of having a professional sports franchise," such as "jobs, revenues, and other

19  local economic development" generated by an NFL team.  (*Id*.)  The NFL conceded that "the League

20  should have . . . the obligation to follow a set process before the relocation of a team is permitted to

21  occur."  (*Id*.)  Thus, the "surrounding circumstances" make clear that Host City enforcement of the

22  Relocation Policies is consistent with the "objectives of the enterprise" embodied in those Policies.

23  *Goonewardene*, 434 P.3d at 133.

24  _____

[15]    Defying third-party beneficiary law, Defendants argue that allowing Host Cities to sue is "not
25  necessary to effectuate the objectives of the contract" because the Relocation Policies "lay out a process to
resolve whether a proposed relocation satisfies the NFL teams' business interests," and the Statement of
26  Principles supposedly "affirms the importance of the League's own internal processes."  (MTD at 23-24).
In other words, "don't worry, we will take care of things by ourselves."  Of course, third-party beneficiary
27  principles exist *because* contracting parties – even where they have expressly promised a benefit to a third
party – sometimes breach their promise and fail to abide by the contract.

28

1

### 3.   Oakland Has Alleged A Viable Claim Under The Relocation Policies

2

As a third-party beneficiary, Oakland has standing to sue where, as here, the contract is breached.

3

*See Id.* at 126.  Defendants breached the Relocation Policies because they ignored those Policies, and,

4

among other things, did not even try to fulfill their obligations to "work diligently and in good faith to

5

obtain and maintain suitable stadium facilities in their home territor[y]" or "operate in a manner that

6

maximizes fan support in their current home community."  (FAC ¶¶ 167, 169, 182).  Instead, Defendants

7

"colluded to facilitate the Raiders' move before and during the time period in which negotiations" with

8

Oakland were taking place.  (*Id.* ¶ 185; *see also id.* ¶¶ 113-29).  These breaches caused Oakland to suffer

9

damages, as detailed in the FAC.  (*Id.* ¶¶ 187, 200-217).  In short, Oakland has alleged sufficient facts to

10

satisfy the "essential elements" of a breach of contract claim.  *Hickcox-Huffman v. US Airways, Inc*., 855

11

F.3d 1057, 1062 (9th Cir. 2017).

12

### D.   OAKLAND'S UNJUST ENRICHMENT CLAIM IS SUFFICIENTLY PLED

13

Oakland has also sufficiently alleged facts to support its alternative claim for unjust enrichment.  A

14

claim for unjust enrichment is understood as one for restitution.  *McNeary-Calloway v. JP Morgan Chase*

15

*Bank, N.A.*, 863 F. Supp. 2d 928, 964 (N.D. Cal. 2012) (to state a restitution claim, a plaintiff "must plead

16

'receipt of a benefit and the unjust retention of the benefit at the expense of another'").  Here, the FAC

17

alleges that Oakland invested millions of dollars to attract, retain, and support the Raiders.  (FAC ¶¶ 200-

18

217).  Oakland made those investments with the understanding that:  (a) Defendants would comply with

19

the Relocation Policies, which include an obligation to negotiate in good faith; (b) Defendants would

20

support Oakland as the Host City for the Raiders; and (c) Oakland would recoup its investments through

21

the revenues generated by the Raiders' continued presence in Oakland.  (*Id.* ¶¶ 73-92, 105-138, 237-242).

22

Further, Plaintiff is permitted to simultaneously advance unjust enrichment and breach of contract claims

23

in the alternative at the pleading stage.  *Hawthorne v. Umpqua Bank*, No. C–11–6700 YGR, 2012 WL

24

1458194, at *3 (N.D. Cal. Apr. 26, 2012); Fed. R. Civ. Proc. 8(d)(2), 8(a)(3).  Oakland's claim for unjust

25

enrichment should not be dismissed.

26

### IV.   CONCLUSION

27

Based on the foregoing, Defendants' Motion to Dismiss should be denied in its entirety.

28

/ / /

PLAINTIFF'S OPPOSITION TO DEFENDANTS' MOTION TO DISMISS THE FIRST AMENDED COMPLAINT

1  DATED:  December 10, 2019

2

3  By:  _____/s/ Maria Bee_____          By:  _____/s/ James W. Quinn_____
                    MARIA BEE                                         JAMES W. QUINN
4  BARBARA J. PARKER (Bar No. 69722)            JAMES W. QUINN (*pro hac vice*)
      bparker@oaklandcityattorney.org              jquinn@bafirm.com
5  MARIA BEE (Bar No. 167716)                   DAVID BERG (*pro hac vice*)
      mbee@oaklandcityattorney.org                 dberg@bafirm.com
6  ERIN BERNSTEIN (Bar No. 231539)              MICHAEL M. FAY (*pro hac vice*)
      ebernstein@oaklandcityattorney.org           mfay@bafirm.com
7  **OAKLAND CITY ATTORNEY**                    JENNY H. KIM (*pro hac vice*)
   One Frank Ogawa Plaza, 6th Floor                jkim@bafirm.com
8  Oakland, California  94612                   CHRIS L. SPRENGLE (*pro hac vice*)
   Telephone:   (510) 238-3601                     csprengle@bafirm.com
9  Facsimile:   (510) 238-6500                  BRONWYN M. JAMES (*pro hac vice*)
                                                   bjames@bafirm.com
10                                              EMILY BURGESS (*pro hac vice*)
                                                   eburgess@bafirm.com
11                                              **BERG & ANDROPHY**
                                                120 West 45th Street, 38th Floor
12                                              New York, New York  10036
                                                Telephone:   (646) 766-0073
13                                              Facsimile:   (646) 219-1977

14

15  By:  _____/s/ Bruce L. Simon_____
                    BRUCE  L. SIMON
16  CLIFFORD H. PEARSON (Bar No. 108523)        BRUCE L. SIMON (Bar No. 96241)
      cpearson@pswlaw.com                          bsimon@pswlaw.com
17  DANIEL L. WARSHAW (Bar No. 185365)          BENJAMIN E. SHIFTAN (Bar No. 265767)
      dwarshaw@pswlaw.com                          bshiftan@pswlaw.com
18  MICHAEL H. PEARSON (Bar No. 277857)         **PEARSON, SIMON & WARSHAW, LLP**
      mpearson@pswlaw.com                        350 Sansome Street, Suite 680
19  MATTHEW A. PEARSON (Bar No. 291484)         San Francisco, California  94104
      mapearson@pswlaw.com                       Telephone:   (415) 433-9000
20  **PEARSON, SIMON & WARSHAW, LLP**           Facsimile:   (415) 433-9008
   15165 Ventura Boulevard, Suite 400
21  Sherman Oaks, California  91403

22  Telephone:   (818) 788-8300
   Facsimile:   (818) 788-8104
23
   *Attorneys for Plaintiff City of Oakland*
24

25

26

27

28

PLAINTIFF'S OPPOSITION TO DEFENDANTS' MOTION TO DISMISS THE FIRST AMENDED COMPLAINT