1

KENNETH G. HAUSMAN (Bar No. 57252)
kenneth.hausman@arnoldporter.com

2

DANIEL B. ASIMOW (Bar No. 165661)
daniel.asimow@arnoldporter.com

3

**ARNOLD & PORTER KAYE SCHOLER LLP**
Three Embarcadero Center, 10th Floor

4

San Francisco, CA 94111-4024
Telephone:    415.471.3100

5

Facsimile:    415.471.3400

6

[*additional counsel listed on signature page*]

7

Attorneys for Defendant THE OAKLAND
RAIDERS, a California limited partnership

8

JOHN E. HALL (Bar No. 118877)
jhall@cov.com
**COVINGTON & BURLING LLP**
One CityCenter
850 Tenth Street, NW
Washington, DC  20001-4956
Telephone:    202.662.6000
Facsimile:    202.662.6291

[*additional counsel listed on signature page*]

Attorneys for Defendants THE NATIONAL
FOOTBALL LEAGUE and all NFL Clubs other
than The Oakland Raiders

9

UNITED STATES DISTRICT COURT

10

NORTHERN DISTRICT OF CALIFORNIA

11

SAN FRANCISCO DIVISION

12

13

CITY OF OAKLAND,

14

Plaintiff,

15

vs.

16

THE OAKLAND RAIDERS, et al.,

17

Defendants.

18

19

Case No.:  3:18-cv-07444-JCS

Action Filed:  December 11, 2018

**DEFENDANTS' REPLY BRIEF IN
SUPPORT OF MOTION TO DISMISS
FIRST AMENDED COMPLAINT**

Date:      March 6, 2020
Time:      9:30 a.m.
Place:     Courtroom G, 15th Floor
Judge:     Hon. Joseph C. Spero

20

21

22

23

24

25

26

27

28

1

**TABLE OF CONTENTS**

2
**Page**

3    INTRODUCTION ...............................................................................................1

4    I.    THE CITY OF OAKLAND FAILS TO STATE AN ANTITRUST
            CLAIM .................................................................................................1

5
6          A.    Oakland Lacks Standing To Sue Under The Antitrust Laws...........1

7                1.    Oakland Has Not Alleged Injury In Fact. ............................1

8                2.    Oakland Has Not Alleged Antitrust Injury. .........................3

9                3.    Oakland Is Not A Proper Plaintiff.......................................3

10                     a.    Oakland Lacks Standing Because It Did Not Pay The
                             Alleged Overcharge Caused By The Challenged Conduct.....4
11
12                     b.    Oakland Lacks Standing Because Any Injury Is Indirect. .......4

13               4.    Oakland Lacks Antitrust Standing Because Its Alleged
                       Injuries Are Not Cognizable Under The Antitrust Laws. ..................6
14
15         B.    Oakland's Claims Fail As A Substantive Matter. ...........................7

16               1.    Oakland Fails Adequately To Allege A Relevant Market. .................7

17               2.    The NFL's 32-Team Structure And Required Vote To
                       Admit New Teams Is Not Unlawful "Price Fixing." ..........................8
18
19               3.    Oakland Fails To Allege A Group Boycott.........................9

20    II.   THE CITY OF OAKLAND FAILS TO STATE A CONTRACT CLAIM .............10

21         A.    The Relocation Policy Is Not A Contract ......................................11

22         B.    Oakland Is Not A Third Party Beneficiary Of The Relocation
                 Policy. ............................................................................................11
23
24               1.    The Relocation Policy's Motivating Purpose Is To Protect
                       the League's Interests, Not To Help Incumbent Cities Lock
                       In Franchises. ....................................................................12
25
26               2.    Third Party Enforcement Is Not Consistent With The
                       "Contracting Parties'" Reasonable Expectations ..............................14
27         C.    Oakland Has Not Alleged A Breach ...............................................15

28

III.    THE CITY OF OAKLAND FAILS TO STATE AN UNJUST
        ENRICHMENT CLAIM..................................................................................................15

CONCLUSION ........................................................................................................................................15

1

## TABLE OF AUTHORITIES

2

**Page(s)**

3

<u>Cases</u>

4

*Am. Needle, Inc. v. Nat'l Football League,*
    560 U.S. 183 (2010) ................................................................................................. 9

5

6

*Amaral v. Cintas Corp. No. 2,*
    163 Cal. App. 4th 1157 (2008) .............................................................................. 11

7

8

*Ass'n of Wash. Pub. Hosp. Dists. v. Philip Morris Inc.,*
    241 F.3d 696 (9th Cir. 2001) .................................................................................... 4

9

*Bell Atl. Corp. v. Twombly,*
    550 U.S. 544 (2007) ................................................................................................. 9

10

11

*Brunswick Corp. v. Pueblo Bowl-O-Mat, Inc.,*
    429 U.S. 477 (1977) ................................................................................................. 3

12

*Cal. Dental Ass'n v. Am. Dental Ass'n,*
    23 Cal. 3d 346 (1979) ............................................................................................ 11

13

14

*Charley's Taxi Radio Dispatch Corp. v. SIDA of Haw., Inc.,*
    810 F.2d 869 (9th Cir. 1987) .................................................................................... 9

15

16

*City of Rohnert Park v. Harris,*
    601 F.2d 1040 (9th Cir. 1979) .............................................................................. 6, 7

17

18

*Cole v. Sunnyvale,*
    No. C-08-05017 RMW, 2010 WL 532428 (N.D. Cal. Feb. 9, 2010) ......................... 5

19

*Goonewardene v. ADP, LLC,*
    6 Cal. 5th 817 (2019) ............................................................................ 10, 11, 12, 14

20

21

*Hawaii v. Standard Oil Co.,*
    405 U.S. 251 (1972) ................................................................................................. 6

22

*Hawthorne v. Umpqua Bank,*
    No. C-11-6700 YGR, 2012 WL 1458194 (N.D. Cal. Apr. 26, 2012) ...................... 15

23

24

*Hicks v. PGA Tour, Inc.,*
    897 F.3d 1109 (9th Cir. 2018) .................................................................................. 8

25

*Klamath Water Users Protective Ass'n v. Patterson,*
    204 F.3d 1206 (9th Cir. 1999) ................................................................................ 13

26

27

*Ladas v. Cal. State Auto. Ass'n,*
    19 Cal. App. 4th 761 (1993) ................................................................................... 11

28

*Lance Camper Mfg. Corp. v. Republic Indem. Co.*,
    44 Cal. App. 4th 194 ................................................................................................ 15

*Los Angeles Mem'l Coliseum Comm'n v. National Football League*,
    726 F.2d 1381 (9th Cir. 1984) ................................................................................ 7, 8

*Martinez v. Socoma Cos.*,
    11 Cal. 3d 394 (1974) .............................................................................................. 14

*McNeary-Calloway v. JP Morgan Chase, N.A.*,
    863 F. Supp. 2d 928 (N.D. Cal. 2012) .................................................................... 15

*Meridian Project Sys., Inc. v. Hardin Constr. Co.*,
    No. Civ. S-04-2728 FCD DAD, 2005 WL 2615523 (E.D. Cal. Oct. 14, 2005) (Opp. )................ 2

*Mid-South Grizzlies v. Nat'l Football League*,
    720 F.2d 772 (3d Cir. 1983) ...................................................................................... 9

*Montreal Trading Ltd. v. Amax Inc.*,
    661 F.2d 864 (10th Cir. 1981) .................................................................................... 4

*Newcal Indus., Inc. v. Ikon Office Sol.*,
    513 F.3d 1038 (9th Cir. 2008) .................................................................................... 7

*Papasan v. Allain*,
    478 U. S. 265 (1986) ................................................................................................. 5

*Provost v. Regents of the Univ. of Cal.*,
    201 Cal. App. 4th 1289 (2011) ................................................................................ 12

*Rebel Oil Co. v. Atl. Richfield Co.*,
    51 F.3d 1421 (9th Cir. 1995) (Opp. ) ......................................................................... 2

*Reyes v. Saxon Mortg. Servs.*,
    No. 09cv1366 DMS (WMC), 2009 WL 3738177 (S.D. Cal. Nov. 5, 2009) ................ 12

*Saint Alphonsus Med. Ctr.-Nampa Inc. v. St. Luke's Health Sys., Ltd.*,
    778 F.3d 775 (9th Cir. 2015) ...................................................................................... 8

*Seattle Totems Hockey Club, Inc. v. Nat'l Hockey League*,
    783 F.2d 1347 (9th Cir. 1986) .................................................................................... 9

*Solinger v. A.&M. Records, Inc.*,
    718 F.2d 298 (9th Cir. 1983) ...................................................................................... 5

*Spinks v. Equity Residential Briarwood Apartments*,
    171 Cal. App. 4th 1004 (2009) ................................................................................ 12

*St. Louis Reg'l Convention & Sports Complex Auth. v. Nat'l Football League*,
   No. 1722-CC0976, 2017 WL 6885089 (Mo. Cir. Ct. Dec. 27, 2017) ......................................... 11

*Taylor v. Philip Morris Inc.*,
   No. C 03-0758MMC (PR), 2003 WL 22416693 (N.D. Cal. Oct. 20, 2003) ................................. 5

*United States v. Microsoft Corp.*,
   253 F.3d 34 (D.C. Cir. 2001) ............................................................................................... 2

*US Airways, Inc. v. Sabre Holdings Corp.*,
   105 F. Supp. 3d 265 (S.D.N.Y. 2015), *aff'd in relevant part*, 938 F.3d 43 (2d Cir. 2019) .......... 2

*Verni v. Cleveland Chiropractic Coll.*,
   212 S.W.3d 150 (Mo. 2007) ............................................................................................... 11

*Vinci v. Waste Mgmt., Inc.*,
   80 F.3d 1372 (9th Cir. 1996) ............................................................................................... 5

*Yount v. Salazar*,
   No. CV11–8171–PCT DGC, 2013 WL 93372 (D. Ariz. Jan. 8, 2013) ......................................... 6

## **Other Authorities**

Phillip E. Areeda & Herbert Hovenkamp, *Antitrust Law* ¶2214c (3d ed. 1995) ................................. 8

David Haddock et al., *League Structure & Stadium Rent-Seeking – The Role of
   Antitrust Revisited*, 65 Fla. L. Rev. 1 (2013) .............................................................................. 10

**INTRODUCTION**

The Court's Order dismissing Oakland's original Complaint provided a detailed roadmap of the issues Plaintiff would need to address to survive a motion to dismiss:

> (1) whether there are additional potential owners willing to establish new teams if the NFL allowed them to do so; (2) whether such potential owners would have based a team in Las Vegas before the Raiders decided to relocate there; (3) whether the Raiders still would have left Oakland for another city if the NFL allowed additional teams; (4) if the Raiders might still have left, whether an additional team would have been established in Oakland to replace the Raiders, or (5) whether Oakland has made any effort to attract an existing team other than the Raiders or to establish a new expansion team to replace the Raiders. (Order Granting Motion to Dismiss (ECF 64, "Order") (July 25, 2019) at 18)

Oakland's First Amended Complaint (ECF 68, "FAC"), while offering an elaborate term paper advocating for structures like those of European soccer leagues, addressed none of those requirements.

Defendants' Motion to Dismiss the FAC (ECF 73, "Mot.") demonstrated that Oakland had not—and could not—allege the types of facts that the Court held were necessary to state a claim. Oakland's Opposition (ECF 74, "Opp.") does not meaningfully address these failures; instead, it largely rehashes arguments that the Court has already rejected. Oakland still does not allege injury-in-fact; it still does not allege facts that establish antitrust standing; and the FAC's market definition is still fundamentally flawed. Its antitrust claims also fail as a substantive matter because the challenged conduct is neither "price fixing" nor a "group boycott." Oakland's state law contract claim fares no better because nothing in the FAC changes the legal conclusions that the Relocation Policy is not a contract, Oakland is not a third party beneficiary, and Oakland has not alleged a breach.

The FAC should now be dismissed with prejudice.

## I.   THE CITY OF OAKLAND FAILS TO STATE AN ANTITRUST CLAIM

Nothing in the Opposition suggests that Oakland has pled the elements of an antitrust claim.

### A.   Oakland Lacks Standing To Sue Under The Antitrust Laws.

#### 1.   Oakland Has Not Alleged Injury In Fact.

The Court's Order set out the causal chain that Oakland needed to allege (and ultimately prove) to establish that it had suffered injury-in-fact from the NFL's structure. Order at 18. Defendants' Motion demonstrated that the FAC had failed to allege *any* of the links in that chain.

1    Mot. at 7–8. Oakland's Opposition does not disagree. Under the roadmap laid out by the Court's

2    Order, that should be the end of the matter.

3            Oakland attempts to sidestep its obligation to allege and prove injury-in-fact by claiming

4    (Opp. at 8) that the existence of "barriers to entry" relieved it of the obligation to allege each element

5    of the causal chain required to establish injury-in-fact. But that is not the law, and the cases that

6    Oakland cites do not come close to supporting its position. Unlike Oakland, the plaintiffs in *US*

7    *Airways* and *Microsoft* identified specific competitors that had been foreclosed from the market by

8    the defendant' conduct. *See US Airways, Inc. v. Sabre Holdings Corp.*, 105 F. Supp. 3d 265, 282

9    (S.D.N.Y. 2015) (identifying Switchworks and ITA as potential entrants that had tried unsuccessfully

10   to enter the market), *aff'd in relevant part*, 938 F.3d 43 (2d Cir. 2019); *United States v. Microsoft*

11   *Corp.*, 253 F.3d 34, 79 (D.C. Cir. 2001) (identifying Netscape Navigator and Java as foreclosed

12   middleware competitors that posed "nascent threats" to Microsoft). Oakland fails to identify *any*

13   ownership group that unsuccessfully sought to join the NFL, let alone one that would have chosen to

14   locate in Oakland (or Las Vegas prior to the Raiders' decision to move there). Nor does Oakland

15   allege a single fact suggesting an "effort to attract an existing team other than the Raiders or to

16   establish a new expansion team to replace the Raiders." Order at 18.

17           *Rebel Oil Co. v. Atlantic Richfield Co.*, 51 F.3d 1421, 1439 (9th Cir. 1995) (Opp. at 8), does

18   nothing more than define barriers to entry. *Meridian Project Systems, Inc. v. Hardin Construction*

19   *Co.*, No. Civ. S-04-2728 FCD DAD, 2005 WL 2615523, at *6 (E.D. Cal. Oct. 14, 2005) (Opp. at 9),

20   states that barriers to entry are required to allege market power. Neither case stands for the

21   proposition that asserting barriers to entry excuses plaintiff's obligation to allege injury-in-fact.

22           The "intention and preparedness" cases upon which Oakland relies (Opp. at 9–10) are

23   likewise irrelevant. The question is not whether the City had the requisite intention and preparedness

24   to host an NFL team. To allege injury-in-fact, the City was required to allege that there was an NFL

25   team that wanted to be hosted by the City or that the City had sought to attract a new team by

26   expansion or relocation. There are no such allegations in the FAC or arguments in Oakland's

27   Opposition.

28           In any event, the Opposition does not identify any barrier to entry properly alleged in the FAC.

1    The only purported "barrier" is the need for three-fourths of the existing NFL teams to approve

2    expansion, but here too the FAC does not (i) identify any ownership group that sought admission and

3    was denied or (ii) describe any effort by Oakland to secure a new team that was unsuccessful due to

4    the vote requirement. (Of course, a sports league could not exist without some ability to exercise

5    control over the size of its membership.)

6         Nor is there any barrier to a team *applying* to join the NFL. As provided in Section 3.3 of the

7    NFL Constitution and Bylaws (FAC Ex. 1), the only requirement to apply for admission is a $25,000

8    application fee. The FAC does not and cannot allege that this fee is a barrier to seeking admission.[1]

9    Nor could it allege that that ownership groups have been discouraged from applying by a history

10   showing that such an attempt would be futile. On the contrary, the FAC alleges that four new teams

11   have been admitted to the NFL since 1966. FAC ¶9.[2]

12              **2.  Oakland Has Not Alleged Antitrust Injury.**

13        Oakland's claim that it has alleged antitrust injury is wrong. The only *conduct* challenged by

14   the FAC (aside from the NFL's 32-team structure, as to which no injury-in-fact is alleged) is the

15   Raiders' move to Las Vegas without objection by the NFL. Oakland did not suffer *antitrust* injury

16   from the Raiders' move, which resulted from a competitive process in which Las Vegas prevailed. As

17   the Court held, "any harm Oakland may have suffered as an existing host city from procedures that

18   tend to encourage NFL approval of teams' requests to relocate neither 'flows from that which makes

19   the conduct unlawful' nor 'is of the type the antitrust laws were intended to prevent.'" Order at 17

20   (quoting *Brunswick Corp. v. Pueblo Bowl-O-Mat, Inc.*, 429 U.S. 477, 489 (1977)).

21              **3.  Oakland Is Not A Proper Plaintiff.**

22        Even if someone suffered antitrust injury from the Raiders' move to Las Vegas, Oakland did

23   not. That is clear from the cases cited in Defendants' Motion. Oakland's attempts to distinguish those

24   cases are unavailing.

25

26   [1] The City points to "the enormous cost of building a professional team to play in the NFL." Opp. at
     10. But the NFL Constitution and Bylaws does not require that a team (or stadium) be built before an
27   ownership group applies or a city attempts to persuade an ownership group to apply for membership.
     [2] In fact there have been six expansion teams admitted since 1976 (Seattle, Tampa Bay, Jacksonville,
28   Carolina, Cleveland, Houston). Between 1966 and 1976, the NFL admitted two other expansion
     teams (Atlanta, New Orleans) and added ten more through the merger with the AFL in 1970.

1

2

**a.      Oakland Lacks Standing Because It Did Not Pay The Alleged Overcharge Caused By The Challenged Conduct.**

3        Oakland complains that the NFL's structure forces host cities to overpay for teams or to make

4 large public contributions to the construction costs of unduly expensive stadiums. Oakland's premise

5 is demonstrably wrong. As noted in our opening brief (Mot. at 4), Los Angeles recently attracted two

6 teams with no municipal contribution, a fact to which the Opposition did not even respond. But the

7 key point here is that Oakland did not incur—and cannot claim to have incurred—any such expense.

8 That failure is fatal to Oakland's claim of standing.

9        *Montreal Trading Ltd. v. Amax Inc.*, 661 F.2d 864 (10th Cir. 1981) holds that non-purchasers

10 (e.g., those allegedly priced out of the market by the defendants' high prices) lack standing. Oakland

11 attempts to distinguish *Montreal Trading* on the ground that—unlike the plaintiff there—it had a

12 prior course of dealing with the Defendants. *See* Opp. at 12. But as noted in Defendants' opening

13 brief (Mot. at 10 n.5), Oakland is not claiming that it was damaged when it originally attracted the

14 Raiders to Oakland; any such claim would be long-barred by the statute of limitations. Oakland

15 complains that it cannot attract a *new* team (or retain the Raiders) without paying a high price; in that

16 regard, it is situated similarly to every other city in America that might want an NFL team if it could

17 attract one with a modest (or no) contribution or investment. That is a "seemingly unlimited number

18 of plaintiffs" (661 F.2d at 868), of precisely the kind that led the *Montreal Trading* court to deny

19 standing.

20                **b.      Oakland Lacks Standing Because Any Injury Is Indirect.**

21        Defendants demonstrated in their opening brief that Oakland's alleged injury is too indirect to

22 afford standing because any injury-in-fact would be derivative of the "harm" suffered by Oakland's

23 prospective tenant, which presumably would have unsuccessfully sought to join the NFL. *See* Mem.

24 at 10. Oakland's brief fails to address the argument that it lacks standing to sue for such derivative

25 harm. It also fails to account for the Ninth Circuit's holding in *Association of Washington Public*

26 *Hospital Districts v. Philip Morris Inc.*, 241 F.3d 696, 703 (9th Cir. 2001), that insurers lacked

27 standing to challenge an alleged conspiracy among tobacco companies to suppress safer cigarettes

28 because any insurer's harm from paying higher costs to treat smokers was derivative of the harm

- 4 -

1   suffered by the smokers themselves. Oakland's only argument is that there is nobody more directly

2   harmed because of "barriers to entry," but—as described above—the City's real problem is that there

3   is no injury in fact. Oakland's inability to allege the required causal chain cannot be used to transform

4   its indirect alleged injury into one sufficiently direct to afford standing.

5   Oakland also ignores its own allegation that it is only an "indirect owner of the Coliseum"

6   (Complaint ¶17),[3] and its acknowledgment that the "Coliseum is jointly owned by Oakland and

7   Alameda County and is leased to the Oakland-Alameda County Coliseum Financing Corporation,

8   which, in turn, has assigned its rights under that lease to the Oakland-Alameda County Coliseum

9   Authority." FAC ¶29. Oakland does not wholly own or control the Coliseum; it is not the Raiders'

10  landlord and does not collect rents from the Raiders. The current co-owner of the Coliseum, the

11  County of Alameda, is not a plaintiff and has no interest in either this lawsuit or in operating the

12  stadium site as a football stadium. *See* Complaint, *City of Oakland v. County of Alameda*, Alameda

13  Superior Court, Case No. RG19-36930, ¶3 (filed Sept. 27, 2019) (alleging that the County wants to

14  get "out of the sports business").[4] As such, even if the lessor of the stadium could be a proper

15  plaintiff, Oakland's alleged injury would still be too indirect to afford antitrust standing because

16  Oakland is not itself the lessor. *See Vinci v. Waste Mgmt., Inc.*, 80 F.3d 1372, 1375 (9th Cir. 1996)

17  ("'[a] shareholder of a corporation injured by antitrust violations has no standing to sue in his or her

18  own name.'") (quoting *Solinger v. A.&M. Records, Inc.*, 718 F.2d 298, 299 (9th Cir. 1983)).

19  The City cannot avoid dismissal by pointing (Opp. at 13 n.4) to a paragraph of the FAC

20  alleging that the City "is the party injured." FAC ¶217. That legal conclusion is belied by the facts

21  pled in the FAC. *See Papasan v. Allain*, 478 U. S. 265, 286 (1986) (on a motion to dismiss, courts

22  "are not bound to accept as true a legal conclusion couched as a factual allegation").[5]

23  Finally, notwithstanding the Court's invitation (Order at 20 n.12), neither the FAC nor the

24  Opposition explains whether Oakland would have been a "direct" owner and lessor of some new

[3] The Court may properly consider allegations of the original complaint when deciding this motion. *Cole v. Sunnyvale*, No. C-08-05017 RMW, 2010 WL 532428, at *4 (N.D. Cal. Feb. 9, 2010).

[4] "The court may take judicial notice of public records, including allegations made in pleadings and other documents filed in other lawsuits in federal and state court." *Taylor v. Philip Morris Inc.*, No. C 03-0758MMC (PR), 2003 WL 22416693, at *1 (N.D. Cal. Oct. 20, 2003).

[5] The City's statements that it "owns the Coliseum property" (Opp. at 7, 8) are misleading, but even if the City were the sole owner, that would not confer standing.

DEFENDANTS' REPLY BRIEF ISO MOTION TO DISMISS FAC    CASE NO. 3:18-cv-07444-JCS

1   stadium to be built on the Coliseum site or elsewhere. That comes as no surprise; Oakland does not

2   (and cannot) effectively address the allegations of its own lawsuit against Alameda County, where the

3   City alleged that it sought the current Coliseum site "for the development of affordable housing,

4   parks, or open space." Complaint, *City of Oakland v. County of Alameda*, Alameda Superior Court,

5   Case No. RG19-36930, ¶46 (filed Sept. 27, 2019).[6] Nor does the Opposition address the City's term

6   sheet with the Lott Group, which Defendants cited (Mot. at 11) to demonstrate that the City could not

7   allege, consistently with Rule 11, that it would have been a direct owner of any new stadium on the

8   Coliseum site under that proposal. Given Oakland's regular complaints that it *loses* money from the

9   presence of the Raiders (Mot. at 13 n.8), it is not surprising that Oakland failed to explain how it

10  would have participated in and profited from a theoretical new stadium.

### 4. Oakland Lacks Antitrust Standing Because Its Alleged Injuries Are Not Cognizable Under The Antitrust Laws.

13          Oakland continues its failed quest to distinguish *Hawaii v. Standard Oil Co.*, 405 U.S. 251

14  (1972), a position that the Court rejected in its Order (at 21–22). Oakland argues that *Hawaii* is

15  distinguishable because it is suing in its "proprietary capacity," but it is wrong. The City's suit to

16  recover lost tax revenue is not a suit for "damages for injuries to its commercial interests" (*id.* at

17  264), which are the only damages that constitute injury to "business or property" within the scope of

18  Section 4 of the Clayton Act (which creates the private right of action to sue under the Sherman Act).

19          Oakland cites *Yount v. Salazar*, No. CV11–8171–PCT DGC, 2013 WL 93372, at *11–13 (D.

20  Ariz. Jan. 8, 2013), for the proposition that "a local government's proprietary interests can

21  include . . . its powers of revenue and taxation." But *Yount* is not an antitrust case and does not

22  discuss *Hawaii*, so it says nothing about whether lost tax revenue is injury to "business or property"

23  recoverable under the Clayton Act. *Yount*'s discussion of Article III standing, which allows a state

24  government to sue to protect "sovereign interests" (*id.* at *10), is irrelevant to any issue in this case.

25          Oakland also argues (Opp. at 14, citing Opp. at 6–8) that "Defendants misconstrue" *City of*

---

[6] A copy of the Complaint is available at https://www.courthousenews.com/wp-content/uploads/2019/09/Oakland-Coliseum.pdf. While the City of Oakland has since abandoned its complaint against the County, the filing of the lawsuit show how entirely speculative is the City's allegation that, but for the fact the NFL has thirty-two teams, a new football stadium would have sprung up at the Coliseum site.

| DEFENDANTS' REPLY BRIEF ISO MOTION TO DISMISS FAC | CASE NO. 3:18-cv-07444-JCS |

1    *Rohnert Park v. Harris*, 601 F.2d 1040, 1045 (9th Cir. 1979). Oakland appears to be conflating the

2    injury-in-fact requirements (discussed at Opp. at 6–8) and the separate requirement of cognizable

3    antitrust injury (discussed at Opp. at 14). Injury-in-fact has no bearing on whether "municipal

4    investments" may be recovered in an antitrust lawsuit, and the City cannot—and does not—

5    distinguish the Ninth Circuit's plain holding that municipal investments are not a "proprietary

6    interest" within the scope of the Clayton Act. *Rohnert Park*, 601 F.2d at 1044; Order at 20–21.

7            Finally, the City's claim for diminished value of the Coliseum building and Coliseum

8    property fails because the City has not pled a causal chain showing "not only that the Raiders would

9    have remained in Oakland but for Defendants' purported antitrust violation, but also that the Raiders

10   would have remained at the Coliseum, rather than a new stadium as envisioned by the proposal

11   involving Ronnie Lott's investment group." Order at 23. Alleging that "the Raiders would have

12   stayed in Oakland" (Opp. at 15, citing FAC ¶92) is not enough. Even if the Raiders had "stayed in

13   Oakland" with their lease at the Coliseum expired, nothing in Oakland's antitrust theory would have

14   required the Raiders to sign a lease to play in the Coliseum (thus excluding any claim for lost value of

15   the Coliseum building) or at a new building in the same location (thus excluding any claim based

16   upon the lost value of the Coliseum property).

17           **B.  Oakland's Claims Fail As A Substantive Matter.**

18               **1.   Oakland Fails Adequately To Allege A Relevant Market.**

19           Oakland still fails to allege a plausible relevant market. It acknowledges that a market must be

20   based on the product or service offered, not the customer. Opp. at 16. But it is wrong when it argues

21   that its proposed "market is based on a product (here, NFL teams)." *Id*. NFL teams are not the

22   product sold by the cities; cities are offering stadia and other services to NFL teams. FAC ¶189 (cities

23   are "offering"—i.e. *selling*—"home stadia and other support to major league professional football

24   teams"). Accordingly, Oakland's alleged market for "hosting NFL teams" is based on the identity of

25   the customer served—NFL teams. A market so defined is improper, and a complaint based on one

26   should be dismissed. *Newcal Indus., Inc. v. Ikon Office Sol.*, 513 F.3d 1038, 1045 (9th Cir. 2008).

27   *Los Angeles Memorial Coliseum Commission v. National Football League*, 726 F.2d 1381 (9th Cir.

28   1984) ("*Raiders I*"), offers Oakland no support; the Ninth Circuit did not reach a conclusion on the

DEFENDANTS' REPLY BRIEF ISO MOTION TO DISMISS FAC          CASE NO. 3:18-cv-07444-JCS

scope of the relevant market. In that case stadia (not cities, as Oakland alleges here) were the sellers (not the buyers). *Id.* at 1386–90. And the City's claim (Opp. at 17) that "the NFL recognized such a market" for "cities hosting stadium activities" in *Raiders I* is false. In *Raiders I*, the NFL claimed that cities were the sellers. 726 F.2d at 1393. The NFL also alleged that the buyers of the cities' services (or the services offered by stadia) were producers of all forms of entertainment that could take place in a stadium, not just NFL teams. *Id.* Nothing about the NFL's allegations in *Raiders I*, let alone about the Ninth Circuit's decision in that case, supports the City's relevant market here.

Finally, Oakland does not satisfy the Court's instruction that any amended complaint should address the "test of whether a hypothetical monopolist could impose a small but significant nontransitory increase in price (SSNIP) in the proposed market or whether potential host cities would respond to such an increase by substituting other products." Order at 24 (internal quotation marks omitted) (citing *Saint Alphonsus Med. Ctr.-Nampa Inc. v. St. Luke's Health Sys., Ltd.*, 778 F.3d 775, 784 (9th Cir. 2015)). Oakland's response (Opp. at 18) is limited to an argument about the alleged *geographic* market.[7] Oakland makes no effort—nor could it—to demonstrate that the FAC alleged a proper *product or service* market in which the SSNIP test would be satisfied. As this Court already held, "[f]ailure to plead a relevant market for a rule of reason antitrust claim warrants dismissal." Order at 23 (citing *Hicks v. PGA Tour, Inc.*, 897 F.3d 1109, 1120 (9th Cir. 2018)).

### 2. The NFL's 32-Team Structure And Required Vote To Admit New Teams Is Not Unlawful "Price Fixing."

Oakland infers a collusive restriction of output from the fact that the NFL is structured as a closed-membership joint venture with a finite number of teams. *See* Opp. at 18–19. But such a venture is "entitled to determine its members and is certainly not required to accept every applicant." Phillip E. Areeda & Herbert Hovenkamp, *Antitrust Law* ¶2214c (3d ed. 1995). Oakland offers no

---

[7] The City's application of the SSNIP test to its proposed geographic market is in any event incorrect. It is irrelevant that there are currently no NFL teams outside the United States. To apply the SSNIP test to a geographic market, the question is whether customers (here the NFL teams) would lease stadia and procure other services from host cities outside United States in response to unfavorable terms offered by host cities inside the United States. *See, e.g.*, *Saint Alphonsus Med. Ctr.*, 778 F.3d at 784 ("If enough consumers would respond to a SSNIP by purchasing the product from outside the proposed geographic market, making the SSNIP unprofitable, the proposed market definition is too narrow.").

1    authority—and we are aware of none—supporting its suggestion that an antitrust court or jury may

2    substitute its judgment for that of the venture about the optimal number of venture members; that

3    argument fails the test of common sense.

4         Relying on academic opinion, Oakland asserts that the NFL would profit from expanding into

5    additional markets, but that is not a basis for antitrust liability. As the Supreme Court noted in

6    affirming dismissal of an antitrust challenge, no business "enters every market that an outside

7    observer might regard as profitable." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 569 (2007); *see also*

8    *Am. Needle, Inc. v. Nat'l Football League*, 560 U.S. 183, 202 (2010) ("Football teams that need to

9    cooperate are not trapped by antitrust law."). Oakland's citation to a monograph providing an

10   "international perspective" on the economics of sports which puts the number at 42 teams (FAC ¶43)

11   cannot justify imposing antitrust liability based on Oakland's disagreement with the business

12   judgment of the NFL's members regarding the optimal NFL structure.

13        Oakland's attempt to distinguish the cases rejecting antitrust challenges to closed-membership

14   sports leagues also fails. Like the plaintiffs in those cases, Oakland has failed to "allege[] any harm to

15   competition." Opp. at 19. As the Ninth Circuit has recognized, a league's failure to add a franchise in

16   a particular city leaves that city open as a potential site for a club in another league, so no injury to

17   competition results. *See Seattle Totems Hockey Club, Inc. v. Nat'l Hockey League*, 783 F.2d 1347,

18   1350 (9th Cir. 1986). The same is true here: the lack of an NFL team in Oakland provides an

19   opportunity for competing leagues to gain the fan base and stadium facilities that Oakland touts as

20   purportedly second to none. *See* FAC ¶138; *see also Mid-South Grizzlies v. Nat'l Football League*,

21   720 F.2d 772, 786 (3d Cir. 1983) (leaving franchise location open was "patently pro-competitive").

             **3.   Oakland Fails To Allege A Group Boycott.**

23        The Opposition contains no substantive response to Defendants' argument that Oakland

24   cannot allege a group boycott where only one team—the Raiders—has decided not to do business

25   with the City. Mot. at 17–18. "[I]n order to have a group boycott, there must be more than one

26   boycotter." *Charley's Taxi Radio Dispatch Corp. v. SIDA of Haw., Inc.*, 810 F.2d 869, 877 n.7 (9th

27   Cir. 1987). The Court's Order required Oakland to allege more than that "Defendants jointly allowed

28   the Raiders to relocate"; to state a group boycott claim, Oakland was required to allege "an agreement

- 9 -

that no team could be located in or do business with Oakland." Order at 14 n.7 (emphasis omitted). There is no such allegation.

Instead, Oakland cites a law review article. *See* Opp. at 20 (citing FAC ¶140 (quoting David Haddock et al., *League Structure & Stadium Rent-Seeking – The Role of Antitrust Revisited*, 65 Fla. L. Rev. 1, 3–7, 49–50 (2013)). A law review article is not an evidentiary fact, and a law review article published four years before the NFL approved the Raiders' relocation does not and cannot provide evidence about what happened in this case. It cannot salvage Oakland's group boycott claim.[8]

## II.  THE CITY OF OAKLAND FAILS TO STATE A CONTRACT CLAIM.

The Court previously cautioned Oakland that it should amend only if it "is able to cure the defects identified" in the Court's Order granting the Defendants' motion to dismiss. Order at 30. Oakland has not done so with its claim asserting a breach of the League's Relocation Policy. Oakland's new allegations are almost exclusively about two completely different documents: a failed Senate bill and a "Statement of Principles" regarding relocation. The City does not contend that either of these documents was a contract or was breached. And the Court already took note of both of these documents (which are referenced in the Relocation Policy itself) when it ruled that Oakland's contract claim failed as a matter of law. *See* Order at 27 n.16.

In its Order, the Court recognized that the Relocation Policy on its face "repeatedly reinforces the conclusion that its overriding motivation is the NFL's business interests . . . not the interests of host cities." *Id.* at 25, 28. The Court also recognized that the Policy "lays out a process to resolve whether a proposed relocation satisfies the NFL teams' business interests" (a vote of the teams). *Id.* at 28. That process is inconsistent with the notion that the NFL teams "intended that host cities should be able to sue for breach." *Id.* Oakland's opposition does not and cannot overcome the Court's determination that, in light of those indisputable facts, the Relocation Policy fails two of the three requirements recently established by the California Supreme Court in *Goonewardene v. ADP, LLC*, 6 Cal. 5th 817 (2019), for third-party beneficiary status. In addition, the Opposition does nothing to address the Court's legal conclusion that dismissal of Oakland's contract claim likely would also be required by the Relocation Policy's lack of a "sufficiently definite promise" to support either the

---

[8] Oakland has also never explained how the NFL could be boycotting the market when the 49ers play in Santa Clara. Does Oakland believe the NFL is boycotting every other city in the Bay Area?

existence of an enforceable contract or the allegation that the Policy was breached. Order at 28.

### A.  The Relocation Policy Is Not A Contract.

As set forth in the opening brief, the Relocation Policy is not enforceable as a contract—even by the NFL and its members clubs—for two reasons: it was unilaterally adopted and can be changed at any time by the Commissioner, and the portion relied on by Oakland is at most a list of non-exclusive factors that the NFL members clubs may consider in exercising their business judgment.

Oakland ignores the first point. While "[t]he Court assume[d] for the sake of argument" that a breach of the Policy could be enforced by member teams as a breach of the NFL's bylaws (Order at 24), Defendants maintain their position that the manner in which the Policy was promulgated—unilaterally by the Commissioner—alone is fatal to Oakland's claim of a binding contract.

With respect to the second point, Oakland merely reasserts its previous argument that promises to consider factors may be enforceable if sufficiently definite. The cases it cites do not support that contention. *Ladas v. Cal. State Auto. Ass'n*, 19 Cal. App. 4th 761, 771 (1993), gives no examples of enforcement of a contract in which the promisor agreed only to consider factors. *Amaral v. Cintas Corp. No. 2*, 163 Cal. App. 4th 1157, 1192 (2008), addresses vagueness in the context of a contract that required an employer to pay a "living wage," not a promise to consider. Neither case explains how a court would determine if parties had actually and sufficiently considered a factor (some minimum amount of time they were required to discuss it? A memo addressing it?). And here, to find the Policy enforceable as a contract would require a further leap, since the Policy merely provides a list of factors that the clubs "may" consider. Oakland has cited no precedent to support enforcement of such an indefinite "promise," especially in light of the California Supreme Court's warning that enforcement of vague internal policies of private associations is to be avoided. *See Cal. Dental Ass'n v. Am. Dental Ass'n*, 23 Cal. 3d 346, 353 (1979).[9]

### B.  Oakland Is Not A Third Party Beneficiary Of The Relocation Policy.

As the Court previously found, Oakland's purported claim to third party beneficiary status does not satisfy two of the three factors under the California Supreme Court's test in *Goonewardene*.

---

[9] Oakland again cites the trial court's short order in *St. Louis Regional Convention & Sports Complex Authority v. National Football League*, No. 1722-CC0976, 2017 WL 6885089 (Mo. Cir. Ct. Dec. 27, 2017). This order contains no reasoning, is not binding on this Court, and is inconsistent with Missouri law. *See Verni v. Cleveland Chiropractic Coll.*, 212 S.W.3d 150, 153 (Mo. 2007).

The FAC does not and cannot cure these defects.

### 1. The Relocation Policy's Motivating Purpose Is To Protect the League's Interests, Not To Help Incumbent Cities Lock In Franchises.

The Relocation Policy itself identifies its motivating purpose: advancing "the League's collective interests" with regard to the potential relocation of member clubs. Oakland does not dispute that this is the primary purpose of the Relocation Policy; it argues only that a contract may have more than one motivating purpose and that an *additional* motivating purpose of the Policy might have been to protect incumbent home cities against the relocation of NFL franchises. But as the Court determined, "the overriding motivation" of the Policy is to further the League's "business interests." Order at 25. Indeed, the words "business judgment," "interests of the League," "the League's interests," and "collective interests" of the clubs appear no fewer than 15 times in the six-page Policy. The purported secondary purpose suggested by Oakland is the opposite of the primary and overriding purpose articulated in the Relocation Policy. If the Policy were read to require the NFL to prevent a club from relocating when doing so would, in its judgment, be in in the League's business interests, then the Policy would *prevent* the League from advancing its collective business interests. Not surprisingly, Oakland cites no authority finding a motivating purpose to benefit a third party when that purpose is inconsistent with the overriding purpose of the contract.

To the contrary, the authorities cited by Oakland involve circumstances in which there was no actual or potential inconsistency. In *Provost v. Regents of the University of California*, 201 Cal. App. 4th 1289, 1299 (2011), defendants were permitted to enforce a settlement that they had not themselves signed because the language of the settlement "demonstrate[ed] it was made for the benefit of [all] defendants." [10] In *Reyes v. Saxon Mortgage Services*, No. 09cv1366 DMS (WMC), 2009 WL 3738177, at *2 (S.D. Cal. Nov. 5, 2009), plaintiff alleged that he was a third party beneficiary of a contract between his lender and Fannie Mae to assist homeowners with loan modifications; there was no evidence before the court that the agreement had any other purpose.

---

[10] Plaintiff also cites *Provost* for its quotation from *Spinks v. Equity Residential Briarwood Apartments*, 171 Cal. App. 4th 1004, 1022–23 (2009), which found a triable issue of fact as to whether a lease between a landlord and an employer to provide housing for an employee conferred third party beneficiary status on the employee. If *Spinks* stands for the position that third party beneficiary status can be found merely because the promisor knows that performance may benefit the third party, it is inconsistent with *Goonewardene*'s three prong test.

1    The plain import of the Policy's language is not changed because *other* documents contain

2    different language or because people involved in drafting those other documents spoke about

3    protecting cities. Similarly, while the FAC cites a letter from an NFL executive in which he stated

4    that "[t]he amended guidelines balance and protect the interest of the cities, the League and

5    individual teams" (FAC ¶81), the letter says nothing about allowing third parties to enforce the

6    Relocation Policy. Rather it is a statement that the League itself may choose to give consideration to

7    such interests in determining whether to approve a relocation. And, in fact, that is what the Statement

8    of Principles says: "The League should have the ability to enforce its own rules and the obligation to

9    follow a set process before the relocation of a team is permitted to occur. . . . Control of team location

10   is a matter for the League members to determine jointly, according to rules established and applied by

11   the League." FAC ¶80.

12   Oakland also fails to recognize that the Relocation Policy applies to "home territories," not

13   "host cities." It never uses the word "host" or "cities" and refers to "city" only in the context of

14   describing the NFL Constitution.[11] The difference is intentional and important. "Home Territory" is a

15   defined term in the NFL Constitution and Bylaws, meaning "the surrounding territory to the extent of

16   75 miles in every direction from the exterior corporate limits" of the city in which a team plays. FAC

17   Ex. 1, §4.1. The plain language of the Policy does not apply to an individual "city" or that city's

18   particular stadium deal; indeed, relocations by a team to a different city within its "Home Territory"

19   (e.g., the 49ers' relocation from San Francisco to Santa Clara) does not require consideration of the

20   factors listed in the Policy at all. Oakland has no answer to this.

21   Thus, if the Policy were intended to advance the interest of anyone in addition to the

22   League—and it is not—it could only be with regard to the specifically defined broad term "Home

23   Territories." By its plain language, it cannot have been intended to protect interests of constituent

24   parts of Home Territories (like particular cities, stadia, stadium lease deals, individual fans, or

25   businesses that benefit from the fact that a particular team plays in a particular location) because

26   those interests may be no less affected by team movements within a home territory.

27   Oakland attempts to distinguish *Klamath Water Users Protective Ass'n v. Patterson*, 204 F.3d

28   ───────────────

[11] In fact, the reference to "city" in the NFL Constitution shows that the NFL knows how to identify cities when it means to. It did not do so in the Relocation Policy.

- 13 -

1206, 1212 (9th Cir. 1999), and *Martinez v. Socoma Cos.*, 11 Cal. 3d 394, 406 (1974) (*see* Opp. at 23

n.14), but it misses the point of those decisions: When a contract broadly benefits an overall region, it

does not confer third party beneficiary status on all members of the general public within that

region—even those who are "in a position to benefit more directly than certain other members of the

public from performance of the contract." *Socoma*, 11 Cal. 3d at 406. *If* "host cities" had standing as

third party beneficiaries, then so would every constituent part of the home territory—every person

and entity within 75 miles.[12]

### 2.   Third Party Enforcement Is Not Consistent With The "Contracting Parties'" Reasonable Expectations.

In arguing that it can satisfy *Goonewardene*'s third factor, Oakland cites various statements to

the effect that the League would consider certain interests in evaluating relocation applications. None

of those statements speaks to the League's expectations or understanding concerning third party

lawsuits to enforce the Relocation Policy. As this Court recognized in dismissing the original

complaint, the California Supreme Court held that if the contract itself provided a process to

determine whether its purpose had been achieved, that would indicate that the parties did not intend

third-party enforcement. Order at 28 (citing *Goonewardene*, 6 Cal. 5th at 836). Here, as the Court

emphasized, there is such "a process to resolve whether a proposed relocation satisfies the NFL

teams' business interests: the vote of the NFL's member teams themselves." *Id*. The Court also

recognized that third party enforcement would be deeply disruptive and could impose substantial

costs on the League. *See id.*; *see also Goonewardene*, 6 Cal. 5th at 836 (identifying such costs as

inconsistent with the expectations of the contracting party). Third party enforcement would also

compromise the "objectives of the enterprise embodied in the contract," namely the NFL's business

interests. Order at 28. Oakland has no answer as to why the Commissioner or the teams would have

reasonably expected third party enforcement or why such third party enforcement would not be

deeply unsettling to the League's objective of self-governance.

---

[12] While there may be no legal entity called a "home territory," that does not require conferring intended third party beneficiary status on cities (or anyone else); it just means that there are no intended third party beneficiaries. Many contracts are not amenable to third party enforcement. The Relocation Policy (if it were even a contract) would fall within that category: it would only be enforceable by the Commissioner and the members, who may reject a Club's application to relocate.

**C.  Oakland Has Not Alleged A Breach.**

Finally, Oakland does not allege a breach. In its opposition, Oakland retreats from its prior contention that the Relocation Policy's factors favored keeping the Raiders in Oakland. It now argues that the Raiders breached the Relocation Policy merely by engaging in discussions with other jurisdictions and by not maximizing fan support in Oakland. Opp. at 25. But the Policy expressly *permits* a team to "discuss a possible relocation" and "negotiate a proposed lease or other arrangement" with a community outside its Home Territory. And even if a vague commitment to "maximize fan support" were enforceable, the FAC does not say what more the Raiders could have done; to the contrary, it alleges the Raiders had strong fan support in Oakland. *See, e.g.*, FAC ¶¶16, 22 ("Raiders . . . had one of the most loyal fan bases in the NFL in Oakland.").

**III.  THE CITY OF OAKLAND FAILS TO STATE AN UNJUST ENRICHMENT CLAIM.**

Oakland argues that it can maintain a stand-alone claim for unjust enrichment, understood as a claim for restitution or quasi-contract, in the alternative to its contract claim. But it continues to ignore its own claim of a lease agreement setting forth the Raiders' obligations. It nowhere alleges that the lease is invalid or unenforceable. "An action based on an implied-in-fact or quasi-contract cannot lie when there exists between the parties a valid express contract covering the same subject matter." *See Lance Camper Mfg. Corp. v. Republic Indem. Co.*, 44 Cal. App. 4th 194, 203 (1996).

The cases cited by Oakland are not to the contrary. *See McNeary-Calloway v. JP Morgan Chase, N.A.*, 863 F. Supp. 2d 928, 964 (N.D. Cal. 2012) (permitting claim when plaintiff alleged contract "was procured by fraud or is unenforceable or ineffective for some reason"); *Hawthorne v. Umpqua Bank*, No. C-11-6700 YGR, 2012 WL 1458194, at *3 (N.D. Cal. Apr. 26, 2012) (plaintiffs alleged contract was unconscionable). Notably, Oakland does not and cannot allege that the Raiders breached their lease. To the contrary, the Raiders honored their lease through its conclusion and several extensions; and Oakland received the full benefit of the bargain under those agreements.

**CONCLUSION**

For the foregoing reasons, the First Amended Complaint should be dismissed with prejudice.

DATED:  January 10, 2020.

Respectfully submitted,

**ARNOLD & PORTER KAYE SCHOLER LLP**
KENNETH G. HAUSMAN (Bar No. 57252)
kenneth.hausman@arnoldporter.com
DANIEL B. ASIMOW (Bar No. 165661)
daniel.asimow@arnoldporter.com
DAVID J. REIS (Bar No. 155782)
david.reis@arnoldporter.com

WILLIAM J. BAER (appearance *pro hac vice*)
bill.baer@arnoldporter.com
JONATHAN I. GLEKLEN (appearance *pro hac vice*)
jonathan.gleklen@arnoldporter.com
601 Massachusetts Ave, NW
Washington, D.C. 20001-3743
Telephone:    202.942.5000
Facsimile:    202.942.5999

By:    /s/ *Daniel B. Asimow*
          DANIEL B. ASIMOW

*Attorneys for Defendant*
THE OAKLAND RAIDERS

**COVINGTON & BURLING LLP**
JOHN E. HALL (Bar No. 118877)
jhall@cov.com
GREGG H. LEVY (appearance *pro hac vice*)
glevy@cov.com
DEREK LUDWIN (appearance *pro hac vice*)
dludwin@cov.com
BENJAMIN J. RAZI (appearance *pro hac vice*)
brazi@cov.com
One CityCenter
850 Tenth Street, NW
Washington, DC  20001-4956
Telephone:    202.662.6000
Facsimile:    202.662.6291

By:    /s/ *John E. Hall*
          JOHN E. HALL

*Attorneys for Defendants*
THE NATIONAL FOOTBALL LEAGUE and
all NFL clubs other than The Oakland Raiders

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**SIGNATURE ATTESTATION**

I, Daniel B. Asimow, am the ECF user whose user ID and password are being utilized to electronically file this **Defendants' Reply Brief in Support of Motion to Dismiss First Amended Complaint**. Pursuant to Local Rule 5-1(i)(3), I hereby attest that the other signatory to the Reply Brief, John E. Hall, has concurred in this filing.

Dated: January 10, 2020.                    ARNOLD & PORTER KAYE SCHOLER LLP

By:   */s/ Daniel B. Asimow*
      DANIEL B. ASIMOW

      *Attorneys for Defendant*
      THE OAKLAND RAIDERS