1
2
3
4                       UNITED STATES DISTRICT COURT

5                     NORTHERN DISTRICT OF CALIFORNIA

6

7    CITY OF OAKLAND,                          Case No. 18-cv-07444-JCS

8                    Plaintiff,

9          v.                                  **ORDER REGARDING MOTION TO
                                               DISMISS FIRST AMENDED
10   OAKLAND RAIDERS, et al.,                  COMPLAINT**

                     Defendants.               Re: Dkt. No. 73
11

12   **I.      INTRODUCTION**

13          Plaintiff the City of Oakland ("Oakland") brings this action against the Defendants the

14   Oakland Raiders (the "Raiders"), the National Football League (the "NFL"), and all thirty-one

15   other teams in the NFL,[1] asserting that the Raiders' decision to leave Oakland, and the NFL's

16   approval of that decision, violate the antitrust laws and the NFL's own governing documents,

17   among other claims.  On a motion by Defendants, the Court previously dismissed Oakland's

18   complaint with leave to amend.  Oakland has now filed a first amended complaint, and Defendants

19   move to dismiss once again under Rule 12(b)(6) of the Federal Rule of Civil Procedure.  The

20   Court held a public hearing by videoconference on April 17, 2020.  For the reasons discussed

21   below, Defendants' motion is GRANTED, Oakland's claim under the Sherman Act is

22   DISMISSED with prejudice, and its remaining claims under state law are DISMISSED for lack of

23

24   [1] The other teams are the Arizona Cardinals, Atlanta Falcons, Baltimore Ravens, Buffalo Bills,
25   Carolina Panthers, Chicago Bears, Cincinnati Bengals, Cleveland Browns, Dallas Cowboys,
     Denver Broncos, Detroit Lions, Green Bay Packers, Houston Texans, Indianapolis Colts,
26   Jacksonville Jaguars, Kansas City Chiefs, Los Angeles Chargers, Los Angeles Rams, Miami
     Dolphins, Minnesota Vikings, New England Patriots, New Orleans Saints, New York Giants, New
27   York Jets, Philadelphia Eagles, Pittsburgh Steelers, San Francisco 49ers, Seattle Seahawks, Tampa
     Bay Buccaneers, Tennessee Titans, and Washington Redskins.  The full names of the entities
28   controlling those teams and named as defendants can be found at paragraph 31 of Oakland's
     amended complaint.

United States District Court
Northern District of California

1   subject matter jurisdiction, without prejudice to pursuing those claims in a court of competent

2   jurisdiction.[2]

3   **II.       BACKGROUND**

4          **A.    Factual Overview and Previous Order**

5          This case concerns the Raiders' decision, formalized in a January 2017 request to the NFL,

6   to relocate from Oakland, California—where the Raiders had played in a stadium known as the

7   Coliseum for many years—to Las Vegas, Nevada, despite efforts by Oakland to entice the Raiders

8   to stay.  Under the NFL's bylaws, any team's relocation must be approved by a three-quarters

9   majority of all thirty-two NFL teams, and such decisions often require the relocating team to pay a

10  fee to the other teams.  In March of 2017, the team owners voted to approve the Raiders'

11  relocation with a $378 million fee.  Oakland brings claims for violation of § 1 of the Sherman Act,

12  breach of contract (i.e., the NFL relocation policy), and unjust enrichment.  The factual allegations

13  of the case are summarized in more detail in the Court's previous order dismissing Oakland's

14  original complaint with leave to amend.  Order Granting Mot. to Dismiss ("July 2019 Order," dkt.

15  64)[3] at 2–8.  New allegations of the first amended complaint are addressed where relevant in the

16  analysis section of this order.

17         The Court previously dismissed Oakland's Sherman Act claims for failure to allege

18  antitrust injury.  *Id.* at 15–18.  To the extent that Oakland's claims were based on the NFL's

19  imposition of a $378 million fee as part of its approval of the Raiders' request to relocate, the

20  Court held that requiring such a fee would *discourage* teams like the Raiders from seeking to

21  relocate, and thus would tend to help rather than harm existing host cities like Oakland.  *Id.* at 15–

22  16.  Once a team has applied to relocate, a mechanism that encourages the NFL to approve that

23  request moves the process closer to an unrestricted market (where teams would be free to relocate

24  without seeking approval), and the Court therefore held that any harm caused by that incentive for

25

26  _____

    [2] The parties have consented to the undersigned magistrate judge presiding over the case for all
27  purposes pursuant to 28 U.S.C. § 636(c).
    [3] *City of Oakland v. Oakland Raiders*, No. 18-cv-07444-JCS, 2019 WL 3344624 (N.D. Cal. July
28  25, 2019).  Citations herein to the Court's previous order refer to page numbers of the version filed
    in the Court's ECF docket.

United States District Court
Northern District of California

United States District Court
Northern District of California

approval is not "'of the type the antitrust laws were intended to prevent.'"  *Id.* at 16–17 (quoting *Somers v. Apple, Inc.*, 729 F.3d 953, 963 (9th Cir. 2013)).  To the extent that Oakland instead based its claim on the NFL's restriction to thirty-two teams, the Court held that Oakland had not sufficiently alleged antitrust injury because it neither alleged that the Raiders would have remained (or some other team would have played in Oakland) if more teams were allowed in the NFL, nor addressed what structure it believed would be permissible if the current thirty-two teams structure were not.  *Id.* at 17–18.

While those issues of antitrust injury were sufficient for dismissal, the Court also briefly addressed some of Defendants' arguments concerning damages.  *Id.* at 19–24.  The Court held that Oakland's status as a "landlord" did not inherently bar it from recovering antitrust claims, *id.* at 19–20 (distinguishing *R.C. Dick Geothermal Corp. v. Thermogenics, Inc.*, 890 F.2d 139 (9th Cir. 1989) (en banc)), but that the Ninth Circuit's decision in *City of Rohnert Park v. Harris*, 601 F.2d 1040, 1044 (9th Cir. 1979), foreclosed a theory of damages based on "lost municipal investment" that Oakland might have made based on its expectation that the Raiders would remain, July 2019 Order at 20–21.  The Court also held that "lost tax revenue based broadly on 'the presence of the Raiders and the economic activity their presence generates,'" *id.* at 22 (quoting Compl. (dkt. 1) ¶ 96), was not the type of injury redressable under the antitrust laws, but the Court did not rule out the possibility that a more narrowly tailored category of tax revenue, negotiated as part of an agreement between a local government and a private entity, might "take on a 'commercial' instead of—or as well as—'sovereign' character" such that it could support antitrust damages.  *Id.* at 21–22.  The Court did not address in detail Oakland's claim for damages based on diminution in value of the Coliseum, but noted that it "would require Oakland to plausibly allege not only that the Raiders would have remained in Oakland but for Defendants' purported antitrust violation, but also that the Raiders would have remained at the Coliseum, rather than a new stadium" in Oakland as some of the negotiations between the parties had contemplated.  *Id.* at 22–23.

Without reaching a firm conclusion on the subject of Oakland's alleged relevant market, the Court addressed that issue as follows:

Oakland's theory of the relevant market—cities offering or willing to offer "home stadia and other support to major league professional football teams in the geographic United States," Compl. ¶ 88—is somewhat unorthodox. Although *L.A. Memorial Coliseum* considered a somewhat similar market for "[f]ootball stadia," 791 F.2d at 1365, Oakland cites no case recognizing a market comprised of cities seeking to attract professional sports franchises. Failure to plead a relevant market for a rule of reason antitrust claim warrants dismissal, *Hicks v. PGA Tour, Inc.*, 897 F.3d 1109, 1120 (9th Cir. 2018), and as Defendants note, markets defined by their consumers rather than the products at issue are not generally cognizable, *Newcal Indus., Inc. v. Ikon Office Sol.*, 513 F.3d 1038, 1045 (9th Cir. 2008). Oakland's reference to "support to major league professional football teams" raises issues with respect to that rule, although Oakland may be able to amend to allege specific forms of "support" that happen to be unique to NFL teams. As Defendants also note, Oakland's complaint includes only conclusory assertions that other professional sports franchises do not complete with NFL teams for stadiums. *See* Compl. ¶ 89 ("Not only is the entire Host City tied up in the NFL process, a professional baseball team is not a substitute for a professional football team."). Oakland's complaint does not address the test of "whether a hypothetical monopolist could impose a 'small but significant nontransitory increase in price' ('SSNIP') in the proposed market," or whether potential host cities would respond to such an increase by substituting other "products." *See Saint Alphonsus Med. Ctr.-Nampa Inc. v. St. Luke's Health Sys., Ltd.*, 778 F.3d 775, 784 (9th Cir. 2015). On the other hand, the massive public subsidies of NFL stadiums and the competition among cities alleged in the complaint tend to suggest a market at least similar to Oakland's proposed definition. While the Court declines to resolve whether Oakland's current allegations support a cognizable relevant market, if Oakland chooses to amend its complaint, it should consider Defendants' arguments regarding this issue.

*Id.* at 23–24.

The Court assumed for the sake of argument that the NFL's relocation policy was enforceable as a contract, but held that Oakland had not alleged facts sufficient to show that it was a third-party beneficiary of that policy with standing to enforce it under California law. *Id.* at 24–28. Although the Court declined to reach Defendants' other arguments regarding Oakland's claim for breach of contract, the Court noted that "the issues of whether the relocation policy's statement that teams' 'business judgments may be informed through consideration of the factors listed below, as well as other appropriate factors' is a sufficiently definite promise to be enforceable and whether Oakland has plausibly alleged a breach of that provision would likely also support dismissal of Oakland's contract claim." *Id.* at 28. Finally, the Court dismissed Oakland's claims for quantum meruit and unjust enrich because those claims do not lie where parties have an

1    enforceable written contract, and Oakland's relationship with the Raiders was governed by the

2    Raiders' lease agreement at the Coliseum. *Id.* at 29.

3        **B.    Parties' Arguments**

4            **1.    Arguments Regarding Oakland's Sherman Act Claim**

5        Defendants argue that Oakland has not cured the defects identified in the Court's previous

6    order. *See generally* Mot. (dkt. 73).  According to Defendants, Oakland has not added any factual

7    allegations to indicate that the Raiders would have remained in Oakland or a different NFL team

8    would have played in Oakland if the NFL permitted more than thirty-two teams in the league. *Id.*

9    at 7–8.[4]  In response, Oakland argues its allegations that the Raiders have historically played at the

10   Coliseum and that a recent economic analysis ranked Oakland as the top city for an NFL team, as

11   well as allegations regarding the NFL's barriers to entry, are sufficient to show damage as a result

12   of the limited number of teams. Opp'n (dkt. 74) at 7–10.

13       Defendants also argue that Oakland lacks antitrust standing because it is not a participant

14   in the same market as Defendants, with Oakland neither competing against Defendants nor

15   consuming their product.  Mot. at 9–10.  Defendants contend that courts do not allow plaintiffs

16   who declined to purchase a product at issue to bring antitrust claims, even if the plaintiffs allege

17   that they would have purchased the product but for the price increase caused by purportedly

18   anticompetitive product, and that the same principle would apply regardless of whether Oakland

19   were viewed as a potential "buyer" or potential "supplier" in the relationship between "host cities"

20   and NFL teams. *Id.* & 9–10 & n.4 (citing *Montreal Trading Ltd. v. Amax Inc.*, 661 F.2d 864 (10th

21   Cir. 1981)).  Oakland argues that the rule of *Montreal Trading* only applies to plaintiffs with no

22   prior course of dealing with the defendants, and that the Ninth Circuit has recognized that a

23   plaintiff can sue for being forced out of business by anticompetitive conduct, as Oakland claims it

24   was here with respect to its "business" as a host city.  Opp'n at 11–13 (citing, *e.g.*, *Oltz v. St.*

25   *Peter's Cmty. Hosp.*, 19 F.3d 1312, 1314 (9th Cir. 1994)).  Defendants' reply brief does not

26

27   _____

     [4] Defendants note that the NFL's bylaws do not restrict the league to thirty-two teams per se, but
28   required approval by the existing teams to admit any new teams beyond the existing thirty-two
     teams.  Mot. at 7.

United States District Court
Northern District of California

United States District Court
Northern District of California

1   address this theory of a plaintiff with a previous course of dealing being "forced out of business"

2   as an exception to *Montreal Trading*.  *See generally* Reply (dkt. 76).

3          Defendants contend that any injury suffered by Oakland is indirect, because Oakland

4   neither owns a football team excluded from the NFL nor directly entered a lease with the Raiders

5   for the use of the Coliseum, which Oakland and co-owner Alameda County instead leased to the

6   Oakland-Alameda County Coliseum Financing Corporation, which assigned its rights under the

7   lease to the Oakland-Alameda County Coliseum Authority ("OACCA"), which in turn leased the

8   stadium to the Raiders.  Mot. at 10–11.  Defendants briefly renew their argument (rejected in the

9   Court's previous order) that the Ninth Circuit's decision in *R.C. Dick* forecloses any antitrust

10  claim based on a party's interest as a landlord, and also argue that Oakland has not alleged the sort

11  of price fixing directly affecting a rental market that the Court previously held might survive *R.C.*

12  *Dick*.  *Id.* at 11–12.  Oakland contends that it is an appropriate plaintiff because Defendants'

13  arguments raise factual issues inappropriate for resolution on the pleadings and because it alleges

14  that "'[a]lthough [the OACCA] manages the Coliseum site for Oakland, Oakland is the entity with

15  the economic interest in that site and, accordingly, is the entity that suffers from losses related to

16  that site.'"  Opp'n at 13–14 & n.4 (quoting 1st Am. Compl. ("FAC", dkt. 68) ¶ 217).

17         In a somewhat overlapping argument, Defendants contend that Oakland's alleged injuries

18  are not of a type cognizable under the antitrust laws, because the Ninth Circuit held in *Rohnert*

19  *Park* that lost municipal investment is not recoverable, because lost tax revenue is a sovereign

20  interest that does not fall within the commercial damages redressable under the Clayton Act,

21  because Oakland does not allege that the Raiders paid rent to Oakland, and because any

22  diminution of value of the Coliseum would occur even if the Raiders remained in Oakland but

23  played at a new stadium, which was one of the options contemplated in the parties' negotiations.

24  Mot. at 12–14.  Oakland argues that its injury is sufficient, based on the Supreme Court's holding

25  that governments may sue under the Clayton Act in their "'proprietary capacity,'" and based on

26  general principles against requiring specificity in allegations of damages.  Opp'n at 14–16 (citing,

27  *e.g.*, *Hawaii v. Standard Oil Co. of Cal.*, 405 U.S. 251, 264 (1972)).

28         Defendants argue that Oakland has not alleged a cognizable market, contending that

6

because "Defendants do not compete with each other in the alleged relevant market of 'hosting NFL team,'" but instead cities and stadiums compete to attract teams, a more appropriate framework would view the cities as suppliers and the NFL teams as consumers of the cities' stadiums. *See* Mot. at 14–15.  Because the Ninth Circuit has held that a market cannot be defined merely by the identity of its consumers, Defendants argue that viewing host cities as suppliers and the teams as consumers would require the market to encompass other forms of stadium entertainment or other ways in which cities can generate tax revenue and economic activity, which Oakland's complaint does not consider. *Id.* at 15–16.  Oakland contends that the Ninth Circuit has more than once recognized that NFL football is a unique product, that a jury so found in litigation regarding the Raiders' 1982 move to Los Angeles, and that it has addressed the appropriate economic test for determining a relevant market in the context of alleging that the United States is the relevant geographic market.  Opp'n at 17–18.

Defendants also contend that Oakland has not stated a claim based on the NFL's limited thirty-two structure because courts have generally recognized that sports leagues may limit their membership, and because Oakland has not—despite the invitation of the Court's previous order—addressed what alternative structure might be permissible if the NFL's current structure is not. Mot. at 16–17.  Oakland argues that this case differs from those cited by Defendants because the teams and athletes seeking to join leagues in those cases had not alleged a broader harm to competition beyond their own exclusion.  Opp'n at 18–20.  Finally, Defendants argue that Oakland has not stated a claim based on a "group boycott" because it has not alleged that it sought to attract any NFL team besides the Raiders (or a new expansion team) nor alleged that the NFL prevented any other team from playing in Oakland, Mot. at 17–18, while Oakland argues that it has alleged a boycott because the decision to relocate the Raiders required joint approval by the other NFL teams and because commentators have suggested that, in closed sports leagues, " ' "a threat by an individual team to relocate may comprise an implicit threat of a concerted boycott," ' " Opp'n at 20 (quoting FAC ¶ 140 (in turn quoting a law review article)).

### 2.    Arguments Regarding Breach of Contract and Unjust Enrichment

Defendants argue that Oakland's claim for breach of contract fails for the same reason it

was previously dismissed—Oakland is not an intended third-party beneficiary capable of enforcing the NFL's relocation policy under California law. Mot. at 20–24. Oakland contends that new allegations regarding the development of factors eventually incorporated into the relocation policy—in response to a Senate bill intended to "protect[] . . . cities" and in the creation of a "Statement of Principles" with the Mayors' Conference—are sufficient, along with provisions of the policy addressing interests of "communities," to show that Oakland should have standing to enforce the policy. Opp'n at 22–24. The parties also dispute whether the relocation policy's requirement that teams "consider" certain factors in determining their business interests is enforceable as a contract, and whether Oakland has alleged a breach. Mot. at 19–20; Opp'n at 20–21, 25.

With respect to Oakland's final claim for "unjust enrichment,"[5] Defendants argue that Oakland has not cured the defect for which the Court previously dismissed the claim—that such a claim cannot lie where the Raiders' tenancy at the Coliseum was governed by a written and enforceable lease agreement—while Oakland contends that it should be allowed to assert a claim for unjust enrichment in the alternative to its claim for breach of contract. Mot. at 25; Opp'n at 25.

## III.  ANALYSIS

### A.  Legal Standard

A complaint may be dismissed for failure to state a claim on which relief can be granted under Rule 12(b)(6) of the Federal Rules of Civil Procedure. "The purpose of a motion to dismiss under Rule 12(b)(6) is to test the legal sufficiency of the complaint." *N. Star Int'l v. Ariz. Corp. Comm'n*, 720 F.2d 578, 581 (9th Cir. 1983). Generally, a claimant's burden at the pleading stage is relatively light. Rule 8(a) of the Federal Rules of Civil Procedure states that a "pleading which sets forth a claim for relief . . . shall contain . . . a short and plain statement of the claim showing that the pleader is entitled to relief." Fed. R. Civ. P. 8(a).

In ruling on a motion to dismiss under Rule 12(b)(6), the court generally takes "all

---

[5] As noted in the Court's previous order, California law does not recognize a claim for "unjust enrichment" under that name, but courts generally construe claims so captioned as asserting an implied contract. July 2019 Order at 29.

United States District Court
Northern District of California

allegations of material fact as true and construe[s] them in the light most favorable to the non-moving party." *Parks Sch. of Bus. v. Symington*, 51 F.3d 1480, 1484 (9th Cir. 1995). Dismissal may be based on a lack of a cognizable legal theory or on the absence of facts that would support a valid theory. *Balistreri v. Pacifica Police Dep't*, 901 F.2d 696, 699 (9th Cir. 1990). A pleading must "contain either direct or inferential allegations respecting all the material elements necessary to sustain recovery under some viable legal theory." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 562 (2007) (citing *Car Carriers, Inc. v. Ford Motor Co.*, 745 F.2d 1101, 1106 (7th Cir. 1984)). "A pleading that offers 'labels and conclusions' or 'a formulaic recitation of the elements of a cause of action will not do.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Twombly*, 550 U.S. at 555). "[C]ourts 'are not bound to accept as true a legal conclusion couched as a factual allegation.'" *Twombly*, 550 U.S. at 555 (quoting *Papasan v. Allain*, 478 U.S. 265, 286 (1986)). "Nor does a complaint suffice if it tenders 'naked assertion[s]' devoid of 'further factual enhancement.'" *Iqbal*, 556 U.S. at 678 (quoting *Twombly*, 550 U.S. at 557). Rather, the claim must be "'plausible on its face,'" meaning that the claimant must plead sufficient factual allegations to "allow the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* (quoting *Twombly*, 550 U.S. at 570).

### B.   Sherman Act

Section 1 of the Sherman Act prohibits any "contract, combination in the form of trust or otherwise, or conspiracy, in restraint of trade." 15 U.S.C. § 1. Courts have long held that the Sherman Act is not as broad as its literal language might suggest, and "that Congress intended to outlaw only *unreasonable* restraints." *Texaco v. Dagher*, 547 U.S. 1, 5 (2006) (quoting *State Oil Co. v. Khan*, 522 U.S. 3, 10 (1997)) (emphasis in *Texaco*). Courts "presumptively appl[y] rule of reason analysis, under which antitrust plaintiffs must demonstrate that a particular contract or combination is in fact unreasonable and anticompetitive before it will be found unlawful." *Id.* Courts consider certain forms of restraint illegal per se in other contexts, but where some "'restraints on competition are essential if the product is to be available at all'"—as in the case of professional sports leagues—"per se rules of illegality are inapplicable, and instead the restraint must be judged according to the flexible Rule of Reason." *Am. Needle, Inc. v. Nat'l Football*

United States District Court
Northern District of California

1    *League*, 560 U.S. 183, 203 (2010) (quoting *NCAA v. Bd. of Regents of Univ. of Okla.*, 468 U.S. 85,

2    101 (1984)); *see also L.A. Mem'l Coliseum Comm'n v. Nat'l Football League*, 726 F.2d 1381,

3    1392 (9th Cir. 1984) ("[T]he unique structure of the NFL precludes application of the per se

4    rule.").  Under the rule of reason test, Oakland must "demonstrate that a particular contract or

5    combination is in fact unreasonable and anticompetitive," *Texaco*, 547 U.S. at 5, or in other words,

6    must address "whether the restraint imposed is such as merely regulates and perhaps thereby

7    promotes competition or whether it is such as may suppress or even destroy competition," *Am.*

8    *Needle*, 560 U.S. at 203 n.10 (quoting *Bd. of Trade of Chi. v. United States*, 246 U.S. 231, 238

9    (1918)).

10           Section 4 of the Clayton Act, codified as 15 U.S.C. § 15, authorizes suits for treble

11   damages by "any person who shall be injured in his business or property by reason of anything

12   forbidden in the antitrust laws."  15 U.S.C. § 15(a).  In much the same way that the facially broad

13   language of the Sherman Act has been construed as addressing only certain restraints on

14   competition, however, "[t]he Supreme Court has held that Congress did not intend to afford a

15   remedy to everyone injured by an antitrust violation."  *Knevelbaard Dairies v. Kraft Foods, Inc.*,

16   232 F.3d 979, 987 (9th Cir. 2000) (citing *Associated Gen. Contractors of Cal., Inc. v. Cal. State*

17   *Council of Carpenters*, 459 U.S. 519, 535 (1983)).  In other words, it is not enough that a plaintiff

18   has been injured; the plaintiff also "must have 'antitrust standing.'"  *Id.*  That question turns on the

19   following factors: "(1) the nature of the plaintiff's alleged injury; that is, whether it was the type

20   the antitrust laws were intended to forestall; (2) the directness of the injury; (3) the speculative

21   measure of the harm; (4) the risk of duplicative recovery; and (5) the complexity in apportioning

22   damages."  *Id.* (quoting *Am. Ad Mgmt., Inc. v. Gen. Tel. Co. of Cal.*, 190 F.3d 1051, 1054 (9th Cir.

23   1999)).

24           The first of those factors, "antitrust injury," is a "substantive element of an antitrust claim,

25   and the fact of injury or damage must be alleged at the pleading stage."  *Somers v. Apple, Inc.*, 729

26   F.3d 953, 963 (9th Cir. 2013).  "'Antitrust injury' means 'injury of the type the antitrust laws were

27   intended to prevent and that flows from that which makes defendants' acts unlawful,'" and

28   "consists of four elements: '(1) unlawful conduct, (2) causing an injury to the plaintiff, (3) that

1  flows from that which makes the conduct unlawful, and (4) that is of the type the antitrust laws

2  were intended to prevent.'" *Id.* (quoting *Brunswick Corp. v. Pueblo Bowl-O-Mat, Inc.*, 429 U.S.

3  477, 489 (1977); *Am. Ad Mgmt., Inc. v. Gen. Tel. Co. of Cal.*, 190 F.3d 1051, 1055 (9th Cir.

4  1999)).  The Ninth Circuit also requires "that 'the injured party be a participant in the same market

5  as the alleged malefactors,' meaning 'the party alleging the injury must be either a consumer of

6  the alleged violator's goods or services or a competitor of the alleged violator in the restrained

7  market.'" *Id.* (quoting *Glen Holly Entm't, Inc. v. Tektronix, Inc.*, 343 F.3d 1000, 1008 (9th Cir.

8  2003)).  In at least some circumstances, a potential market entrant thwarted from entering a market

9  by the defendant's violations can also establish antitrust injury.  *See, e.g., In re Dual-Deck Video*

10  *Cassette Recorder Antitrust Litig.*, 11 F.3d 1460, 1464 (9th Cir. 1993).

### 1.  Relocation Fee and Joint Approval Process

12  The Court previously dismissed Oakland's Sherman Act claims to the extent that they were

13  based on the NFL's relocation fee because any harm that the fee caused Oakland "neither 'flows

14  from that which makes the conduct unlawful' nor 'is of the type the antitrust laws were intended to

15  prevent.'" July 2019 Order at 17; *see Somers*, 729 F.3d at 963.  The Court granted Oakland leave

16  to amend despite noting that it was "not clear how Oakland could amend to cure the defects of this

17  theory." July 2019 Order at 17.  Nothing in Oakland's first amended complaint or opposition to

18  the present motion alters that conclusion.

19  To the extent that the fee was relevant to the Raiders' decision to seek permission to

20  relocate, it would have weighed against that decision—a business motivated by self-interest does

21  not generally seek out opportunities to pay its competitors, or even its joint venturers or cartel co-

22  conspirators, hundreds of millions of dollars that it could otherwise keep for itself.  At that stage of

23  the decision-making, the relocation fee tended to protect Oakland's interests against other cities

24  that might seek to attract the Raiders away.[6]

---

[6] Oakland's allegations based on revenue sharing somewhat similarly fail to address the Raiders' self-interest.  Oakland alleges that the NFL's revenue sharing policy "breeds indifference to the home territory" and that, as a result, "it simply does not matter that Raider Nation was one of the most devoted fan bases in the NFL," thus incentivizing a move to Las Vegas.  *See* FAC ¶¶ 54–56. In the same breath, however, Oakland alleges that revenue sharing allowed Defendants to collectively benefit from "the Raiders' doubled enterprise value" after the move.  *Id.* ¶ 56.  While

11

1    There is no question that *once the Raiders committed to relocate* and pay whatever fee

2  might be imposed, the fee increased the likelihood that owners of the other teams in the NFL

3  would vote to approve the relocation, because they stood to benefit financially from doing so.  At

4  that stage, however, such approval does not impair competition.  As the Court previously held:

5        Restrictions on NFL teams' ability to relocate to different cities are
         *themselves* restraints on competition *favoring the existing cities*,
6        although they may in some circumstances be justified under the rule
         of reason. *See L.A. Mem'l Coliseum*, 726 F.2d at 1395 ("The
7        competitive harms of Rule 4.3 are plain."). In a market entirely
         lacking such restraints, no approval from the NFL would have been
8        necessary, and the Raiders' decision to relocate to Las Vegas would
         have been the end of the story. Oakland has not explained how the
9        relocation fee, which makes approval more likely—only after a team
         has applied to relocate—and thus brings the process closer to that
10       which would exist in a market lacking competitive restraints, is itself
         an anticompetitive restraint harming existing host cities. Oakland's
11       position on this issue would go beyond the dicta of *Los Angeles
         Memorial Coliseum* indicating that some restraints on team relocation
12       may be *permissible*, and instead asks the Court to hold that such
         restraints are *required* under the antitrust laws.

13

14  July 2019 Order at 16–17.

15    Despite the relocation fee once again taking center stage in Oakland's amended

16  complaint—Oakland seeks as relief a declaration that "redistribution of the resulting ill-gotten

17  supra-competitive gains through artificially set relocation fees to all NFL Clubs, and the supra-

18  competitive revenue generated by the relocation, as a quid pro quo for breaching the terms of

19  those Policies, amount to an unreasonable restraint on trade and interstate commerce and a

20  violation of the antitrust laws," FAC at 83 (prayer for relief)—Oakland barely discusses the fee in

21  its opposition brief, arguing only that the ability of the Raiders to pay a $378 million fee tends to

22  suggest that Defendants extract supracompetitive subsidies from the localities that host their

23  teams.  *See* Opp'n at 4.

24    To the extent that the first amended complaint pursues a claim based on the relocation fee

25

26  _____

27  Oakland also alleges that the Raiders' value would have increased with a new stadium in Oakland,
    *see id.*, the first amended complaint does not allege that the value of the Raiders would have been
    *higher* if they had remained in Oakland than if they moved to Las Vegas, nor does it explain why,
28  if that were the case, the Raiders would have chosen to seek permission to relocate.  A business
    moving to a new city under terms that maximize its value is not anticompetitive.

United States District Court
Northern District of California

as itself a restraint on trade, or more generally based on the NFL's approval of the Raiders' request to relocate, it is DISMISSED for the same reasons stated in the previous order.  Whatever harm may result from allowing teams to relocate to the city with the highest bid is not harm redressable under the antitrust laws.[7]

### 2.    Limited Supply of NFL Teams

The more traditional antitrust problem presented by this case is that to the extent that NFL teams might be a unique product making up a distinct market, the NFL restricts the supply of such teams, requiring approval by three quarters of the existing thirty-two teams to expand beyond that number.  *See* FAC Ex. 1 (NFL Bylaws) § 3.1.  Courts have long recognized that restrictions on supply can increase prices beyond competitive levels.  *See, e.g.*, *NCAA v. Bd. of Regents of Univ. of Okla.*, 468 U.S. 85, 116–17 (1984) ("The television plan protects ticket sales by limiting output—just as any monopolist increases revenues by reducing output.").

Oakland's attack on this limitation is somewhat halfhearted.  At the hearing on the previous motion, Oakland's attorney stated that Oakland is "not attacking the 32-team limitation per se."  July 19, 2019 Tr. (dkt. 65) at 13:14–15.  Oakland's current amended complaint does not seek any equitable relief with respect to this limitation, such as a declaration that it is illegal or an injunction against its enforcement.  *See* FAC at 82–83 (prayer for relief).  Nevertheless, as the primary method of allowing the NFL to demand purportedly supracompetitive public subsidies, the limited number of teams plays a key role in Oakland's allegations.  *See, e.g.*, *id.* ¶ 50 ("Of course, the NFL and its clubs want to maintain these supra-competitive prices and thus, they constrain the supply of teams and ensure the financial success of the existing 32 NFL Clubs."); *id.* ¶ 198 ("As a result of the artificially restricted supply in the market of professional football teams, Defendants have caused excess demand among actual and potential Host Cities for an NFL franchise.").  Oakland alleges that the number of teams has not increased at a rate commensurate

---

[7] Once again, this Court has no occasion to consider whether a team seeking to relocate or a city or stadium seeking to attract a team from a different location might have a valid antitrust claim based on the *impediment* to relocating caused by the NFL's policies and fee.  *See* July 2019 Order at 16 n.10.  The Court holds only that to the extent the NFL's policies *allow* a team to leave a city where it no longer wishes to play, that city has no recourse under the Sherman Act.

13

1   with the United States population or the number of cities capable of supporting a team, and that "it

2   has been estimated that the current NFL could support as many as 42 teams" and that "any city

3   with a population greater than 700,000[8] could support an NFL team."  *Id.* ¶ 43 & n.4.

4                   a.      Relevant Market Definition

5           As a starting point, Oakland has not rigorously addressed the relevant market for its

6   antitrust claim.  Failure to plead a relevant market for a rule of reason antitrust claim warrants

7   dismissal, *Hicks v. PGA Tour, Inc.*, 897 F.3d 1109, 1120 (9th Cir. 2018),[9] and as Defendants note,

8   markets defined by their consumers rather than the products at issue are not generally cognizable,

9   *Newcal Indus., Inc. v. Ikon Office Sol.*, 513 F.3d 1038, 1045 (9th Cir. 2008).  Oakland's first

10  amended complaint defines the market as follows:

> The relevant market in this action is the market for hosting NFL
> teams. The consumers in this market are all Host Cities offering, and
> all cities and communities that are willing to offer (i.e., potential Host
> Cities), home stadia and other support to major league professional
> football teams in the geographic United States. The product in this
> market is the NFL team, as a hosted entity.

15  FAC ¶ 189.  Oakland alleges that cities and other localities are willing to provide such support in

16  order to "generate direct payments to local government, economic benefits to the community,

17  media impact (effectively showcasing the community to other parts of the country and world), and

18  provide a public consumption benefit (quality of life offerings) or psychic impact for local

19  residents."  *Id.* ¶ 188.

20          Despite the Court's previous note of this deficiency, Oakland still has not "address[ed] the

21  test of 'whether a hypothetical monopolist could impose a "small but significant nontransitory

22  increase in price" ("SSNIP") in the proposed market,' or whether potential host cities would

23

---

24  [8] Although not relevant to the outcome of the present motion, the Court notes that the U.S. Census
    Bureau's most recent estimate of the population of the city of Oakland is 429,082 people.  *See*
25  U.S. Census Bureau, QuickFacts: Oakland city, California,
    https://www.census.gov/quickfacts/oaklandcitycalifornia.
26  [9] In some cases involving "naked restriction[s] on output," a plaintiff may "not [be] required to
    establish a relevant market," even under the rule of reason.  *See In re Nat'l Football League's*
27  *Sunday Ticket Antitrust Litig.*, 933 F.3d 1136, 1152 (9th Cir. 2019) (citing *NCAA*, 468 US. at 109),
    *pet. for cert. docketed*, No. 19-1098 (S. Ct. Feb. 7, 2020).  Because, as discussed below, the Court
28  assumes for the sake of argument that Oakland has sufficiently alleged a relevant market, the Court
    need not determine whether this is such a case.

United States District Court
Northern District of California

respond to such an increase by substituting other 'products.'"  July 2019 Order at 24 (quoting *Saint Alphonsus Med. Ctr.*, 778 F.3d at 784).  Oakland's first amended complaint briefly discusses that test for its proposed *geographic* market—arguing only that it is inapplicable because there are no NFL football teams outside the United States—but does not address the test for the *product* market, or in other words, whether cities would respond to a "price increase" in NFL teams' demands for public support by shifting such support to other professional (or perhaps collegiate) sports teams, other forms of entertainment, or entirely different forms of public investment to develop economic activity, civic pride, and the other benefits that cities might obtain from hosting an NFL team.  The Court nevertheless assumes for the sake of argument that Oakland's market definition is sufficient at the pleading stage.[10]

> b.      Non-Speculative Antitrust Injury

The Court also previously held that Oakland had not plausibly alleged that, but for the limited number of teams, Oakland would still have an NFL team.  July 2019 Order at 17–18.  The Court identified the following "incomplete list of issues that might be relevant" but were not addressed in Oakland's original complaint:

> (1) whether there are additional potential owners willing to establish new teams if the NFL allowed them to do so; (2) whether such potential owners would have based a team in Las Vegas before the Raiders decided to relocate there; (3) whether the Raiders would still have left Oakland for another city if the NFL allowed additional teams; (4) if the Raiders might still have left, whether an additional team would have been established in Oakland to replace the Raiders; or (5) whether Oakland has made any effort to attract an existing team other than the Raiders or to establish a new expansion team to replace the Raiders.

*Id.* at 18.

---

[10] Defendants argue that cities must be suppliers rather than consumers in whatever market exists between cities and NFL teams, because cities compete to host NFL teams, rather than NFL teams competing for cities.  *See* Mot. at 14–15.  While Defendants are correct that in some markets (for example, retail markets) consumers generally do not compete with one another, other markets include competition both among sellers and among buyers.  As one example, in the real estate market for single family homes, sellers compete in their list prices, but buyers also compete in their offers.  Defendants' lack of competition among themselves could just as easily be explained by their agreement not to compete—which Defendants characterize as a joint venture and Oakland characterizes as a cartel—as by any inherent market dynamic.

United States District Court
Northern District of California

United States District Court
Northern District of California

1    Oakland's first amended complaint alleges none of those things.  Instead, it repeats an

2    allegation from the original complaint that entrepreneur and basketball-team-owner Mark Cuban

3    believes Oakland is a better site for the Raiders than Las Vegas, FAC ¶ 127, and adds an

4    allegation that an economic analysis commissioned by Oakland determined that, of U.S. cities

5    without NFL teams, Oakland "best reflect[s] the demographic and financial conditions of existing

6    Host Cities" and has "the best prospects for new NFL franchises," *id.* ¶ 138.  But Oakland still has

7    not plausibly alleged what the playing field would look like if the NFL allowed more than thirty-

8    two teams.  In that hypothetical world, what would prevent Las Vegas from offering a more

9    attractive deal, as in fact occurred?  Would another team have already existed in Las Vegas?

10   Would the Raiders have gone elsewhere if Las Vegas already had a team?  If the Raiders left,

11   would a different team play in Oakland?  The first amended complaint answers none of those

12   questions.  Oakland also once again declines to address what sort of league structure might be

13   permissible if the current number of teams is not.  Oakland's injury remains speculative, and its

14   claim remains subject to dismissal on that basis.

15   Oakland argues that the "barriers to entry" of the NFL are sufficient that "[n]o rational

16   investor or city would put together a team or build a football stadium without Defendants' prior

17   approval," and that Oakland therefore should not be required to attempt to create an expansion

18   team to pursue this claim.  Opp'n at 8–9.  The cases that it cites for that proposition generally

19   involve businesses excluded by their potential direct competitors.  *See generally Rebel Oil Inc. v.*

20   *Atl. Richfield Co.*, 51 F.3d 1421 (9th Cir. 1995); *Parks v. Watson*, 716 F.2d 646 (9th Cir. 1983)

21   (per curiam) (considering a company's claim against a city that allegedly competed against the

22   company in developing geothermal energy); *Meridian Project Sys., Inc. v. Hardin Const. Co.*,

23   LLC, No. CIV.S-04-2728FCDDAD, 2005 WL 2615523, at *6 (E.D. Cal. Oct. 14, 2005).[11]  One

24   case, *Solinger v. A&M Records, Inc.*, 586 F.2d 1304 (9th Cir. 1978), involved somewhat more

25   similar facts in that the plaintiff wished to distribute the defendants' records rather than compete

26   directly against them.  There, however, the defendants allegedly refused to deal with the plaintiff

27

28   [11] Some of Oakland's citations also refer to entry barriers in the context of market power rather
     than as a substitute for showing injury.

16

because he would not agree to the defendants' territorial allocation plan for distribution. *Solinger*, 586 F.2d at 1307.  In contrast, Oakland essentially alleges here that it was outbid; it does not plausibly allege a concerted refusal to deal, or that a deal was conditioned on Oakland agreeing to an anticompetitive restraint.

Oakland cites no case where, as here, a plaintiff that was priced out of the market for a product it wished to purchase (or perhaps to sell) established antitrust injury, much less without some showing that the plaintiff would have obtained the product but for the purported anticompetitive conduct that raised the price.  Courts have generally rejected such a theory.  The Tenth Circuit addressed the issue in *Montreal Trading*:

> A price fixing conspiracy is certainly "aimed" at those who purchase the product at the inflated price; their injury is more direct and more proximately caused than those who are unable to purchase due to product scarcity. But a conspiracy to withhold goods from the market may also injure nonpurchasers and we must determine whether a nonpurchaser in Montreal Trading's position should be treated as "directly injured."
>
> The two purposes of the treble damage remedy are "to compensate victims of antitrust violations for their injuries" and to deprive violators of "the fruits of their illegality." *Illinois Brick* [*Co. v. Illinois*, 431 U.S. 720, 746 (1977)]. Here, we note that while nonpurchasers may be considered victims of the conspiracy, the alleged conspirators gained no "fruits" from nonsales except to the extent that sales volume had to decline if they were to succeed in charging inflated prices. Other factors that merit consideration are whether a grant of standing might result in "potentially disastrous recoveries by those only tenuously hurt," *Jeffrey v. Southwestern Bell*, 518 F.2d 1129, 1131 (5th Cir. 1975), and whether the fact of a party's injury, as opposed to the amount, would be inherently speculative. We find these considerations dispositive. If nonpurchasers who have never dealt with a defendant could recover, a seemingly unlimited number of plaintiffs could assert a virtually unlimited quantity of lost purchases, perhaps exceeding the potential output of the entire industry. With a treble damages entitlement, the result could be multiple recoveries and total damage awards wholly out of proportion with "the fruits of the illegality," easily bankrupting the named defendants. *See Illinois Brick*, 431 U.S. at 730, 97 S. Ct. at 2067; *Mid-West Paper Prods. Co. v. Continental Group, Inc.*, 596 F.2d 573, 586-87 (3d Cir. 1979).

*Montreal Trading Ltd. v. Amax Inc.*, 661 F.2d 864, 867–68 (10th Cir. 1981).  As a district court following *Montreal Trading* explained:

> Allowing nonpurchasers to recover would unduly broaden the spectrum of potential plaintiffs with price fixing and monopolization claims. Anyone who considered, or claimed to consider, purchasing a product or service would have standing to bring such claims. Damages would vary widely depending on the consequences of a potential consumer's inability to purchase. Courts would also be faced with complex causation issues.

*Lambert v. Bd. of Comm'rs of Orleans Levee Dist.*, No. CIV A 05-5931, 2009 WL 152668, at *7 (E.D. La. Jan. 22, 2009).

Oakland is, of course, correct that the *Montreal Trading* court distinguished a plaintiff with a prior course of dealing as a potential exception where "injury may not be inherently speculative."  661 F.2d at 868.  And as the Tenth Circuit noted in that case, the Supreme Court has suggested that direct purchaser who resells a product at higher price to account for its increased cost "may still claim injury from a reduction in the volume of its sales caused by its higher prices." *Illinois Brick*, 431 U.S. at 733 n.13.  Here, however, Oakland has provided no reason to believe that it would have "purchased" the right to host an NFL team but for the thirty-two team restriction.  Under the circumstances of this case, Oakland's past dealing with the NFL does not show what would have occurred absent the limitation on the number of teams, because it occurred under substantially similar restrictions—the league was not open to more teams then than now.

At the hearing, Oakland argued that requiring plausible allegations that, but for the limited number of teams in the league, it would have retained an NFL team is incompatible with the "holistic" approach used by the Ninth Circuit in *In re National Football League's Sunday Ticket Antitrust Litigation*, 933 F.3d 1136 (9th Cir. 2019).  *See* Apr. 17, 2020 Tr. (dkt. 85) at 9:18–10:10. That case did not pose any comparable question of the plaintiffs having themselves suffered antitrust injury.  Each plaintiff subscribed to the "Sunday Ticket" package at issue, and thus had standing because they allegedly paid a premium to DirecTV, an alleged co-conspirator, as a result of purportedly anticompetitive collusion in licensing broadcasts of NFL games.  *See Sunday Ticket*, 933 F.3d at 1148, 1156–58.  The plaintiffs there did not present a theory that they were "priced out" of purchasing viewing rights, and as discussed above, Oakland has not alleged here that it in fact paid a premium to obtain or retain an NFL team, at least within the applicable statute of limitations.  The Ninth Circuit's "holistic approach" in *Sunday Ticket* pertained to showing

18

1    cognizable injury to *competition*, not to the individual plaintiffs.  *Id.* at 1152.  Both are required,

2    and here, Oakland has not shown the latter.

3         Ultimately, Oakland's refusal to grapple with the question of what would be permissible if

4    the thirty-two structure is not,[12] much less how the distribution of teams might fall under such a

5    structure, renders this case particularly unsuitable as a novel expansion of antitrust liability to non-

6    purchaser plaintiffs.  Reading Oakland's complaint and arguments as a whole—in particular, the

7    lack of any suggestion as to how the NFL should be structured, and the request for equitable relief

8    only as to the decision to permit a relocation rather than the limitation on the number of teams—it

9    does not appear that Oakland actually objects to the limited number of teams in the NFL.  Instead,

10   it would seem that Oakland simply wishes it could have kept one of those teams for itself, and

11   benefited from the prestige and economic windfall that derive from that scarcity, without paying

12   the supracompetitive price that also arises from it.  This Court declines to be the first to endorse

13   that unorthodox theory of antitrust injury, and GRANTS Defendants' motion to dismiss.  In light

14   of Oakland's failure to address the concerns raised in the Court's previous order, the Court finds

15   that further leave to amend would be futile, and dismisses Oakland's Sherman Act claim with

16   prejudice.

                    c.      Injury Compensable Under the Antitrust Laws

18        As a separate and sufficient reason for dismissal, none of Oakland's damages are of a type

19   compensable under the Clayton Act.  That statute provides for recovery of injury to "business or

20   property."  15 U.S.C. § 15(a).  Oakland alleges injury in the form of: (1) lost investment value,

21   FAC ¶¶ 201–03; (2) "Lost Income" (including rental income, payments on bonds to fund

22   Coliseum renovations, and money collected for ticket sales to fund education), *id.* ¶¶ 204–05; lost

23   tax revenue, *id.* ¶¶ 206–20; and (4) devaluation of the Coliseum property, *id.* ¶¶ 211–17.

24        Beginning with lost tax revenue, the Supreme Court has held that while the Clayton Act

---

[12] At the hearing, Oakland's attorney stated that Oakland's argument is not that the NFL cannot permissibly restrict the number of teams, but that it cannot do so "in an anticompetitive way," without meaningfully explaining how the NFL might restrict the number of teams in a manner that Oakland would not consider anticompetitive, or what number of teams would be appropriate.  *See* Apr. 17, 2020 Tr. at 13:20–14:13, 19:4–25.

United States District Court
Northern District of California

allows a state to "seek[] damages for injuries to its commercial interests," it "does not authorize recovery for economic injuries to the sovereign interests of a State." *Hawaii v Standard Oil Co. of Cal.*, 405 U.S. 251, 264–65 (1972). This Court previously held that, based on that principle, Oakland "cannot recover damages based on lost tax revenue from the broad scope of economic activity associated with the presence of a professional football team." July 2019 Order at 21. The Court acknowledged that Oakland "has a more personal and proprietary interest in damages based on lost tax revenue than a state has in a parens patriae suit for 'injury to its general economy,'" but held that the types of tax revenue at issue here raised similar concerns and fell outside the scope of the Clayton Act. *Id.* at 21–22 (quoting *Hawaii*, 405 U.S. at 263–64). Nothing in Oakland's amended complaint or present opposition brief alters that conclusion. While the Court left the door open to a possibility that "there could perhaps be circumstances where a tax specifically negotiated as part of an agreement between a local government and a private entity could take on a 'commercial' instead of—or as well as—'sovereign' character," July 2019 Order at 22, Oakland has provided no further allegations to show that such a tax exists in this case,[13] nor cited any authority holding that such a tax would in fact be recoverable under the Clayton Act.

Oakland's claim for lost municipal investment, including bonds used for Coliseum renovations, fails for the same reason. As noted in this Court's previous order, the Ninth Circuit has rejected an argument that a city "raising and disbursing . . . special assessment funds used to improve [a] commercial zone . . . is a sufficient proprietary interest" to bring an antitrust claim. *City of Rohnert Park v. Harris*, 601 F.2d 1040, 1045 (1979). Oakland focuses on the Ninth Circuit's separate holding that Rohnert Park's injury was too speculative with respect to property that it actually owned, Opp'n at 7–8, but ignores the holding applicable to the less concrete interest in municipal investment. (This order addresses Oakland's ownership of the Coliseum separately below.)

As for lost rent, Oakland has not specifically alleged that the Raiders paid rent to Oakland

---

[13] Oakland provides no details, for example, with respect to funds that it "collected . . . from each Raiders ticket for the express purpose of funding education in Oakland" to suggest those funds constituted a commercial rather than sovereign interest. *See* FAC ¶ 204.

United States District Court
Northern District of California

1  directly, and instead alleges that Oakland and co-owner (but non-party) Alameda County leased

2  the Coliseum to the Oakland-Alameda County Coliseum Financing Corporation, which assigned

3  its rights under the lease to the OACCA.  FAC ¶ 29.  The Ninth Circuit has rejected such indirect

4  claims under the Sherman Act in the somewhat analogous context of corporate shareholder

5  plaintiffs:

6  
7      "A shareholder of a corporation injured by antitrust violations has no
       standing to sue in his or her own name . . . ." *Solinger v. A. & M.
8      *Records, Inc.*, 718 F.2d 298, 299 (9th Cir. 1983). This rule applies
       even if the injured shareholder is the sole shareholder, *Sherman v.
       British Leyland Motors, Ltd.*, 601 F.2d 429, 439 (9th Cir. 1979), or if
9      the shareholder alleges that the antitrust violations were intended to
       drive the individual out of the industry. *Stein v. United Artists Corp.*,
10     691 F.2d 885, 897 (9th Cir. 1982). "If shareholders were permitted to
       recover their losses directly, there would be the possibility of a double
11     recovery, once by the shareholder and again by the corporation." *Id.*
       at 896–97.

12  *Vinci v. Waste Mgmt., Inc.*, 80 F.3d 1372, 1375 (9th Cir. 1996).  The Ninth Circuit has also held,

13  in an en banc plurality opinion, that "a landlord or receiver of royalties does not establish antitrust

14  standing by showing its receipts are down and it is in the area where an antitrust violation

15  produced this result."  *R.C. Dick Geothermal Corp. v. Thermogenics, Inc.*, 890 F.2d 139, 146 (9th

16  Cir. 1989).[14]

17      Reading those cases together, Oakland's only argument that "'[a]lthough the [OACCA]

18  manages the Coliseum site for Oakland, Oakland is the entity with the economic interest in that

19  site and, accordingly, is the entity that suffers from losses related to that site,'" Opp'n at 13

20  (quoting FAC ¶ 217), is not sufficient to establish standing.  The Court previously declined to

21  reach the question of whether "Oakland's status as an 'indirect' landlord" barred its claims, July

22  2019 Order at 20 n.12, but with Oakland still having cited no authority allowing claims to proceed

23  under similar circumstances, this Court now holds that they cannot.  Absent authority to the

24  contrary, the fact that the non-party OACCA "is directly controlled by Oakland and Alameda

25  
26  _____

[14] The Court previously declined to read *R.C. Dick* as foreclosing a claim by a landlord alleging
27  anticompetitive conduct in the market for rental transactions.  While the Court stands by that
   conclusion, it is now clear that Oakland was not itself a landlord renting the Coliseum to the
28  Raiders.  *See* FAC ¶ 29 (alleging that Oakland and Alameda County leased the Coliseum to the
   Oakland-Alameda County Coliseum Financing Corporation, which assigned its rights to the
   OACCA, which manages the Coliseum).

1    County" does no more to impart standing to Oakland than status as a "sole shareholder" did for the

2    plaintiff in *Sherman*, 601 F.2d at 439–40.  If anything, because Oakland shares control of the

3    OACCA with non-party Alameda County, its degree of control is less than that of the sole

4    shareholder whose standing the Ninth Circuit rejected.  Moreover, the Court holds that the same

5    principles apply equally to lost value in the Coliseum as to lost rental income.  Just as mere loss of

6    rental income "in the area where an antitrust violation produced this result" was not a sufficiently

7    direct injury in *R.C. Dick*, loss of property value as a result of failure by a tenant (the OACCA) to

8    secure continued use by a subtenant (the Raiders) is similarly indirect and insufficient,

9    notwithstanding Oakland's control over the OACCA.

10          Because Oakland has not alleged a cognizable direct injury to business or property, its

11   antitrust claim must be dismissed.

12                    **3.    Group Boycott**

13          Finally, to the extent that Oakland continues to argue that it has alleged a "group boycott,"

14   Opp'n at 20, it still has not alleged that any NFL team besides the Raiders has refused to deal with

15   Oakland, or that the NFL has prohibited any team from dealing with Oakland or set any "agreed

16   terms" that Oakland must meet to attract a new or different team.  Certain commentators' view

17   that "'a threat by an individual team to relocate *may* comprise an *implicit* threat of a concerted

18   boycott'" does not, without more, show that such a boycott in fact occurred.  *See id.* (quoting

19   Haddock et al., *League Structure & Stadium Rent-Seeking – The Role of Antitrust Revisited*, 65

20   Fla. Law Rev. 1, 6 (2013)) (emphasis added).

21          **C.    State Law Claims**

22          Oakland asserts its claims for breach of contract and unjust enrichment under California

23   law.  With no indication that there is complete diversity of citizenship as required for jurisdiction

24   under 28 U.S.C. § 1332,[15] those claims fall within this Court's subject matter jurisdiction only by

---

[15] The Court raised this issue at the hearing, and Defendants submitted a supplemental brief confirming that they "do not believe that there is complete diversity of citizenship under 28 U.S.C. § 1332," although they asked the Court to exercise supplemental jurisdiction under 28 U.S.C. § 1367 even if the only federal claim is dismissed.  *See* dkt. 84.  Oakland also has not suggested that this case satisfies § 1332, and its counsel stated at the hearing that Defendants would likely have more knowledge of the facts relevant to this issue.  Apr. 17, 2020 Tr. at 29:5–13.

United States District Court
Northern District of California

virtue of their relationship to Oakland's federal antitrust claim under the supplemental jurisdiction provided by 28 U.S.C. § 1367(a).  Under subsection (c) of that statute, however, a district court "may decline to exercise supplemental jurisdiction over a claim under subsection (a) if," among other reasons, "the district court has dismissed all claims over which it has original jurisdiction." 28 U.S.C. § 1367(c).  "[I]n the usual case in which all federal-law claims are eliminated before trial, the balance of factors to be considered under the [supplemental] jurisdiction doctrine— judicial economy, convenience, fairness, and comity—will point toward declining to exercise jurisdiction over the remaining state-law claims."  *Carnegie-Mellon Univ. v. Cohill*, 484 U.S. 343, 350 n.7 (1988).

Although the concerns regarding these claims raised in the Court's previous order remain largely unaddressed, this case has not progressed beyond the pleading stage, and the Court finds no reason to deviate from the usual approach of declining to exercise supplemental jurisdiction after all federal claims have been dismissed.  The Court therefore DISMISSES Oakland's state law claims for lack of subject matter jurisdiction, without reaching the parties' arguments regarding the sufficiency of Oakland's allegations.

## IV.   CONCLUSION

For the reasons discussed above, Defendants' motion is GRANTED, and Oakland's Sherman Act claim is DISMISSED with prejudice.  Based on Oakland's failure to redress the deficiencies noted in the previous order, the Court concludes that further leave to amend that claim would be futile.  Oakland's state law claims for breach of contract and unjust enrichment are DISMISSED for lack of subject matter jurisdiction, without prejudice to Oakland bringing those claims in a court of competent jurisdiction.  The Clerk is instructed to enter judgment in favor of Defendants and close the case.

**IT IS SO ORDERED.**

Dated: April 30, 2020

_____
JOSEPH C. SPERO
Chief Magistrate Judge

United States District Court
Northern District of California

23